1  MARK I. LABATON (CA Bar No. 159555)
   HILARY B. TAYLOR (CA Bar No. 203796)
2  **KREINDLER & KREINDLER LLP**
   707 Wilshire Boulevard
3  Suite 5070
   Los Angeles, CA 90017
4  Telephone:  (213) 622-6469
   Facsimile:  (213) 622-6019
5  Email:     mlabaton@kreindler.com
              htaylor@kreindler.com
6
   SCOTT D. LEVY
7  **LAW OFFICES OF SCOTT D. LEVY**
   1010 Lamar St.
8  Houston, Texas  77002
   Telephone:  (713) 877-0808
9  Facsimile:  (713) 877-0809
   Email:     scottdlevy@sbcglobal.net
10
   Attorneys for the Relators
11

12              UNITED STATES DISTRICT COURT

13         FOR THE CENTRAL DISTRICT OF CALIFORNIA

14                   WESTERN DIVISION

                     CV07 - 01984 PSG (MAN X)

15  ┌─────────────────────────────────
    UNITED STATES OF AMERICA ex    ) Civil Case Number:
16  rel. [Under Seal],             )
                                   ) COMPLAINT FOR VIOLATION OF
17              Plaintiffs,        ) FEDERAL FALSE CLAIMS ACT
                                   )
18                                 ) JURY TRIAL DEMANDED
    v.                             )
19                                 ) **FILED UNDER SEAL**
                                   ) **PURSUANT TO THE FALSE**
20  [Under Seal],                  ) **CLAIMS ACT [31 U.S.C. § 3729 et**
                                   ) **seq.]**
21              Defendants.        )
                                   )
22                                 )
                                   )
23  ─────────────────────────────

24

25

26                                        DOCKETED ON CM

27                                        APR - 2 2007

28                                        BY         019

─────────────────────────────────────────────
201094.1
                COMPLAINT FOR FALSE CLAIMS

MARK I. LABATON (CA Bar No. 159555)
HILARY B. TAYLOR (CA Bar No. 203796)
**KREINDLER & KREINDLER LLP**
707 Wilshire Boulevard
Suite 5070
Los Angeles, CA 90017
Telephone:  (213) 622-6469
Facsimile:  (213) 622-6019
Email:      mlabaton@kreindler.com
            htaylor@kreindler.com

SCOTT D. LEVY
**LAW OFFICES OF SCOTT D.  LEVY**
1010 Lamar St.
Houston, Texas  77002
Telephone:  (713) 877-0808
Facsimile:  (713) 877-0809
Email:      scottdlevy@sbcglobal.net

Attorneys for the Relators

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <u>ex rel.</u> NYOKA LEE and TALALA MSHUJA<br><br>Plaintiffs,<br><br>v.<br><br>CORINTHIAN COLLEGES, ERNST & YOUNG LLP, DAVID MOORE, JACK D. MASSIMINO, PAUL ST. PIERRE, ALICE T. KANE, LINDA A. SKLADANY, HANK ADLER, AND TERRY O. HARTSHORN, and DOES 1-500, inclusive,<br><br>Defendants. | Civil Case Number:<br><br>COMPLAINT FOR VIOLATION OF FEDERAL FALSE CLAIMS ACT<br><br>JURY TRIAL DEMANDED<br><br>**FILED UNDER SEAL PURSUANT TO THE FALSE CLAIMS ACT [31 U.S.C. § 3729 et seq.]** |

Relators/plaintiffs Nyoka Lee and Talala Mshuja (collectively "Relators"), reserve the right to make additional allegations to plead additional allegations and claims to correspond to the overwhelming evidence relators have based on their personal knowledge and documents they have already provided or will soon provide to the United States. Based on personal knowledge and information and belief, they allege as follows:

## SUMMARY OF THE ACTION

1.      Relators bring this action on behalf of the United States of America to recover damages, civil penalties, and other relief arising from false claims and false statements made in violation of the Federal False Claims Act ("FCA"). Congress enacted the FCA in 1863 to combat war profiteering, and last amended it in 1986 to stem pervasive fraud.

2.      Corinthian Colleges ("Corinthian"), a public company headquartered in Orange County, operates for-profit vocational schools throughout the United States. It is one of the largest and most profitable such companies in the United States, and has net revenues exceeding one-half billion dollars a year.

3.      These "technical schools" promise claim to train students for jobs at companies like IBM, Cisco Systems, and Kaiser Permanente. But, when, and if, the students graduate, few of them ever get school jobs at blue chip companies — or, for that matter, any jobs at all through Corinthian. Instead, they often leave the students saddled with tens of thousands of dollars in personal debt. Based on its false representations about the job placement, the California Attorney General is seeking to shut down Corinthian.

4.      But this action concerns another exploitive corporate practice costly to Corinthian's students and federal taxpayers. It arises from false claims, certifications, contract proposals, costs reports, progress payments reports, and other documents and false statements that Corinthian and its co-defendants made

1  or caused to be made to the United States Department of Education pursuant to the
2  Higher Education Act ("HEA"), Title IV.

3      5.      Over the past few years, Corinthian  received several billion dollars
4  from the federal government.  Its revenues totaled $511 million in 2003, $796
5  million in 2004, and $964 million in 2005.  Of these amounts — Corinthian's life
6  blood — approximately 80% came from HEA, Title IV funds.

7      6.      To increase its enrollment and obtain federal funds through their
8  student loans, Corinthian aggressively recruits thousands of students each year
9  through advertising campaigns targeted at poor persons and recent immigrants.  It
10  then uses trained recruiters to "close" or sign-up persons responding to these
11  advertisements.

