1  SCOTT D. LEVY (TEX. Bar No. 24000598)
2  LAW OFFICES OF SCOTT D. LEVY PC
3  1844 Wheeler Street
4  Houston, Texas  77002
5  Telephone:  (713) 528-5409
6  Facsimile:  (713) 528-0117
7  Email:  levy.scott@mac.com
8
9  Attorney for the Relators
10
11
12           IN THE UNITED STATES DISTRICT COURT

13         FOR THE CENTRAL DISTRICT OF CALIFORNIA

14                    WESTERN DIVISION

15

16  UNITED STATES OF AMERICA          )
17  Ex Rel. NYOKA LEE and             )
18  TALALA MSHUJA,                    )
19                                    )
20          Plaintiffs,               )
21                                    )
22  VS.                               )    2:07-cv-01984-PSG-MANx
23                                    )
24  CORINTHIAN COLLEGES, INC.;        )
25  ERNST & YOUNG, LLP;               )    JURY TRIAL
26  DAVID MOORE; and                  )
27  JACK D. MASSIMINO,                )
28                                    )
29          Defendants                )
30  _____ )
31
32

33           **FIRST AMENDED COMPLAINT**

34

FILED
CLERK, U.S. DISTRICT COURT

DEC 2 1 2011

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY



**PARTIES**

1.    The Plaintiff is the United States of America *ex relatione* NYOKA JUNE LEE and TALALA MSHUJA under the provisions of 31 U.S.C. § 3730(b).

2.    Relator NYOKA JUNE LEE ("LEE") is an individual residing in California. She brings this action for herself and for the United States under 31 U.S.C. § 3730(b).    LEE was employed at Bryman College, one of the Corinthian Colleges, for periods of time from 1998 until 2006. LEE served as an admissions representative, senior admissions representative, and master admissions representative at Corinthian's San Francisco campus; the director of admissions at the Hayward campus in 2004; and a masters admissions representative at Corinthian's San Francisco campus from 2005-2006.

3.    Relator TALALA MSHUJA ("MSHUJA") is an individual residing in San Jose, California. He brings this action for himself and for the United States under 31 U.S.C. § 3730(b).  MSHUJA was employed as an independent test proctor at Corinthian's San Francisco campus from August 2000 until February 2003, and then at the San Jose campus from January 2004 until July 2005. MSHUJA worked at Corinthian's Fremont campus from 2006-2009.

4.    Defendant CORINTHIAN COLLEGES, INC. ("COCO" or the "Company") is a Delaware corporation with its principal corporate in Santa

1  Ana, California.  Said Defendant has made its appearance herein.  COCO was

2  founded in 1995, and became, at one time, the second largest for-profit college,

3  or "proprietary" school, in the post-secondary education industry.  COCO owns

4  the following schools: Rhodes College, Inc., Everest College, Everest Institute,

5  Everest University, Everest Online, Everest-Canada, Bryman College, Titan

6  Schools, National Institute of Technology, Florida Career College, WyoTech,

7  Tampa College, Orlando College, and, Heald College.  COCO is comprised of

8  approximately 100 campuses. The practices described below took place at all

9  colleges owned by COCO. Corinthian Colleges, Inc. is publicly traded on the

10  NASDAQ Exchange under the ticker symbol "COCO."  The United States

11  government has paid COCO several billion dollars in federal student financial

12  aid made available under Title IV of the Higher Education Act.  COCO's

13  revenues totaled $511 million in 2003, $796 million in 2004, and $964 million

14  in 2005.

15          5.        Defendant ERNST & YOUNG LLP ("E&Y") is a national firm

16  of certified public accountants, known as one of the Big Four accounting and

17  auditing firms. Defendant E&Y is a limited liability partnership headquartered

18  in New York and is one of the largest accounting firms in the United States.

19  For fiscal years 2002-2011, E&Y acted as auditor for COCO.  Said Defendant

20  has made its appearance herein.  E&Y was engaged to conduct the audits and

3

1    issue opinions on COCO's financial statements in accordance with *Generally*

2    *Accepted Auditing Standards (GAAS)*.  E&Y was also engaged, pursuant to the

3    Higher Education Act, to audit COCO under *Government Auditing Standards*

4    and to prepare certain required compliance opinions, including "Reports on

5    Internal Control Over Financial Reporting and on Compliance and Other

6    Matters Based on an Audit of the Consolidated Financial Statements Performed

7    in Accordance with *Government Auditing Standards*."  E&Y, moreover,

8    advised COCO regarding its annual reports filed with the Securities &

9    Exchange Commission, specifically including the Company's Forms 10-K.

10   E&Y annually issued these various audit opinions, without ever conducting the

11   necessary auditing tests and procedures to determine how COCO was actually

12   implementing its written recruiter compensation programs.

13        6.    Defendant David Moore ("MOORE") is an individual who served as

14   chairman, president, and chief executive officer of COCO.  MOORE was a

15   founding shareholder in COCO, and was directly in charge of COCO's

16   recruiting operations and enrollment practices, and setting Company enrollment

17   targets, until 2006, when he left management of the Company.  Said Defendant

18   has made his appearance herein.  MOORE also served on COCO's board of

19   directors.  MOORE signed many of the Program Participation Agreements that

20   were submitted to United States Department of Education pursuant to 20 U.S.C.

4

§ 1094 so that COCO could participate in the federal student financial aid programs. MOORE was primarily responsible for the ramp up in COCO's enrollments in the period through 2006.

7. Defendant Jack D. Massimino ("MASSIMINO") is an individual who served as chairman, president, and chief executive officer of COCO. Said Defendant has made his appearance herein. MASSIMINO also served on COCO's board of directors. MASSIMONO signed many of the Program Participation Agreements that were submitted to the United States Department of Education so that COCO could participate in the federal student financial aid programs. MASSIMINO had primary responsibility for setting yearly enrollment targets for COCO's colleges. MASSIMINO was responsible for implementing the recruiting compensation practices described herein to achieve the Company's annual enrollment targets.

8. The United States Department of Education ("DEPT-EDU" or Agency) is the agency of the United States government responsible for the regulation, administration, and distribution of the student financial aid programs authorized by Title IV of the Higher Education Act of 1965, as amended ("Title IV, HEA Programs").