12      7.      Recruiting alone is not illegal.  But the Department of Education
13  *strictly prohibits* schools receiving Title IV, HEA funds from paying recruiters
14  bonuses based on the number of students — known internally at Corinthian as
15  leads — they sign up.  *See, e.g., United States ex rel. Hendow and Albertson v.*
16  *University of Phoenix,* 461 F.3d 1166 (9th Cir. 2006); *United States ex rel. Main v.*
17  *Oakland City University*, 426 F.3d 914 (7th Cir. 2005), cert. denied, – U.S.  –
18  (2006).  Prior to its imposing this clear and absolute bar on awarding any incentive
19  compensation, Congress found that this prohibition was a major means of
20  preventing unscrupulous and fraudulent recruiting tactics.  Congress found that
21  such tactics victimize some of society's most vulnerable persons, deny many
22  students access to limited financial-aid funds, and drain public taxpayer coffers

23      8.      Despite this ban, as a matter of corporate practice, Corinthian schools
24  pay recruiters bonuses amounting to 2.5% to 10% of their base pay based on the
25  number of students they recruit.  *See* Exhibit A, attached hereto (promotional
26  guidelines for recruiters as of July 2005).  The bonuses kick in only if these
27  students remain in school for a short period of time — long enough though for
28  Corinthian to receive their federally-funded financial aid.  In the case of Pell

1    Grants and certain other financial aid, Corinthian would receive the benefit of a

2    full year's of aid even if the student drops out of school during that year. The

3    student, however, would still be obliged to pay a full year's worth of aid.

4        9.    Corinthian and its co-defendants are liable to the United States under

5    the FCA because of the company's use of false statements to obtain HEA, Title IV

6    loan funds. Specifically, in requesting and receiving approximately one-half-

7    billion dollars annually, Corinthian and its co-defendants falsely represented that

8    Corinthian complied with HEA's prohibitions against using incentive payments

9    for recruiters, which is a core prerequisite to receive any HEA, Title IV funds.

10   Had the defendants told the truth, Corinthian would never have received these

11   funds and/or would have had to return them to the United States. Thus, Corinthian

12   and its co-defendants victimize both vulnerable students and federal taxpayers.

13       10.   Besides Corinthian, the plaintiffs/relators have sued its directors, and

14   its outside auditors for their knowing participation or willful ignorance in

15   facilitating its submission of false claims to the United States. Congress made it

16   clear that outside auditors must play a key role as gatekeepers in policing HEA,

17   Title IV fraud.

18                              **THE PARTIES**

19       11.   Relator Nyoka Lee is a resident of California, who worked for

20   Bryman College for approximately six years on and off over the past decade. Her

21   jobs included serving as a test proctor, admissions representative, senior

22   admissions representative, and master admissions representative at the school's

23   San Francisco campus from 1999 to 2003; the director of admissions at the

24   school's Haywood, California campus from 2003-2004, and a master admissions

25   representative in the school's San Francisco campus from 2004-2005.

26       12.   Relator Talala Mshuja is a resident of California, who worked as a

27   test proctor at Bryman College between 2000 and 2005. He worked at both the

28   San Jose and San Francisco campuses of these schools.

13.    The United States, through the Department Of Education, an agency of the United States of America, is responsible for regulation and administration of the federal student financial assistance programs authorized by Title IV. Corinthian executed Program Participation Agreements ("PPAs") with the Department of Education to become eligible and remain eligible in HEA programs.

14.    Defendant Corinthian Colleges is incorporated in Delaware, maintains its headquarters in Santa Ana, California, and regularly conducts business throughout the United States, including the Central District of California. It is one of the largest for-profit, post-secondary education companies in the United States, with more than 66,000 students in 97 "colleges" in 25 states. It maintains 16 "colleges" in California. One is located in Los Angeles, and several are located within the Central District of California.

15.    Defendants David Moore, Jack D. Massimino, Paul St. Pierre, Alice T. Kane, Linda A. Skladany, Hank Adler, and Terry O. Hartshorn are directors of Corinthian Colleges. Jack Massimino also is the company's chief executive officer. The board of directors monitored and approved of the illegal recruiter compensation practices as the means to obtain the targeted enrollments levels for the respective Corinthian campuses.

16.    Defendant Ernst & Young is a firm of certified public accountants, that regularly conducts business throughout the United States, including the Central District of California. Ernst & Young performed Corinthian's compliance audits, which were submitted to the United States Department of Education pursuant to the statutory requirements for participation in Title IV, HEA Programs.

17.    Relators are unaware of the true names and capacities of the defendants sued as Does 1-500 inclusive.

## JURISDICTION AND VENUE

18.    This Court has subject matter jurisdiction pursuant to 31 U.S.C. § 1331 and 31 U.S.C. § 3732, which confer jurisdiction on this Court for actions brought under 31 U.S.C. §§ 3729 and 3730.

19.    This Court has jurisdiction over the defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nation-wide service of process.  Moreover, defendants transact business in this district.

20.    Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because the Defendants can be found in, reside in, and/or transact business in the Central District of California.

## SUBSTANTIVE ALLEGATIONS

21.    The HEA prohibits institutions that pay "any commission, bonus, or other incentive payment . . ." to recruiters from receiving federal funds from any HEA program.  Congress enacted this ban following hearings that vocational schools were enrolling unqualified students merely to obtain federal student-aid funds.

22.    The federal government spends approximately $6 billion annually to assist students seeking an education at colleges and vocational schools.  Corinthian alone receives roughly 10% of these federal funds.  Such funds, in the form of student loans, do not go directly to the students.  Instead, the federal government remits the funds to the college or vocational school in trust for the student.

23.    As long as a student matriculates, the college or vocational school credits that student's tuition with the federal funds.  If the student drops out of school during the school year, the school in many cases gets to retain the federal funds.  But, the student is responsible to pay back the loan even if he or she fails to complete his or her program of studies — and many Corinthian students don't.  For many of the Title IV, HEA loan programs, as long as the student remains at

Corinthian for a brief period of time, the school retains the federal funds, and the former student must repay the loans.