## JURISDICTION AND VENUE

10. This Court has jurisdiction and venue of this action 28 U.S.C. § 1345 and 31 U.S.C. § 3732(a).

## SUMMARY OF THE ACTION

11. Relators allege an ongoing fraud by Corinthian Colleges, Inc., that from 2000 continually through the present, the Company has submitted false statements to the U.S. Department of Education every year in order to obtain educational grants and guaranteed student loans made available under Title IV of the Higher Education Act ("HEA") to students in financial need. The Company falsely represents every year that it does not provide incentive payments to its recruiters for their recruiting work. The incentive compensation ban is a core prerequisite under the HEA to obtain payment of the Title IV funds. COCO falsely certified to the DEPT-EDU every year that the Company is in compliance with the incentive compensation ban in the Program Participation Agreements that COCO executes and submits to the DEPT-EDU, when in fact the Company pays its recruiters based solely on the number of students they enroll.

12. Contrary to the statutory prohibition that the Company "will not provide any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments" to its recruiters, Corinthian

1   utilizes a compensation system that ties earnings directly and solely to student

2   recruitment.

3       13.   Recruiters at COCO are classified, and paid, based on the number of

4   students enrolled.   Recruiters are ranked in categories that correspond to the

5   number of students enrolled, not by length of service with the Company,

6   seniority, educational background, or hours worked.   For instance, in 2005,

7   COCO ranked, and compensated its recruiters according to the following

8   categories:

9   **Recruiter category**                                **Enrollment Minimum**
10
11   Associate Campus Admissions Representative                    40
12   Campus Admissions Representative                              58
13   Senior Campus Admissions Representative                       70
14   Master Campus Admissions Representative                      100
15   Executive Campus Admissions Representative                   125
16
17       14.   Recruiters at COCO function as sales personnel and are awarded pay

18   increases solely on the basis of the number of student enrollments.   Under its

19   recruiter compensation program, recruiters who exceed the quotas assigned to

20   their ranks are awarded raises between 2.5% to 10% of their base salary,

21   depending on how many additional students they enroll.   Recruiter promotions

22   to higher ranks, moreover, are based solely on the number of students recruited,

23   and are not limited to single rank promotions from recruiters' starting rank.

24   COCO recruiter compensation program indicates that it grades recruiters as

1  "Good" and "Excellent" based on factors other than enrollment numbers.

2  COCO intentionally and knowingly designed its Compensation Program to

3  show "Good" versus "Excellent" factors and ratings for the purpose of

4  concealing COCO's violations of the Incentive Compensation Ban and

5  Regulatory Safe Harbor. The "Good" versus "Excellent" quality ratings are a

6  smoke screen used to disguise the fact that its recruiters are compensated solely

7  based on recruitment, admission, and enrollment numbers. COCO acted with

8  fraudulent intent and did not, in good faith, rely upon the Safe Harbor

9  Provisions.

10     15.  Each student inquiry at COCO is labeled as a "Lead". Every Lead is

11  tagged by COCO's marketing department before it is assigned to a recruiter.

12  COCO monitors each Lead, and keeps a running total of the number of student

13  leads assigned to each recruiter. COCO keeps a running total of every

14  recruiter's "lead-to-conversion ratio" ("L-C Ratio"). The L-C Ratio is a

15  calculation performed daily by COCO's marketing department showing the

16  number and percentage of Leads that have enrolled by every recruiter at COCO.

17  The school monitors whether the Lead resulted in an interview, an application

18  for admission, and finally, enrollment. The calculation of the percentage of

19  Leads that eventually enrolls in classes determines whether the recruiter will be

20  assigned any new Leads, or whether she would be constructively terminated by

1    not receiving additional leads.   The L-C Ratio is the calculation used to

2    determine the recruiters' "Good" versus "Excellent" rating, and is calculated

3    based solely on the numbers of students who enroll at COCO.

4        16.   COCO generates enrollments through highly aggressive marketing.

5    In 2009, COCO's sales force was 1,700 recruiters who worked directly with

6    prospective students in the admissions process.   In comparison, the Company

7    only employed 1,460 full time faculty.   None of the faculty were paid using the

8    variable compensation program COCO uses for compensating its recruiters.

9    The job function of recruiters is ostensibly to provide counseling and advice to

10   potential students.   Unbeknowst to the students, and the U.S. Government,

11   recruiters at COCO are awarded pay increases based on the number of students

12   they enroll.   COCO's recruiters have a direct financial stake in the enrollment

13   decision of every potential student.   COCO's advice to potential students is

14   tainted by this conflict of interest between the financial interest of the recruiter

15   and the academic needs of the students, the very compensation arrangement that

16   is prohibited by the HEA.

17       17.   Despite the ban on incentive recruiter compensation, Corinthian pays

18   its recruiters incentive compensation.   As a matter of corporate practice,

19   recruiters have been required to meet a certain enrollment quota, depending on

20   their salary grade and title.   Those recruiters that exceed their quotas receive

1    raises of 2.5% to 10% of their base salary, every six months, depending on the

2    number of new recruits they sign up. The bonus criteria (number of additional

3    enrollments) are set forth in a matrix designed by Corinthian. Employees

4    failing to meet their quotas are disciplined, demoted, or terminated. *See* Exhibit

5    A to Relators' original Complaint.

6        18. As did Corinthian, Ernst & Young also falsely certified that

7    Corinthian was in compliance with the recruiter compensation prohibitions. In

8    particular, Ernst & Young failed to perform the legally required evaluation to

9    determine if Corinthian's recruiter compensation practices were legal.

10        19. Ernst & Young knew that Corinthian derived almost all of its revenue

11    from HEA funds, and that Corinthian spent close to one-fourth of its budget on

12    recruiters' compensation and advertising.

13        20. Ernst & Young simply rubber-stamped the information provided by

14    Corinthian. E&Y issued its compliance audits and financial statement audit

15    opinions knowing them to be false and/or in reckless disregard of the truth or

16    falsity of the information provided to the United States.

17        21. Corinthian owed a massive liability to the United States as the result

18    of the Company's illegal recruiter compensation practices. Corinthian's

19    financial statements were misstated and were false because they failed to

20    disclose that the Company owed a massive liability to the United States as the

10

result of Corinthian's illegal recruiter compensation practices.    Under Pronouncement Number 5 of the Financial Accounting Standards Board ("FASB 5"), Ernst & Young was obligated to disclose all contingent obligations on the financial statements.   Yet, it failed to do so.   Nor did it mention any qualifications on Corinthian's financial statements, which it was required to do under applicable accounting and auditing standards.

22.  Ernst & Young made false certifications of compliance respecting Corinthian's financial statements and compliance obligations, knowing the same were going to be submitted to the Department of Education to obtain funds from the United States treasury.

23.  Ernst & Young also fraudulently caused the United States to pay Title IV, HEA Program funds to Corinthian by such false and fraudulent compliance audit and financial statement audit opinions.   At the same time E&Y issued clean, unqualified audit opinions to the DEPT-EDU, E&Y endorsed the cautionary disclaimers contained in the MD&A section of the Company's Form 10-K filed with the Securities & Exchange Commission.