24.    Relators, who have direct and independent knowledge of the information upon which this action is based, sue on behalf of the United States to recover all federal educational grants and all federally insured educational loans, including but not limited to defaulted loans, made to students who attended Corinthian schools.

25.    For a period of years, but particularly in 2005 and subsequently, Corinthian made false certifications of compliance, both express and implied, to the United States that it did not pay commissions and other incentive compensation to its recruiters. These representations were patently false, and violated PPAs Corinthian signed as well as federal statutes and regulations governing eligibility to receive Title IV, HEA Program benefits. Corinthian made these false certifications, false statements and fraudulent inducements to obtain Title IV, HEA Program grants and guaranteed loans from the United States. Its illegal conduct is ongoing.

26.    The Higher Education Act of 1965, Title IV, Part G, § 487, as amended, prohibits an institution that pays incentive compensation to admissions and recruitment representatives from participating in Title IV, HEA Programs. An institution must enter into a PPA with the Department of Education to participate in the Title IV, HEA Programs:

> The agreement ***shall*** condition the initial and continuing eligibility of an institution to participate in a program upon compliance with the following:
>
> \*    \*    \*

1  The institution will not provide any commission, bonus, or other

2  incentive payment based directly or indirectly on success in securing

3  enrollments or financial aid to any persons or entities engaged in any

4  student recruiting or admission activities or in making decisions

5  regarding the award of student financial assistance, except that this

6  paragraph shall not apply to the recruitment of foreign students

7  residing in foreign countries who are not eligible to receive Federal

8  student assistance.

9  20 U.S.C. § 1094(2).

10  27.    In 1992, Congress banned incentive recruiter compensation to

11  recipients of Title IV, HEA after finding that recruiters paid commissions to

12  generate enrollments at proprietary schools and exploited students looking for

13  impartial advice about their education.  Congress found that students enrolling in

14  these schools were exploited while the United States treasury was drained of

15  limited funds set aside to provide low and moderate income students with an

16  opportunity to obtain an education.

17

18  28.    To eliminate the conflict of interest and protect students, Congress

19  outlawed incentive compensation for recruiters based on the hearings that

20  catalogued a series of abuses summarized below:

21  [T]he Permanent Subcommittee on Investigations held two days of

22  hearings on problems in the Title IV guaranteed student loan

23  program.  Those hearings uncovered an alarming pattern of waste,

24  fraud and abuse in the program, particularly in regard to those loans

25  given to students enrolled in trade and proprietary schools.  At those

26  hearings, the General Accounting Office reported that their review of

27  the 1987 data showed that, although proprietary school students

28  accounted for only 22 percent of the outstanding loans in the Title IV

program, they produced 44 percent of all defaults. Of perhaps even greater significance, we also heard testimony that vividly demonstrated that the students for whom the loan program had been developed were being victimized themselves by unscrupulous school owners. Tens of thousands of such students failed to receive the promised training and skills from those schools and, accordingly, found themselves saddled with debt they had no way of repaying.

*Abuses In Federal Student Aid Programs: Hearing Before the Permanent Committee On Investigations of the Senate Committee On Governmental Affairs,* S. Hearing. 101-659, Pt. 2 (Statement of Sam Nunn, Chairman).

29.    As a result of the legislation passed in 1992, executing PPAs became a mandatory, statutory requirement for "initial and continued participation in any Title IV, HEA Program." The agreements contain the statutory prohibition against paying incentive compensation to recruiters.

30.    An educational institution is not eligible to receive Title IV funds without executing the PPA agreements and annual certifications, and institutions violating the incentive pay ban must return Title IV funds with interests and cost to the Department of Education.

31.    Despite the ban on incentive recruiter compensation, Corinthian pays its recruiters incentive compensation. As a matter of corporate practice since at least July 2005, recruiters have been required to meet a certain enrollment quota, depending on their salary grade and title. Those recruiters that exceed their quotas receive raises of 2.5% to 10% of their base salary, every six months, depending on the number of new recruits they sign up. The bonus criteria are set forth in a matrix designed by Corinthian. Employees failing to meet their quotas are disciplined, demoted, or terminated. *See* Exhibit A.

32.    The company monitors these quotas, euphemistically called "goals," at daily meetings, weekly meetings, and monthly meetings. In order for a recruiter to meet his or her quota or get a bonus the student must remain in school just long enough for the school to collect his or her financial aid — on average about $10,000 per student. (Regardless of how long they stay in school, the students' debt cannot be extinguished and the schools impose extreme obstacles to students seeking refunds).

33.    A second requirement to both obtain and maintain eligibility to receive funds from Title IV, HEA Programs is demonstrating through an annual audited financial statement financial responsibility to meet certain potential debts. An important purpose of this audit is for the entity receiving federal funds to demonstrate it is fiscally stable.

34.    A third requirement to obtain and maintain eligibility is the annual submission of a separate annual compliance or "attestation" audit report to the Department of Education. This "attestation" audit includes a letter from the company's management asserting that the institution is in compliance with the laws and regulations applicable to Title IV, HEA Programs. An critical purpose of this audit is for the entity receiving federal funds to demonstrate that it is complying with federal law, particularly the prohibition against paying recruiters.

35.    The institution must represent that it has "not paid to any persons or entities any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments, financial aid to students, or student retention. Moreover, the auditor and the institution must agree that the auditor's attestation report will be submitted to, and relied upon by, the Department of Education. Their engagement letter must include a statement that both parties understand that the Department of Education intends to use the report "to help carry out its oversight responsibilities of the Title IV programs."