Third-Party Auditor

24.  When E&Y took over as COCO's auditor, in 2002, the Incentive Compensation Regulations accompanying the Higher Education Act had just been amended to allow, under the Regulatory Safe Harbor, schools to pay

1    "fixed compensation, such as a fixed annual salary or a fixed hourly wage, as

2    long as that compensation is not adjusted up or down more than twice during

3    any twelve month period, and any adjustment is not based solely on the number

4    of students recruited, admitted, enrolled, or awarded financial aid." 34 C.F.R. §

5    668.14(b)(22)(ii)(A) (2002).

6        25.   Aware that the U.S. Department of Education would not review or

7    pre-approve individual schools' compensation plans, a third party auditor was

8    engaged to perform the attestation engagement required by the HEA.   The

9    device of using a third party auditor to alleviate compliance risk and thereby

10   insulate E&Y from liability is a violation of both *Generally Accepted Auditing*

11   *Standards* and *Government Auditing Standards*.   In particular, AU § 543

12   prevents an auditor from serving as the principal auditor and issuing opinions in

13   cases where a third party auditor has been delegated the task of evaluating high

14   risk material issues.   E&Y at all time abdicated its responsibility to audit

15   COCO's recruiter compensation practices, for each audit year under suit.

16       26.   The professional standard governing the outsourcing of audit

17   procedures to a third party accounting firm is AU § 543, *Part of Audit*

18   *Performed by Other Independent Auditors.* Where the audit function that is

19   being conducted by the third party relates to a matter that is of such importance

20   to the financial statements that it impacts the overall financial condition of the

12

1    company, the rule urges the principal auditor to decline serving in the

2    engagement.

3        AU § 543.02

4        "The auditor considering whether he may serve as principal auditor
5        may have performed all but a relatively minor portion of the work, or
6        significant parts of the audit may have been performed by other
7        auditors. In the latter case, he must decide whether his own
8        participation is sufficient to enable him to serve as the principal
9        auditor and to report as such on the financial statements. In deciding
10       this question, the auditor should consider, among other things, the
11       materiality of the portion of the financial statements he has audited in
12       comparison with the portion audited by other auditors, the extent of
13       his knowledge of the overall financial statements, and the importance
14       of the components he audited in relation to the enterprise as a whole.
15       [As modified, September 1981, by the Auditing Standards Board.]"

16

17       27.   The main purpose of AU § 543 is to prevent the principal auditor

18   from blindfolding itself to significant audit risks by having those functions

19   delegated to third-party accountants. The principal auditor who issues an

20   opinion based on the work of a third party auditor does so at its peril, as the rule

21   eliminates lack of knowledge as a defense to audit failure under such

22   circumstances.

23       28.   E&Y had the responsibility under *GAAS* to report on possible illegal

24   acts by its client, as explained in part by AU Section 317, *Illegal Acts by Client*.

25   E&Y simply disregarded that COCO received 90% of its revenue directly from

26   the U.S. government and the audit risk involved with this revenue source.

13

1    COCO's compliance with the laws and regulations under which those funds

2    were provided would have been recognized by reasonable auditors to have a

3    direct and material effect on the determination of COCO's financial statement

4    amounts.  The effect of violations of such laws and regulations requires the

5    auditor to disclose a contingent liability because of the allegation or

6    determination of illegality, under *GAAS* and *Government Auditing Standards*.

7        29.  E&Y abdicated its responsibility under AU Section 317 to apply audit

8    procedures specifically directed to ascertaining whether an illegal act has

9    occurred, in relation to COCO's recruiter compensation practices, and to

10    disclose the material uncertainty over the legality of COCO's recruiter

11    compensation practices in E&Y's audit opinions.

12    **AU 317.01**

13            This section prescribes the nature and extent of the consideration an
14            independent auditor should give to the possibility of illegal acts by
15            a client in an audit of financial statements in accordance with
16            generally accepted auditing standards. The section also provides
17            guidance on the auditor's responsibilities when a possible illegal act
18            is detected.

19    *    *    *

20    *Audit Procedures in Response to Possible Illegal Acts*

21        **317.10**

22            When the auditor becomes aware of information concerning a
23            possible illegal act, the auditor should obtain an understanding of
24            the nature of the act, the circumstances in which it occurred, and
25            sufficient other information to evaluate the effect on the financial
26            statements. In doing so, the auditor should inquire of management

14

1         at a level above those involved, if possible. If management does not
2         provide satisfactory information that there has been no illegal act,
3         the auditor should—

4    *a.*   Consult with the client's legal counsel or other specialists about
5         the application of relevant laws and regulations to the
6         circumstances and the possible effects on the financial
7         statements. Arrangements for such consultation with client's
8         legal counsel should be made by the client.

9    b.   Apply additional procedures, if necessary, to obtain further
10        understanding of the nature of the acts.

11   * * *

*Effect on the Auditor's Report*

**317.18**

If the auditor concludes that an illegal act has a material effect on the financial statements, and the act has not been properly accounted for or disclosed, the auditor should express a qualified opinion or an adverse opinion on the financial statements taken as a whole, depending on the materiality of the effect on the financial statements.

30. E&Y was required to know every significant aspect of COCO's recruiter compensation practices under both *GAAS* and *Government Auditing Standards*, irrespective of any compliance work done by a third-party auditor. Had E&Y conducted its audits of COCO in accordance with *Government Auditing Standards* and *Generally Accepted Auditing Standards*, E&Y would have known, and reported, that COCO's financial statements violated *Generally Accepted Accounting Principles ("GAAP")*, which require that such statements

15

1    (a) not be misleading, (b) fairly disclose the Company's financial position, and

2    (c) not omit material information necessary to fairly present the financial

3    position. As the public auditor for COCO, E&Y had the absolute obligation to

4    ensure that COCO's financial statements complied with *GAAP* and did not

5    mislead the U.S. government, the State licensing agencies, and the students.

6    Instead of fulfilling this obligation, E&Y gave a clean, unqualified opinion each

7    year, erroneously stating that COCO's financial statements complied with

8    *GAAP*. E&Y sat by silently while COCO deceived the U.S. Department of

9    Education by concealing the recruiter compensation practices and

10   misrepresenting the Company's compliance with the Higher Education Act. By

11   doing so, E&Y directly facilitated a major accounting fraud, and helped COCO

12   mislead the U.S. Department of Education, the States that granted licenses to

13   COCO, and the students recruited by the commissioned recruiters as to its true

14   financial condition. E&Y, which reaped substantial fees from COCO, must be

15   held accountable for its role in this fraud.