36.    According to Congress, outside auditors, like Ernst & Young, are a critical line of defense in protecting against fraud, and by law, certify that their work will be relied upon by the Department of Education, which does not have the resources alone to regulate the vast for-profit education section.  For this reason, the outside auditors are required by law to perform two types of strictly monitored audits for for-profit educational companies.  First, they must perform annual audits of the financial condition of the for-profit company.  Second, they must perform a very careful compliance audit, designed to ensure the Department of Education that the for-profit educational company does not give any incentive compensation to its recruiters in any form, including bonuses.

37.    Ernst & Young's engagement letters with Corinthian contained its representation that the report on Corinthian's management's assertions of compliance with specified laws and regulations applicable to the Title IV, HEA Programs, together with Ernst & Young's opinion on the financial statements, would be used to establish and maintain Corinthian's eligibility to participate in the Title IV, HEA, *i.e.*, to get Corinthian's claims approved and paid by the Department of Education.  Without this representation, upon which the Department of Education relied to ensure that Ernst & Young's financial and compliance audits were complete, addressing all red flag issues, Corinthian could not receive even a dime of Title IV, HEA funds — much less the billions of dollars it has received.

38.    Title IV, HEA Programs from which Corinthian receives hundreds of millions of dollars each year include: the Pell Grant Program; the Federal Supplemental Educational Opportunity Program; the Federal Perkins Loan Program; and the Federal Education Loan Program.

39.    Upon entering the PPA with the United States (and certifying compliance with the terms of the PPA annually), Corinthian is eligible to request

Title IV funds from the Department of education for Pell Grant Funds or for other third-party lenders for government-insured loans.

40.    Corinthian submitted false claims for payment and obtained Title IV, HEA Program funds from the Department of Education through the various loan programs.

41.    For Pell Grants, Corinthian submits a request for funds directly to the Department of Education based on the total number of students eligible for the grants and the total grant amount.  The funds are then electronically transferred to Corinthian to be disbursed for financial aid.  The students do not request or directly receive any of these grant funds.

42.    Corinthian requests for Pell Grant funds amounted to false claims because it knew it was not eligible to receive such funds based on its recruiting compensation  practices, including awarding bonuses based on the number of students a recruiter signs up, and had made false statements and submitted false certifications in its PPAs and other representations relating to the United States.

43.    For government-insured student loans, including those made under the Federal Family Education Loan Program, Corinthian submits a request for funds directly to a private lender.  The Corinthian request for government-insured loan funds is prepared by Corinthian, and includes a requires representations that the student (and school) are eligible to receive Title IV loans.  The same is true for loans disbursed under the Federal Direct Student Loan Program, the Federal Perkins Loan Program, and the Federal Supplemental Educational Opportunity Grant programs, which require the same certifications and under which the Department of Education distributes student financial aid from funds appropriated by Congress.

44.    As did Corinthian, Ernst & Young also falsely certified that Corinthian was in compliance with the recruiter compensation prohibitions. In particularly, Ernst & Young failed to perform the legally required evaluation to determine if Corinthian's recruiter compensation practices were legal.

45.    Ernst & Young knew that Corinthian derived almost all its revenue from HEA funds, and that Corinthian spent close to one-fourth of its budget on recruiters' compensation and advertising.

46.    Ernst & Young simply rubber-stamped the information provided to it by Corinthian.   It issued its compliance audits and financial statement audit opinions knowing them to be false and/or in reckless disregard of the truth or falsity of the information provided to the United States

47.    Corinthian owed a massive liability to the United States as the result of the company's illegal recruiter compensation practices.  Corinthian's financial statements were mis-stated and were false because they failed to disclose that the company owed a massive liability to the United States as the result of Corinthian's illegal recruiter compensation practices.  Under Pronouncement Number 5 of the Financial Accounting Standards Board ("FASB 5"), Ernst & Young was obligated to disclose all contingent obligations on the financial statements.  Yet, it failed to do so.  Nor did it mention any qualifications on Corinthian's financial statements, which it was required to do under applicable accounting and auditing standards.

48.    Ernst & Young made false certifications of compliance respecting Corinthian's financial statements and compliance obligations, knowing the same were going to be submitted to the Department of Education to obtain funds from the United States treasury.

49.    Ernst & Young also fraudulently caused the United States to pay Title IV, HEA Program funds to Corinthian by such false and fraudulent compliance audit and financial statement audit opinions.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COUNT ONE**

**(False Claims Act, 31. U.S.C. § 3729(a)(1)**

**(Against All Defendants)**

50.     The Relators reallege and incorporate by reference all paragraphs set forth herein.

51.     By virtue of the acts described above, defendants knowingly or acting in deliberate ignorance or reckless disregard presented or caused to be presented to the United States false or fraudulent claims for payment or approval in violation of the FCA.

52.     Because of these acts, the United States has suffered damages.

**COUNT TWO**

**(False Claims Act, 31. U.S.C. § 3729(a)(2)**

**(Against All Defendants)**

53.     The Relators reallege and incorporate by reference all paragraphs set forth herein.

54.     By virtue of the acts described above, defendants knowingly or acting in deliberate ignorance or reckless disregard made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the United States in violation of the FCA.

55.     Because of these acts, the United States has suffered damages.

**COUNT THREE**

**(False Claims Act, 31. U.S.C. § 3729(a)(3)**

**(Against All Defendants)**

56.     The Relators reallege and incorporate by reference all paragraphs set forth herein.

57.    By virtue of the acts described above, defendants conspired to defraud the United States by getting a false or fraudulent claim allowed or paid in violation of the FCA.

58.    Because of these acts, the United States has suffered damages.

### COUNT FOUR

### (False Claims Act, 31. U.S.C. § 3729(a)(7)

### (Against All Defendants)

59.    The Relators reallege and incorporate by reference all paragraphs set forth herein.

60.    Defendant knowingly committed the acts described above for the purpose of concealing, avoiding, or decreasing an obligation to pay or transmit money or property.