16   31. E&Y simply rubber stamped the information COCO management

17   provided to E&Y, without making an audit determination about how COCO

18   was actually implementing its written recruiter compensation program. E&Y

19   issued its financial statement audit opinions and E&Y's Report of Independent

20   Registered Public Accounting Firm and Report on Internal Control Over

1   Financial Reporting and on Compliance and Other Matters Based on an Audit

2   of the Consolidated Financial Statements Performed in Accordance with

3   *Government Auditing Standards* without conducting the necessary audit

4   procedures to determine what COCO's recruiter compensation practices were.

5   Instead, directly contrary to AU 317, E&Y issued its opinions representing that

6   it had conducted its audits in accordance with *Government Auditing Standards*,

7   knowing this to be false, or in reckless disregard of the truth or falsity of the

8   assertions made to the United States, or deliberately indifferent to the truth of

9   the assertions made in its audit opinions.

10

11                          **INSTITUTIONAL ELIGIBILITY**

12       32.  The Higher Education Act of 1965, Title IV, Part G, § 487, as

13   amended, prohibits an institution that pays incentive compensation to

14   admissions and recruitment representatives from participating in Title IV, HEA

15   Programs.  The first prong to obtain eligibility to receive payment of Title IV,

16   HEA Programs is the institution must enter into a program participation

17   agreement with the DEPT-EDU.  "The agreement ***shall*** condition the initial and

18   continuing eligibility of an institution to participate in a program upon

19   compliance with the following:

20       *    *    *

17

1    The institution will not provide any commission, bonus, or other
2    incentive payment based directly or indirectly on success in
3    securing enrollments or financial aid to any persons or entities
4    engaged in any student recruiting or admission activities or in
5    making decisions regarding the award of student financial
6    assistance, except that this paragraph shall not apply to the
7    recruitment of foreign students residing in foreign countries who
8    are not eligible to receive Federal student assistance.
9

10   20 U.S.C. § 1094(a)(20).

11
12       33.  The initial implementing regulation for the program participation

13   agreement was 34 CFR § 668.14(b)(22).  In 2002, the Department of Education

14   amended the regulation and created a "safe harbor" provision interpreting the

15   ban on recruiter compensation.  The safe harbor provides that for-profit schools

16   may, without violating the incentive compensation ban, provide "payment of

17   fixed compensation, such as a *fixed* annual salary or a *fixed* hourly wage, as

18   long as that compensation is not adjusted up or down more than twice during

19   any twelve month period, and any adjustment is not based solely on the number

20   of students recruited, admitted, enrolled, or awarded financial aid."  34 C.F.R.

21   668.14(b)(22)(ii)(A) (2010) ("Safe Harbor Provision") (emphasis added).

22       34.  COCO signed and submitted PPAs to the Department of Education on

23   behalf of all its schools and branches in the United States.  COCO certified to

24   the United States that "[i]t will not provide, nor contract with any entity that

25   provides, any commission, bonus, or other incentive payment based directly or

18

1    indirectly on success in securing enrollments or financial aid to any persons or

2    entities engaged in any student recruiting or admission activities or in making

3    decisions regarding the awarding of student financial assistance . . ." in order to

4    obtain Title IV funding.

5    35.    Furthermore, COCO certified that "[i]t will comply with all

6    statutory provisions of or applicable to Title IV of the HEA, all applicable

7    regulatory provisions prescribed under that statutory authority, and all

8    applicable special arrangements, agreements, and limitations entered into under

9    the authority of statutes applicable to Title IV of the HEA. . ." in order to obtain

10    Title IV funding.

11    36.  By entering into such PPAs, COCO has collected vast amounts of

12    student financial aid from the United States government.  Almost ninety percent

13    (90%) of COCO's reported revenues were paid from Title IV Program funds.

| Year | Net Revenue | Admissions & Marketing expenses | % |
|------|-------------|--------------------------------|---|
| 2009 | $1,307,825,000 | $294,728,000 | 22.54% |
| 2008 | $1,068,671,000 | $276,875,000 | 25.91% |
| 2007 | $ 933,182,000 | $252,332,000 | 27.03% |
| 2006 | $ 966,646,000 | $256,438,000 | 26.52% |
| 2005 | $ 963,565,000 | $228,437,000 | 23.71% |
| 2004 | $ 795,636,000 | | |
| 2003 | $ 511,429,000 | | |
| 2002 | $ 332,342,000 | | |
| 2001 | $ 244,163,000 | | |
| 2000 | $ 170,734,000 | | |

27    37.  At all times while COCO was receiving these revenues from the

19

1  United States, it was paying its recruiters based solely on the number of

2  students enrolled the recruiter.  COCO was not eligible to receive any of said

3  Title IV program funds as a consequence of its illegal recruiter compensation

4  practices.

5      38.  COCO has compensated its recruiters, including Relator Nyoka June

6  Lee, and their supervisors, the campus directors of admission, based upon the

7  number of new students they recruit to enroll in COCO schools.  These

8  practices have been in place from July 1, 2000 to the present.

9      39.  Exhibit "A" to Relators' original Complaint is COCO's

10  compensation system for admissions personnel.  COCO's compensation system

11  for admissions personnel is called the "Corinthian Schools and Rhodes Colleges

12  Adult Admissions Representatives Compensation Program, Promotion

13  Guidelines, Updated: 7/6/05".  COCO's implementation of this Compensation

14  Program provides raises and promotions taking into account only the number of

15  students recruited.

16      40.  COCO's compensation system ranks recruiters according to how

17  many students they enroll.  The recruiters' compensation is based directly and

18  indirectly on the success in securing enrollments.  The single factor considered

19  in recruiter compensation is enrollment numbers.

20      41.  Compensation advancement for recruiters at COCO depends entirely

20

1    on the number of new students a recruiter is able to enroll. COCO pressures its

2    recruiters to enroll every possible prospective student through its recruiter

3    compensation system. In practice, increased compensation for recruiters is

4    achieved only through increases in the number of students the recruiter enrolls

5    to attend Corinthian.

6        42. In practice, COCO has a high-pressure sales culture where enrolling

7    new students is the sole focus of its compensation system.   COCO's

8    Admissions Department openly admonishes its recruiters that their employment

9    and compensation are tied to enrollment numbers.

10        43. At COCO, the recruiters' financial goals are tied solely and directly to

11    recruiting an identified number of student enrollments.