61.    By virtue of the acts described above, the United States has suffered damages.

### COUNT FIVE

### (Common Law Fraud)

### (Against All Defendants)

62.    The Relators reallege and incorporate by reference all paragraphs set forth herein.

63.    The false records or statements made by defendants, as described above, were misrepresented and concealed material facts.

64.    Defendants knowingly and/or in reckless disregard of the truth misrepresented and concealed material facts.

65.    Defendants made these misrepresentations of material fact or failed to disclose material facts intending that the United States would rely on their

accuracy in evaluating Defendants' contract proposal, in granting the contract, and in paying their claims in connection with the contract award.

66.    The United States justifiably relied on Defendants' false and misleading representations in evaluating Defendant's contract applications, in granting their contract award, and in paying their claims in connection with this contract.

67.    Defendants defrauded the United States.

68.    Defendants' conduct has caused the United States to suffer damages.

## COUNT SIX

### (Unjust Enrichment)

### (Against All Defendants)

69.    The Relators reallege and incorporate by reference all paragraphs set forth herein.

70.    Defendants have been unjustly enriched at the expense of the United States.

71.    The United States is entitled to damages as a result of this unjust enrichment.

## COUNT SEVEN

### (Payment Under Mistake of Fact)

### (Against All Defendants)

72.    The Relators reallege and incorporate by reference all paragraphs set forth herein.

73.    The United States paid or approved the claims submitted by defendants under the erroneous belief that the statements Defendants made were truthful.

74.    The United States' erroneous beliefs were material to the amount of money the United States paid.

75.    Because of these mistakes of fact, Defendants received money to which they were not entitled.

76.    By reason of the overpayments described above, the United States is entitled to damages in the amount of overpayment.

WHEREFORE, RELATORS DEMAND JUDGEMENT AGAINST DEFENDANTS AS FOLLOWS:

A.    On Counts One, Two, Three, and Four judgment against Defendants for treble the damages sustained by the United States, plus civil monetary penalties for false claims and statements as allowable by law;

B.    On Counts Five, Six and Seven judgment against Defendants for the damages sustained by the United States;

C.    The Relators respectfully request leave of the Court to amend the Complaint when the amount of damages has been fully ascertained or to amend the Complaint to conform to proof at or prior to trial;

D.    For costs, fees, and other relief as may be must and proper;

E.    For a ten percent (10%) surcharge in the amount of the debt owed pursuant to 28 U.S.C. § 3011.

COMPLAINT FOR FALSE CLAIMS

## **DEMAND FOR A JURY TRIAL**

Pursuant to Rule 38 of Federal Rules of Civil Procedure and pursuant to the local rules of Court, the Relator demands a jury trial as to all issues so triable.

Dated: March 26, 2007   Respectfully submitted by:

KREINDLER & KREINDLER LLP

MARK I. LABATON
HILARY B. TAYLOR

LAW OFFICES OF SCOTT D. LEVY

SCOTT D. LEVY

**EXHIBIT A**

**Corinthian Schools and Rhodes Colleges**
**Adult Admissions Representative**
**Compensation Program**

*Updated:* 7/6/05

Promotion Guidelines

(Attachment A)

### Promotion from
### Associate Campus Admissions Representative
### to
### Campus Admissions Representative

**A. Eligibility.** An Associate Campus Admissions Representative will be eligible for promotion to Campus Admissions Representative provided that the following performance criteria are achieved:

1. Complete at least 6 months employment in the position of Associate Campus Representative.

2. Successfully achieve all of the Minimum Standards of Performance as an Associate Campus Admissions Representative.

3. Achieve an overall performance rating of at least "Good" on the company Employee Performance Review Form.

4. The Associate Campus Representative must have a minimum of 40 Starts which occur within the Representative's six-month review period.

5. Achieve a minimum 80% 30-Day Sit Rate during the Representative's six-month review period. (i.e., 80% of the Starts remain in school for at least 30 days).

**B. Promotion salary increase.** Associate Campus Admissions Representatives will be eligible to receive a promotion salary increase that corresponds to the greater of the following conditions:

1. A promotion salary increase percentage that corresponds to the actual number of starts achieved within the participant's six-month review period, or

2. A promotion salary increase to the minimum of the salary range of the position to which the participant is being promoted.

| Promotion Salary Increase from Associate to Campus Representative | | |
|---|---|---|
| **2.5% of Annual Salary** | **5.0% of Annual Salary** | **7.5% of Annual Salary** |
| Good Rating plus 40 Net Starts | Good Rating plus 45 Net Starts | Good Rating plus 50 Net Starts |
| **5.0% of Annual Salary** | **7.5% of Annual Salary** | **10.0% of Annual Salary** |
| Excellent Rating plus 40 Net Starts | Excellent Rating plus 45 Net Starts | Excellent Rating plus 50 Net Starts |

**Note:**

For the purpose of this program, eligible employees and dependents who attend one of our colleges and receive the company provided tuition discount will not be counted in the performance statistics used to determine eligibility for promotion under this program.

Program Effective:  July 1, 2005
Document Created: 7/5/05; Last Revised: 7/6/05
U:\Base Pay Programs\Corinthian Schools & Rhodes Colleges Adult Admiss Repr
Program\Communication Materials\B - Promotion Guidelines 7-6-05.doc

1 of 10



**Corinthian Schools and Rhodes Colleges
Adult Admissions Representative
Compensation Program**

*Updated: 7/6/05*

Promotion Guidelines

(Attachment A)
(continued)

Promotions and related salary increases earned under this program will be withheld for breaches of regulatory policy or company policy on the part of the representative. Breaches of regulatory policy will also lead to further disciplinary action, including termination of employment. Breaches of company policy, depending upon the severity, may lead to further disciplinary action, up to and including termination of employment. Falsifying information used to determine eligibility for a promotion and related salary increase under this program would be considered a serious breach of company policy.