12        44. COCO tracks every Lead assigned to the recruiters. The number of

13    student enrollments for each recruiter is monitored on a daily, weekly, monthly,

14    quarterly, and annual basis.   The recruiting activity is also reported on a

15    percentage basis. COCO keeps real time reporting of the Lead-to-Enrollment

16    activity of all recruiters working for the Company, which are shown in

17    numerous corporate reports that are widely disseminated within COCO.

18        45. The job of the Director of Admissions at each COCO campus is to

19    serve as the recruiting manager for that COCO school, and his compensation

20    depends solely on the number of students who enroll at his campus.    The

21

1  campus Director of Admissions manages the distribution of "Leads" among the

2  recruiters employed at that campus.

3      46.  All marketing and recruiting functions are directed and supervised by

4  COCO's management.  The enrollment numbers for all campus recruiters and

5  the campus Directors of Admissions are monitored throughout each working

6  day.

7      47.  COCO knew, or acted with reckless disregard of the fact that its

8  conduct in implementing its compensation program did not fall within the

9  Department of Education Safe Harbor Provision when it certified to the United

10  States government that it was compliant with the HEA.

11      48.  Alternatively, even if COCO believed that its written Compensation

12  Program fell under the Safe Harbor Provision, it knew or acted with reckless

13  disregard of the fact that, in reality, recruiter compensation decisions were made

14  solely on the basis of recruitment.

15      49.  COCO knew, or acted with reckless disregard, or was deliberately

16  indifferent to the truth of the fact that its conduct in implementing its

17  compensation system violates the incentive compensation ban and does not

18  qualify for the regulatory Safe Harbor.

19      50.  Despite the Compensation Program's purported or documented

20  reliance on something other than recruitment numbers, salary increases for

22

1    recruiters are *in practice* determined on the sole basis of recruitment numbers.

2        51.   COCO's corporate practice with respect to awarding raises to

3    recruiters is inconsistent with its written recruiter compensation program.

4    COCO's Business Plan & Its Consequences

5        52.   COCO's business policy is "relentless" recruiting. The Company has

6    engaged in practices designed to milk the U.S. taxpayers out of every possible

7    dime in the name of providing education to underprivileged students.   COCO

8    has the highest student loan default rate of all the publicly traded for-profit

9    education companies.   Likewise, COCO has the highest student drop-out rate of

10   the publicly traded for-profit education companies, which COCO never took

11   into consideration in awarding raises to its recruiters.   Nor did COCO take into

12   consideration the student loan default rate in awarding raises to its recruiters.

13       53.   COCO lured students, especially minorities, with promises of quick

14   degrees and high paying jobs.   However, in reality these students were left with

15   loads of debt, unprepared to enter the work place.   COCO has left hundreds of

16   thousands of students with huge student loans, and virtually no training with

17   which to pay their loans.   Many of COCO's former students who have not

18   formally entered into default status are in periods of statutory forbearance due

19   to unemployment.   The result leaves U.S. taxpayers paying all the costs, while

20   COCO reaps all the rewards from its relentless recruiting practices.   COCO has

23

1    victimized the very students the Title IV, HEA Program funds were intended to

2    benefit.

3          54. COCO redoubled its already aggressive recruiting practices by

4    focusing its recruiting on high school drop-outs, beginning in 2005, when rates

5    of enrollment began to decline.    One of COCO's main objectives in the

6    recruiting process was to target high school drop-outs under a program called

7    "ability to benefit." These high school drop outs comprised 25% of COCO's

8    student population.    Tuition at COCO increased to $39,000 (compare to

9    Stanford) for the high school drop-outs being recruited by COCO's highly

10   incentivized recruiters.

11         55. Combining COCO's marketing strategy of targeting the least

12   qualified student population (high school drop-outs), along with its recruiter

13   compensation program that ties compensation directly to the number of students

14   enrolled, resulted in a massive increase in enrollments.   By 2010, COCO's

15   enrollments dramatically increased to 110,000 students from 60,000 students in

16   2006 through exploiting these at risk students under the HEA "ability to

17   benefit" eligibility.  With its heavy investment in recruitment and marketing,

18   COCO preyed on the desperation of many first generation college students

19   whose career decision-making was guided by the advice of COCO's recruiters,

20   who were induced to enroll every possible student.

56.  Defendants, MOORE and MASSIMINO, while they served as the president, chairman and chief executive officer of the institutions and of COCO, designed and implemented COCO's recruiter compensation practices.  MOORE and MASSIMINO executed Program Participation Agreements every year so that COCO could receive the federal student financial aid described herein. MOORE and MASSIMINO knew that COCO was paying incentive compensation to its recruiters, and that COCO would continue to pay incentive compensation to its recruiters, each year when they executed the Program Participation Agreements.

57.  At the time that COCO certified to the United States in its PPAs and other documents that it would not make incentive payments to admissions personnel based on their success in securing enrollments, COCO knew that it was paying and planned to continue to pay admissions personnel incentive payments strictly based on how many students they enrolled.   COCO's recruiters operated with the understanding that they would be awarded raises for exceeding the enrollment quotas assigned to their respective ranking.

58.  COCO's recruiter compensation system was an illegal attempt to circumvent the HEA's prohibition on incentive compensation, and did not qualify for safe harbor protection.  There is a direct correlation between student enrollments and recruiter compensation at COCO.

59.   COCO knew that the only factor considered in its compensation system was actual enrollments, and further assessed as the percentage of leads that were converted to enrollments by the recruiters, the L-C Ratio.   COCO's implementation of its recruiter compensation only took into account the number of students enrolled, both directly and indirectly, which COCO knew did not satisfy the Incentive Compensation Ban and Regulatory Safe Harbor.

60.   The "Good" or "Excellent" ratings for recruiters were based solely on the recruiters' L-C Ratio, *i.e.*, the recruiters' success in securing enrollments, calculated as the number of Leads that were converted to enrollments.   COCO's rating system for recruiters was nothing more than a calculation of the recruiters' enrollment percentage.   COCO's recruiter performance rating system is merely a proxy for employee recruitment numbers.

61.   COCO knowingly made false statements, certifications, and claims regarding compliance with the Incentive Compensation Ban, each year, in order to remain eligible to receive Title IV funding. COCO's statements were false when made, and caused the Department of Education to pay the claims for financial aid submitted by the students who enrolled in study at COCO.

62.      COCO has had, and continues to have, actual knowledge that it is not adhering to the incentive compensation ban, and that its representations of adherence to recruiter compensation laws to the United States have at all times

26

1 | been false.

2 |     63.  In order to deceive the U.S. Department of Education, COCO

3 | engaged in practices designed to obscure the fact that its recruiters are paid as

4 | salesmen, whose salaries were not "fixed" as required by the Safe Harbor

5 | Provisions. Rank, seniority, and compensation are not determined by the hours

6 | worked, or hire date, but are assessed solely based on the number of students

7 | recruited.