The company reserves the right to adjust goals as it deems appropriate. The company also reserves the right to suspend, modify or terminate this program at anytime. Nothing in this document is to be construed to guarantee continuation of this program. In addition, nothing in this program prevents a college from counseling or placing a representative on probation for performance deficiencies.

If the promoted employee's overall performance falls below the performance criteria which earned the promotion, the employee may be subject to disciplinary action as appropriate or in rare circumstances reassignment may be considered, with required levels of approval. However, prior to the occurrence of any of these actions, the employee will be formally counseled and given an appropriate period of time to correct the performance deficiencies.

This is a non-exempt position and the incumbents are to be paid for all hours scheduled and approved, or allowed, to work. Therefore, it is imperative that their work hours be carefully scheduled, approved in advance and closely monitored by the Director of Admissions.

Program Effective:  July 1, 2005
Document Created:  7/5/05;  Last Revised:  7/6/05
U:\Base Pay Programs\Corinthian Schools & Rhodes Colleges Adult Admiss Repr
Program\Communication Materials\B - Promotion Guidelines 7-6-05.doc

2 of 10



**Corinthian Schools and Rhodes Colleges**
**Adult Admissions Representative**
**Compensation Program**

*Updated: 7/6/05*

---

Promotion Guidelines

---

(Attachment B)

**Promotion from**
**Campus Admissions Representative**
**to**
**Senior Campus Admissions Representative**

A. **Eligibility.** A Campus Admissions Representative will be eligible for promotion to Senior Campus Admissions Representative provided that the following performance criteria are achieved:

1. Employed in the Campus Admissions Representative classification for at least 6 months.

2. Successfully achieve all of the Minimum Standards of Performance as a Campus Admissions Representative.

3. Achieve an overall performance rating of at least "Good" on the company Employee Performance Review Form.

4. The Campus Representative must have a minimum of 58 Starts which occur within the Representative's six-month review period.

5. Achieve a minimum 80% 30-Day Sit Rate during the Representative's six-month review period. (i.e., 80% of the Starts remain in school for at least 30 days).

B. **Promotion salary increase.** Campus Admissions Representatives will be eligible to receive a promotion salary increase that corresponds to the greater of the following conditions:

1. A promotion salary increase percentage that corresponds to the actual number of starts achieved within the participant's six-month review period, or

2. A promotion salary increase to the minimum of the salary range of the position to which the participant is being promoted.

| Promotion Salary Increase from Campus to Senior Representative | | |
|---|---|---|
| **2.5% of Annual Salary** | **5.0% of Annual Salary** | **7.5% of Annual Salary** |
| Good Rating plus 58 Net Starts | Good Rating plus 63 Net Starts | Good Rating plus 68 Net Starts |
| **5.0% of Annual Salary** | **7.5% of Annual Salary** | **10.0% of Annual Salary** |
| Excellent Rating plus 58 Net Starts | Excellent Rating plus 63 Net Starts | Excellent Rating plus 68 Net Starts |

**Note:**

For the purpose of this program, eligible employees and dependents who attend one of our colleges and receive the company provided tuition discount will not be counted in the performance statistics used to determine eligibility for promotion under this program.

---

Program Effective:  July 1, 2005
Document Created: 7/5/05; Last Revised:  7/6/05
U:\Base Pay Programs\Corinthian Schools & Rhodes Colleges Adult Admiss Repr
Program\Communication Materials\B - Promotion Guidelines 7-8-05.doc

3 of 10



**Corinthian Schools and Rhodes Colleges
Adult Admissions Representative
Compensation Program**

*Updated: 7/6/05*

Promotion Guidelines

(Attachment B)
(continued)

Promotions and related salary increases earned under this program will be withheld for breaches of regulatory policy or company policy on the part of the representative. Breaches of regulatory policy will also lead to further disciplinary action, up to and including termination of employment. Breaches of company policy, depending upon the severity, may lead to further disciplinary action, up to and including termination of employment. Falsifying information used to determine eligibility for a promotion and related salary increase under this program would be considered a serious breach of company policy.

The company reserves the right to adjust goals as it deems appropriate. The company also reserves the right to suspend, modify or terminate this program at anytime. Nothing in this document is to be construed to guarantee continuation of this program. In addition, nothing in this program prevents a college from counseling or placing a representative on probation for performance deficiencies.

If the promoted employee's overall performance falls below the performance criteria which earned the promotion, the employee may be subject to disciplinary action as appropriate or in rare circumstances reassignment may be considered, with required levels of approval. However, prior to the occurrence of any of these actions, the employee will be formally counseled and given an appropriate period of time to correct the performance deficiencies.

This is a non-exempt position and the incumbents are to be paid for all hours scheduled and approved, or allowed, to work. Therefore, it is imperative that their work hours be carefully scheduled, approved in advance and closely monitored by the Director of Admissions.

Program Effective: July 1, 2005
Document Created: 7/5/05; Last Revised: 7/6/05
U:\Base Pay Program\Corinthian Schools & Rhodes Colleges Adult Admiss Repr
Program\Communication Materials\B - Promotion Guidelines 7-6-05.doc

4 of 10

CCi
CORINTHIAN
COLLEGES, INC.

**Corinthian Schools and Rhodes Colleges**
**Adult Admissions Representative**
**Compensation Program**

*Updated: 7/6/05*

Promotion Guidelines

(Attachment C)

**Promotion from**
**Senior Campus Admissions Representative**
**to**
**Master Campus Admissions Representative**

A. **Eligibility.** A Senior Campus Admissions Representative will be eligible for promotion to Master Campus Admissions Representative provided that the following performance criteria are achieved:

   1. Employed in the Senior Campus Admissions Representative classification for at least 6 months.

   2. Successfully achieve all of the Minimum Standards of Performance as a Senior Campus Admissions Representative.

   3. Achieve an overall performance rating of at least "Good" on the company Employee Performance Review Form.

   4. The Senior Campus Representative must have a minimum of 70 Starts which occur within the Representative's six-month review period.