8 |

9 | **REPORTS BY INDEPENDENT AUDITORS**

10 |     64.  Specific information was brought to E&Y's attention that provided

11 | evidence concerning illegal acts in the compensation of COCO's recruiters that

12 | would have a material effect on the Company's financial statements, prior to

13 | E&Y's initial audit of the Company.

14 | *Restrictions on Payment of Bonuses, Commissions or Other*
15 | *Incentives.*
16 | The HEA prohibits an institution from providing any commission,
17 | bonus or other incentive payment based directly or indirectly on
18 | success in securing enrollments or financial aid to any person or
19 | entity engaged in any student recruitment, admission or financial aid
20 | awarding activity for programs eligible for Title IV Program funds.
21 | The DOE published new regulations, which took effect in July 2003,
22 | to attempt to clarify this so-called "incentive compensation"
23 | prohibition. The new regulations identify 12 compensation
24 | arrangements that the DOE has determined are not in violation of the
25 | incentive compensation prohibition, including the payment and
26 | adjustment of salaries, bonuses or commissions in certain
27 | circumstances. The DOE's new regulations do not establish clear

27

criteria for compliance in all circumstances, and the DOE has announced that it will no longer review and approve individual schools' compensation plans.   Nonetheless, we believe that our current compensation plans are in compliance with HEA standards and the DOE's new regulations, although we cannot provide assurance that the DOE will not find deficiencies in our compensation plans."

MD&A discussion Form 10-K, 2004 FY.

65.   E&Y intended for the United States Government to rely on E&Y's audit opinions and statements.   E&Y's audit opinions clearly reflected this intention:

"This report is intended solely for the information and use of the Board of Directors, management, others within the entity and *the U.S. Department of Education* and is not intended to be and should not be used by anyone other than these specified parties." (emphasis added)

66.   E&Y substantially assisted COCO, a Company now on the verge of bankruptcy, to engage in a massive accounting fraud, involving the surreptitious practice of paying its recruiters on the basis of how many students they enrolled in violation of the Higher Education Act, thereby defrauding the U.S. Department of Education, the States who issued licenses to COCO, and most of all, the students who enrolled at COCO.   E&Y was fully aware of "the recruiter compensation ban," and the issue of whether COCO was engaging in illegal practices came to E&Y's attention in E&Y's initial audit of COCO.   E&Y vouched for COCO by issuing unqualified, clean opinions on COCO's financial statement, which allowed COCO to collect billions of dollars of "Pell" grants

1    and government insured student loans from the U.S. Department of Education

2    which COCO was ineligible to receive. E&Y painted a false picture of a crucial

3    compliance issue for the U.S. Department of Education. COCO's

4    compensation program for its recruiters involved nothing less than salesmen

5    being paid by the head based on the number of students they enrolled, which

6    E&Y knew or recklessly disregarded.

7    67. E&Y knew that COCO's only source of revenue was the student

8    financial aid COCO received from the U.S. Government. Specifically, E&Y

9    was aware that COCO received close to ninety percent (90%) of its annual

10   revenues from Title IV student financial aid paid by the United States, and that

11   COCO could not receive those funds without the clean, unqualified audit

12   opinions from E&Y.

13   68. E&Y was aware that COCO generated an exceptionally high level of

14   growth in revenues between 2000-2010, and should have exercised professional

15   skepticism in evaluating how the Company consistently achieved higher and

16   higher enrollment targets each year.

17   69. E&Y not only endorsed COCO's recruiter compensation practices

18   with its unqualified audit opinions, but E&Y affirmatively refuted the very

19   caution made in the Management Discussion and Analysis ("MD&A") section

20   of COCO's Form 10-K, thereby enabling COCO to continue paying recruiters

29

1    based on the number of students they enrolled.  E&Y knew, but did not disclose

2    in any audit opinion provided to the U.S. Department of Education, either in the

3    financial statement footnotes or otherwise, that COCO's violations of the

4    recruiter compensation restrictions would obligate COCO to repay the U.S.

5    Department of Education billions of dollars in government revenues.

6         70.   E&Y deceived all parties.  COCO's shareholders were deceived by

7    the Company's Form 10-K filings, which never disclosed that a third party

8    accounting firm was used to perform compliance work for the audit.

9    Conversely, while the MD&A disclosure in COCO's Form 10-K filings warned

10   investors that the legality of the recruiter compensation practice was in

11   question, E&Y made no such disclosure to the U.S. Department of Education.

12   E&Y was obligated under both *Government Auditing Standards* and *Generally*

13   *Accepted Auditing Standards* to disclose in the footnotes to the financial

14   statements, or by some other means that would have alerted the U.S.

15   Department of Education, that compliance with the recruiter compensation was

16   unknown -- at best – because it affected 90% of COCO's revenues.  In addition

17   the compliance considerations, the issue should have also been addressed as an

18   audit risk and closely evaluated because recruiter compensation and marketing

19   costs accounted for 25% of COCO's expenses.

20        71.   E&Y  well  knew  that  COCO  received  billions  of  dollars  of

30

1    government education funds on the basis of its audit opinions.

2        72.   Rather than expose this fraud as auditors are required by their

3    professional standards to do, E&Y expressly "approved" the practices every

4    year by issuing clean, unqualified opinions on COCO's financial statements and

5    compliance audit.   E&Y's clean opinions on COCO's financial statements

6    concealed the massive liability to the United States resulting from the recruiter

7    compensation violations.

8        73.   E&Y completely abandoned its responsibility as COCO's auditor to

9    carefully audit COCO's recruiter compensation, at a time when disclosure was

10   most warranted, after the U.S. Department of Education formally notified the

11   Company that it would no longer provide advisory opinions as to the legality of

12   COCO's recruiter compensation practices.

13       74.   E&Y knew it was critical for COCO to meet budgeted enrollment

14   levels in order to support COCO's stock price.   The collapse in COCO's stock

15   price, due to COCO's rapidly deteriorating student loan default rate, and its

16   student drop-out rate, were the direct consequence of COCO's illegal recruiter

17   compensation practices.   E&Y thus assisted COCO in defrauding not only the

18   U.S. Department of Education, but also the shareholders, about the recruiting

19   compensation practices which eventually led to the demise of the Company's

20   stock price.   E&Y knew the adverse impact that COCO's use of salesmen-

31

1    recruiters to generate enrollments would eventually have on the Company and

2    its stock price. This known risk ultimately materialized, as COCO appears close

3    to bankruptcy, as an escalating student loan default that will soon make the

4    Company ineligible to receive the Title IV, HEA Program funds.

5    E&Y's Attempt to Disavow Compliance Responsibilities

6          75.    The mechanism employed, in an attempt to avoid responsibility for

7    evaluating and reporting COCO's violations of the recruiter compensation

8    prohibition, was to fragment the audit.  The audits were to structured in a

9    way that would attempt to shift responsibility to a third party accounting

10   firm to conduct COCO's compliance attestation. *GAAS* and *Government*

11   *Auditing Standards* do not allow such shifting of audit responsibility, as

12   both standards require the auditor to report and identify illegal acts of the

13   client that would material impact on the client's reported account balances.