   5. Achieve a minimum 80% 30-Day Sit Rate during the Representative's six-month review period. (i.e., 80% of the Starts remain in school for at least 30 days).

B. **Promotion salary increase.** Senior Campus Admissions Representatives will be eligible to receive a promotion salary increase that corresponds to the greater of the following conditions:

   1. A promotion salary increase percentage that corresponds to the actual number of starts achieved within the participant's six-month review period, or

   2. A promotion salary increase to the minimum of the salary range of the position to which the participant is being promoted.

| Promotion Salary Increase from Senior to Master Representative | | |
|---|---|---|
| **2.5% of Annual Salary** | **5.0% of Annual Salary** | **7.5% of Annual Salary** |
| Good Rating plus 70 Net Starts | Good Rating plus 75 Net Starts | Good Rating plus 80 Net Starts |
| **5.0% of Annual Salary** | **7.5% of Annual Salary** | **10.0% of Annual Salary** |
| Excellent Rating plus 70 Net Starts | Excellent Rating plus 75 Net Starts | Excellent Rating plus 80 Net Starts |

**Note:**

For the purpose of this program, eligible employees and dependents who attend one of our colleges and receive the company provided tuition discount will not be counted in the performance statistics used to determine eligibility for promotion under this program.

Program Effective: July 1, 2005
Document Created: 7/5/05; Last Revised: 7/6/05
U:\Base Pay Programs\Corinhian Schools & Rhodes Colleges Adult Admiss Reprs
Program\Communication Materials\B - Promotion Guidelines 7-6-05.doc

5 of 10



**Corinthian Schools and Rhodes Colleges
Adult Admissions Representative
Compensation Program**

*Updated: 7/6/05*

---

Promotion Guidelines

---

(Attachment C)
(continued)

Promotions and related salary increases earned under this program will be withheld for breaches of regulatory policy or company policy on the part of the representative. Breaches of regulatory policy will also lead to further disciplinary action, up to and including termination of employment. Breaches of company policy, depending upon the severity, may lead to further disciplinary action, up to and including termination of employment. Falsifying information used to determine eligibility for a promotion and related salary increase under this program would be considered a serious breach of company policy.

The company reserves the right to adjust goals as it deems appropriate. The company also reserves the right to suspend, modify or terminate this program at anytime. Nothing in this document is to be construed to guarantee continuation of this program. In addition, nothing in this program prevents a college from counseling or placing a representative on probation for performance deficiencies.

If the promoted employee's overall performance falls below the performance criteria which earned the promotion, the employee may be subject to disciplinary action as appropriate or in rare circumstances reassignment may be considered, with required levels of approval. However, prior to the occurrence of any of these actions, the employee will be formally counseled and given an appropriate period of time to correct the performance deficiencies.

This is a non-exempt position and the incumbents are to be paid for all hours scheduled and approved, or allowed, to work. Therefore, it is imperative that their work hours be carefully scheduled, approved in advance and closely monitored by the Director of Admissions.

Program Effective: July 1, 2005
Document Created: 7/5/05; Last Revised: 7/6/05
U:\Base Pay Programs\Corinthian Schools & Rhodes Colleges Adult Admiss Repr
Program\Communication Materials\B - Promotion Guidelines 7-6-05.doc

6 of 10



**Corinthian Schools and Rhodes Colleges**
**Adult Admissions Representative**
**Compensation Program**

*Updated: 7/6/05*

---

Promotion Guidelines

---

(Attachment D)

**Promotion from**
**Master Campus Admissions Representative**
**to**
**Executive Campus Admissions Representative**

A. **Eligibility.** A Master Campus Admissions Representative will be eligible for promotion to Executive Campus Admissions Representative provided that the following performance criteria are achieved:

1. Employed in the Master Campus Admissions Representative classification for at least 6 months.

2. Successfully achieve all of the Minimum Standards of Performance as a Master Campus Admissions Representative.

3. Achieve an overall performance rating of at least "Good" on the company Employee Performance Review Form.

4. The Master Representative must have a minimum of 100 Starts which occur within the Representative's six-month review period.

5. Achieve a minimum 80% 30-Day Sit Rate during the Representative's six-month review period. (i.e., 80% of the Starts remain in school for at least 30 days).

B. **Promotion salary increase.** Master Campus Admissions Representatives will be eligible to receive a promotion salary increase that corresponds to the greater of the following conditions:

1. A promotion salary increase percentage that corresponds to the actual number of starts achieved within the participant's six-month review period, or

2. A promotion salary increase to the minimum of the salary range of the position to which the participant is being promoted.

| Promotion Salary Increase from Master to Executive Representative | | |
|---|---|---|
| **2.5% of Annual Salary** | **5.0% of Annual Salary** | **7.5% of Annual Salary** |
| Good Rating plus 100 Net Starts | Good Rating plus 105 Net Starts | Good Rating plus 110 Net Starts |
| **5.0% of Annual Salary** | **7.5% of Annual Salary** | **10.0% of Annual Salary** |
| Excellent Rating plus 100 Net Starts | Excellent Rating plus 105 Net Starts | Excellent Rating plus 110 Net Starts |

**Note:**

For the purpose of this program, eligible employees and dependents who attend one of our colleges and receive the company provided tuition discount will not be counted in the performance statistics used to determine eligibility for promotion under this program.