14         76.   Equally important is the fact that E&Y had actual knowledge of

15   the uncertainty over recruiter compensation as explained above.

16         77.   E&Y abandoned its audit responsibility on recruiter compensation,

17   from its initial engagement through the present.   In particular, auditing

18   compliance with laws and regulations is an essential requirement under

19   *GAAS* and *Government Auditing Standards* for recipients of significant U.S.

20   government funds.   One of the professional standards governing the

32

requirement for compliance auditing, AU section 801, *Compliance Auditing Considerations in Audits of Governmental Entities and Recipients of Governmental Financial Assistance*, instructs the auditor that business enterprises that receive government financial assistance are subject to laws and regulations that may have a direct and material effect on the determination of amounts in their financial statements.

AU section 801.01

This section is applicable when the auditor is engaged to audit a governmental entity under generally accepted auditing standards (GAAS), and engaged to test and report on compliance with laws and regulations under Government Auditing Standards (the Yellow Book) or in certain other circumstances involving financial assistance such as single or organization-wide audits or program specific audits under certain federal or state audit regulations.

AU section 801.02

Specifically, this section provides general guidance to the auditor to --

a.    Apply the provisions of section 317, Illegal Acts by Clients, relative to detecting misstatements resulting from illegal acts related to laws and regulations that have a direct and material effect on the determination of financial statement amounts in audits of the financial statements of governmental entities and other recipients of governmental financial assistances (paragraphs .03 through .07).

AU section 801.06

Section 317 describes the auditor's responsibility, in an audit performed in accordance with GAAS, for considering laws and

33

regulations and how they affect the audit. Thus, the auditor should design the audit to provide reasonable assurance that the financial statements are free of material misstatements resulting from violations of laws and regulations that have a direct and material effect on the determination of financial statement amounts.

78. E&Y knew that the statements in its opinion letters that E&Y performed audits of COCO's financial statements in accordance with *GAAS* and *Government Auditing Standards* were false.

79. E&Y was deliberately indifferent to the truth of the opinion letters and statements that E&Y performed audits of COCO's financial statements in accordance with *GAAS* and *Government Auditing Standards*. E&Y intended for the United States Government to rely on E&Y's audit opinions and statements.

80. E&Y acted in reckless disregard of the truth of the statements contained in E&Y's opinion letters, and the assertion that E&Y performed audits of COCO's financial statements in accordance with *GAAS* and *Government Auditing Standards*. E&Y intended for the United States Government to rely on E&Y's audit opinions and statements.

E&Y's Reports on Internal Control Over Financial Reporting and on Compliance and Other Matters Based on an Audit of the Consolidated Financial Statements Performed in Accordance with *Government Auditing Standards*

81. The main purpose of an audit of internal control over financial reporting and on compliance is to identify the areas of "material weakness" in the client's financial reporting. E&Y's opinions and reports on internal control

34

1   over financial reporting and on compliance were false, and did not comply with

2   *Government Auditing Standards*, because they failed to identify the material

3   weakness on COCO's recruiter compensation practices, a material weakness of

4   which E&Y was fully aware.

5   AT § 501.09 The auditor's objective in an examination of internal
6   control is to form an opinion on the effectiveness of the entity's
7   internal control. Because an entity's internal control cannot be
8   considered effective if one or more **material weaknesses** exist, to
9   form a basis for expressing an opinion, the auditor should plan and
10  perform the examination to obtain sufficient appropriate evidence
11  to obtain reasonable assurance about whether material weaknesses
12  exist as of the date specified in management's assertion. A material
13  weakness in internal control may exist even when financial
14  statements are not materially misstated. The auditor is not required
15  to search for deficiencies that, individually or in combination, are
16  less severe than a material weakness.

17
18  Role of Risk Assessment

19  .23   **Risk assessment underlies the entire examination process**
20  **described by this section,** including the determination of
21  **significant accounts and disclosures** and relevant assertions, the
22  selection of controls to test, and the determination of the evidence
23  necessary to conclude on the effectiveness of a given control.
24  When performing an examination of internal control that is
25  integrated with an audit of financial statements, the same risk
26  assessment process supports both engagements.

27  .24   **The auditor should focus more attention on the areas of**
28  **highest risk**. A direct relationship exists between the degree of
29  risk that a material weakness could exist in a particular area of the
30  entity's internal control and the amount of attention that would be
31  devoted to that area. In addition, an entity's internal control is less
32  likely to prevent, or detect and correct a misstatement caused by
33  fraud than a misstatement caused by error. It is not necessary to
34  test controls that, even if deficient, would not present a reasonable

35

1    possibility of material misstatement to the financial statements.
2    [footnote omitted] (emphasis added)

3    Going Concern Qualification

4    82.    E&Y also failed to report on COCO's ability to continue as a going

5    concern if its access to the student financial aid was terminated as the result of

6    COCO's violations of the recruiter compensation ban.   Under *GAAS*, every

7    audit opinion carries the implicit assertion that there is no substantial doubt

8    about the entity's ability to continue as a going concern. "Continuation of an

9    entity as a going concern is assumed in financial reporting in the absence of

10   significant information to the contrary." AU § 341.01.

11   83.   E&Y's opinions violated *GAAS* and *Government Auditing Standards*

12   by   failing   to   disclose   how   the   uncertainty   about   COCO's   recruiter

13   compensation would impact on the Company's continued existence as a "going

14   concern."   An entity is a going concern when it has the ability to continue in

15   operation and meet its obligations.   The concept that financial statements are

16   prepared on the basis of a going concern is one of the basic tenets of financial

17   accounting.   Because the going concern assumption is so basic, the standard

18   auditor's report does not make reference to it.

19   84.   E&Y failed to meet its obligations under AU § 341, *The Auditor's*

20   *Consideration of an Entity's Ability to Continue as a Going Concern*, which

21   required E&Y to report on COCO's ability to continue as a going concern when

36

1    its recruiter compensation jeopardized its access to the Title IV Program

2    funding.