---

Program Effective: July 1, 2005
Document Created: 7/5/05; Last Revised: 7/6/05
U:\Base Pay Programs\Corinthian Schools & Rhodes Colleges Adult Admiss Repr
Program\Communication Materials\B - Promotion Guidelines 7-6-05.doc

7 of 10



**Corinthian Schools and Rhodes Colleges
Adult Admissions Representative
Compensation Program**

*Updated: 7/6/05*

Promotion Guidelines

(Attachment D)
(continued)

Promotions and related salary increases earned under this program will be withheld for breaches of regulatory policy or company policy on the part of the representative. Breaches of regulatory policy will also lead to further disciplinary action, up to and including termination of employment. Breaches of company policy, depending upon the severity, may lead to further disciplinary action, up to and including termination of employment. Falsifying information used to determine eligibility for a promotion and related salary increase under this program would be considered a serious breach of company policy.

The company reserves the right to adjust goals as it deems appropriate. The company also reserves the right to suspend, modify or terminate this program at anytime. Nothing in this document is to be construed to guarantee continuation of this program. In addition, nothing in this program prevents a college from counseling or placing a representative on probation for performance deficiencies.

If the promoted employee's overall performance falls below the performance criteria which earned the promotion, the employee may be subject to disciplinary action as appropriate or in rare circumstances reassignment may be considered, with required levels of approval. However, prior to the occurrence of any of these actions, the employee will be formally counseled and given an appropriate period of time to correct the performance deficiencies.

This is a non-exempt position and the incumbents are to be paid for all hours scheduled and approved, or allowed, to work. Therefore, it is imperative that their work hours be carefully scheduled, approved in advance and closely monitored by the Director of Admissions.

Program Effective: July 1, 2005
Document Created: 7/5/05; Last Revised: 7/6/05
U:\Base Pay Program\Corinthian Schools & Rhodes Colleges Adult Admiss Repr
Program\Communication Materials\B - Promotion Guidelines 7-6-05.doc

8 of 10



**Corinthian Schools and Rhodes Colleges**
**Adult Admissions Representative**
**Compensation Program**

*Updated: 7/6/05*

---

Promotion Guidelines

---

(Attachment E)

**Promotion from**
**Executive Campus Admissions Representative**
**to**
**Senior Executive Campus Admissions Representative**

A. **Eligibility.** An Executive Campus Admissions Representative will be eligible for promotion to Senior Executive Campus Admissions Representative provided that the following performance criteria are achieved:

1. Employed in the Executive Campus Admissions Representative classification for at least 6 months.

2. Successfully achieve all of the Minimum Standards of Performance as an Executive Campus Admissions Representative.

3. Achieve an overall performance rating of at least "Good" on the company Employee Performance Review Form.

4. The Executive Representative must have a minimum of 125 Starts which occur within the Representative's six-month review period.

5. Achieve a minimum 80% 30-Day Sit Rate during the Representative's six-month review period. (i.e., 80% of the Starts remain in school for at least 30 days).

B. **Promotion salary increase.** Executive Campus Admissions Representatives will be eligible to receive a promotion salary increase that corresponds to the greater of the following conditions:

1. A promotion salary increase percentage that corresponds to the actual number of starts achieved within the participant's six-month review period, or

2. A promotion salary increase to the minimum of the salary range of the position to which the participant is being promoted.

| Promotion Salary Increase from Executive to Senior Executive Representative | | |
|---|---|---|
| **2.5% of Annual Salary** | **5.0% of Annual Salary** | **7.5% of Annual Salary** |
| Good Rating plus 125 Net Starts | Good Rating plus 130 Net Starts | Good Rating plus 135 Net Starts |
| **5.0% of Annual Salary** | **7.5% of Annual Salary** | **10.0% of Annual Salary** |
| Excellent Rating plus 125 Net Starts | Excellent Rating plus 130 Net Starts | Excellent Rating plus 135 Net Starts |

**Note:**

For the purpose of this program, eligible employees and dependents who attend one of our colleges and receive the company provided tuition discount will not be counted in the performance statistics used to determine eligibility for promotion under this program.

---

Program Effective: July 1, 2005
Document Created: 7/5/05; Last Revised: 7/6/05
U:\Base Pay Programs\Corinthian Schools & Rhodes Colleges Adult Admiss Repr Program\Communication Materials\B - Promotion Guidelines 7-6-05.doc

9 of 10

CCi
CORINTHIAN
COLLEGES, INC.

**Corinthian Schools and Rhodes Colleges**
**Adult Admissions Representative**
**Compensation Program**

*Updated: 7/6/05*

Promotion Guidelines

(Attachment E)
(continued)

Promotions and related salary increases earned under this program will be withheld for breaches of regulatory policy or company policy on the part of the representative. Breaches of regulatory policy will also lead to further disciplinary action, up to and including termination of employment.  Breaches of company policy, depending upon the severity, may lead to further disciplinary action, up to and including termination of employment.  Falsifying information used to determine eligibility for a promotion and related salary increase under this program would be considered a serious breach of company policy.

The company reserves the right to adjust goals as it deems appropriate.  The company also reserves the right to suspend, modify or terminate this program at anytime.  Nothing in this document is to be construed to guarantee continuation of this program.  In addition, nothing in this program prevents a college from counseling or placing a representative on probation for performance deficiencies.

If the promoted employee's overall performance falls below the performance criteria which earned the promotion, the employee may be subject to disciplinary action as appropriate or in rare circumstances reassignment may be considered, with required levels of approval.  However, prior to the occurrence of any of these actions, the employee will be formally counseled and given an appropriate period of time to correct the performance deficiencies.

This is a non-exempt position and the incumbents are to be paid for all hours scheduled and approved, or allowed, to work.  Therefore, it is imperative that their work hours be carefully scheduled, approved in advance and closely monitored by the Director of Admissions.

Program Effective: July 1, 2005
Document Created: 7/5/05; Last Revised: 7/6/05
U:\Base Pay Programs\Corinthian Schools & Rhodes Colleges Adult Admiss Repr
Program\Communication Materials\B - Promotion Guidelines 7-6-05.doc

10 of 10