3            The Auditor's Responsibility
4
5            AU 341.02
6            The auditor has a responsibility to evaluate whether there is
7            substantial doubt about the entity's ability to continue as a
8            going concern for a reasonable period of time, not to exceed
9            one year beyond the date of the financial statements being
10           audited (hereafter referred to as *a reasonable period of*
11           *time*). ...
12
13       85.    The ability to continue operations as a going concern is one of the

14   basic standard of financial responsibility required under Agency regulations.

15

16                              **COUNT ONE**

17       (False Claims Regarding Compliance with the Higher Education Act)
18                       31 U.S.C. § 3729(a)(1) (1986)
19
20       86.    The Relators reallege and incorporate by reference all paragraphs

21   set forth herein.

22       87.    By virtue of the acts described above, defendants knowingly or

23   acting in deliberate ignorance or reckless disregard presented or caused to be

24   presented false or fraudulent claims for payment or approval to the United

25   States, in violation of the False Claims Act.

26       88.    From 2000 to 2010, Defendants knowingly presented or caused to be

37

1  presented false or fraudulent claims to the United States for payment, in

2  violation of the FCA, 31 U.S.C. § 3729(a)(1). Specifically, Defendants

3  knowingly submitted or caused to be submitted, false certifications regarding

4  compliance with the requirements of Title IV of the HEA, in, *inter alia*, its

5  PPAs and annual financial and compliance audits, as well as in student loan and

6  grant applications, in order to obtain eligibility to participate in Title IV, HEA

7  programs and receive Title IV funding, when in fact, COCO's compensation

8  system, as implemented by COCO, was not compliant with the Title IV of the

9  HEA and its associated Safe Harbor regulations. In practice, the sole factor that

10  determined changes to the compensation of COCO's admissions personnel was

11  the number of students recruited by the admissions employee during the

12  previous twelve months. In submitting or causing to be submitted such

13  certifications and applications, COCO acted with actual knowledge, reckless

14  disregard, or deliberate ignorance of the truth or falsity of the claims.

15  89.  COCO, MOORE and MASSIMINO made express representations in

16  writing to the Department of Education that it would not make incentive

17  payments to its admissions personnel based directly or indirectly on their

18  success in securing enrollments. These representations induced the Department

19  of Education to make students at COCO eligible for many forms of financial

20  aid. These representations were material to the Department of Education's

38

1    decision to make COCO eligible for these financial aid programs. At the time

2    COCO made these representations, it knew that these representations were

3    false, and would continue to be false, because COCO was paying its admissions

4    personnel incentive payments based on their success in securing enrollments.

5    Therefore, COCO fraudulently induced the Department of Education to make

6    COCO eligible to participate in the Title IV, HEA programs, and each and

7    every one of the claims it submitted or caused a student to submit violated the

8    FCA.

9        90.  Even if COCO, MOORE and MASSIMINO had not affirmed to the

10   government that it would comply with the Incentive Compensation Ban, the

11   mere fact that such compliance was material to the government's decision to

12   make COCO eligible for Title IV, HEA programs, combined with the fact that

13   COCO, knowing that it was in violation of the Incentive Compensation Ban and

14   therefore ineligible to receive such student financial aid, submitted claims for

15   student financial aid, caused students to submit claims for student financial,

16   and/or received such aid, makes COCO liable under the FCA.

17       91.  E&Y made express representations in writing to the Department of

18   Education that it performed its audits of COCO in accordance with *Generally*

19   *Accepted Auditing Standards,* and *Government Auditing Standards.* These

20   representations induced the Department of Education to make students at

39

1  COCO eligible for many forms of financial aid. These representations were

2  material to the Department of Education's decision to make COCO eligible for

3  these financial aid programs. At the time E&Y made these representations,

4  E&Y knew that these representations were false, and would continue to be

5  false, because E&Y did not perform the audit steps and procedures required

6  under *Generally Accepted Auditing Standards,* and *Government Auditing*

7  *Standards* with respect to COCO's recruiter compensation practices. Therefore,

8  E&Y fraudulently induced the Department of Education to make COCO

9  eligible to participate in the Title IV, HEA programs, and each and every one of

10 the claims it submitted or caused a student to submit violated the FCA.

11      92.   The United States has suffered damages because of these acts.

12                              **COUNT TWO**

13          (False Claims Act, 31 U.S.C. § 3729(a)(2) (1986)

14      93.   The Relators reallege and incorporate by reference all paragraphs

15 set forth herein.

16      94.   By virtue of the acts described above, defendants knowingly or

17 acting in deliberate ignorance or reckless disregard made, used, or caused to

18 made or used, a false record or statement to get a false or fraudulent claim paid

19 or approved by the United States, in violation of the False Claims Act.

20      95.   The United States has suffered damages because of these acts.

40

**COUNT THREE**

(False Claims Act, 31 U.S.C. § 3729(a)(3) (1986)

96.   The Relators reallege and incorporate by reference all paragraphs set forth herein.

97.   By virtue of the acts described above, defendants conspired to defraud the United States by getting a false or fraudulent claim allowed or paid, in violation of the False Claims Act.

98.   The United States has suffered damages because of these acts.

**COUNT FOUR**

(False Claims Act, 31 U.S.C. § 3729(a)(7) (1986)

99.   The Relators reallege and incorporate by reference all paragraphs set forth herein.

100.  Defendants knowingly committed the acts described above for the purpose of concealing, avoiding, or decreasing an obligation to pay or transmit money or property to the United States, in violation of the False Claims Act.

101.  The United States has suffered damages because of these acts.

WHEREFORE, RELATORS DEMAND JUDGMENT AGAINST DEFENDANTS AS FOLLOWS:

A.    On Counts One, Two, Three, and Four, judgment against Defendants for treble damages sustained by the United States, plus

41

1    civil monetary penalties for false claims and statements as

2    allowable by law;

3    B.   Relators respectfully seek leave of the Court to amend the

4         Complaint when the amount of damages has been fully ascertained

5         or to amend the Complaint to conform to proof at or prior to trial;

6    C.   For costs, fees, and other relief as may be just and proper;

7    D.   For a ten percent (10%) surcharge in the amount of the debt owed

8         pursuant to 28 U.S.C. § 3011.

9                          **DEMAND FOR JURY TRIAL**

10   102.  Pursuant to Rule 38 of the Federal Rules of Civil Procedure and

11   pursuant to the local rules of Court, the Relators demand a jury trial.

12   Dated:    December 15, 2011
13             Houston, Texas
14

15                                  Respectfully submitted:

16                                  Law Offices of Scott D. Levy PC

17

18
19                                  _____
                                    Scott D. Levy