BLANCA F. YOUNG (State Bar No. 217533)
Blanca.Young@mto.com
ACHYUT J. PHADKE (State Bar No. 261567)
Achyut.Phadke@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street
Twenty-Seventh Floor
San Francisco, California 94105-2907
Telephone:  (415) 512-4000
Facsimile:   (415) 512-4077

Attorneys for Defendants
Corinthian Colleges, Inc., David Moore,
and Jack D. Massimino

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| United States ex rel. Nyoka Lee, et al., <br><br> Plaintiff, <br><br> vs. <br><br> Corinthian Colleges, Inc., et al., <br><br> Defendants. | Case No. 07-cv-01984 PSG (MANx) <br><br> **DEFENDANTS CORINTHIAN COLLEGES, INC., DAVID MOORE, AND JACK D. MASSIMINO'S NOTICE OF MOTION AND RULE 12(B)(1) MOTION TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES** <br><br> [Request for Judicial Notice; Declaration of Achyut J. Phadke filed concurrently herewith] <br><br> Judge:  Honorable Philip S. Gutierrez <br> Courtroom:  880 <br> Date:  March 11, 2013 <br> Time:  1:30 p.m. |

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on March 11, 2013, or as soon thereafter as this matter may be heard, in Courtroom 880, United States Courthouse, 255 East Temple Street, Los Angeles, California 90012, before the Honorable Philip S. Gutierrez, Defendants Corinthian Colleges, Inc. (the "School") and David Moore, and Jack D. Massimino (the "Individual Defendants") will, and hereby do, move the Court for an order dismissing the instant action for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).

This Motion is made on the grounds that Relators' claims against the School and the Individual Defendants are precluded by the "public disclosure bar" to jurisdiction under False Claims Act ("FCA"), 31 U.S.C. § 3730(e)(4). Relators' action is "based upon" numerous and extensive public disclosures that predate the filing of this case. Furthermore, neither Relator qualifies as an "original source" because neither Relator has "direct" or "independent" knowledge of the information on which Relators' allegations are based; neither Relator disclosed the requisite information underlying Relators' claims to the government prior to filing suit; and neither Relator had a hand in making the prior public disclosures. Accordingly, the Court lacks subject matter jurisdiction under the public disclosure bar of the FCA, and Relators' action should be dismissed with prejudice.

This motion is based upon this Notice of Motion, the attached Memorandum of Points and Authorities, the accompanying request for judicial notice and declarations, all pleadings and records on file in this case, and any argument at the hearing of this matter.

This Motion is made following the conference of counsel pursuant to Local Rule 7-3, which took place on January 7, 2013.

19727020.2

1   DATED:  January 14, 2013

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MUNGER, TOLLES & OLSON LLP
Blanca F. Young
Achyut J. Phadke


By:_____/s/ Blanca F. Young_____
          BLANCA F. YOUNG

Attorneys for Defendants
CORINTHIAN COLLEGES, INC.,
DAVID MOORE, JACK D.
MASSIMINO

19727020.2

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................ 1

BACKGROUND ........................................................................................... 5

I.  DOZENS OF PUBLIC DISCLOSURES PREDATED THIS ACTION.......... 5

    A.  Qui Tam Litigation Against Career Schools—Including Five
        Prior Cases Brought by Relators' Counsel—Disclosed Alleged
        Violations of the Incentive Compensation Ban Throughout the
        Industry ............................................................................... 6

    B.  The School's Alleged Violation of the Incentive Compensation
        Ban Was Made Public Many Times Before This Action Was
        Filed ..................................................................................... 8

        1.  The School's Alleged Incentive Compensation Practices
            Were Disclosed at a March 2005 Congressional Hearing........... 8

        2.  Securities Class Action Plaintiffs Alleged in 2005 and
            2006 That the School Made False Statements of
            Compliance with the Incentive Compensation Ban .................... 9

    C.  The Original Complaint Rehashed Publicly Disclosed
        Allegations ........................................................................... 11

    D.  After the Original Complaint Was Dismissed, Relators Filed a
        First Amended Complaint That Again Repeated Allegations
        Already in the Public Domain .............................................. 11

II.  THIS CASE WAS MANUFACTURED BY COUNSEL AND IS NOT
    BASED ON ANY INFORMATION KNOWN TO RELATORS................. 15

    A.  The Allegations in This Action Are Not Based on Any
        Information Known by Nyoka Lee ...................................... 15

    B.  The Allegations in This Action Are Not Based on Any
        Information Known by Talala Mshuja.................................. 24

    C.  This Lawsuit Was "Put Together" by Relators' Counsel ...................... 26

ARGUMENT ............................................................................................... 29

I.  LEGAL STANDARD ............................................................................. 29

    A.  The FCA Jurisdictionally Bars Qui Tam Actions Based Upon a
        Public Disclosure if the Relator Is Not an Original Source.................. 29

**TABLE OF CONTENTS**
(continued)

Page

B.    Relators Have the Burden to Show Jurisdiction ................................... 30

C.    Under the Public Disclosure Bar, the Court Lacks Jurisdiction
      Now if It Lacked Jurisdiction over the Original Complaint ................ 31

II.   THIS ACTION IS BARRED BY THE PUBLIC DISCLOSURE RULE ...... 31

A.    This Action Is Based Upon Qualifying Public Disclosures ................. 31

      1.    The Prior Allegations of Incentive Compensation
            Violations Were Made in Qualifying Public Disclosures .......... 32

      2.    This Action Is "Based Upon" the Public Disclosures
            Because It Raises Substantially Similar Allegations ................. 32

B.    Relators Are Not Original Sources of the Information on Which
      the Allegations in This Action Are Based ............................................ 37

      1.    Relators Do Not Have Direct or Independent Knowledge
            of Information on Which Their Allegations Are Based ............ 37

      2.    Relators Did Not Disclose the Information on Which Their
            Allegations Are Based to the Government Before Filing
            This Action ................................................................................ 43

      3.    Relators Did Not Have a Hand in Any of the Public
            Disclosures ................................................................................ 44

CONCLUSION ....................................................................................................... 45

**TABLE OF AUTHORITIES**

**Page**

**FEDERAL CASES**

*A-1 Ambulance Serv, Inc. v. California,*
    202 F.3d 1238 (9th Cir. 2000) .................................................................. 30

*Aflatooni v. Kitsap Physicians Servs.,*
    163 F.3d 516 (9th Cir. 1999) .................................................................... 39

*Arbaugh v. Y & H Corp.,*
    546 U.S. 500 (2006) .................................................................................. 31

*Fed. Recovery Servs. Inc. v. United States,*
    72 F.3d 447 (5th Cir. 1995) ...................................................................... 33

*Glaser v. Wound Care Consultants, Inc.,*
    570 F.3d 907 (7th Cir. 2009) .............................................................. 31, 36

*Graham Cnty. Soil & Water Cons. Dist. v. U.S. ex rel. Wilson,*
    130 S. Ct. 1396 (2010) ........................................................................ 29, 30

*Hagood v. Sonoma Cnty. Water Agency,*
    81 F.3d 1465 (9th Cir. 1996) .................................................................... 32

*In re Nat'l Gas Royalties Qui Tam Litig.,*
    562 F.3d 1032 (10th Cir. 2009) ................................................................ 35

*Morongo Band of Mission Indians v. Cal. State Bd. of Equalization,*
    858 F.2d 1376 (9th Cir. 1988) ............................................................ 31, 36

*Robinson v. United States,*
    586 F.3d 683 (9th Cir. 2009) .................................................................... 31

*Rockwell Int'l Corp. v. United States,*
    549 U.S. 457 (2007) ............................................................................ 33, 39

*Schindler Elevator Corp. v. U.S. ex rel. Kirk,*
    131 S. Ct. 1885 (2011) .......................................................................... 1, 30

*Schultz v. DeVry Inc.,*
    No. 07-C-5425, 2009 WL 562286 (N.D. Ill. Mar. 4, 2009)................ 2, 7, 35, 38

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Seal 1 v. Seal A*,
   255 F.3d 1154 (9th Cir. 2001) ............................................................... 29

*U.S. ex rel. Boothe v. Sun Healthcare Grp., Inc.*,
   496 F.3d 1169 (10th Cir. 2007) ....................................................... 33, 34

*U.S. ex rel. Branch Consultants LLC v. Allstate Ins. Co.*,
   782 F. Supp. 2d 248 (E.D. La. 2011) ................................................... 31

*U.S. ex rel. Devlin v. California*,
   84 F.3d 358 (9th Cir. 1996) ........................................................... passim

*U.S. ex rel. Duxbury v. Ortho Biotech Prods. L.P.*,
   No. 03-12189, 2010 WL 3810858 (D. Mass. Sept. 27, 2010) ........................... 39

*U.S. ex rel. Findley v. FPC-Boron Employees' Club*,
   105 F.3d 675 (D.C. Cir. 1997) ............................................................ 36

*U.S. ex rel. Fine v. Sandia*,
   70 F.3d 568 (10th Cir. 1995) ..................................................... 32, 33, 34

*U.S. ex rel. Harshman v. Alcan Elec. & Eng., Inc.*,
   197 F.3d 1014 (9th Cir. 1999) ....................................................... passim

*U.S. ex rel. Hockett v. Columbia/HCA Healthcare Corp.*,
   498 F. Supp. 2d 25 (D.D.C. 2007) ............................................. 33, 37, 41

*U.S. ex rel. Irwin v. Significant Educ., Inc.*,
   No. 07-CV-1771 (D. Ariz. Aug. 11, 2007)) ........................................... 15

*U.S. ex rel. Jamison v. McKesson Corp.*
   649 F.3d 322 (5th Cir. 2011) ......................................................... 31, 36

*U.S. ex rel. Lee v. Corinthian Colleges Inc.*,
   655 F.3d 984 (9th Cir. 2011) ......................................................... 12, 21

*U.S. ex rel. Leveski v. ITT Ed. Services, Inc.*,
   07-cv-00867, 2011 WL 3471071 (S.D. Ind. Aug. 8, 2011) ........................... 38

*U.S. ex rel. Leveski v. ITT Educ. Servs. Inc.*,
   No. 07-cv-00867, 2012 WL 1028794 (S.D. Ind. Mar. 26, 2012) ............... 41, 45

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page**

3    *U.S. ex rel. Longstaffe v. Litton Indus. Inc.*,

4        296 F. Supp. 2d 1187 (C.D. Cal. 2003) .......................................................33, 34

5    *U.S. ex rel. Lopez v. Strayer Educ., Inc.*,

6        698 F. Supp. 2d 633 (E.D. Va. 2010) .......................................................passim

7    *U.S. ex rel. Lujan v. Hughes Aircraft Co.*,

        162 F.3d 1027 (9th Cir. 1995) ....................................................................... 33

8
     *U.S. ex rel. Meyer v. Horizon Health Corp.*,

9        565 F.3d 1195 (9th Cir. 2009) .................................................................passim

10   *U.S. ex rel. Newsham v. Lockheed*,

11       190 F.3d 963 (9th Cir. 1998) ......................................................................... 31

12   *U.S. ex rel. Precision Co. v. Koch Indus., Inc.*,

13       971 F.2d 548 (10th Cir. 1992) ...................................................................... 34

14   *U.S. ex rel. Rosales v. S.F. Housing Auth.*,

15       173 F. Supp. 2d 987 (N.D. Cal. 2001).....................................................33, 36

16   *U.S. ex rel. Settlemire v. Dist. of Columbia*

        198 F.3d 913 (D.C. Cir. 1999)....................................................................... 33
17
     *United States v. Bank of Farmington*,

18       166 F.3d 853 (7th Cir. 1999) ......................................................................... 43

19   *Wang v. FMC Corp.*,

20       975 F.2d 1412 (9th Cir. 1992) .............................................................4, 44, 45

21   **STATUTES AND RULES**

22   20 U.S.C. § 1094(a)(20) ...................................................................................5, 9

23
     31 U.S.C. § 3729(a)(2) ...................................................................................... 38
24
     31 U.S.C. § 3730(b) and (d) .............................................................................. 29
25
     31 U.S.C. § 3730(e)(4) (2007)......................................................................passim
26
     Patient Protection and Affordable Care Act,
27
         Pub. L. No. 111-148, 124 Stat. 119 ...............................................................30
28

# TABLE OF AUTHORITIES
## (continued)

**Page**

**OTHER AUTHORITIES**

34 C.F.R. § 668.14(b)(22)(ii)(A) (2010) .................................................... 5

75 Fed. Reg. 34817 (proposed June 18, 2010) (to be codified at 34 C.F.R. pt. 668.14(b)(22)(iii)(C)) ......................................... 14

*Emerging Risk? An Overview of the Federal Investment in For-Profit Education: Hearing of the Committee on Health, Education, Labor, and Pensions*, U.S. Senate, S. Hrg. No. 111-1000, 111th Cong. (June 24, 2010) ...................................................................................... 14

*Enforcement of Federal Anti-Fraud Laws in For-Profit Education: Hearing Before the Committee on Education and the Workforce*, U.S. House of Representatives, Serial No. 109-2, 109th Cong. (Mar. 1, 2005) ......................... 8

*Ensuring Student Eligibility Requirements for Financial Aid: Hearing Before the Subcommittee on Higher Education, Lifelong Learning, and Competitiveness, Committee on Education and Labor,* U.S. House of Representatives, Serial No. 111-36, 111th Cong. (Oct. 14, 2009) ................... 13

U.S. Gov't Accountability Office, *Higher Education: Information on Incentive Compensation Violations Substantiated by the U.S. Department of Education*, GAO-10-370-R (Feb. 23, 2010) .................................................. 13

## MEMORANDUM OF POINTS AND AUTHORITIES

## PRELIMINARY STATEMENT

The False Claims Act ("FCA") jurisdictionally bars qui tam actions such as this one if (1) the allegations or transactions identified in the complaint have been publicly disclosed, and (2) the relators are not "original sources" of the information on which their allegations are based.  31 U.S.C. § 3730(e)(4) (2007); *U.S. ex rel. Meyer v. Horizon Health Corp.*, 565 F.3d 1195, 1199 (9th Cir. 2009) ("*Horizon Health*").  Known as the "public disclosure bar," this rule "strike[s] *a balance* between encouraging private persons to root out fraud and stifling parasitic lawsuits." *Schindler Elevator Corp. v. U.S. ex rel. Kirk*, 131 S. Ct. 1885, 1894 (2011).  This case is a classic example of a jurisdictionally infirm "parasitic suit[] through which [relators] seek[] a reward even though [they have] contributed nothing significant to the exposure of the fraud." *U.S. ex rel. Devlin v. California,* 84 F.3d 358, 362 (9th Cir. 1996).  The allegation made by Relators—that Corinthian Colleges ("the School") falsely certified its compliance with a prohibition in the Higher Education Act ("HEA") against paying incentives to admissions personnel based on the number of students recruited to the School—was publicly disclosed many times over before Relators filed this lawsuit.  And far from having the "direct and independent" knowledge required to qualify as "original sources," 31 U.S.C. § 3730(e)(4), both Relators have admitted they have no firsthand knowledge whatsoever regarding the purported "fraud" they have alleged.  On the contrary, discovery has revealed that Relators were recruited to join a case pre-packaged by lawyers who had already (unsuccessfully) filed serial qui tam actions making identical allegations of fraud against other career schools.  This is precisely the kind of opportunistic lawsuit the public disclosure bar is intended to prevent.

Relators have the burden of showing by a preponderance of the evidence that this Court has subject matter jurisdiction over their action. *Horizon Health,* 565

1  F.3d at 1199.  The overwhelming evidence, however, shows no basis for jurisdiction

2  over this case because both elements of the public disclosure bar are satisfied.

3  *First,* the allegations and transactions in this action were disclosed in

4  numerous public sources before the Original Complaint was filed.  In 2005 and

5  2006, plaintiffs in a federal shareholder class action against the School alleged in

6  numerous court filings that the School had violated the HEA's incentive

7  compensation ban throughout its campuses.  The shareholder plaintiffs described the

8  same widespread conduct, the same alleged statutory violation, and the same alleged

9  false statements, that Relators alleged when they filed this lawsuit nearly two years

10  later.  Similarly, at a Congressional hearing in 2005, a representative of Congress

11  and a former employee of the School alleged that the School implemented a policy

12  that violated the incentive compensation ban.  Such prior allegations are

13  quintessential public disclosures under the FCA, and more than suffice to trigger the

14  public disclosure bar.  *See* 31 U.S.C. § 3730(e)(4)(A).

15  And these disclosures are only the start.  A striking feature of this case is the

16  sheer number of prior public disclosures, and the role *Relators' own counsel* has

17  played in relentlessly pursuing qui tam lawsuits based on those disclosures.  The

18  theory of liability that Relators rely on was widely disclosed in nearly a dozen

19  similar FCA lawsuits brought against a multitude of major career schools prior to

20  Relators' action.  This includes at least *five* qui tam cases filed by Relators' counsel

21  between 1999 and 2005 making substantially similar claims.  Courts have repeatedly

22  found the slew of prior litigation in this area to constitute a public disclosure of

23  allegations materially indistinguishable from Relators' claims.  *See Schultz v. DeVry*

24  *Inc.*, No. 07-C-5425, 2009 WL 562286, at *2-3 (N.D. Ill. Mar. 4, 2009); *U.S. ex rel.*

25  *Lopez v. Strayer Educ., Inc.*, 698 F. Supp. 2d 633, 642 (E.D. Va. 2010).

26  *Second*, discovery has confirmed that Relators are anything but "original

27  sources" under the FCA.  To qualify as original sources, Relators must show

28  (1) they had "direct and independent knowledge of the information on which the[ir]

allegations are based;" (2) they "voluntarily provided the information to the Government" before filing their action; and (3) they "had a hand in the public disclosure."  31 U.S.C. § 3730(e)(4)(B)(2007); *Horizon Health*, 565 F.3d at 1201. Relators cannot meet any of these requirements.

Relator Nyoka Lee not only admitted to having no direct or independent knowledge of the alleged fraud, her personal experience *directly contradicts* the central allegations in this case.  Lee worked for the School from 1999 through 2005 as a test proctor, admissions representative, and briefly (for less than three months) as a director of admission.  Lee's deposition testimony established that:

- Lee has no knowledge of any statements made by the School to the government (let alone any false statements);

- Lee has no knowledge of any claims for payment made by the School to the government;

- Lee received no promotions or raises during any time period relevant to this lawsuit (*i.e.*, after January 1, 2005), and never discussed with anyone else, at any time, how they were compensated by the School;

- Lee never evaluated or recommended anyone for a promotion or raise, and does not know what factors were considered in that process;

- Lee never held a corporate-level position and has no insight into how the School developed or implemented its compensation policies at an institutional level;

- Lee and others *followed* the School's written compensation policies, in contrast to the complaint's allegation that the School's written policies were a sham to cover up purportedly rampant illegal practices;

- Lee understood that her performance evaluations and pay increases were based on factors *in addition to* enrollment numbers, in contrast to the complaint's allegation that admissions representatives were evaluated and paid based "solely" on numbers.

NOTICE OF MOT. TO DISMISS; MEM. OF P. & A.
CASE NO 07-CV-01984 PSG (MANx)

-3-

The other Relator in this action, Talala Mshuja, conceded that his knowledge of information relating to this lawsuit is entirely derivative of other sources. Mshuja, who is Lee's brother, worked for the School periodically from 2000 to 2009 as an independent contractor proctoring tests.  In this role, he was paid an hourly wage, never received a promotion or bonus, and was never evaluated or compensated based on the policies that covered admissions staff.  Mshuja testified that Lee was his "only source" of information regarding the allegations in this case, aside from written materials he received from his attorney (which he had never previously seen), and Internet research he conducted relating to claims brought against other career schools.  Such secondhand knowledge plainly is not "direct" or "independent."  *U.S. ex rel. Devlin v. California*, 84 F.3d 358, 361 (1996).

In addition to lacking the direct or independent knowledge necessary to be original sources, Relators failed to make the requisite voluntary disclosure of information to the government before filing their initial complaint in March 2007, and had no "hand" in bringing about the public disclosures.

"*Qui tam* suits are meant to encourage insiders privy to a fraud on the government to blow the whistle on the crime.  In such a scheme, there is little point in rewarding a second toot."  *Wang v. FMC Corp.*, 975 F.2d 1412, 1419 (9th Cir. 1992).  Discovery has made abundantly clear that Relators are not "whistleblowing insider[s]," *id.*, but instead, are shills for an attorney-generated lawsuit.  Relators' depositions revealed that neither Relator initiated contact with their counsel in this action.  Instead, in 2006—long after allegations of incentive compensation violations at the School had been publicly disclosed—Relators were invited to dinner with the lawyers through a person who had served as a relator in two of five failed FCA cases Relators' counsel had already filed against other career schools. Prior to being recruited as plaintiffs, neither Relator had considered suing the School, let alone thought that the School had done anything wrong in compensating

employees involved in admissions.  Relators were not privy to any fraud and have no information of their own to contribute to this case.

Because of the many public disclosures of Relators' allegations prior to their filing this case, and because neither Relator is an "original source," this Court lacks jurisdiction over this action and should dismiss it with prejudice.

## **BACKGROUND**

## I.  **DOZENS OF PUBLIC DISCLOSURES PREDATED THIS ACTION**

The School is a for-profit educational institution focused on providing career education to students, and operates campuses throughout the United States.  (Compl. (Doc. 1) ¶¶ 2, 14.)  Many of the School's students pay for their education with financial aid from the federal government under Title IV of the HEA.  (*Id.* ¶ 23.)  To receive Title IV funds, the School enters into Program Participation Agreements, or "PPAs," with the government in which it certifies compliance with various requirements under the HEA.  (*Id.* ¶ 26.)  One such requirement is that the School "not provide any commission, bonus or other incentive payment based directly or indirectly on success in securing enrollments" to any person "engaged in any student recruiting or admission activities."  20 U.S.C. § 1094(a)(20).  From 2003 until July 2011, Department of Education ("DoE") regulations provided a "safe harbor" from this prohibition that permitted "[t]he payment of fixed compensation, such as a fixed annual salary . . . as long as that compensation is not adjusted up or down more than twice during any twelve month period, and any adjustment is not based solely on the number of students recruited, admitted, enrolled, or awarded financial aid."  34 C.F.R. § 668.14(b)(22)(ii)(A) (2010).

Relators filed this action on March 26, 2007, alleging that "[f]or a period of years, but particularly in 2005 and subsequently, [the School] made false certifications . . . to the United States" that it complied with the HEA and "did not pay commissions and other incentive compensation to its recruiters."  (Compl. ¶¶ 25, 26; *see also id.* ¶ 31.)  Relators claimed that these allegedly false statements

1  were made in PPAs the School entered with the government in order to receive

2  funds under Title IV.  (*Id.* ¶¶ 13, 25-30, 42.)  They also claimed that the School's

3  auditors, Ernst & Young ("E&Y"), assisted the alleged fraud.  (*Id.* ¶¶ 36-37, 44-49.)

4         These same allegations, however, had already been made repeatedly against

5  both the School specifically, and against the career education sector more generally,

6  long before Relators filed their Original Complaint.

7       **A.    Qui Tam Litigation Against Career Schools—Including Five Prior**
        **Cases Brought by Relators' Counsel—Disclosed Alleged Violations**
8       **of the Incentive Compensation Ban Throughout the Industry**

9         As early as 1999, counsel for Relators began bringing FCA actions materially

10  identical to this case against career schools across the country.  Prior to filing this

11  action in 2007, Relators' counsel had filed at least five other qui tam suits disclosing

12  substantially identical allegations against career schools and their auditors.[1]

13         The complaints in these earlier cases closely resemble the Original Complaint

14  here.  They each allege that the defendant career school violated the HEA ban on

15  incentive compensation; that the school signed PPAs conditioning the receipt of

16  Title IV funds upon compliance with that ban; and that the school falsely certified

17  its compliance with that ban.[2]  Three of these complaints make claims against the

18

19

20  _____

21  [1] *See U.S. ex rel. Graves v. ITT Educ. Servs., Inc.*, No. H-99-3889 (S.D. Tex.) (filed 1999) (Am. Compl. filed Apr. 23, 2002, RJN Ex. 1); *U.S. ex rel. Bowman v. Educ.*

22  *Am., Inc.*, No. 00-cv-03028 (S.D. Tex.) (Compl. filed Aug., 29, 2000, RJN Ex. 2);

23  *U.S. ex rel. Payne v. Whitman Educ. Grp., Inc.*, No. 03-cv-03089 (S.D. Tex.) (Compl. filed Dec. 3, 2002, RJN Ex. 3); *U.S. ex rel. Gay v. Lincoln Tech. Inst., Inc.*,

24  No. 01-CV-505-D (N.D. Tex) (Am. Compl. filed Sept. 17, 2002, RJN Ex. 4); *U.S. ex rel. Bott v. Silicon Valley Colls.*, No. 04-cv-0320 (N.D. Cal.) (Second Am.

25  Compl. filed July 22, 2005, RJN Ex. 5).

26  [2] *Bott* Compl. (RJN Ex. 5) ¶¶ 13, 38; *Gay* Compl. (RJN Ex. 4) ¶¶ 30, 43-44, 46;

27  *Payne* Compl. (RJN Ex. 3) ¶¶ 26, 29, 57, 67-68, 73; *Bowman* Compl. (RJN Ex. 2)

28  ¶¶ 13-14, 18-20; *Graves* Compl. (RJN Ex. 1) ¶¶ 16, 37, 40.

NOTICE OF MOT. TO DISMISS; MEM. OF P. & A.
CASE NO 07-CV-01984 PSG (MANx)

school's independent auditors.[3]  In each case, as here, the government declined to intervene.[4]  Each of these cases had been dismissed with prejudice before Relators' counsel filed this action.[5]

In addition to Relators' counsel's five unsuccessful cases, numerous other complaints publicly disclosed substantially similar allegations against career schools prior to the filing of this action on March 26, 2007.[6]  As courts have recognized, by 2007, the "critical elements" of FCA claims alleging that career schools had violated the incentive compensation ban "were disclosed through the cases filed against educational institutions based upon the same regulatory scheme and alleged conduct."  *Schultz v. DeVry Inc.*, 2009 WL 562286, at *2-3; *accord U.S. ex rel. Lopez v. Strayer Educ., Inc.*, 698 F. Supp. 2d 633, 642 (E.D. Va. 2010).  As these courts have noted, "[t]he nature of the 'false certification' claims alleged [in these types of qui tam cases] make them amenable to formulaic repetition" by

---

[3] *Bott* Compl. (RJN Ex. 5) ¶¶ 44-72; *Payne* Compl. (RJN Ex. 3) ¶¶ 79-121; *Graves* Compl. (RJN Ex. 1) ¶¶ 75-99.

[4] *Bott*, No. 04-cv-00320 (N.D. Cal. May 26, 2004) (ECF No. 8); *Graves*, No. 99-cv-03889 (S.D. Tex. May 25, 2001) (ECF No. 35); *Gay*, No. 01-cv-00505 (N.D. Tex. Feb, 26, 2002) (ECF No. 16); *Bowman*, No. 00-cv-03028 (S.D. Tex. Nov. 11, 2011) (ECF No. 10); *Payne*, No. 03-cv-03089 (S.D. Tex. Apr. 18, 2003) (ECF No. 11).

[5] *See Bott*, No. 04-cv-00320 (N.D. Cal. Oct. 5, 2005) (ECF No. 99), *aff'd* 262 F. App'x 810; *Graves*, 284 F. Supp. 2d. 487 (S.D. Tex. 2003), *aff'd* 111 F. App'x 296; *Gay*, 2003 WL 22474586 (N.D. Tex. Sept. 3, 2003), *aff'd* 111 F. App'x 286; *Bowman*, No. 00-cv-03028 (S.D. Tex. Jan. 8, 2004) (ECF No. 36); *Payne*, No. 03-cv-03089 (S.D. Tex. June 20, 2005) (ECF No. 18).

[6] *See, e.g.*, *U.S. ex rel. Main v. Oakland City Univ.*, No. 3:03-cv-00071 (S.D. Ind. Apr. 28, 2003) (RJN Ex. 6); *U.S. ex rel. Hendow v. Univ. of Phoenix*, No. 2:03-cv-00457 (E.D. Cal. Mar. 4, 2004) (RJN Ex. 7); *U.S. ex rel. Ector v. Axia College*, No. 1:05-cv-01637 (D.D.C. Aug. 15, 2005) (RJN Ex. 8); *U.S. ex rel. Gatsiopoulos v. Kaplan Higher Educ. Corp.*, No. 2:06-cv-1452 (W.D. Penn. Nov. 2, 2006) (RJN Ex. 9); *U.S. ex rel. Pilecki-Simko v. Chubb Inst.*, No. 2:06-cv-3562 (D.N.J. Aug. 2, 2006) (RJN Ex. 10); *U.S. ex rel. Ortiz v. Univ. of Phoenix*, No. 3:04-cv-00109 (W.D. Tex. Mar. 15, 2004) (RJN Ex. 11).

"unqualified relators."  *Lopez*, 698 F. Supp. 2d at 642-43.  And repeat these allegations is precisely what Relators' counsel has done in serial FCA litigation, including this case.

### B.   The School's Alleged Violation of the Incentive Compensation Ban Was Made Public Many Times Before This Action Was Filed

The relevant public disclosures go well beyond the barrage of prior qui tam complaints against other career schools.  Several additional public disclosures pre-dating the Original Complaint specifically alleged that *the School itself* violated the HEA ban on incentive compensation.

### 1.   The School's Alleged Incentive Compensation Practices Were Disclosed at a March 2005 Congressional Hearing

In March 2005, more than two years before this action was filed, the School was accused in a Congressional hearing of implementing an incentive compensation system focused exclusively on enrollment numbers.[7]  At the hearing, Representative Maxine Waters testified that career schools engaged in a "thinly disguised incentive compensation or quota system which violates the spirit and intent of the prohibition" on incentive compensation, and specifically named the School as engaging in such conduct.  (2005 Hearing Report at 19 (RJN Ex. 12).)  She also stated that the School's alleged incentive compensation practices "may have contributed" to "financial aid violations" at the School's San Jose campus, because "admissions representatives were trying to meet their quotas."  (*Id.* at 19, 20.)

Paula Dorsey, a former director of admissions at a School campus in Reseda, California, provided similar testimony, alleging that the School focused on "mere admission enrollment numbers and quotas," (*id.* at 39), and that the "main priority on each [Corinthian] campus[]" was to meet "admissions target number[s]."  Dorsey

---

[7] *See Enforcement of Federal Anti-Fraud Laws in For-Profit Education: Hearing Before the Committee on Education and the Workforce*, U.S. House of Representatives, Serial No. 109-2, 109th Cong. (Mar. 1, 2005) ("2005 Hearing Report") (RJN Ex. 12).

1    and Waters urged the government to "further investigate" the School (*id.* at 39-40;

2    *see also id.* at 20 (criticizing DoE for failing to "investigate[] the complaints of

3    multiple Corinthian students")), and to "enforce existing law."  (*Id.* at 20-21.)

4            **2.    Securities Class Action Plaintiffs Alleged in 2005 and 2006
                     That the School Made False Statements of Compliance with
5                    the Incentive Compensation Ban**

6            The public disclosure of the allegations made in this action is even more

7    pronounced in court documents filed in 2005 and 2006 in a securities class action

8    brought against the School.  *See In re Corinthian Colls. Inc. Shareholder Litig.*, No.

9    04-cv-5025 (C.D. Cal.), *appealed sub nom. Metzler Inv. GMBH v. Corinthian*

10   *Colls., Inc.*, No. 06-55826 (9th Cir.).  In that litigation, the securities plaintiffs

11   repeatedly alleged widespread violations of the incentive compensation ban and

12   false statements of compliance by School management.

13           ***2005 Securities Complaint*:**  The complaint filed by securities plaintiffs in

14   October 2005 ("2005 Securities Complaint") alleged that the School violated the

15   same statutory provision barring incentive compensation that is at issue in this

16   action—20 U.S.C. § 1094(a)(20).  (2005 Securities Complaint ¶ 226 (RJN Ex. 13).)

17   The 2005 Securities Complaint also alleged that the School and its management

18   "falsely represented that they were in compliance with Title IV regulations

19   regarding the payment of bonuses, commissions, and other incentives."  (*Id.* ¶ 224.)

20   And the 2005 Securities Complaint alleged that "bonuses and other compensation

21   was [*sic*] paid by Corinthian for admissions and recruiting activity, in violation of

22   HEA regulations."  (*Id.* ¶ 227.)

23           The 2005 Securities Complaint cited statements of School employees from

24   across the country in support of its allegations.  For example, it cited "a Senior

25   Admissions Representative at the Port Orchard, Washington campus of Bryman

26   College" who "stated that, although admissions representatives in [her] department

27   did not get commissions for hitting quotas, *hitting target numbers was a condition*

28   *of employment and determined whether a representative would receive the annual*

NOTICE OF MOT. TO DISMISS; MEM. OF P. & A.
CASE NO 07-CV-01984 PSG (MANx)

-9-

*raise of 20% or not*." (*Id.* ¶ 232 (emphasis added).)  The 2005 Securities Complaint also cited a "Senior Financial Aid Representative at Everest College in Dallas, Texas" who "said *bonuses were given to . . . department heads and individual representatives in both the admissions and financial aid departments who met their quotas*, in violation of the HEA's prohibition against incentive compensation." (*Id.* ¶ 228 (emphasis added).)  It even included allegations by staff at the same San Francisco campus of the School that employed Relators: "A former Financial Aid officer at the San Francisco campus of Bryman college until mid-2004 . . . admitted that Directors of Admissions, Directors of Financial Aid and School Presidents *received quarterly bonuses contingent upon meeting target numbers set by corporate and, therefore, had incentive to cheat*." (*Id.* ¶ 231 (emphasis added).)

The 2005 Securities Complaint also included institution-wide allegations from "a former payroll tax analyst[]" who "handled the tax-related documentation the Company produced for the bonuses," and alleged "that [the School] awarded its regional vice presidents, school presidents, directors of admissions and admissions representatives and officers bonuses ranging from $2,000 to $100,000 per employee based on their ability to meet the Company's goals.  [This former tax analyst] explained 'Bonuses were tied to the numbers, meeting their goals.'" (*Id.* ¶ 233.)

***2006 Securities Complaint*:**  The securities plaintiffs filed an amended complaint in March 2006 that re-pleaded every allegation in the 2005 Securities Complaint relating to the School's alleged violations of the HEA ban on incentive compensation.  (*See* 2006 Securities Complaint ¶¶ 234-244 (RJN Ex. 14).)

***2006 Appellate Briefing*:**  The appellate briefing in the securities class action in October 2006 again disclosed the School's alleged institution-wide violation of the ban on incentive compensation.  In their opening brief before the Ninth Circuit, the securities plaintiffs stated that the School's alleged "fraudulent practices included . . . falsely representing that Corinthian complied with Title IV's prohibition against incentive compensation for securing enrollments or financial

aid," and cited the relevant paragraphs of the 2006 Securities Complaint.
(Appellant's Op. Br. at 6-7, *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, No. 06-55826 (9th Cir. Oct. 10, 2006) (RJN Ex. 15).)  The appellate briefing confirmed that
that the alleged fraud "*was not confined to [particular campuses] but was
widespread*," and "*[b]y basing bonuses and other compensation on success in
securing enrollments or financial aid (in violation of Title IV) and threatening
termination if admissions quotas were not met, Defendants fueled the fraudulent
practices endemic throughout Corinthian.*"  (*Id.* at 22, 23 (emphasis added).)

### C. <u>The Original Complaint Rehashed Publicly Disclosed Allegations</u>

On March 26, 2007, Relators' counsel filed a qui tam complaint that parroted
these preexisting disclosures.  As in the prior disclosures, the Original Complaint in
this case alleged violations of the incentive compensation ban under Title IV of the
HEA (Compl. ¶¶ 7, 21, 26, 31); claimed that the School made false statements of
compliance with the ban (*id.* ¶¶ 25, 39-40, 42); and alleged that the School's auditor
was involved (*id.* ¶¶ 36-37, 44-49.)  The Original Complaint is a formulaic copy of
prior public disclosures against the School and other career education institutions.

### D. <u>After the Original Complaint Was Dismissed, Relators Filed a First Amended Complaint That Again Repeated Allegations Already in the Public Domain</u>

This Court dismissed the Original Complaint for failure to state a claim
because it did not allege any conduct by the School that fell outside of the "safe
harbor" permitting up to two salary adjustments per year so long as the adjustments
were not based "solely" on enrollment numbers.  (Doc. 66 at 4-5.)  The Original
Complaint alleged that a written compensation program attached as Exhibit A
demonstrated the School's non-compliance with the incentive compensation ban.
(Compl. ¶¶ 8, 31.)  However, the written program on its face conditioned salary
increases on factors besides enrollment numbers and thus was protected by the safe
harbor.  (Doc. 66 at 4-5.)  The Original Complaint also claimed that the School

violated the ban by terminating employees who failed to meet enrollment quotas, but the Court rejected that claim as well, finding that the relevant HEA provision addresses only compensation and not other employment actions.  (*Id.* at 5.)

Relators appealed to the Ninth Circuit, which affirmed this Court's dismissal of the Original Complaint, but found that leave to amend should have been granted. *U.S. ex rel. Lee v. Corinthian Colleges Inc.*, 655 F.3d 984 (9th Cir. 2011).  In its opinion, the Ninth Circuit suggested that Relators could state a claim by alleging that the School in practice did not follow its own written policies, *id.* at 996, or that elements of the written program that did not directly address enrollment numbers—such as a requirement conditioning salary increases on a "good" or "excellent" performance rating—were merely a proxy for enrollment quotas.  *Id.*

Following the Ninth Circuit's lead, Relators' counsel filed a First Amended Complaint ("FAC") on December 15, 2011.  The FAC alleged that the School's written compensation program was merely a "smoke screen used to disguise the fact that its recruiters are compensated solely based on recruitment, admission, and enrollment numbers."  (FAC (Doc. 78) ¶¶ 14, 15.)  It also alleged that the School's written program was "designed . . . for the purpose of concealing [the School's] violations" of the incentive compensation ban and the regulatory safe harbor.  (*Id.* ¶¶ 14, 48-49.)  Thus, the FAC alleged, the system used by the School to rate performance as "Good" or "Excellent" considered only enrollment numbers and no other factors.  (*Id.* ¶¶ 14-15, 60.)  Pointing to these new allegations, the Court held that the FAC stated a claim; but, the Court also found that allegations of conduct pre-dating 2005 were time-barred by the statute of limitations. (Doc. 111 at 5-7, 9.)

As with the allegations in the Original Complaint, the "new" allegations in the FAC had already been publicly disclosed.  Between the filing of the Original Complaint in March 2007, and the filing of the FAC in December 2011, a slew of additional alleged violations of the incentive compensation ban were made public that entirely anticipated the allegations added to the FAC.

A 2010 report by the Government Accountability Office ("GAO") firmly put the government on notice of alleged widespread failures to comply with the incentive compensation ban.  The GAO report summarized 32 DoE investigations resulting in findings that a school violated the ban, including 14 investigations after the regulatory safe harbors went into effect in 2003.[8]  The report added that "*[m]any of the violations involved payments by schools to their staff in the form of bonuses or commissions for successfully enrolling students in the school*."  (GAO Rep. at 5 (RJN Ex. 16) (emphasis added).)  The report also noted that 27 other schools had been identified as having potential incentive compensation violations during DoE program reviews.  (*Id.* at 6.)  Further, in addition to the 32 alleged violations, the GAO report stated that the DoE had "enter[ed] into settlement agreements with 22 other schools."  (*Id.* at 2-3.)  Thus, by 2010, the allegation of endemic violations of the incentive compensation ban in the industry was well known by DoE *and* publicly disclosed by the GAO.

In addition, multiple Congressional hearings in 2009 and 2010 disclosed potential violations of the incentive compensation ban by career schools.  At a 2009 Congressional hearing,[9] the Deputy Undersecretary of DoE argued that, under the safe harbors, institutions could engage in "what might otherwise be viewed as improper student recruiting activities by . . . unscrupulous institutions."  (2009 Hearing at 16 (RJN Ex. 17).)  At a subsequent Congressional hearing in 2010, the Inspector General of DoE stated that DoE "ha[s] reviewed compensation plans that

---

[8] U.S. Gov't Accountability Office, *Higher Education: Information on Incentive Compensation Violations Substantiated by the U.S. Department of Education*, GAO-10-370-R, at 2 (Feb. 23, 2010) (RJN Ex. 16) ("GAO Rep.").

[9] *Ensuring Student Eligibility Requirements for Financial Aid*: *Hearing Before the Subcommittee on Higher Education, Lifelong Learning, and Competitiveness, Committee on Education and Labor,* U.S. House of Representatives, Serial No. 111-36, 111th Cong. (Oct. 14, 2009) (RJN Ex. 17) ("2009 Hearing").

1   are clearly providing direct financial incentives for recruiters to increase

2   enrollment."[10]  (2010 Hearing at 38 (RJN Ex. 18).)

3        A DoE Notice of Proposed Rulemaking in June 2010 (in which DoE

4   announced the revocation of the "safe harbor") expressly stated that the "safe harbor

5   . . . has led institutions to establish, *on paper*, other factors that are purportedly used

6   to evaluate student recruiters other than the sheer number of students enrolled.

7   However, *in practice*, consideration of these factors has been minimal at best, or

8   otherwise indiscernible."  (2010 Proposed Rulemaking, 75 Fed. Reg. 34817

9   (proposed June 18, 2010) (to be codified at 34 C.F.R. pt. 668.14(b)(22)(iii)(C))

10   (RJN Ex. 19) (emphasis added).)  Thus, the use of supposedly sham compensation

11   policies that created a "window-dressing" of compliance with the incentive

12   compensation ban—a key allegation in the FAC—had been publicized by DoE *and*

13   *had already led to agency rulemaking* more than a year before the FAC was filed.

14   The FAC's allegations on this subject were publicly disclosed and entirely stale.

15        Likewise, complaints filed against career schools years before the FAC had

16   also alleged sham compensation policies at such schools.  Relators have even stated

17   to the Court that "identical violations of the Higher Education Act that are at issue in

18   this case" were raised in *U.S. ex rel. Hendow v. University of Phoenix*, No. 2:03-cv-

19   457 (E.D. Cal.), a case filed in March 2004.  (Doc. 127 at 26.)  And indeed, the

20   allegations in the FAC could have been plucked out of the complaint in *Hendow*.

21   Some seven years before the FAC (and three years before the Original Complaint),

22   the *Hendow* complaint alleged that (1) the defendant career school used a "*smoke*

23   *and mirrors*" scheme to compensate its admissions staff (*Hendow* Second Am.

24   Compl. ¶¶ 58, 59(a) (RJN Ex. 7)); (2) the school purported to use a mix of

25   quantitative and qualitative criteria to evaluate admissions staff, but in fact, there

26   ────────────────────────

27   [10] *Emerging Risk? An Overview of the Federal Investment in For-Profit Education: Hearing of the Committee on Health, Education, Labor, and Pensions*, U.S. Senate,

28   S. Hrg. No. 111-1000, 111th Cong. (June 24, 2010) ("2010 Hearing") (RJN Ex. 18).

NOTICE OF MOT. TO DISMISS; MEM. OF P. & A.
CASE NO 07-CV-01984 PSG (MANx)

was "no discussion or review of the qualitative factors" in performance evaluations, and admissions staff's "quantitative performance . . . corresponds to a performance rating . . . which in turn corresponds to a salary [increase]" (*id.* ¶ 59(a)); and (3) the school tracked enrollment numbers (*id.* ¶¶ 44-45) and those numbers provided the sole basis for any promotions or raises (*id.* ¶ 59(a)).  Moreover, *Hendow* was far from the only case alleging a "sham" or "smoke-screen" compensation scheme prior to Relators' FAC, as a slew of FCA cases brought against various career schools made that claim long before the FAC did.[11]  The FAC, like the Original Complaint, simply rehashed allegations already in the public domain.

## II.   THIS CASE WAS MANUFACTURED BY COUNSEL AND IS NOT BASED ON ANY INFORMATION KNOWN TO RELATORS

Because of the many prior public disclosures, Defendants sought early discovery as to whether Relators could show they were "original sources" under the FCA.  Pursuant to this Court's order (Doc. 131), Defendants deposed Relators on December 17 and 18, 2012.  Relators' depositions confirmed that they are anything but "original sources."  Far from being insiders who have exposed a fraud, Relators were completely unaware of any of the claims or conduct at issue until they were recruited to sue the School by a third party who has since disappeared from the case.

### A.   The Allegations in This Action Are Not Based on Any Information Known by Nyoka Lee

Relator Nyoka Lee worked for the School from November 1999 to May 2005, mostly as an admissions representative.  From November 1999 to August 2000, she

---

[11] *See, e.g.*, *U.S. ex rel. Cruz v. W. Career Coll.*, No. 07-cv-1666 (E.D. Cal. Aug. 15, 2007) (Compl. ¶ 23 (RJN Ex. 20)); *U.S. ex rel. Schultz v. DeVry*, No. 07-CV-5426 (N.D. Ill. Sept. 26, 2007) (Compl. ¶¶ 26-27 (RJN Ex. 21)); *U.S. ex rel. Torres v. Kaplan Higher Educ. Corp.*, No. 07-cv-5643 (N.D. Ill. Oct. 4, 2007) (Compl. ¶¶ 22-23 (RJN Ex. 22)); *U.S. ex rel. Irwin v. Significant Educ., Inc.*, No. 07-CV-1771 (D. Ariz. Aug. 11, 2008) (Compl. ¶¶ 43-46 (RJN Ex. 23)); *U.S. ex rel. Leveski v. ITT Educ. Servs.*, No. 07-CV-0867 (S.D. Ind. Oct. 8, 2009) (Compl. ¶¶ 30, 32, 34 (RJN Ex. 24)).

proctored tests at the School's San Francisco campus of Bryman College and was paid by the hour as an independent contractor.  (Declaration of Achyut Phadke "Phadke Decl.") Ex. A ("Lee Dep.") at 23:21-27:12; 27:19-21.)  In August 2000, she was hired as an admissions representative at the same campus and received a salary.  (*Id.* at 27:14-30:18; 36:17-23.)  She served as an admissions representative in San Francisco until May 2004, receiving two promotions and two salary increases during that period.  (*Id.* at 85:4-87:19; 132:3-10; Lee Dep. Ex. 7 (Phadke Decl. Ex. I) at R00077.)  Lee then worked as a director of admissions supervising admissions representatives at the Hayward campus of Bryman College for two-and-a-half months before being terminated in August 2004.  (*Id.* at 96:25-100:4.)  During that short time period—which was the only time Lee held a management-level position at the School—Lee never evaluated anyone's performance or recommended anyone for a salary increase or promotion, nor did she receive any bonus, salary increase, or promotion herself.  (*Id.* at 98:15-99:20; 101:8-103:3; 104:9-16; 116:2-117:4;118:2-16; *see also id.* at 159:22-162:2.)  Lee was rehired by the School in November 2004 and worked as an admissions representative at the San Jose and San Francisco campuses until May 2005, when she was terminated.  (*Id.* at 119:17-121:4; 124:5-11; 125:3-126:2; 130:4-6; 132:24-133:25. )  Lee did not receive a salary increase, promotion, or bonus after being rehired in November 2004, either.  (*Id.* at 124:12-125:2; 125:23-126:2; 128:10-17; 130:7-24.)  This work history, coupled with Lee's deposition testimony, makes clear that she has no knowledge of the purported fraud alleged in this case.

> ***Lee has no knowledge of any violation of the incentive compensation ban.***
At the heart of this case is Relators' allegation that the School paid admissions representatives and directors of admission based "solely" on the number of students recruited to the School, in violation of the HEA and the relevant safe harbor.  But Lee could point to *nothing* in her personal experience at the School to show that she—or anyone else—was compensated on this basis alone.  In fact, Lee's

NOTICE OF MOT. TO DISMISS; MEM. OF P. & A.
CASE NO 07-CV-01984 PSG (MANx)

testimony frequently contradicted allegations in the complaint about the School's compensation practices.

For instance, Lee repeatedly contradicted the FAC's central allegation that "[d]espite [the School's] . . . purported or documented reliance on something other than recruitment numbers," "salary increases [for admissions representatives] are *in practice* determined on the sole basis of recruitment numbers."  (FAC ¶ 50.)  Lee testified that over a dozen non-enrollment related criteria set forth in written compensation guidelines for admissions representatives accurately described her job responsibilities, and that she understood her performance would be evaluated, and she would be eligible for a raise or promotion, based on those criteria.  (Lee Dep. 66:3-72:18; 121:7-123:11; 352:19-354:12; 359:21-361:24 (testifying that "[p]art of my performance" and "[p]art of my raise" was based on compliance with 18 measures set out in the written compensation program)).)  These criteria included the promptness and accuracy of communications with prospective students; accurate classification of student inquiries; compliance with applicable regulations; ensuring pre-start paperwork was completed; and the accuracy of the employee's recordkeeping, among a number of other qualitative requirements.  (*Id.* at 67:6-72:18; *see* Lee Dep. Exs. 5, 13 (Phadke Decl. Exs. G, K).)

Also contrary to the FAC's allegation that the School's practices deviated from written policies, Lee conceded that "in [her] experience the directors of admissions, the other people that were responsible for determining promotions and salary raises . . . just did what the written policy told them to do" and that "the written policy is what [she] followed."  (*Id.* at 114:2-115:11; *id.* at 114:20-24 ("Q: . . . So if we want to figure out what the practices were like, we should look at the written policies? A: Yeah, that or the brochures or whatever corporate sends you or whatever"); *id.* at 170:6-19.)  Lee did not recall anyone at the School ever saying that the School did not follow its written compensation plan for admissions

1   representatives, (*id.* at 64:13-66:1), nor was she ever told she should not follow the

2   School's written policies and procedures.  (*Id.* at 170:16-23.)

3          Additionally, Lee conceded that supervisors had "discretion" in promoting

4   admissions representatives (*id.* at 115:12-19), and that at least "part of" the basis for

5   awarding a raise or promotion were the qualitative factors listed in written

6   compensation programs (*id.* at 360:21-362:22)—facts that cannot be squared with

7   the FAC's allegation that raises were given lock-step based "solely" on enrollment

8   numbers.  (FAC ¶¶ 11-15.)  Similarly, Lee admitted that although she does not recall

9   the reason for a raise she received in 2002, the explanation for the raise in

10  documentation that she signed was entirely unrelated to her enrollment numbers.

11  (Lee Dep. 88:8-90:4 (acknowledging that the documented basis for the raise was

12  that she was "hired in at a very low wage and new employees with less experience

13  are hired in at [higher] wages . . . due to high cost of Bay Area"); *see* Lee Dep. Ex. 8

14  (Phadke Decl. Ex. J).)  This again flatly contradicts the FAC's allegation that salary

15  increases were based "solely" on the number of students enrolled.

16         Lee also knew no information that supports the FAC's central allegation that

17  non-numerical criteria in the written compensation program were in reality a

18  "proxy" for enrollment numbers.  (FAC ¶ 60.)  As noted, the FAC alleges that

19  performance ratings of "Good" or "Excellent," which were required for a salary

20  increase under the written program, were based exclusively on enrollment numbers.

21  (*Id.*)  All of the written performance evaluations for Lee, however, show that she

22  earned "Excellent" ratings based on points awarded for more than a dozen non-

23  numerical criteria plus a narrative write-up exclusively addressed to her qualitative

24  performance.  (*See* Lee Dep. Exs. 6, 7 (Phadke Decl. Exs. H, I).)  Discussing these

25  evaluations, Lee repeatedly admitted that she did not know what factors her

26  supervisors considered when scoring the form, or the extent to which those scores

27  determined whether she got a promotion or raise.  (*See* Lee Dep. 72:19-73:7

28  (admitting that she did not know what evaluation criteria her supervisor used to

evaluate her on qualitative job requirements); *id.* at 74:9-15 (same); *id.* at 77:3-79:24 (same); *id.* at 95:2-21 (same); *id.* at 93:23-94:12 (conceding her lack of knowledge as to whether her performance review scores informed the decision to give her a promotion); *see also id.* at 74:23-79:24 (discussing performance review).)  If anything, Lee believed that her qualitative scores reflected an "honest" evaluation— a far cry from the sham evaluations alleged in the FAC.  (*Id.* at 79:22-80:20 (testifying that a review given by her supervisor in 2003 when recommending her for a promotion—which mentioned Lee's "outstanding work ethic," "attention to detail," and "excellent customer service," but said nothing about enrollment numbers—was something Lee's supervisor was "feeling honest about.").)

Significantly, Lee herself never filled out a performance evaluation form or recommended any admissions representative for a promotion or salary increase. During her two-and-a-half months as director of admission at the Hayward campus in 2004, Lee never gave an admissions representative a promotion or performance review (*id.* at 101:19-102:7), nor did she have any discussions with her supervisors about what criteria to consider in doing so.  (*Id.* at 102:12-103:3.)  Other than her brief stint as a director of admission, Lee was never in a position to give performance evaluations.  (*Id.* at 31:23-32:2.)  Her only experience with performance evaluations, in other words, is her own receipt of them; an experience that led her to understand that the School's practice *followed* its written policies, and that factors *in addition to* enrollments were considered in evaluating and compensating employees.  *See supra* at 17.

For similar reasons, Lee has no knowledge of facts supporting the FAC's allegation that the School deliberately designed its written compensation programs and performance rating system to cover up its purportedly unlawful practices.  (FAC ¶¶ 14, 47-49, 59-63.)  Lee had no responsibility for or involvement with developing the compensation programs or performance evaluation forms for admissions representatives or directors of admission.  (Lee Dep. 155:19-159:21.)  She had no

NOTICE OF MOT. TO DISMISS; MEM. OF P. & A.
CASE NO 07-CV-01984 PSG (MANx)

1   knowledge of how those materials were developed, who was involved, what factors
2   were considered, or what the intent was, in developing those materials.  (*Id.*)

3            Despite her admitted lack of insight into the performance evaluation and
4   compensation process, Lee stated at her deposition that her eligibility for salary
5   increases and promotions depended on meeting her "numbers."  (*Id.* at 41:6-42:17;
6   90:11-17.)  However, when pressed, she could not provide any details of any
7   conversation in which anyone told her promotions or raises were based exclusively
8   on enrollment numbers.  (*Id.* at 44:3-46:2; 82:2-83:8; 90:5-91:7.)  Nor could she
9   identify any document indicating that her compensation (or anyone else's) was tied
10  to numbers alone.[12]  (*See id.* at 149:6-150:7.)  The only compensation-related
11  documents that Lee was aware of relate to how she, personally, was compensated,
12  (*id.*), and as Lee herself confirmed, those documents *contradict* the allegation that
13  raises and promotions were based "solely" on enrollment numbers.  (*Id.* at 66:3-
14  72:18; 77:12-80:20; 121:7-123:11 & Lee Dep. Exs. 5, 6, 7, 13 (Phadke Decl. Exs. G,
15  H, I, K) (identifying numerous non-numerical criteria on which performance was
16  evaluated and raises depended); *id.* at 88:10-89:4 & Lee Dep. Ex. 8 (Phadke Decl.
17  Ex. J) (raise based entirely on non-numerical factors); *id.* at 354:4-12 (conceding
18  that "to figure out if you had met [the] numbers" required for a raise "you would
19  refer to the written program," which was the "same document that would govern
20  *other factors* that went into whether or not you got a raise." (emphasis added).)

21           In the end, the only factual basis Lee identified for her statement that raises
22  and promotions depended on "numbers" was that she had heard employees could be
23  fired for failing to meet enrollment targets set out in the written guidelines, and was
24  herself terminated for that reason.  (*Id.* at 48:11-16 ("Q: . . . [W]ho told you you

---

25
26  [12] In discovery, Relators produced a number of reports, referred to as "flash reports,"
    that summarize enrollment numbers, but as Lee admitted, these flash reports
27  nowhere mention compensation. (Lee Dep. 149:6-150:7.)  In fact, Lee testified that
    the only purpose of the reports was to encourage competition.  (*Id.* at 241:1-15.)
28

NOTICE OF MOT. TO DISMISS; MEM. OF P. & A.
CASE NO 07-CV-01984 PSG (MANx)

have to enroll students to get a raise.  A: Well, they didn't say, 'You have to enroll students to get a raise.'  They said, 'You have enroll students to keep your job.'  Now, if you kept your job, you could get a raise."); *id.* at 49:5-52:17 (testifying that she arrived at the "bottom line" that raises depended on enrollment numbers because her job was to enroll students, and "if you don't meet your numbers . . . you get fired"); *see also id.* at 203:17-205:13 & Lee Dep. Ex. 13 (Phadke Decl. Ex. K).)[13] But, as this Court and the Ninth Circuit have held, terminating employees for failing to meet admissions targets is not prohibited under the HEA.  (Doc. 66 at 5); *U.S. ex rel. Lee v. Corinthian Colleges Inc.*, 655 F.3d 984, 992-93 (9th Cir. 2011).

   ***Lee has no firsthand knowledge of how directors of admission were compensated, other than by a fixed salary.***  The FAC claims that the School paid directors of admission "depend[ing] solely on the number of students who enroll at [their] campus," but that, too, is inconsistent with Lee's personal experience.  (FAC ¶ 45.)  Lee was paid a fixed salary when she was a director of admission, and never received a bonus or salary increase.  (Lee Dep. 98:12-21; *see id.* at 134:8-21.)  Moreover, she is unaware of any document explaining how directors of admission were compensated by the School.  (*Id.* at 150:4-7.)  Other than her own brief experience as a director of admission, Lee's only knowledge of how directors of admission were compensated is entirely secondhand, as it is based solely on Lee's conversations with the director of admission who supervised her when she was an admissions representative in San Francisco until 2004.  (*Id.* at 152:16-153:16.)

   ***Lee has no knowledge of the School's compensation practices during any time period at issue in this action.***  Not only does Lee have no information about any improper compensation practices at the School, she has no information whatsoever from the time period relevant to this case.  As the Court has held, all

---

[13] At other times, Lee testified that admissions representatives would be terminated based on their "attitude" and "marketing plan," not just "numbers."  (Lee Dep. 112:5-9.)

claims pre-dating January 1, 2005 are barred by the statute of limitations.  While this action therefore covers conduct *only* from that date forward, every promotion and salary increase Lee received occurred *before* January 1, 2005.  (Lee Dep. 144:6-20.)  Moreover, Lee left her employment with the School in May 2005 and testified that she had no idea how "admissions was run" after her departure from the School.  (*Id.* at 91:7-92:9.)  Indeed, Lee could not name a single admissions representative or director of admission who received a promotion or salary increase after January 1, 2005.  (*Id.* at 153:17-154:2.)  She also has not communicated with any witness listed on Relators' Rule 26 disclosures since 2005.  (*Id.* at 227:7-9; 236:15-17.)

Lee also is not the source of any documentary evidence from the relevant time period.  Relators' counsel has produced documents that post-date Lee's departure from the School (bearing dates from late 2005 and 2006), but Lee testified those documents did not come from her, and she has no idea how those documents came into her counsel's possession.  (*Id.* at 247:4-258:23.)

***Lee has no knowledge of the School's compensation practices across the country.***  Lee also has no knowledge of the purportedly rampant violations of the incentive compensation ban at School campuses throughout the country, as alleged in the complaint.  Lee never discussed compensation with any other admissions representative at any time, and never so much as visited a School campus other than the three Bay Area campuses where she worked.  (Lee Dep. 115:23-116:20; 139:17-143:18; 143:19-23.)  Nor did Lee ever hold a management- or corporate-level position that might have provided insight into how other campuses operated.  As Lee admitted, she was never privy to corporate-level discussions relating to the evaluation or compensation of admissions staff.  (*Id.* at 159:22-162:2; 158:13-25.)

***Lee has no knowledge of any statement made by the School to the government.***  Lee also knows nothing about the complaint's allegations pertaining to the School's supposed false statements.  The complaint alleges that the School falsely certified in PPAs with the government that it complied with the HEA ban on

incentive compensation.  (Compl. ¶¶ 13, 25, 39-43; FAC ¶¶ 32-36, 47.)  But Lee
admitted that she had no idea what a PPA was (Lee Dep. 164:10-165:2); that she
was not aware of any agreement of any kind between the School and the
government (*id.* at 165:3-166:4); and that she never communicated with the
government on behalf of the School and was not aware of any such communications
by anyone else (*id.* at 166:24-167:11).  Further, Lee admitted that she was not aware
of any legal or regulatory requirements relating to the compensation of recruiters,
and was unable to describe any pertinent feature of the HEA.  (*Id.* at 170:24-
171:18.)  Indeed, Lee testified that she was not aware of the incentive compensation
ban until after "working on this case."  (*Id.* at 171:24-173:12.)

   ***Lee knows nothing about claims the School allegedly submitted to the
government***.  The alleged false "claims" identified in this action are claims for
federal financial aid funds (Compl. ¶¶ 40-42), another subject that Lee admitted she
knows nothing about.  Lee testified that she was not involved in financial aid and
has never submitted or even seen a claim for payment by the School to the federal
government.  (Lee Dep. 166:5-167:11.)

   ***Lee has no knowledge regarding the Individual Defendants.***  Lee is
similarly ignorant regarding the allegations against the Individual Defendants,
School executives Jack Massimino and David Moore.  These defendants are alleged
to have signed the School's PPAs and "monitored and approved" of the purportedly
illegal compensation practices.  (FAC ¶¶ 6, 7, 56, 89; Orig. Compl. ¶ 15.)  Lee could
not say who Massimino or Moore were and never communicated with either
Defendant.  (Lee Dep. 162:3-164:9.)  She guessed, incorrectly, that they were
affiliated with a different career school, the University of Phoenix.  (*Id.*)

   In short, Lee has no information of her own to offer regarding the allegations
in this case.  She is unaware of a single violation of the incentive compensation ban,
a single false statement, or a single claim submitted to the federal government, let
alone the endemic "fraud" alleged in this action.

### B.   The Allegations in This Action Are Not Based on Any Information Known by Talala Mshuja

Relator Talala Mshuja similarly has no direct knowledge of information regarding any of the allegations asserted in this action.

Mshuja, who is Lee's brother, worked for three stints from 2000 to 2009 at three School campuses in Northern California, always as an independent contractor providing test proctoring services.  (FAC ¶ 3; Phadke Decl. Ex. 2 ("Mshuja Dep.") at 79:11-80:6; 81:23-82:19; 86:19-88:24.)  This work provided him with no information relating to the allegations in this case.  He was never a salaried School employee and his pay never depended on how many students he recruited; rather, he was always paid an hourly wage.  (Mshuja Dep. 82:11-83:11.)  Mshuja never had an e-mail address at the School and did not have access to the School's file system or network, or any corporate documents.  (*Id.* at 89:15-92:18.)

Mshuja was never an admissions representative or a director of admissions at the School.  (*Id.* at 92:20-93:2.)  His pay was never based on compensation policies that covered admissions representatives or directors of admission, and he never gave or received a performance review.  (*Id.* at 93:3-95:2.)  He was never paid a performance bonus or commission.  (*Id.* at 82:20-83:11.)

Given these facts, it is no surprise that Mshuja admitted to having no personal knowledge of the School's compensation practices for admissions representatives or directors of admissions.  Mshuja admitted that Lee was the only person he ever talked to at the School about how admissions staff were compensated by the School, and that she was his "only source" of information on that subject.  (*Id.* at 191:10-192:17; 193:20-194:11.)  Lee, however, stated that she did *not* communicate with Mshuja about her work at the School.  (Lee Dep. 187:7-13.)  Taking Relators' testimony together establishes that Mshuja had no knowledge—not even secondhand knowledge—about the School's alleged compensation practices.

1    Mshuja also testified that his knowledge of the allegations in this case was

2    informed by materials he received from his counsel and from his own research on

3    the Internet.  (Mshuja Dep. 77:15-78:22.)  Starting in 2006, Mshuja's attorneys sent

4    him materials concerning "profit schools . . . and a variety of issues related to

5    education and schools."  (*Id.* at 30:6-31:6; 31:18-22.)  These materials included

6    information about claims then being brought against other career schools, including

7    news reports about how other schools were compensating admissions staff and

8    about lawsuits against other schools.  (*Id.* at 30:11-14; 31:23-33:24.)  Mshuja had

9    never seen these materials before receiving them from counsel.  (*Id.* at 77:15-78:22.)

10    Mshuja then learned more about "what was going on" by doing Internet

11    research.  (*Id.* at 34:5-25; 37:15-38:22; *see also id.* at 42:24-43:6; 45:21-46:11.)  His

12    research was primarily about claims brought against other career schools, (*id.* at

13    42:24-43:6), including claims he could bring against career schools and research

14    into allegations that career schools had paid admissions staff incentive

15    compensation.  (*Id.* at 34:24-25; 35:11-38:22.)  Mshuja learned of three to five other

16    lawsuits against career schools before filing this case.  (*Id.* at 45:21-46:11.)  Other

17    than whatever Lee might have told him and information he received from his

18    attorney or the Internet, Mshuja could identify no other basis for his knowledge of

19    the alleged fraud.  (*Id.* at 77:15-78:22.)

20    As Mshuja also readily admitted, he has no direct or independent knowledge

21    of any documents or witnesses that support Relators' claims.  Mshuja was not the

22    source of any of the documents that Relators' counsel produced in response to

23    discovery requests on public disclosure and original source issues.  (*Id.* at 169:21-

24    171:10.)  Further, Mshuja played no part in the preparation of Relators' Rule 26

25    disclosures and did not know the vast majority of witnesses listed on that document.

26    (*Id.* at 201:15-220:5; *see id.* at 215:14-22.)  As to the few he did know, his only

27    basis for believing they had information relevant to Relators' claims was that they

28

1  held positions in the School's admissions department at certain times.  (*Id.* at
2  209:23-210:23; 212:2-23; 216:4-217:17; *see id.* at 208:6-25.)

3      Like Lee, Mshuja also admitted that he lacked any knowledge as to any
4  statements or claims that the School allegedly made to the government: (1) he did
5  not know what a PPA was (*id.* at 140:5-141:12); (2) he was unable to describe any
6  legal or regulatory restrictions pertaining to the compensation of admissions
7  representatives (*id.* at 141:13-145:10), and he was not aware of applicable Title IV
8  requirements before meeting his counsel in 2006 (*id.* at 144:8-24); (3) he had never
9  communicated with the government on behalf of the School and could not identify
10 any communications between the School and the government (*id.* at 148:14-152:12);
11 (4) he had never seen any claims for payment made by the School to the government
12 (*id.* at 151:20-152:12); and (5) he had never heard of Defendants Moore or
13 Massimino prior to his and Lee's depositions.  (*Id.* at 155:2-157:10.)[14]

14      **C.    This Lawsuit Was "Put Together" by Relators' Counsel**

15      How did these individuals, who know absolutely nothing about the alleged
16 fraud, become involved in this case? As Relators testified at their depositions, they
17 were recruited to bring the instant suit through a person named Susan Newman, who
18 had worked with Relators' counsel as a relator in at least two prior FCA cases
19 against career schools.[15]

20      Newman, who was a co-worker of Talala Mshuja's in 2006 at the Institute for
21 Business and Technology ("IBT") (which is unaffiliated with the School), "called"
22 Mshuja to a dinner meeting in San Jose in 2006, asking him to "be involved" and

23 _____

24 [14] A chart comparing the allegations in the Original Complaint and FAC against
25 Relators' deposition testimony is attached as Appendix A.

26 [15] *See U.S. ex rel. Mounthasone Bott & Susan Newman v. Silicon Valley Colls., Inc.*,
   No. 04-cv-0320 (N.D. Cal. July 22, 2005) (RJN Ex. 5); *U.S. ex rel. Dan Graves &*
27 *Susan Newman v. ITT Educ. Servs., Inc.*, No. H-99-3889 (S.D. Tex. Apr. 23, 2002)
28 (RJN Ex. 1).

NOTICE OF MOT. TO DISMISS; MEM. OF P. & A.
CASE NO 07-CV-01984 PSG (MANx)

"take a look at what was going on" with "the practices of [Corinthian and IBT]." (Mshuja Dep. 101:12-103:18; 21:14-22:14; 164:21-25; *see* Lee Dep. 174:15-175:17 (noting that Relators' counsel was "recommended" to Lee by Newman).)

At the dinner meeting, Mshuja met Mark Labaton and Scott Levy—attorneys who would go on to become Relators' counsel in this action—for the first time. (Mshuja Dep. 129:18-21.) Also at the dinner were Newman and John Chacon, a former School employee in San Jose whom Mshuja had never spoken to before. (*Id.* at 101:23-25; 20:3-21:13; 166:2-8.) According to Mshuja, it was "more than likely" Newman who brought up the School's "practices and admissions" at this dinner, and the discussion at the dinner concerned admissions representatives. (*Id.* at 111:13-112:10.) When Mshuja attended the dinner in San Jose, he was not looking for legal counsel and, in fact, "didn't know what was going on." (*Id.* at 109:9-16.)[16]

During that initial dinner, Mshuja offered to contact his sister, Nyoka Lee, because of her prior work in admissions at the School. (*Id.* at 113:24-114:20.) Everyone at the dinner agreed to meet again soon. (*Id.* at 115:13-116:2.) A second dinner took place a few days later at a restaurant in San Mateo, California. (*Id.* at 121:25-122:3; 128:2-20.) Lee attended that dinner at the invitation of her brother, along with everyone who was at the first dinner, including counsel. (*Id.* at 121:13-24; 122:11-13; Lee Dep. 180:18-23.)[17] Neither Lee nor Mshuja paid for dinner. (Lee Dep. 181:11-17; Mshuja Dep. 128:22-24.)

Prior to meeting her future attorneys at this dinner, Lee had not thought about bringing a suit against the School; she did not think the School had engaged in any

---

[16] Despite the fact that Mshuja did not intend to retain counsel at the time of this dinner, Relators' counsel instructed him not to answer further questions regarding discussions with counsel at this dinner, claiming those communications were privileged. (Mshuja Dep. 116:3-120:7.)

[17] Mshuja stated that, sometime after the second dinner, Newman and Chacon agreed to be co-relators in this case. (Mshuja Dep. 120:9-121:9.) Newman and Chacon, however, are not named as relators in any pleading filed in this case.

fraud; and she did not believe the School had done anything improper in the way it compensated admissions representatives.  (Lee Dep. 181:24-183:5.)  According to Lee, she decided to hire Scott Levy after he told her he was interested in working with her because "he felt at that particular time that Corinthian Colleges was involved in some default . . . and that he wanted to defend [sic] this case right now[.]"  (Lee Dep. 196:8-21.)  As Lee admitted, it was Levy, not her, who "put this lawsuit together."  (*Id.* at 173:6-23.)  After the dinner in San Mateo in 2006, Lee did not meet Levy again until December 16, 2012—the day before her deposition in this action.  (*Id.* at 191:7-12.)

Mshuja likewise admitted that, before the first dinner in San Jose, he had not thought about suing the School.  (Mshuja Dep. 123:14-17.)  Only after the second meeting, with the "input of everyone involved [at the dinner]," did Mshuja begin to think about retaining counsel.  (*Id.* at 117:20-118:21.)  Mshuja also could not recall whether, prior to the first dinner, he was even aware that the School was supposedly violating the ban on incentive compensation.  (*Id.* at 130:10-18.)  Indeed, even as of his deposition, he admitted that it had never crossed his mind that the School was not following its policies for compensating admissions representatives and directors of admissions.  (*Id.* at 163:16-164:7.)

Nonetheless, Mshuja was "spur[red]" to bring this case by information he learned through his attorneys and his Internet research.  In particular, Mshuja was "spur[red]" to pursue this case by learning of a lawsuit against the University of Phoenix and a fine that the University of Phoenix paid for incentive compensation violations in 2004, (*id.* at 44:4-17), as well as a purported $8.6 million judgment against the School in 2007 (which does not, in fact, exist, raising questions about how Mshuja learned that false information).  (*Id.* at 43:14-44:3.)

# ARGUMENT

## I.    LEGAL STANDARD

### A.    The FCA Jurisdictionally Bars Qui Tam Actions Based Upon a Public Disclosure if the Relator Is Not an Original Source

The FCA allows private parties, called "relators," to pursue "qui tam" actions to help the government recover monies it has paid as a result of fraud.  31 U.S.C. § 3730(b).  A prevailing relator may collect a bounty of up to 30% of any recovery by the government.  *Id.* § 3730(d)(2).  However, the FCA imposes strict jurisdictional limits on such actions, in an attempt to "strike a balance between encouraging private persons to root out fraud" while "stifling parasitic lawsuits" by individuals who seek a cut of the government's award but have nothing substantial to contribute to the exposure of the alleged fraud.  *Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 130 S. Ct. 1396, 1407 (2010); *accord Seal 1 v. Seal A*, 255 F.3d 1154, 1158 (9th Cir. 2001).  One such limitation is the public disclosure bar, which "deprives courts of jurisdiction over *qui tam* suits when the relevant information has already entered the public domain through certain channels."  *Graham*, 130 S. Ct. at 1401.  The public disclosure bar provides, in relevant part:

> (A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.
>
> (B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily

1
2

provided the information to the Government before filing an action

under this section which is based on the information.

3    31 U.S.C. § 3730(e)(4)(A)-(B) (2007).[18]  The statute calls for a two-step inquiry:

4          *First*, the Court "must determine whether there has been a prior 'public

5    disclosure' of the 'allegations or transactions' underlying the qui tam suit.'"  *U.S. ex*

6    *rel. Meyer v. Horizon Health Corp.*, 565 F.3d 1195, 1199 (9th Cir. 2009) ("*Horizon*

7    *Health*").  This requires both that (1) the disclosure take place in a manner specified

8    by section 3730(e)(4)(A)—*i.e.*, "in a criminal, civil, or administrative hearing, in a

9    congressional, administrative, or Government Accounting Office report, hearing,

10   audit, or investigation, or from the news media;" and that (2) Relators' allegations

11   are "based upon," or "substantially similar" to, the allegations or transactions that

12   were publicly disclosed.  31 U.S.C. § 3730(e)(4)(A); *A-1 Ambulance Serv., Inc. v.*

13   *California*, 202 F.3d 1238, 1243 (9th Cir. 2000); *Horizon Health*, 565 F.3d at 1199.

14         *Second*, if there has been a prior public disclosure under the FCA, the Court

15   "next must inquire whether the relator is an 'original source'" of the information on

16   which the allegations in the complaint are based.  *Horizon Health*, 565 F.3d at 1199.

17   The Court lacks jurisdiction if the relator is not an original source.  *Id.* at 1198-99.

18         **B.     Relators Have the Burden to Show Jurisdiction**

19         "Relators, as qui tam plaintiffs, bear the burden of establishing subject matter

20   jurisdiction by a preponderance of the evidence."  *Id.*  Plaintiffs hold this burden "at

21

22

23

---

24   [18] The Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat.
25   119, modified the language of 31 U.S.C. § 3730(e)(4), but the Supreme Court has
     held that the amendment is not retroactive and does not apply to "pending cases."
26   *Schindler*, 131 S. Ct. at 1889 n.1; *Graham Cnty.*, 130 S. Ct. at 1401 n.1.  The initial
     complaint was filed in 2007, when the prior version of § 3730(e)(4) was in effect.
27   Accordingly, only the 2007 version of the statute is discussed here.  For the Court's
     convenience, the 2007 version of § 3730(e)(4) is attached as Appendix B.
28

NOTICE OF MOT. TO DISMISS; MEM. OF P. & A.
CASE NO 07-CV-01984 PSG (MANx)

each stage of the jurisdictional analysis." *Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 913 (7th Cir. 2009). [19]

## C.   Under the Public Disclosure Bar, the Court Lacks Jurisdiction Now if It Lacked Jurisdiction over the Original Complaint

In FCA matters as in other federal cases, "[i]n determining federal court jurisdiction," the Court must first "look to the original, rather than to the amended, complaint.  Subject matter jurisdiction must exist as of the time the action is commenced." *Morongo Band of Mission Indians v. Cal. State Bd. of Equalization*, 858 F.2d 1376, 1380 (9th Cir. 1988); *see U.S. ex rel. Jamison v. McKesson Corp.* 649 F.3d 322, 328 (5th Cir. 2011) (looking to the allegations in FCA relator's original complaint to determine whether the court had jurisdiction under the public disclosure bar, pursuant to the "longstanding rule that the amendment process cannot be used to create jurisdiction retroactively where it did not previously exist") (internal quotation marks and citation omitted); *accord U.S. ex rel. Branch Consultants LLC v. Allstate Ins. Co.*, 782 F. Supp. 2d 248, 264 (E.D. La. 2011); *cf U.S. ex rel. Newsham v. Lockheed*, 190 F.3d 963, 969 (9th Cir. 1999) (applying 1988 version of public disclosure bar where original complaint was filed in January 1988).  Accordingly, if the Court lacks jurisdiction over the Original Complaint filed in March 2007, that ends the inquiry.

## II.   THIS ACTION IS BARRED BY THE PUBLIC DISCLOSURE RULE

### A.   This Action Is Based Upon Qualifying Public Disclosures

The first element of the public disclosure bar is easily satisfied here.  There were numerous allegations of violations of the incentive compensation ban in

---

[19] The objection that a federal court lacks subject-matter jurisdiction may be raised at any stage in the litigation.  *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506 (2006). The Court is not limited to the plaintiff's allegations in determining if it has subject-matter jurisdiction, but can consider outside evidence.  *Robinson v. United States*, 586 F.3d 683, 685 (9th Cir. 2009).

sources that qualify as "public disclosures," and the Original Complaint is "based upon" those disclosures because it makes substantially similar allegations.

### 1.   The Prior Allegations of Incentive Compensation Violations Were Made in Qualifying Public Disclosures

The prior allegations of incentive compensation violations catalogued above, *see supra* at 5-11, all were made through channels that qualify as a "public disclosures" under the FCA.  Statements in a Congressional hearing, such as those made about the School in the 2005, are "public disclosures" under the statute. *Horizon Health*, 565 F.3d at 1200; 31 U.S.C. § 3730(e)(4)(A).  So are prior civil complaints, such as the securities complaints against the School and the many previous qui tam complaints against career schools.  *See Horizon Health*, 565 F.3d at 1200.  Likewise, papers filed in court proceedings, such as the appellate briefing in the securities action, also qualify as public disclosures.  *Hagood v. Sonoma Cnty. Water Agency*, 81 F.3d 1465, 1473 n.13 (9th Cir. 1996).

### 2.   This Action Is "Based Upon" the Public Disclosures Because It Raises Substantially Similar Allegations

This lawsuit is "based upon" earlier public disclosures.  "For a qui tam suit to be 'based upon' a prior public disclosure, the publicly disclosed facts need not be identical with, but only substantially similar to, the relator's allegations." *Horizon Health*, 565 F.3d at 1199 (citation omitted).  Under the "substantial similarity" requirement, a prior disclosure suffices if it "contained enough information to enable the government to pursue an investigation."  *U.S. ex rel. Harshman v. Alcan Elec. & Eng'g, Inc.*, 197 F.3d 1014, 1019 (9th Cir. 1999) ("*Alcan*"); *U.S. ex rel. Fine v. Sandia*, 70 F.3d 568, 571-72 (10th Cir. 1995) ("*Sandia*").

Accordingly, "fraud need not be explicitly alleged to constitute public disclosure," so long as the disclosure sufficiently identifies the challenged underlying conduct.  *Alcan*, 197 F.3d at 1020.  Further, a "conclusory statement implying the existence of provable supporting facts" suffices as a public disclosure.

1   *U.S. ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 48

2   (D.D.C. 2007).  It is the disclosure of "allegations or transactions"—not detailed

3   facts and information—that triggers the jurisdictional bar.  31 U.S.C.

4   § 3730(e)(4)(A); *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 471 (2007)

5   ("Section 3730(e)(4)(A) bars actions based on publicly disclosed *allegations*

6   whether or not the *information* on which those allegations are based has been made

7   public.") (emphasis added).  It is therefore "not necessary that a public disclosure

8   contain every detail of the alleged fraud," *Hockett*, 498 F. Supp. 2d at 49, nor must it

9   describe all of the "means" by which the alleged fraud occurred.  *U.S. ex rel.*

10  *Rosales v. S.F. Housing Auth.*, 173 F. Supp. 2d 987, 996 (N.D. Cal. 2001).  It is

11  sufficient that "the general practice has already been publicly disclosed."  *U.S. ex*

12  *rel. Settlemire v. Dist. of Columbia*, 198 F.3d 913, 919 (D.C. Cir. 1999).

13          Thus, a relator cannot escape the jurisdictional bar by adding details to

14  allegations that have already been publicly disclosed.  *Fed. Recovery Servs. Inc. v.*

15  *United States*, 72 F.3d 447, 451 (5th Cir. 1995) (Relator "cannot avoid the

16  jurisdictional bar simply by adding other claims that are substantively identical to

17  those previously disclosed in the state court litigation"); *U.S. ex rel. Longstaffe v.*

18  *Litton Indus., Inc.*, 296 F. Supp. 2d 1187, 1192-96 (C.D. Cal. 2003) (rejecting

19  relators' contention that the bar did not apply because the qui tam complaint

20  included details not mentioned in public disclosures).  Even allegations addressing

21  different time periods or geographic regions—or even different defendants—are

22  "based upon" public disclosures if the disclosures are sufficient to identify the

23  challenged conduct.  *See, e.g.*, *U.S. ex rel. Boothe v. Sun Healthcare Grp., Inc.*, 496

24  F.3d 1169, 1174 (10th Cir. 2007) ("we reject the contention that a 'time, place, and

25  manner' distinction is sufficient to escape the force of the public disclosure bar");

26  *U.S. ex rel. Lujan v. Hughes Aircraft Co.*, 162 F.3d 1027, 1032-33 (9th Cir. 1998)

27  (prior qui tam action alleging similar fraud over different time period qualified as

28  public disclosure); *Sandia*, 70 F.3d at 570 (public disclosure of fraud at some but not

1   all locations sufficient to bar qui tam suit alleging institution-wide fraud); *Alcan*,

2   197 F.3d at 1019 (bar triggered by complaint against a *different* defendant).

3        The allegations in the Original Complaint are not just "substantially similar"

4   to public disclosures predating its filing on March 26, 2007, they are materially

5   indistinguishable from earlier disclosures.

6        *First*, the allegations in the Original Complaint are no different than those

7   made by the securities class action plaintiffs in 2005 and 2006.  The securities

8   plaintiffs explicitly alleged that the School violated the incentive compensation ban

9   under the HEA and made false statements about its compliance with that ban—the

10  same allegation made in the Original Complaint.  Though unnecessary to meet the

11  "substantial similarity" test, the securities plaintiffs also asserted that the alleged

12  conduct occurred at multiple different Corinthian campuses over a long time period,

13  *including* a specific campus where Relators worked; they further asserted that the

14  conduct "was not confined to particular campuses," but was "widespread" and

15  "endemic," *see supra* at 11, the same allegation Relators make here.

16       Such similar allegations in a civil suit against the same defendant are more

17  than enough to trigger the public disclosure bar.  *See, e.g.*, *U.S. ex rel. Precision Co.*

18  *v. Koch Indus., Inc.*, 971 F.2d 548, 553 (10th Cir. 1992) (bar triggered where

19  "substantial identity" existed between prior allegations in RICO lawsuits brought by

20  different party); *Longstaffe*, 296 F. Supp. 2d at 1195-96 (allegation in public

21  disclosures that conduct was "endemic" sufficient to trigger the bar as to relator's

22  allegations regarding 400 individuals); *accord Boothe*, 496 F.3d at 1174.  Indeed,

23  many courts have found the jurisdictional bar to be triggered where the similarity of

24  the public disclosure to the allegations in the qui tam action was far less exact.

25  *Alcan*, 197 F.3d at 1019 (finding that civil complaint against a *different* party that

26  generally described conduct without identifying the defendant was sufficient);

27  *Sandia*, 197 F.3d at 569-71 (GAO report and congressional testimony generally

28  describing industry practices without specifically identifying the defendant enough).

NOTICE OF MOT. TO DISMISS; MEM. OF P. & A.
CASE NO 07-CV-01984 PSG (MANx)

1    *Second*, the allegations in the Original Complaint are also substantially

2    similar to public statements at the 2005 Congressional Hearing in which the School

3    was alleged to have paid incentives to admissions staff.  Representative Waters

4    alleged that the School "violat[ed] the spirit and intent" of the incentive

5    compensation ban, and that its emphasis on "quotas" resulted in actual financial aid

6    violations and ran afoul of "existing law."  Paula Dorsey described the School's

7    allegedly complete focus on "hitting enrollment targets."  Both urged further

8    government investigation of the School.  With this testimony before Congress and

9    the securities action against the School, the School was squarely and publicly

10   implicated in connection with the very misconduct alleged in this action.

11       *Third*, although the Court need look no further than the disclosures expressly

12   claiming that the School violated the ban on incentive compensation, the slew of qui

13   tam litigation against other major career schools also put the government on notice

14   of Relators' allegations.  Indeed, courts have held that the torrent of materially

15   similar FCA cases against the career education industry prior to 2007 constitutes a

16   "public disclosure" in subsequent such cases.  *See Schultz v. DeVry Inc.*, No. 07-cv-

17   5425, 2009 WL 562286, at *2-3 (N.D. Ill. Mar. 4, 2009); *U.S. ex rel. Lopez v.*

18   *Strayer Educ., Inc.*, 698 F. Supp. 2d 633, 642 (E.D. Va. 2010).  In light of these

19   many prior complaints, and the fact that the School is "one of the largest for-profit,

20   post-secondary education companies in the United States" (Orig. Compl. ¶ 14), the

21   school posed an "easily identifiable" target for investigation.  *Alcan*, 197 F.3d at

22   1019; *accord In re Nat'l Gas Royalties Qui Tam Litig.*, 562 F.3d 1032, 1042-43

23   (10th Cir. 2009) (industry-wide disclosures sufficient to put government "on the trail

24   of the fraud"); *U.S. ex rel. Findley v. FPC-Boron Employees' Club*, 105 F.3d 675,

25   687 (D.C. Cir. 1997) (disclosures that "specifically identify the nature of the fraud

26   . . . as well as the federal employee actors engaged in the allegedly fraudulent

27   activity" were sufficient even if they did not specifically identify defendant).

28   Indeed, Relators' testimony that they were recruited by a third party with no link to

the School, to meet with attorneys who had previously filed numerous qui tam actions against other career schools alleging identical violations of the HEA, confirms how easy it was to target the School based on prior disclosures.

Because the allegations in the Original Complaint were the subject of repeated and extensive public disclosures prior to the filing of this action, this action was "based upon" those disclosures.

Relators cannot escape this conclusion by pointing to the FAC. *First,* it is well settled that "the amendment process cannot be used to create jurisdiction retroactively where it did not previously exist." *Jamison,* 649 F.3d at 328 (internal quotation marks omitted). Because the Original Complaint was based upon earlier disclosures, that ends the inquiry. *Morongo Band*, 858 F.2d at 1380 ("subject matter jurisdiction must exist at the time the action is commenced"). *Second,* the FAC merely added detail about the means through which the alleged fraud was accomplished; it did not allege any new fraud. Prior disclosures are "substantially similar" to qui tam allegations despite such differences where, as here, the same general fraudulent conduct is alleged. *Rosales*, 173 F. Supp. at 996 ("Although all of the purported *means* by which the . . . fraud was perpetrated may not have been commonly known," the jurisdictional bar was triggered because the public disclosures "contained enough information to enable the government to pursue an investigation"); *Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 920 (7th Cir. 2009) (allegations that "pertain to the same entity and describe the same fraudulent conduct" are "substantially similar," even if the qui tam complaint "contains particular allegations of fraud that are not mentioned" in prior disclosures). *Third,* the allegations added to the FAC—that the School used "sham" written policies to cover up a practice of compensating admissions staff based solely on enrollment numbers—had in any event been repeatedly disclosed in public fora long before the FAC (and the Original Complaint) was filed. *See supra* at 13-15.

B.   **Relators Are Not Original Sources of the Information on Which the Allegations in This Action Are Based**

Because the allegations in the Original Complaint were publicly disclosed, this Court has no jurisdiction over the action unless Relators each show, by a preponderance of the evidence, that they are an "original source."  31 U.S.C. § 3730(e)(4)(B); *Hockett*, 498 F. Supp. 2d at 51 n.14 ("[E]ach party who wishes to bring a *qui tam* suit must be able to invoke the court's jurisdiction").  The evidence, however, establishes that far from being "original sources," Relators have no firsthand knowledge of the allegations in this case and utterly failed to satisfy other jurisdictional prerequisites to maintain this action.

To qualify as an original source, a relator must satisfy three requirements. *First*, the relator "must show that he or she has direct *and* independent knowledge of the information on which the allegations are based."  *Horizon Health*, 565 F.3d at 1201 (emphasis added).  *Second*, a relator must show that "he or she . . . voluntarily provided the information to the government before filing his or her qui tam action."  *Id.  Third*, a relator must show that he or she "had a hand in the public disclosure of allegations that are a part of [the] suit."  *Id.* at 1202 (citing *Wang*, 975 F.2d at 1418). Neither Lee nor Mshuja satisfies any of these requirements.

1.   **Relators Do Not Have Direct or Independent Knowledge of Information on Which Their Allegations Are Based**

(a)   **Lee Lacks Direct Knowledge**

"To show *direct* knowledge, the relator must show that he had firsthand knowledge of the alleged fraud, and that he obtained this knowledge through his own labor unmediated by anything else."  *Id.* at 1202 (internal quotation marks omitted).  Far from having direct knowledge of any fraud, Lee either has no firsthand knowledge of facts supporting the allegations in this case, or expressly contradicts those allegations.

1    Lee finds company among a growing set of relators whom courts have

2  disqualified from attorney-driven FCA actions against career schools.  In three

3  similar FCA cases—including one in which Relators' former counsel Mark Labaton

4  represented the relator—district courts have found that relators were not original

5  sources because, like Lee, they lacked knowledge of the school's PPAs with the

6  government in which the alleged false statements were made, and of the applicable

7  statutory scheme under the HEA.  *See Lopez v. Strayer Educ. Corp.*, 698 F. Supp. 2d

8  633, 640 (E.D. Va. 2010) ("without knowing what a PPA is, much less whether [the

9  school] even submitted one . . . it is absurd to maintain that [the relator] could allege

10  that [the school] 'knowingly makes, uses, or causes to be made or used, a false

11  record or statement to get a false or fraudulent claim paid or approved by the

12  Government' as required by 31 U.S.C. § 3729(a)(2)"); *U.S. ex rel. Leveski v. ITT

13  Educational Services, Inc.*, 07-cv-00867, 2011 WL 3471071, at *7 (S.D. Ind. Aug.

14  8, 2011) (Relator represented by Mark Labaton) (holding that although relator

15  "possess[ed] facts relating to [the school's] incentive compensation practices," she

16  was not original source because she "presented no facts that support direct and

17  independent knowledge" of the school's "alleged scheme to intentionally and

18  knowingly deceive the Department of Education" through PPAs); *Schultz*, 2009 WL

19  562286, at *4 (holding that relator was not an original source because she had no

20  understanding of the school's PPAs or its obligations under Title IV until after

21  meeting her attorney).

22    Just like the relators in these cases, Lee has disavowed any knowledge

23  whatsoever of the School's alleged false statements or the statutory scheme pursuant

24  to which the allegedly false claims were submitted.  She knew nothing of the

25  School's obligations under Title IV of the HEA, nor of the School's or its

26  executives' alleged certifications of compliance with the HEA, nor of the School's

27  PPAs, nor of School's alleged claims for payment.  *See supra* at 22-23.  This in

28

itself establishes that Lee does not possess the requisite direct knowledge of the fraud alleged in this action.

But Lee's lack of direct knowledge is even more glaring than the relators in *Lopez, Leveski,* and *Schultz,* because *Lee does not even have knowledge of the School's compensation practices during the relevant time period, let alone the purported violations of the incentive compensation ban that are the crux of Relators' case.*

To begin with, Lee admits to having no knowledge of any compensation practices post-dating January 1, 2005, the only time period relevant to this case.  Lee herself never received a salary increase, bonus, or promotion during that time, nor could she name a single admissions representative or director of admission who did. *Supra* at 21-22; *Aflatooni v. Kitsap Physicians Servs.*, 163 F.3d 516, 526 (9th Cir. 1999) (physician relator was not original source where he could not recall the name of any patient allegedly charged for unnecessary medical services).  Lee has nothing to offer besides pure speculation about the School's conduct during the relevant time period.  The FCA, in contrast, requires direct and independent *knowledge.  Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 475 (2007) (Relator could not claim direct and independent knowledge with respect to conduct occurring after he ended employment with defendant); *U.S. ex rel. Duxbury v. Ortho Biotech Prods. L.P.*, No. 03-12189, 2010 WL 3810858, at *2 (D. Mass. Sept. 27, 2010) (Relator lacked direct and independent knowledge for claims postdating employment).

Even during the time she was employed with and received raises and promotions from the School, Lee acquired no knowledge whatsoever of any unlawful compensation practices at the School.  On the contrary, as detailed above, Lee understood that she was evaluated and compensated based on factors *in addition to* enrollment numbers, and in compliance with the School's written policies— which was entirely permissible under the relevant safe harbor and directly contradicts the allegations in the complaint.  *Supra* at 16-21.  Lee could not describe

1   with specificity a single instance where she was given a raise or promotion based

2   solely on numbers, and repeatedly conceded she did not know what factors were

3   considered in evaluating her performance or adjusting her pay. *Supra* at 18-20.

4   As for how other employees were compensated, Lee has no knowledge

5   whatsoever to contribute.  She never evaluated or promoted employees herself, nor

6   was she instructed how to do so.  *Supra* at 19.  She never held a corporate-level

7   position, and had no insight into how the School developed and implemented its

8   programs and practices at an institutional level.  *Supra* at 19-20, 22.  And she never

9   communicated with other employees about their compensation.  *Supra* at 22-23.

10   Lee therefore does not have even secondhand knowledge of the School's

11   compensation practices for other employees.  *Devlin*, 84 F.3d at 361 (relators were

12   not original sources because their knowledge was "derived . . . secondhand" from

13   conversations with someone else).

14   Lee's testimony regarding the allegations in the FAC is especially revealing

15   and confirms that the pivotal allegations in this case are not based on any

16   information known to Lee.  Lee testified that the School took qualitative factors into

17   account when making compensation decisions, followed its written compensation

18   plans, and evaluated her performance based on many criteria other than enrollment

19   numbers.  *See supra* at 16-20.  This testimony flat out contradicts the key allegations

20   that were added to FAC, which allowed Relators to survive Defendants' motion to

21   dismiss: namely, that the School paid admissions representatives "solely" based on

22   enrollment numbers; that the School used a "smoke screen" compensation policy

23   that it knew it did not follow in practice; and that the School's performance

24   evaluation ratings were based solely on enrollment numbers.  (FAC ¶¶ 11, 14, 15,

25   48, 49; *see* Doc. 111 at 5-6 (citing these allegations to find that the FAC stated a

26   claim for relief).)  Lee admitted that she did not learn any new information relating

27   to this case between the filing of the Original Complaint and the filing of the FAC,

28   and did not speak with her attorney between the initial dinner meeting in 2006 and

the day before her deposition in December 2012.[20] *Supra* at 28; (Lee Dep. 225:20-226:3).  In light of Lee's testimony contradicting the new allegations in the FAC, the only reasonable inference is those allegations were not based on Lee's input at all.

Lee "did not see the fraud with [her] own eyes," nor did she "obtain . . . knowledge of it through [her] own labor unmediated by anything else." *Devlin*, 84 F.3d at 361.  Indeed, it did not even occur to Lee that the School was doing anything improper in the way it compensated admissions representatives until 2006 (long after she had stopped working for the School), when she was recruited for this case. (Lee Dep. 181:24-183:5.)  As the record makes plain, Lee has no knowledge of any incentive compensation violation relating even to her own pay, let alone knowledge of the alleged vast conspiracy to perpetuate such purported violations through the more than 100 campuses operated by the School.  *See U.S. ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 54 (D.D.C. 2007) (holding that relator was not an original source of institution-wide allegations where there was "no evidence that relator had any direct or independent knowledge of *anything* that happened at any other Columbia/HCA hospital–let alone that fraud was committed at them").  Lee's knowledge (or more accurately, her lack thereof) falls far below the level required to be "direct." *See, e.g.*, *U.S. ex rel. Leveski v. ITT Educ. Servs. Inc.*, No. 1:07-cv-0867, 2012 WL 1028794, at *7 (S.D. Ind. Mar. 26, 2012) (finding relators' knowledge of facts about career school's compensation practices to be insufficient to make her an original source, where she lacked knowledge of school's PPAs, evaluation practices, or payment scheme); *Alcan*, 197 F.3d at 1021 (relators who attested to being aware of alleged misconduct occurring

---

[20] The privilege log listing purported attorney-client communications that were responsive to written discovery requests relating to public disclosure or original source issues lists only one e-mail communication between Nyoka Lee and Scott Levy after the filing of the Original Complaint—a one-page e-mail on September 8, 2011.  (*See* Relators' Privilege Log, Phadke Decl. Ex. C.)

1  in the organization without specifically and personally observing that conduct did

2  not have direct knowledge); *Devlin*, 84 F.3d at 361-63 (relators' personal efforts to

3  verify accuracy of information obtained from others was insufficient to make their

4  knowledge direct).

5              **(b)     Mshuja Lacks Direct Knowledge**

6          Mshuja cannot meet the direct knowledge requirement, either, since his

7  knowledge of relevant information is one step removed from Lee's.  Mshuja's

8  knowledge of information relating to the allegations in this case is based entirely on

9  materials he received from his attorney, Internet research he conducted relating to

10 similar allegations against other career schools, and communications with his sister,

11 Lee. *See supra* at 24-26.  Knowledge based on information received through such

12 intermediary sources does not constitute "direct" knowledge.  *See, e.g.*, *Devlin*, 84

13 F.3d at 363 ("a person who learns secondhand of allegations of fraud does not have

14 'direct' knowledge within the meaning of 31 U.S.C. § 3730(e)(4)(B)").

15         In fact, Mshuja had no knowledge—not even secondhand knowledge—of key

16 allegations in the complaint: he did not know what a PPA was, could not describe

17 any relevant provisions of the HEA, could not say whether he knew of the incentive

18 compensation ban prior to meeting his attorneys in 2006, did not know of any

19 claims made by the School on the federal government, and did not know who the

20 Individual Defendants were.  *See supra* at 26, 28.  As with Lee, Mshuja's lack of

21 knowledge concerning these matters precludes him from being an original source.

22             **(c)     Relators Lack Independent Knowledge**

23         Relators also fail to satisfy the separate requirement that they possess

24 "independent" knowledge of the information underlying their allegations.  To meet

25 this requirement, Relators must show that they "kn[ew] about the allegations before

26 that information was publicly disclosed." *Horizon Health*, 565 F.3d at 1202.  Both

27 Relators admitted, however, that they did not know anything about an alleged fraud

28

1   until after meeting with counsel for the first time in 2006, long after the underlying

2   public disclosures had been made.  *See supra* at 27-28.

### 2. Relators Did Not Disclose the Information on Which Their Allegations Are Based to the Government Before Filing This Action

Even a relator who has direct and independent knowledge will not qualify as an "original source" if he fails to make a timely and voluntary disclosure of the information on which his claims are based to the government before filing the action.  31 U.S.C. § 3730(e)(4).  This is not merely a procedural rule; like the other requirements of the public disclosure bar, it is jurisdictional and strictly applied. *United States v. Bank of Farmington,* 166 F.3d 853, 866 (7th Cir. 1999) ("Where the statute makes jurisdiction depend on events which occur at determinable times, such as a public disclosure of information or its voluntary provision to the government before filing a lawsuit, a plaintiff is encouraged not to dawdle.  Just as one can lose a right to sue by the running of a statute of limitations, so a court can be denied jurisdiction by such an accident of timing.").

There is no evidence that Relators made a timely pre-filing disclosure of the information on which their allegations are based.  Neither Relator was aware of any information provided on their behalf to the government before the Original Complaint was filed.  (Lee Dep. 214:22-216:1 (not aware of anything being provided); Mshuja Dep. 195:1-199:20 ("not certain" if draft complaint provided prior to filing, and not aware of anything else being provided).)  In fact, Relators' discovery responses show that they provided the government with the information purportedly supporting their claims only *after* the Original Complaint was filed.

The only document that Relators identified as supporting their claims in their Rule 26 Disclosures was entitled "'Confidential & Privileged Disclosure Statement' made to the U.S. Department of Justice pursuant to 31 U.S.C. § 3730(e)(4)(b) and (b)(2), including 402 pages of internal communications between Corinthian Colleges and Relator Nyoka Lee." (*See* Relators' Rule 26 Disclosures, Phadke

1    Decl. Ex. D.)  Relators' responses to the School's interrogatories stated that Relators

2    provided this "Confidential & Privileged Disclosure Statement" to the government

3    on April 26, 2007—*i.e.*, one month *after* Relators filed their Original Complaint.

4    (*See* Relator Nyoka Lee's Objections and Responses to Defendants Corinthian

5    Colleges, Inc., David Moore, and Jack D. Massimino's Interrogatories to Relator

6    Nyoka Lee—Set One ("Lee Interrogatory Responses"), Response to Interrogatory

7    No. 5 (Phadke Decl. Ex. E); Relator Talala Mshuja's Objections and Responses to

8    Defendants Corinthian Colleges, Inc., David Moore, and Jack D. Massimino's

9    Interrogatories—Set One, Response to Interrogatory No. 5 (Phadke Decl. Ex. F).)

10   Both Relators, moreover, testified that they met with the government regarding their

11   lawsuit only *after* it had been filed.  (Lee Dep. 262:6-264:21; Mshuja Dep.

12   224:19-23; 226:1-8.)  Thus, Relators admitted that they failed to timely disclose the

13   only information they have that purportedly supports their claims.[21]

14                    **3.      Relators Did Not Have a Hand in Any of the Public
                               Disclosures**
15

16           Under Ninth Circuit law, Relators cannot qualify as original sources unless

17   they "had a hand" in making the public disclosures that predated the initial

18   complaint.  *Horizon Health*, 565 F.3d at 1201 (citing *Wang*, 975 F.2d at 1418).

19   Relators' testimony confirms they cannot meet this requirement.  Neither Relator

20   communicated with the law firm or any of the lawyers that filed the securities class

21   action against the School, or with Paula Dorsey or Representative Waters; nor were

_____

22   [21] Relators' other discovery responses stated that Relators provided materials to the

23   government on four dates before and after the filing of the Original Complaint, but
     Relators have refused to clarify which materials were provided to the Government

24   on the listed dates, claiming attorney-client and various other privileges.  (*See* Lee
     Interrogatory Responses, Responses to Interrogatory No. 4 (listing multiple dates);

25   *id.*, Response to Interrogatory Nos. 1-3 (refusing to identify timing of production of

26   documents) (Phadke Decl. Ex. E).)  Relators' Rule 26 disclosures and response to
     Interrogatory No. 4, however, bind Relators as to the date of the production of any

27   documents that support Relators' claims.

28

1  they a source for any of the other public disclosures, including the other actions

2  alleging that career schools violated the incentive compensation ban.  (Lee Dep.

3  258:24-262:24; Mshuja Dep. 220:23-225:11.)  Relators fail on all counts to qualify

4  as "original source[s]."

## CONCLUSION

Relators are anything but "whistleblowing insider[s]" who have brought valuable information about a fraud to the government's attention.  *Wang*, 975 F.2d at 1419.  Neither Relator knew anything about an alleged fraud until they were recruited to meet with counsel, and to this day, neither can identify any violation of the incentive compensation ban, any false statement, or any false claim made by the School.  Nor did their filing this action bring any new information to light, since the very same allegations made in this case had been disclosed repeatedly in public sources long before the Original Complaint was filed.  This attorney-made case is a paradigm parasitic lawsuit precluded by the public disclosure bar.[22]  Because there is no jurisdiction over this action under the FCA's public disclosure bar, the Court should dismiss this case with prejudice.

---

[22] Courts have imposed Rule 11 sanctions on closely analogous facts, finding it was frivolous for counsel to pursue a qui tam action without any reasonable basis to believe the underlying allegations had not been publicly disclosed or that the relator was an original source.  *See U.S. ex rel. Leveski v. ITT Educ. Servs. Inc.*, No. 07-cv-0867, 2012 WL 1028794, at *1, *11-18 (S.D. Ind. Mar. 26, 2012).  Notably, one attorney who has been sanctioned for such misconduct, Mark Labaton, initiated this lawsuit together with Relators' current counsel and later withdrew as counsel.

1

Respectfully submitted,

2    DATED:  January 14, 2013                MUNGER, TOLLES & OLSON LLP
                                             Blanca F. Young
3                                            Achyut J. Phadke

4

5                                            By:_____/s/ Blanca F. Young_____
                                                    BLANCA F. YOUNG
6
                                             Attorneys for Defendants
7                                            CORINTHIAN COLLEGES, INC.,
                                             DAVID MOORE, JACK D.
8                                            MASSIMINO

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Appendix A

**Appendix A:  Complaint Allegations Versus Relators' Deposition Testimony**

| Allegation | Testimony of Nyoka Lee | Testimony of Talala Mshuja |
|---|---|---|
| "The HEA prohibits institutions that pay 'any commission, bonus, or other incentive payment ...' to recruiters from receiving federal funds from any HEA program." (Compl. ¶ 21; see also *id.* ¶ 7.) | Q Are you aware of any legal or regulatory requirements that relate to recruiting or compensating recruiters?<br>A No.<br>Q Have you ever heard of the Higher Education Act?<br>A Yes, I have.<br>Q Okay. When -- what is your understanding of the Higher Education Act?<br>A I don't know. I can't tell you right now."<br>(Lee Dep. 171:3-12.)<br><br>Q . . . Before working on putting together this case, were you aware that there was a prohibition in the Higher Education Act against paying incentive compensation to employees involved in recruiting?<br>A No, no.  Well, they didn't tell me that when I got hired at Corinthians no.<br>Q . . . So the first time you became aware of the provision in the Higher Education Act that prohibits the payment of incentive compensation to people involved in recruiting is when you started to put together this lawsuit; is that right?<br>A I didn't put this lawsuit together.  I'm just involved in it.  But I heard of it then, yes.<br>Q When you became involved in the lawsuit?<br>A Yes.<br>Q Okay.  Who put this lawsuit together?<br>A This is my lawyer, Scott Levy.<br>(Lee Dep.  173:6-23.) | Q So do you have any specific understanding of any legal requirements or restrictions on how for-profit schools can pay their ad reps or recruiting staff?<br>A Legal restrictions on how they pay 'em?<br>Q Yeah.<br>A Not to my knowledge.<br>(Mshuja Dep. 143:9-14.)<br><br>Q Are you aware of any requirements under Title IV that pertain to this case?<br>A Yes, somewhat.<br>Q Which requirements are those?<br>A I can't name 'em.<br>Q So you're aware of requirements under Title IV that pertain to this case --<br>A Yes.<br>Q -- but you can't name any of them?<br>A No.<br>Q And when did you become aware of requirements under Title IV that pertain to this case?<br>A I don't exactly know when.<br>Q . . . [W]here you aware of the requirements that pertain to Title IV that pertain to this case, before that dinner in San Jose [with Scott Levy, Mark Labaton, Susan Newman, and John Chacon] in 2006?<br>A No.<br>(Mshuja Dep. 144:8-24.) |
| "Corinthian and its co-defendants are liable to the United States under the FCA | Q Before you had this dinner meeting [in 2006 with Talala Mshuja, Susan Newman, John Chacon, and lawyers Scott Levy and Mark Labaton] . . . did you | Q So before that dinner, you thought that Corinthian was committing fraud against the federal government by having its students enroll in classes and then they |

Appendix A:  Complaint Allegations Versus Relators' Deposition Testimony

| Allegation | Testimony of Nyoka Lee | Testimony of Talala Mshuja |
|---|---|---|
| because of the company's use of false statements to obtain HEA, Title IV loan funds. Specifically, in requesting and receiving approximately one-half-billion dollars annually, Corinthian and its co-defendants falsely represented that Corinthian complied with HEAs prohibitions against using incentive payments for recruiters, which is a core prerequisite to receive any HEA, Title IV funds." (Compl. ¶ 9; *see also* FAC ¶ 12.) | believe that Corinthian had engaged in any fraud against the government? <br> A No.  I would have to say no to that. <br> Q And before attending this meeting, did you believe that Corinthian had done anything improper in the way it compensated admissions representatives? <br> A No. <br> (Lee Dep. 182:21-183:5.) <br><br> Q Had you thought about bringing a lawsuit against Corinthian before that dinner meeting? <br> A No I hadn't.  I didn't know anything about a lawsuit with Corinthians. <br> (Lee Dep. 181:24-182:2.) | are not having job prospects at the end of the program? <br> A Yes. . . . <br> Q Was there any other fraud that Corinthian was committing against the federal government?  Were you aware of any other fraud Corinthian was committing against the federal government before that dinner? <br> A No. <br> (Mshuja Dep. 104:24-105:11.) <br><br> Q And before that dinner with Mr. Levy and Mr. Labaton, did you have any idea that Corinthian was violating the ban on incentive compensation? <br> A I'm not sure if I was aware or not.  I'm not sure. <br> Q You're not sure? <br> A No. <br> Q You have no recollection? <br> A No. <br> (Mshuja Dep. 130:10-18.) |
| "For a period of years, but particularly in 2005 and subsequently, Corinthian made false certifications of compliance, both express and implied, to the United States that it did not pay commissions and other incentive compensation to its recruiters." (Compl. ¶ 25; *see also* Compl. ¶ 31.) | Q So just to summarize, since May of 2005 you've not been employed by the school in any capacity? <br> A No I have not. <br> Q You've not provided any services or any independent contracting work to the school since May of 2005; is that correct? <br> A That's correct. <br> Q You've received no compensation from the school at all since you were terminated in May of 2005? <br> A No, I haven't that's correct. <br> Q All the promotions you received at the school happened before January 1st, 2005; is that right? | Q Was Ms. Lee the only source you had for how DOAs or ad reps got compensated? <br> A Yeah, she had the insight and she got the promotion, so she had all the information. <br> Q So she was the only person you ever talked to about those subjects? <br> A Basically. <br> Q Is that right? <br> A Yes. <br> Q And you never -- you -- you didn't know anything yourself about those -- about how ad reps were compensated or how DOAs were compensated besides |

- 2 -

**Appendix A:  Complaint Allegations Versus Relators' Deposition Testimony**

| Allegation | Testimony of Nyoka Lee | Testimony of Talala Mshuja |
|---|---|---|
|  | A That's correct<br>Q All the salary increases you received from the school happened before January 1st, 2005; is that correct?<br>A I'm pretty sure those dates are correct . . . .<br>(Lee Dep. 143:24-144:18.)<br><br>Q Okay.  Can you identify by name any admissions representative for Corinthian who got a salary increase or a promotion after January 1st, 2005?<br>A No.<br>Q Can you identify by name any director of admissions for the school who got a salary increase or a bonus after January 1st, 2005?<br>A I never saw any of those people when I left or talked to them.  So I couldn't -- I can't identify anybody like that.<br>(Lee Dep. 153:17-154:2.)<br><br>Q The time you were employed [at the School]  was from 1999 to 2005; correct?<br>A That's correct.<br>Q May of 2005; correct?<br>A To my knowledge.<br>Q Okay.  And you don't know how admissions was run after you left in May of 2005?<br>A And I don't know how it was run before I got there . . . .<br>Q . . . You don't know how admissions was run after May of 2005, do you?<br>A Well, I didn't work there anymore.<br>(Lee Dep. 91:12-92:3.) | what you learned from Ms. Lee?<br>A That's the only source, Ms. Lee.<br>Q And that's for the entire period from 2000 to 2012?<br>A That's correct.<br>Q And other than the documents that your counsel produced and the research that you did with respect to lawsuits against other for-profit colleges, are you aware of any other documents relating to ad rep or DOA compensation?<br>A Do I know of any?<br>Q Yeah.<br>A Only documents that my attorneys showed me, and my sister Nyoka.<br>Q So other than documents that your attorney showed you and what Nyoka Lee showed you, you're not aware of any documents relating to ad rep compensation or DOA compensation?<br>A No.<br>(Mshuja Dep. 193:20-194:25.) |

**Appendix A:  Complaint Allegations Versus Relators' Deposition Testimony**

| Allegation | Testimony of Nyoka Lee | Testimony of Talala Mshuja |
|---|---|---|
| "Recruiters at [the School] function as sales personnel and are awarded pay increases solely on the basis of the number of student enrollments. . . . Recruiter promotions to higher ranks, moreover, are based solely on the number of students recruited." (FAC ¶ 14; *see also* FAC ¶¶ 12, 37, 40, 41, 59, 63.) | Q Let's look at … page 4 of [Exhibit 5]. The title of it is 'Minimum Standards Performance.'<br>. . . .<br>Q . . . There' a list of 18 things here on this document?<br>A Uh-huh, yes, I see it.<br>. . .<br>Q So let's just talk about a couple of them. The first one is 'Take all inquiry calls from all potential students interested in knowing or receiving information about the programs, including entrance requirements, curricula and academic standards.'<br>A Uh-huh.<br>Q Was that one of the requirements of your job?<br>A Yes.<br>Q Did you strive to do that?<br>A I strived to do everything that's on this list.<br>. . .<br>Q Did you understand that your performance was being evaluated based on how you were communicating with the prospective students?<br>A Yes.<br>Q And that was one of the factors that your director of admissions was looking at?<br>A All the time.<br>Q When you were doing your job; right?<br>A Yes, uh-huh.<br>Q No. 2 says 'Return inquiry calls promptly to all potential students and give accurate information about the programs including entrance requirements curricula and academic standards.'<br>A Yes.<br>Q And that was another responsibility in your job? | Q Is the only person you ever talked to at Corinthian about how ad reps were compensated your sister, Nyoka Lee?<br>A Yes.<br>Q You never talked to anybody else about how ad reps were compensated?<br>A No.<br>Q You never talked to anybody else about how DOAs were compensated either?<br>A No.<br>Q Did you ever --<br>A Oh --<br>Q Sorry?<br>A Only Nyoka.<br>(Mshuja Dep. 192:4-17.)<br><br>Q Was Ms. Lee the only source you had for how DOAs or ad reps got compensated?<br>A Yeah, she had the insight and she got the promotion, so she had all the information.<br>Q So she was the only person you talked to about those subjects?<br>A Basically.<br>Q Is that right?<br>A Yes.<br>Q And you never -- you -- you didn't know anything yourself about those -- about how ad reps were compensated or how DOAs were compensated besides what you learned from Ms. Lee?<br>A That's the only source, Ms. Lee.<br>Q And that's for the entire period from 2000 to 2012?<br>A That's correct. |

19612307

**Appendix A:  Complaint Allegations Versus Relators' Deposition Testimony**

| Allegation | Testimony of Nyoka Lee | Testimony of Talala Mshuja |
|---|---|---|
|  | A Yes.<br>Q And you tried to do that; right?<br>A Yes.<br>Q And this meant, among other things, noting how -- giving accurate information to students?<br>A Giving as accurate as it was given to me.<br>Q Okay. And was that important to you, to make sure students got accurate information?<br>A It was very important to me because I was a student myself and I didn't want to misinform anyone.<br>Q Uh-huh, of course. And -- and did you understand that your director of admission was monitoring you to see that you were giving accurate information to students?<br>A Yes, I sat right across from his office.  He could hear me talking.<br>Q And you understood that he would be evaluating your performance in part based on whether you were giving accurate information to people; is that right?<br>A That was probably his job to monitor me on that, yes.<br>Q And you understood that that was his job; right?<br>A Uh-huh. Yes, I did.<br>Q No. 3 is 'Accurately classify all inquiries by the appropriate media source and account for all inquiries.' Do you see that?<br>A Yes, I do.<br>Q And that -- that again was part of your responsibilities; correct?<br>A Yes.<br>Q Okay.  And you tried to do that in your job?<br>A Yes, I did. | (Mshuja Dep. 193:20-194:11.) |

**Appendix A:  Complaint Allegations Versus Relators' Deposition Testimony**

| Allegation | Testimony of Nyoka Lee | Testimony of Talala Mshuja |
|---|---|---|
| | Q And was it your understanding that your director was monitoring your performance to see if you accurately classified all inquiries that came in?<br>A Yes, he would do that through the flash sheets.<br>. . .<br>Q Okay.  I'm not going to go through all of these, but just to touch on a couple of other ones.  No. 5, 'Comply with governmental regulations and standards of accreditation as they relate to enrolling students.'<br>Do you see that?<br>A Yes, I do.<br>Q And that was part of your job responsibilities as an admissions representative?<br>A Yes, it was.<br>Q And did you understand that your performance was being evaluated in part by whether you were complying with the governmental regulations and standards of accreditation as they relate to enrolling students?<br>A Yes, because I explained all that to my students.<br>Q Okay.  Another thing on here was -- just take a look at No. 14, and No. 15.  They're kind of related.  'Ensure that all prestart paperwork was completed.'  That was part of your responsibilities?<br>A Yes.<br>Q And you tried to do that?<br>A Yes.<br>Q And you understood that your performance would be evaluated based in part on whether your prestart paperwork was complete? | |

19612307

**Appendix A:  Complaint Allegations Versus Relators' Deposition Testimony**

| Allegation | Testimony of Nyoka Lee | Testimony of Talala Mshuja |
|---|---|---|
| | A Correct.<br>Q Same thing with No. 15, 'Keep all required reports current and accurate'?<br>A I did all those things, yes, I did.<br>Q And you understood your performance was being evaluated in part on whether you kept required reports current and accurate?<br>A Yes, I suppose that's what Cary did . . .<br>(Lee Dep. 66:3-72:18.)<br><br>Q Is [Exhibit 13] the compensation plan that governed your employment as a master campus admissions representative in San Jose?<br>A I think this is the same one you showed me before, yes.<br>Q Is this what applied to you in the 2004 time period when you were rehired?<br>A Yes, it applied to me . . . .<br>. . .<br>Q And on the first page of this document it says, 'Minimum Standards of Performance' and then it lists 18 standards again. Do you see that?<br>A Yes, I do.<br>Q And just like we talked about before, there are -- were your job responsibilities when you were rehired as an admissions representative in 2004?<br>A Same, yes.  It didn't change.<br>Q And -- and you tried to fulfill these responsibilities?<br>A Yes, I did.<br>Q And you understood that you were being evaluated based on whether you fulfilled all 18 of these responsibilities? | |

19612307

**Appendix A:  Complaint Allegations Versus Relators' Deposition Testimony**

| Allegation | Testimony of Nyoka Lee | Testimony of Talala Mshuja |
|---|---|---|
| | A ***That and*** my numbers.  It's always numbers. (Lee Dep. 121:21-123:9 (emphasis added).)<br><br>Q Mr. Levy asked you earlier what did you have to do to get a raise and your response was you had to make your numbers.  Do you recall that?<br>A Yes, that's true.<br>…<br>Q … And Mr. Levy asked you whether you were evaluated on anything other than the numbers of students you recruited to the school.  Do you recall that question?<br>A Well, I recall that question earlier, yes.  Uh-huh.<br>Q Okay. And I asked you earlier -- we went through those minimum standards.  Do you remember that?<br>A Yes.<br>Q And there were something like 18 of them in the document; right?<br>A Uh-huh.<br>Q Do you recall that?<br>A Yes, I recall that.<br>Q And we went through a number of them and I asked you whether you understood that your performance was being evaluated on whether you complied with each of those 18 standards.  Do you recall that?<br>A Part of my performance… Part of my raise was considered in that, but it was -- the bottom line was numbers<br>BY MS. YOUNG:<br>Q But part of your raise?<br>MR. LEVY: Objection to form.<br>BY MS. YOUNG: | |

**Appendix A:  Complaint Allegations Versus Relators' Deposition Testimony**

| Allegation | Testimony of Nyoka Lee | Testimony of Talala Mshuja |
|---|---|---|
| | Q Part of your raise depended on some of the other things, including what we looked at --<br>A Getting to work on time and all that stuff, naturally.<br>Q Okay.  Including what we --<br>A And how I interacted with other people and stuff like that.<br>(Lee Dep. 360:15- 361:24.)<br><br>Q … When you say in paragraph seven, 'The Director of Admissions and members of the Corporate Management Team determine promotions,' what did you mean by the words 'determine'?<br>A Make the final decision.<br>Q Okay.  So they have some discretion in terms of who gets a promotion; is that right?<br>A Yes.  Yes, they do.<br>(Lee Dep. 115:12-19.)<br><br>Q I'm handing you what we will mark as Exhibit 8.<br>BY MS. YOUNG:<br>Q This is another turnaround document. Is that your signature at the bottom of the page?<br>A That's my signature.<br>Q . . . And it's dated in March of 2002. Do you see that?<br>A Yes, I do. I can't see the two on my signature, but I see it above that, yes.<br>Q Did you receive a raise in or around March of 2002?<br>A This looks like I did.<br>Q . . . Do you recall the reason for that raise?<br>A It looks like Mr. Plant was in a good mood that day I don't know. I don't recall the reason, but I'm looking | |

**Appendix A:  Complaint Allegations Versus Relators' Deposition Testimony**

| Allegation | Testimony of Nyoka Lee | Testimony of Talala Mshuja |
|---|---|---|
|  | at this paper and it looks like I received a raise. <br> . . . <br> Q Okay. In the -- next to the numeral ten there's a box called remarks.  Do you see that? <br> A Yes, 'Employee Hires,' that's where you are. <br> Q . . .  And it says, as best I can tell from reading the handwriting, 'Employee hired in at very low wage and new employees with less experience are hired in at produced wages of something like $45,000 due to high cost of Bay Area.'  Do you see that? <br> A I see it. <br> Q Do you recall being given that reason as <br> the reason why you were getting this raise? <br> A No I don't recall that. <br> Q You don't recall any reason you were given for getting this raise; is that correct? <br> A No I don't recall, but I see what Mr. Plant wrote. <br> (Lee Dep. 88:8-90:4.) |  |
| "Despite the Compensation Program's purported or documented reliance on something other than recruitment numbers, salary increases for recruiters are *in practice* determined on the sole basis of recruitment numbers. [THE SCHOOL]'s corporate practice with respect to awarding raises to recruiters is inconsistent with its written recruiter compensation program." (FAC ¶¶ 50-51; *see* | A -- I know policies -- policies. I knew the company policies because it was given to me when I was hired and I worked there for several years so I know -- I knew the company policies. <br> Q Okay.  So the written policy is what you followed? <br> A Yes. <br> Q Okay.  And -- <br> A And what my director and what my president told me. <br> Q Okay. And -- <br> A So I followed the policies. <br> Q And it's your understanding that other directors of admission followed the written policy; is that right? <br> A Yes, you're an employee if you're an employee and | Q Has it ever crossed your mind that Corinthian wasn't following its compensation policies for ad reps or DOAs? <br> A No. <br> (Mshuja Dep. 164:4-7.) <br><br> Q Is the only person you ever talked to at Corinthian about how ad reps were compensated your sister, Nyoka Lee? <br> A Yes. <br> Q You never talked to anybody else about how ad reps were compensated? <br> A No. <br> Q You never talked to anybody else about how DOAs |

19612307

### Appendix A:  Complaint Allegations Versus Relators' Deposition Testimony

| Allegation | Testimony of Nyoka Lee | Testimony of Talala Mshuja |
|---|---|---|
| *also* FAC ¶¶ 14, 39.) | you're a director, you have to follow the policies.<br>Q Okay. So if we want to figure out what the practices were like, we should look at the written policies?<br>A Yeah that or the brochures or whatever corporate sends you or whatever.<br>Q Okay.  But in your experience, the directors of admissions, the other people that were responsible for determining promotions and salary raises, they just did what the written policy told them to do; right?<br>MR. LEVY: Objection; form, calls for speculation.<br>THE WITNESS: As far as I know.<br>BY MS. YOUNG:<br>Q That's your understanding; right?<br>A Yes, that's my understanding because I wasn't trying to create any new rules.<br>(Lee Dep. 114:2-115:11.)<br><br>Q . . . [W]e looked earlier at a compensation plan [marked as Exhibit 4] that you signed when you first started as a campus representative in San Francisco [in 2000]. Do you recall that?<br>. . .<br>A Okay. . . that's this one, 2000.<br>Q And we now have in front of us a compensation plan that you've signed in November of 2001 [marked as Exhibit 5].<br>. . .<br>Q Before you signed this document, did you go over it with anyone else?<br>A I don't recall.<br>Q Did anyone tell you that the school doesn't actually follow this plan? | were compensated either?<br>A No.<br>Q Did you ever --<br>A Oh --<br>Q Sorry?<br>A Only Nyoka.<br>(Mshuja Dep. 192:4-17.)<br><br>Q Was Ms. Lee the only source you had for how DOAs or ad reps got compensated?<br>A Yeah, she had the insight and she got the promotion, so she had all the information.<br>Q So she was the only person you talked to about those subjects?<br>A Basically.<br>Q Is that right?<br>A Yes.<br>Q And you never -- you -- you didn't know anything yourself about those -- about how ad reps were compensated or how DOAs were compensated besides what you learned from Ms. Lee?<br>A That's the only source, Ms. Lee.<br>Q And that's for the entire period from 2000 to 2012?<br>A That's correct.<br>(Mshuja Dep. 193:20-194:11.) |

19612307

**Appendix A:  Complaint Allegations Versus Relators' Deposition Testimony**

| Allegation | Testimony of Nyoka Lee | Testimony of Talala Mshuja |
|---|---|---|
| | A Why would I be signing it and they give it to me if they don't follow it?  I don't understand the question. . . .<br><br>Q [D]id anyone tell you, 'Here's the plan, but we don't actually follow it'?<br>MR. LEVY: Objection to form.<br>THE WITNESS: Nobody told me that.  I don't recall anyone telling me that.<br>(Lee Dep. 63:25-66:1.)<br><br>Q Okay.  And did you personally comply with the school's policies and procedures at the time that you were employed at the school?<br>A Yes, I did.<br>Q You never purposely violated any of those procedures?<br>A No.<br>Q And you did your best to follow the policies and procedures of the school?<br>A Yes, I did.<br>Q Did you ever tell any other employees of the school that they should violate the school's written policies and procedures?<br>A No, I did not.<br>Q Were you ever told that you should violate the school's written policies and procedures?<br>A Regarding enrollments, no, I -- no one told me to do that.<br>(Lee Dep. 170:6-23.)<br><br>Q [W]hat's your understanding of how often you could get a raise? | |

**Appendix A:  Complaint Allegations Versus Relators' Deposition Testimony**

| Allegation | Testimony of Nyoka Lee | Testimony of Talala Mshuja |
|---|---|---|
|  | A It's once a year, uh-huh.<br>Q And same thing with promotions?<br>A Yeah, and they would add up all your numbers and if you met your numbers you could go from one level to the next.<br>Q And to figure out if you had met those numbers you would refer to the written program that the school had put in place; is that right?<br>A Yeah, yeah.  That's all we had to refer to.<br>Q Okay.  And that same document would govern other factors that went into whether or not you would get a raise; is that right?<br>A Yes.<br>(Lee Dep. 353:22-354:12.) |  |
| "The L-C Ratio is the calculation used to determine the recruiters' 'Good' versus 'Excellent' rating, and is calculated based solely on the numbers of students who enroll at [the School]." (FAC ¶ 15; *see also* FAC ¶ 60 (the School's "performance rating system is merely a proxy for employee recruitment numbers").) | Q Do you know what [your supervisor's] evaluation criteria were?<br>A No I never had a conversation with him about it. He expected high standards I know that. . . .  That's what he was getting from me.<br>(Lee Dep. 72:20-73:4.)<br><br>Q . . . What is this document, [Exhibit 6]?<br>A It says employee performance review.<br>Q Is this a performance review that you received while working on the San Francisco campus?<br>A I was working there at that time, yes.<br>. . .<br>Q Do you know -- this form has scores that are identified in various columns?<br>A I see that.<br>Q You'll see in section three there's a four or a five in some of these columns and then there are other scores | Q . . . [T]he only position you've ever had with Corinthian is as an independent test proctor?<br>A That's correct.<br>Q Right?<br>And you never worked in any other capacity?<br>A No.<br>MR. LEVY:  Objection to form.<br>THE WITNESS:  No.<br>(Mshuja Dep. 81:23-82:6.)<br><br>Q You were never an admissions representative; right?<br>A No.<br>Q And you were never director of admissions; right?<br>A No. . . .<br>Q And your pay was never based on any compensation policies that covered ad reps; right?<br>A No.<br>Q And it was never based on any compensation |

- 13 -

**Appendix A:  Complaint Allegations Versus Relators' Deposition Testimony**

| Allegation | Testimony of Nyoka Lee | Testimony of Talala Mshuja |
|---|---|---|
| | that are noted in the 'Overall Employee Rating' box there. Do you see that? <br> A Yes, I do. <br> Q Do you know how the scores on this form were awarded? <br> A Well, the director put them in there. The director of admissions. <br> Q And that was Cary Kaplan? <br> A Yes. <br> Q Do you know how Cary Kaplan decided what score -- <br> A No I do not.  I do not know how he did it.  All I saw was the numbers. <br> Q Okay. <br> A I don't know how he came to the conclusion. He never told me how. <br> (Lee Dep. 76:10-77:15.) <br><br> Q Take a look at section four, 'Major Accomplishments'? <br> A Okay. <br> Q Right under that it says 'Zero to 25 Points of Evaluation,' and then there's a little narrative about your work.  Do you see that in that box? <br> A Uh huh.  Yes, I do. <br> Q It says, 'Nyoka has an outstanding work ethic; arrives to work focused and prepared.  She is highly organized and pays attention to detail.  She relates exceptionally well with students and has excellent customer service.  It's my recommendation that Nyoka receive a promotion from Campus Admissions Representative to Senior Admissions Representative.' | policies that covered directors of admission; right? <br> A No. <br> (Mshuja Dep. 92:20-93:8.) <br><br> Q . . . [A]s a test proctor, you never gave any ad rep a performance evaluation; correct? <br> A No. <br> Q And you never gave a DOA a performance evaluation? <br> A No. <br> Q Right? <br> As a test proctor, had you ever seen the forms which DOAs used to give performance evaluations? <br> A No. <br> Q As a test proctor, had you ever seen the forms which DOAs gave to -- DOAs looked in considering promotional criteria? <br> A Yes. <br> Q When did you seen those? <br> A When?  I don't remember exactly when. <br> Q You don't remember when? <br> A No. <br> Q Do you know who showed them to you? <br> A Who showed 'em to me? <br> Q Do you know who showed 'em to you? <br> A Yes. <br> Q Who? <br> A Nyoka. <br> (Mshuja Dep. 93:12-94:11.) <br><br> Q . . . You only ever saw documents covering ad rep compensation based on what Nyoka Lee, Susan |

- 14 -

**Appendix A:  Complaint Allegations Versus Relators' Deposition Testimony**

| Allegation | Testimony of Nyoka Lee | Testimony of Talala Mshuja |
|---|---|---|
| | Q Do you see that?<br>A Yes, I do.<br>Q And did you agree with that assessment of your performance?<br>A Yes, of course, I did.<br>Q And again, you don't know how Mr. Kaplan arrived at this particular assessment; right?<br>. . .<br>A I have no idea other than the fact that he observed me when I was working and he wrote something he was feeling honest about.<br>Q Okay.  So you have no knowledge of Mr. Kaplan's basis for the ultimate score he awarded you on this performance evaluation?<br>A How could I know?  No.<br>(Lee Dep. 79:14-80:24.)<br><br>Q Okay. Let's look at the performance review form [marked as Exhibit 7]?<br>. . .<br>Q And again, there's a number of criteria listed in here that have points assigned to them.  Do you see that?<br>A Yes, I do.<br>Q Do you know how those points were assigned?<br>A No, I do not. I said that before.  No, I do not.<br>Q In section four, again, which is that box with the narrative description of your major accomplishments and contributions --<br>A . . . I see that.<br>Q [D]o you know how the decision was made about what to write into that box?<br>A No I do not. | Newman, or John Chacon showed you; right?<br>MR. LEVY:  Objection to form.<br>BY MR. PHADKE:<br>Q I need an audible, verbal response.<br>A That's the only way I saw it.<br>Q That's the only way you saw it?<br>A Yeah.<br>Q And you never got -- reviewed yourself -- based on any ad rep performance review; right?<br>A No.<br>(Mshuja Dep. 95:7-18.) |

**Appendix A:  Complaint Allegations Versus Relators' Deposition Testimony**

| Allegation | Testimony of Nyoka Lee | Testimony of Talala Mshuja |
|---|---|---|
| | (Lee Dep. 95:2-21.)<br><br>A [I] never understood how I got fours and fives [on the performance evaluation form].  Nobody said, 'Well, you did you this and that's why I gave you a five' or 'You did this and this and this and this and that's why you got a four.'  I didn't get that information.<br>Q Right. So you had no personal insight into how --<br>A I was evaluated<br>Q -- that performance evaluation form was filled out; correct?<br>A No I did not.<br>. . .<br>And I didn't go up and say, 'Why did you give me a four or five?' I didn't do that.<br>(Lee Dep. 362:8-22.) | |
| "[The School] intentionally and knowingly designed its Compensation Program to show "Good" versus "Excellent" factors and ratings for the purpose of concealing [the School's] violations of the Incentive Compensation Ban and Regulatory Safe Harbor. The "Good" versus "Excellent" quality ratings are a smoke screen used to disguise the fact that its recruiters are compensated solely based on recruitment, admission, and | Q Did you help put together the compensation program that governed how admissions representatives would be paid?<br>A No I wasn't hired to do that.<br>Q . . . So you didn't participate in any discussions about how to design the written program for admissions representatives?<br>A No I didn't do any curriculum design or any of that.<br>Q Okay.<br>A I was an admissions rep and that's what I did when I worked for Bryman.  I didn't do any designing for them . . . .<br>Q . . . And so you didn't play any role in developing the written materials that were part of the --<br>A No. | Q . . . [T]he only position you've ever had with Corinthian is as an independent test proctor?<br>A That's correct.<br>Q Right?<br>And you never worked in any other capacity?<br>A No.<br>MR. LEVY:  Objection to form.<br>THE WITNESS:  No.<br>(Mshuja Dep. 81:23-82:6.)<br><br>Q You were never an admissions representative; right?<br>A No.<br>Q And you were never director of admissions; right?<br>A No. . . .<br>Q And your pay was never based on any |

**Appendix A:  Complaint Allegations Versus Relators' Deposition Testimony**

| Allegation | Testimony of Nyoka Lee | Testimony of Talala Mshuja |
|---|---|---|
| enrollment numbers. [The School] acted with fraudulent intent and did not, in good faith, rely upon the Safe Harbor Provisions." (FAC ¶ 14.) | Q compensation programs for admissions representatives?<br>A No I did not.  Corporate did all that.<br>Q And you have no knowledge, I take it, about how that compensation program was designed; is that right?<br>A No. No, I do not.  All I did was read it when they gave it to me.<br>Q Okay.  Do you know who designed the compensation program for admissions representatives?<br>A I should ask you that or somebody working here. I don't know.<br>Q You don't know?<br>A Huh-uh.<br>Q You don't know what factors they took into account --<br>A No.<br>Q -- to design the compensation program?<br>A No, I could find something that they might want to take part in, though, but I didn't know anything like that.<br>Q Okay.  And you don't know what their intent was in designing the written compensation program?<br>A No, I didn't work with that team.  That was all done through corporate.<br>Q And we looked earlier at some performance evaluation forms.  Did you have any involvement in designing what the performance evaluation forms would look like?<br>A No.<br>Q Okay.  Do you know how they were developed? | compensation policies that covered ad reps; right?<br>A No.<br>Q And it was never based on any compensation policies that covered directors of admission; right?<br>A No.<br>(Mshuja Dep. 92:20-93:8.)<br><br>Q . . . [A]s a test proctor, you never gave any ad rep a performance evaluation; correct?<br>A No.<br>Q And you never gave a DOA a performance evaluation?<br>A No.<br>Q Right? . . .<br>Q As a test proctor, had you ever seen the forms which DOAs gave to -- DOAs looked in considering promotional criteria?<br>A Yes.<br>Q When did you seen those?<br>A When?  I don't remember exactly when.<br>Q You don't remember when?<br>A No.<br>Q Do you know who showed them to you?<br>A Who showed 'em to me?<br>Q Do you know who showed 'em to you?<br>A Yes.<br>Q Who?<br>A Nyoka.<br>(Mshuja Dep. 93:12-94:11.)<br><br>Q . . . You only ever saw documents covering ad rep compensation based on what Nyoka Lee, Susan |

19612307

**Appendix A:  Complaint Allegations Versus Relators' Deposition Testimony**

| Allegation | Testimony of Nyoka Lee | Testimony of Talala Mshuja |
|---|---|---|
|  | A Corporate. It's like I say, I've got that stuff from corporate and that's it.  I don't know anything about it. Q You don't know what factors -- A No. Q -- were taken into account in figuring out how to design that form, do you? A No. Q You don't know what the intent was -- A No I don't. Q  -- in designing the performance evaluation do you? A No. Q And did you participate in any discussions about how the performance of admissions representatives should be evaluated? A No, I did not. Q I take it you also had no involvement in designing the compensation or bonus programs for directors of admission? A No, I did not. Q Okay.  And you didn't participate in any discussion about how to design those programs? A No I did not. Q You didn't develop any of the written materials for those programs? A No I did not. (Lee Dep. 155:23-159:1.) Q . . . So you don't know what the intent was in designing the overall bonus program that applied to directors of admission; is that right? A No. I didn't delve off into that area. | Newman, or John Chacon showed you; right? MR. LEVY:  Objection to form. BY MR. PHADKE: Q I need an audible, verbal response. A That's the only way I saw it. Q That's the only way you saw it? A Yeah. Q And you never got -- reviewed yourself -- based on any ad rep performance review; right? A No. (Mshuja Dep. 95:7-18.) Q Was Ms. Lee the only source you had for how DOAs or ad reps got compensated? A Yeah, she had the insight and she got the promotion, so she had all the information. Q So she was the only person you ever talked to about those subjects? A Basically. Q Is that right? A Yes. Q And you never -- you -- you didn't know anything yourself about those -- about how ad reps were compensated or how DOAs were compensated besides what you learned from Ms. Lee? A That's the only source, Ms. Lee. Q And that's for the entire period from 2000 to 2012? A That's correct. Q And other than the documents that your counsel produced and the research that you did with respect to lawsuits against other for-profit colleges, are you aware of any other documents relating to ad rep or |

**Appendix A:  Complaint Allegations Versus Relators' Deposition Testimony**

| Allegation | Testimony of Nyoka Lee | Testimony of Talala Mshuja |
|---|---|---|
| | (Lee Dep. 159:16-19.) | DOA compensation?<br>A Do I know of any?<br>Q Yeah.<br>A Only documents that my attorneys showed me, and my sister Nyoka.<br>Q So other than documents that your attorney showed you and what Nyoka Lee showed you, you're not aware of any documents relating to ad rep compensation or DOA compensation?<br>A No.<br>(Mshuja Dep. 193:20-194:25.) |
| "The job of the Director of Admissions at each [School] campus is to serve as the recruiting manager for that . . . school, and his compensation depends solely on the number of students who enroll at his campus." (FAC ¶ 45.) | Q . . . [Y]ou started at the Hayward campus as director of admissions sometime in June of 2004?<br>A As director of admissions sometime in June of 2004.<br>Q Okay.  Now, how were you paid as a director of admissions at the Hayward campus?<br>A I was salaried.<br>(Lee Dep. 98:7-14.)<br><br>Q Okay.  Now, I want to talk about your compensation in the short time that you were the director of admissions at Hayward for two and a half months.<br>A Yes.<br>Q Did you -- did you get any promotions while you were the director of admissions --<br>A No, I got demoted if you want to know the truth.<br>…<br>Q Okay.  And did you get any salary increases while you were the director of admissions at Hayward for that two-and-a-half month period? | Q Was Ms. Lee the only source you had for how DOAs or ad reps got compensated?<br>A Yeah, she had the insight and she got the promotion, so she had all the information.<br>Q So she was the only person you ever talked to about those subjects?<br>A Basically.<br>Q Is that right?<br>A Yes.<br>Q And you never -- you -- you didn't know anything yourself about those -- about how ad reps were compensated or how DOAs were compensated besides what you learned from Ms. Lee?<br>A That's the only source, Ms. Lee.<br>Q And that's for the entire period from 2000 to 2012?<br>A That's correct.<br>(Mshuja Dep. 193:20-194:11.) |

- 19 -

**Appendix A:  Complaint Allegations Versus Relators' Deposition Testimony**

| Allegation | Testimony of Nyoka Lee | Testimony of Talala Mshuja |
|---|---|---|
|  | A No, I did not.<br>Q And I take it you didn't receive any<br> bonuses either.  I think you testified to that.<br>A No, I didn't.<br>(Lee Dep. 116:21-118:16; *see also id.* at 98:12-21<br>(testifying that she did not work at Hayward for long<br>enough to be eligible for  a bonus).)<br><br>Q And are you aware of any documents<br>explaining how directors of admissions would be<br>compensated by Corinthian?<br>A No.<br>(Lee Dep. 150:4-7.)<br><br>Q And Mr. Kaplan was your director of admissions up<br>until 2004; correct?<br>A Yeah, when I was working at Bryman.<br>Q Okay.  You didn't work with him after 2004; is<br>that right?<br>A No I did not.  No I did not.<br>Q And your only knowledge of how directors of<br>admissions were compensated other than your own<br>experience as a director of admissions is what you<br>heard secondhand from Mr. Kaplan; is that right?<br>A Yes.<br>(Lee Dep. 152:16-153:1.) |  |
| "[The School] owns the<br>following schools: Rhodes<br>College, Inc., Everest College,<br>Everest Institute, Everest<br>University, Everest Online,<br>Everest-Canada, Bryman | Q [Y]ou've never at any time worked at a school<br>campus other than San Francisco, San Jose or<br>Hayward; is that correct?<br>A Not for Corinthians (sic).<br>. . .<br>Q Okay.  And you've never recruited students to go to | Q . . . [T]he only position you've ever had with<br>Corinthian is as an independent test proctor?<br>A That's correct.<br>Q Right?<br>And you never worked in any other capacity?<br>A No. |

**Appendix A:  Complaint Allegations Versus Relators' Deposition Testimony**

| Allegation | Testimony of Nyoka Lee | Testimony of Talala Mshuja |
|---|---|---|
| College, Titan Schools, National Institute of Technology, Florida Career College, WyoTech, Tampa College, Orlando College, and, Heald College. [The School] is comprised of approximately 100 campuses. The practices described below took place at all colleges owned by [the School]." (FAC ¶ 4.) | a campus other than San Francisco, San Jose or Hayward?<br>A I never worked in admissions after I left Corinthians at any other campus.<br>(Lee Dep. 134:22-135:13.)<br><br>Q Have you ever visited a campus of Corinthian other than San Francisco, San Jose or Hayward?<br>A Let's see, I don't think so. I don't recall.<br>(Lee Dep. 143:19-23.)<br><br>Q And did you have a discussion with any admissions representative who worked for Corinthian at a campus other than where you worked about whether they got promotions or raises?<br>. . .<br>THE WITNESS:  Basically Blanca the conversations I had with other admissions reps were always about numbers.  That's what it was always about.  I never discussed their compensation or how much they got for a raise -- they didn't talk about stuff like.  They talked about how many enrollments you had.<br>Q And did they discuss anything about getting promotions or whether they were --<br>A No, I didn't discuss that kind of information with other employees.  Nobody talked to me about it, and I didn't talk to them about it because it wasn't my business.  Because I could see what enrollments were when I got the flashes.  And everybody that worked at all the campuses could see that. . . That's what we got.<br>. . . | MR. LEVY:  Objection to form.<br>THE WITNESS:  No.<br>(Mshuja Dep. 81:23-82:6.)<br><br>Q And just to clarify the campuses you worked at, your only work at Corinthian was at Bryman College in San Jo- -- in San Francisco from 2000 to 2003, Bryman in San Jose from 2004 to 2005, and WyoTech in Fremont from late 2006 to 2009; is that correct?<br>A Yes.<br>(Mshuja Dep. 82:14-19.)<br><br>Q You were never an admissions representative; right?<br>A No.<br>Q. And you were never director or admission; right?<br>A No.<br>Q So you were never responsible for admitting or recruiting students; right?<br>A No.<br>(Mshuja Dep. 92:20-93:2.)<br><br>Q Was Ms. Lee the only source you had for how DOAs or ad reps got compensated?<br>A Yeah, she had the insight and she got the promotion, so she had all the information.<br>Q So she was the only person you ever talked to about those subjects?<br>A Basically.<br>Q Is that right?<br>A Yes.<br>Q And you never -- you -- you didn't know anything yourself about those -- about how ad reps were |

**Appendix A:  Complaint Allegations Versus Relators' Deposition Testimony**

| Allegation | Testimony of Nyoka Lee | Testimony of Talala Mshuja |
|---|---|---|
|  | Q You didn't discuss -- <br> A No I didn't discuss. <br> Q . . . You didn't discuss salary raises or whether someone was eligible for a raise of other employees Corinthian, did you? <br> A Again, no, I didn't discuss that. <br> (Lee Dep. 142:3-143:18.) <br><br> Q Okay.  So other than the documents that describe how you, Nyoka Lee, were compensated, you're not aware of any documents describing how other admissions representatives were compensated? <br> A No I'm not aware of that. <br> (Lee Dep. 149:24-150:2.) <br><br> Q Now, a director of admissions couldn't just promote somebody all by themself; right? <br> A I never knew what director that did that. <br> Q Okay.  Didn't they have to get approval from someone else before somebody got promoted? <br> A I'm not sure because I didn't ever promote anybody. <br> Q Okay. So you don't know whether -- <br> A I only know from my experience of getting promoted.  That's all I know. <br> . . . <br> Q So you don't know to what extent there was management oversight over the decision to promote somebody or give them a raise? <br> A No.  Because that was always done for me so I just know that part. <br> Q You just know it was done for you? | compensated or how DOAs were compensated besides what you learned from Ms. Lee? <br> A That's the only source, Ms. Lee. <br> Q And that's for the entire period from 2000 to 2012? <br> A That's correct. <br> (Mshuja Dep. 193:20-194:11.) |

- 22 -

**Appendix A:  Complaint Allegations Versus Relators' Deposition Testimony**

| Allegation | Testimony of Nyoka Lee | Testimony of Talala Mshuja |
|---|---|---|
| | A Yes.<br>(Lee Dep. 116:2-20.) | |
| "These representations [of compliance with the ban against incentive compensation] were patently false, and violated PPAs Corinthian signed as well as federal statutes and regulations governing eligibility to receive Title IV, HEA Program benefits." (Compl. ¶ 25.)<br><br>"An institution must enter into a PPA with the Department of Education to participate in the Title IV, HEA Programs: The agreement **shall** condition the initial and continuing eligibility of an institution to participate in a program upon compliance with the [prohibition against incentive compensation]." (Compl. ¶ 26; *see also* Compl. ¶¶ 29, 30, 39 (discussing Program Participation Agreements, or "PPAs"); FAC ¶¶ 6, 7, 56 (alleging that individual defendants signed PPAs ).) | Q Do you know what a 'program participation agreement' is?<br>A No.  What is that?<br>Q I'm just asking whether you know what it is?<br>A No I don't.<br>. . .<br>Q Have you ever seen any agreements that Corinthian has with the government, the U.S. government?<br>A Like what?<br>Q Any agreements of any kind.  Have you ever seen any agreements that Corinthian has with the government?<br>A Not that I know of, no.  I would have to say no to that.<br>(Lee Dep. 164:10-165:11.)<br><br>Q Have you ever communicated with the federal government on behalf of Corinthian?<br>A No.<br>Q Did you ever see or hear any communications between a representatives of Corinthian and the government?<br>A No.<br>(Lee Dep. 166:24-167:5.) | Q Do you know what a Program Participation Agreement is?<br>A No.  Could you explain that to me?<br>Q Do you know what a PPA is?<br>A No.<br>Q So sitting here right now, without explanation from somebody else, you don't have any understanding of what a PPA is?<br>A I'm not familiar with that type of document, haven't had any need -- need to.<br>Q So you've never had to prepare a PPA for anybody before?<br>A As far as I know, no.<br>Q You've never reviewed a Program Participation Agreement, or PPA, at any point?<br>A Program Participation Agreement?  No.<br>Q And you've never submitted a Program Participation Agreement to anybody?<br>A No.<br>Q Because you have no idea what it is?<br>A Until you mentioned it.<br>(Mshuja Dep. 140:5-25.)<br><br>Q Have you ever seen any communications at all between anybody at Corinthian and anybody in any department of the federal government?<br>A Have I seen them do it, talk to somebody?<br>Q In any department of the federal government.<br>A Possibly.  I'm not sure.<br>Q So you have no recollection of any communications |

**Appendix A:  Complaint Allegations Versus Relators' Deposition Testimony**

| Allegation | Testimony of Nyoka Lee | Testimony of Talala Mshuja |
|---|---|---|
| | | --<br>MR. LEVY:  Objection.  He just said he's not sure; he didn't say he had no recollection.<br>THE WITNESS:  I'm not sure.<br>(Mshuja Dep. 150:21-151:6.) |
| "Corinthian submitted false claims for payment and obtained Title IV, HEA Program funds from the Department of Education through the various loan programs."  (Compl. ¶ 40; *see also* Compl. ¶¶ 41-43 (describing how allegedly false claims were made through different Title IV financial aid programs).) | Q Okay.  I want to ask you about financial aid.  And by that I mean any federal government or state government assistance that's given to a student to help finance their education.  So that could be a grant, it could be a loan. As an employee of Corinthian, did you have any responsibility for helping students submit financial aid applications?<br>A I didn't work in financial aid, I worked in admissions. . .  That's what I did.  I didn't mess around with financial aid.<br>Q Okay.  Have you ever prepared a financial aid application for a Corinthian student?<br>A No, I have not.<br>Q Have you ever submitted a financial aid application for a Corinthian student?<br>A No.<br>. . . .<br>Q Did you ever submit any claim for payment to the federal government on behalf of Corinthian?<br>A No.<br>Q Did you ever see any claim for payment to the federal government that was made by Corinthian?<br>A No.<br>(Lee Dep. 166:5-167:11.) | Q Have you ever submitted any claims . . . to the federal government on behalf of Corinthian?<br>A No.<br>Q And you've never seen any claims to the federal government on behalf of Corinthian; right?  Have you ever seen any of those claims . . . at Corinthian, made to the federal government for payment?<br>A No.<br>(Mshuja Dep. 151:24-152:12.) |
| "Defendant David Moore ("MOORE") is an individual who served as chairman, | Q David Moore is one of the defendants in this case.  Do you know who he is?<br>A He was at the University of Phoenix, wasn't he. | Q Do you know who David Moore is?<br>A No.<br>Q David Moore is one of the defendants in this action. |

19612307

**Appendix A:  Complaint Allegations Versus Relators' Deposition Testimony**

| Allegation | Testimony of Nyoka Lee | Testimony of Talala Mshuja |
|---|---|---|
| president, and chief executive officer of [THE SCHOOL]. MOORE was a founding shareholder in [THE SCHOOL], and was directly in charge of [THE SCHOOL]'s recruiting operations and enrollment practices, and setting Company enrollment targets, until 2006, when he left management of the Company. . . . . MOORE signed many of the Program Participation Agreements that were submitted to United States Department of Education pursuant to 20 U.S.C. § 1094 so that [THE SCHOOL] could participate in the federal student financial aid programs. MOORE was primarily responsible for the ramp up in [THE SCHOOL]'s enrollments in the period through 2006." (FAC ¶ 6.)<br><br>"Defendants, MOORE and MASSIMINO, while they served as the president, chairman and chief executive officer of the institutions and of [THE SCHOOL], designed and implemented [THE | Q I'm just asking if he know who he is.<br>A Oh, I'm trying to figure out if I do.  I think he was at University of Phoenix.  I'm not sure.<br>Q He's not somebody you know personally?<br>A No.<br>Q You don't even know if he worked for Corinthian?<br>A Well, I saw -- I don't know where he's working now, but I saw the corporate page and I think he got transferred over here from the University of Phoenix. I don't know. That's a question you have to ask David Moore because I don't know the answer to that.<br>Q Okay. You've never met him in person?<br>A I might have seen him on the Web page, but I have never met him.<br>Q And you've never communicated with David Moore; is that right?<br>A Not like I'm communicating with you.<br>Q I'm asking if you've ever communicated --<br>A No.<br>Q -- with David Moore?<br>A No.<br>Q And have you ever been in a meeting in which he was present?<br>A Oh, I think he might have spoken at some of those University of Phoenix meetings.  I'm not sure.<br>Q Okay.  You don't recall a meeting --<br>A No.<br>Q . . .at Corinthian?<br>A I had no meetings with David Moore.<br>Q Okay.  And you don't recall him speaking at any meeting at Corinthian; is that correct?<br>A No. | Have you ever met him in person?<br>A No.<br>Q So you've never talked to him?<br>A No.<br>Q Have you ever received any communications from him?<br>A I'm not sure.<br>Q Have you ever heard of David Moore?<br>A Kind of vaguely remember, I've heard of him.<br>Q What do you remember about him?<br>A I don't know.<br>Q So the name's not --<br>A I mean, I've heard it mentioned in these depositions.<br>Q So other -- other than the -- what you've heard in yesterday's deposition of Ms. Lee and today's deposition, you haven't heard of David Moore?<br>A No.<br>Q And the name does not sound familiar?<br>A No.<br>Q So that would mean you've never participated in any communications or meetings with Mr. Moore?<br>A No.<br>Q And you've never observed any communications or meetings with Mr. Moore?<br>A No.<br>Q And you've never seen any documents that Mr. Moore authored or signed?<br>A Not that I can remember.<br>(Mshuja Dep. 155:2-156:8.) |

- 25 -

**Appendix A:  Complaint Allegations Versus Relators' Deposition Testimony**

| Allegation | Testimony of Nyoka Lee | Testimony of Talala Mshuja |
|---|---|---|
| SCHOOL]'s recruiter compensation practices. MOORE and MASSIMINO executed Program Participation Agreements every year so that [THE SCHOOL] could receive the federal student financial aid described herein. MOORE and MASSIMINO knew that [THE SCHOOL] was paying incentive compensation to its recruiters, and that [THE SCHOOL] would continue to pay incentive compensation to its recruiters, each year when they executed the Program Participation Agreements (FAC ¶ 56.) | Q Is that correct? A That's correct. (Lee Dep. 162:3-163:19.) | |
| "Defendant Jack D. Massimino ("MASSIMINO") is an individual who served as chairman, president, and chief executive officer of [THE SCHOOL]. Said Defendant has made his appearance herein. MASSIMINO also served on [THE SCHOOL]'s board of directors. MASSIMONO signed many of the Program Participation Agreements that were submitted to the United States Department of Education | Q Another one of the defendants is someone named Jack Massimino.  Do you know who that is? A I think he was with the University of Phoenix. I can't remember the names. Q Okay. A But he might have been with the University of Phoenix. . . .  I think he was the president over there or something.  I'm not sure. Q And you never met him in person? A I can't remember meeting him in person. Q Okay.  And I take it you don't recall communicating with him? A No. (Lee Dep.  163:20-164:9.) | Q Do you know Jack Massimino? A Do I know him personally?  No. . . . Q Have you ever received any communications from Mr. Massimino? A I don't think so. Q And you've never participated in any meetings with Mr. Massimino? A No. Q Have you ever seen any documents that Mr. Massimino signed? A I don't remember. Q Any -- any documents that Mr. Massimino authored? A I don't remember. |

- 26 -

**Appendix A:  Complaint Allegations Versus Relators' Deposition Testimony**

| Allegation | Testimony of Nyoka Lee | Testimony of Talala Mshuja |
|---|---|---|
| so that [THE SCHOOL] could participate in the federal student financial aid programs. MASSIMINO had primary responsibility for setting yearly enrollment targets for [THE SCHOOL]'s colleges. MASSIMINO was responsible for implementing the recruiting compensation practices described herein to achieve the Company's annual enrollment targets." (FAC ¶ 7.)<br><br>"Defendants, MOORE and MASSIMINO, while they served as the president, chairman and chief executive officer of the institutions and of [THE SCHOOL], designed and implemented [THE SCHOOL]'s recruiter compensation practices. MOORE and MASSIMINO executed Program Participation Agreements every year so that [THE SCHOOL] could receive the federal student financial aid described herein. MOORE and MASSIMINO knew that [THE SCHOOL] was paying incentive compensation to its | | Q But the name doesn't sound familiar in the least?<br>MR. LEVY:  Objection.  Form.<br>THE WITNESS:  Vaguely.  I just heard it --<br>BY MR. PHADKE:<br>Q How does it sound familiar?<br>A I just heard it mentioned.<br>Q So the only time you've heard of Jack Massimino is at today's deposition and at yesterday's deposition –<br>A Yeah.<br>Q -- of Ms. Lee?<br>A That's true.<br>(Mshuja Dep. 156:9-157:10.) |

19612307

**Appendix A:  Complaint Allegations Versus Relators' Deposition Testimony**

| Allegation | Testimony of Nyoka Lee | Testimony of Talala Mshuja |
|---|---|---|
| recruiters, and that [THE SCHOOL] would continue to pay incentive compensation to its recruiters, each year when they executed the Program Participation Agreements (FAC ¶ 56.) | | |
| "Relators . . .have direct and independent knowledge of the information upon which this action is based…" (Compl. ¶ 24.) | *See above.* | Q Now, earlier you had testified that you reviewed materials that Mr. Levy has sent to you about Corinthian, in order to prepare for this deposition, and that you had reviewed those same materials before you filed the original Complaint; is that correct? A Yes. Q And those materials that Mr. Levy sent to you, you had never seen those before?  Yes? A No. Q So they came from your attorney and you'd never seen them before? A Yes. Q And other than those materials that Mr. Levy sent to you that you had never seen before, and materials based on your Internet research, did you base your knowledge of the Complaint on anything else? A No. Q So that was the basis of the knowledge -- that was the basis of your knowledge of your allegations of the Complaint? A Yes. Q Those two pieces of information? A Yes. Q Materials that Mr. Levy sent you about Corinthian – A Uh-huh. |

- 28 -

**Appendix A:  Complaint Allegations Versus Relators' Deposition Testimony**

| Allegation | Testimony of Nyoka Lee | Testimony of Talala Mshuja |
|---|---|---|
|  |  | Q -- that you had never seen before, and then Internet research you had done? <br> A That's true. <br> Q And those are materials -- those materials are ones you reviewed prior to March 2007 when you filed the original Complaint. <br> A Yes. <br> (Mshuja Dep. 77:15-78:22.) <br><br> Q Is the only person you ever talked to at Corinthian about how ad reps were compensated your sister, Nyoka Lee? <br> A Yes. <br> Q You never talked to anybody else about how ad reps were compensated? <br> A No. <br> Q You never talked to anybody else about how DOAs were compensated either? <br> A No. <br> Q Did you ever -- <br> A Oh -- <br> Q Sorry? <br> A Only Nyoka. <br> (Mshuja Dep. 192:4-17.) <br><br> Q Was Ms. Lee the only source you had for how DOAs or ad reps got compensated? <br> A Yeah, she had the insight and she got the promotion, so she had all the information. <br> Q So she was the only person you ever talked to about those subjects? <br> A Basically. |

19612307

Appendix A:  Complaint Allegations Versus Relators' Deposition Testimony

| Allegation | Testimony of Nyoka Lee | Testimony of Talala Mshuja |
|---|---|---|
| | | Q Is that right? |
| | | A Yes. |
| | | Q And you never -- you -- you didn't know anything yourself about those -- about how ad reps were compensated or how DOAs were compensated besides what you learned from Ms. Lee? |
| | | A That's the only source, Ms. Lee. |
| | | Q And that's for the entire period from 2000 to 2012? |
| | | A That's correct. |
| | | Q And other than the documents that your counsel produced and the research that you did with respect to lawsuits against other for-profit colleges, are you aware of any other documents relating to ad rep or DOA compensation? |
| | | A Do I know of any? |
| | | Q Yeah. |
| | | A Only documents that my attorneys showed me, and my sister Nyoka. |
| | | Q So other than documents that your attorney showed you and what Nyoka Lee showed you, you're not aware of any documents relating to ad rep compensation or DOA compensation? |
| | | A No. |
| | | (Mshuja Dep. 193:20-194:25.) |

19612307

# Appendix B

Westlaw.

31 U.S.C.A. § 3730

United States Code Annotated Currentness
Title 31. Money and Finance (Refs & Annos)
  Subtitle III. Financial Management
  Chapter 37. Claims (Refs & Annos)
    Subchapter III. Claims Against The United States Government (Refs & Annos)
      **§ 3730. Civil actions for false claims**

**(a) Responsibilities of the Attorney General.**—The Attorney General diligently shall investigate a violation under section 3729. If the Attorney General finds that a person has violated or is violating section 3729, the Attorney General may bring a civil action under this section against the person.

**(b) Actions by private persons.**—**(1)** A person may bring a civil action for a violation of section 3729 for the person and for the United States Government. The action shall be brought in the name of the Government. The action may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting.

**(2)** A copy of the complaint and written disclosure of substantially all material evidence and information the person possesses shall be served on the Government pursuant to Rule 4(d)(4) of the Federal Rules of Civil Procedure. [FN1] The complaint shall be filed in camera, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders. The Government may elect to intervene and proceed with the action within 60 days after it receives both the complaint and the material evidence and information.

**(3)** The Government may, for good cause shown, move the court for extensions of the time during which the complaint remains under seal under paragraph (2). Any such motions may be supported by affidavits or other submissions in camera. The defendant shall not be required to respond to any complaint filed under this section until 20 days after the complaint is unsealed and served upon the defendant pursuant to Rule 4 of the Federal Rules of Civil Procedure.

**(4)** Before the expiration of the 60-day period or any extensions obtained under paragraph (3), the Government shall—

**(A)** proceed with the action, in which case the action shall be conducted by the Government; or
**(B)** notify the court that it declines to take over the action, in which case the person bringing the action shall have the right to conduct the action.

**(5)** When a person brings an action under this subsection, no person other than the Government may intervene or bring a related action based on the facts underlying the pending action.

**(c) Rights of the parties to qui tam actions.**—**(1)** If the Government proceeds with the action, it shall have the primary responsibility for prosecuting the action, and shall not be bound by an act of the person bringing the action. Such person shall have the right to continue as a party to the action, subject to the limitations set forth in paragraph (2).

**(2)(A)** The Government may dismiss the action notwithstanding the objections of the person initiating the action if the person has been notified by the Government of the filing of the motion and the court has provided the person with an opportunity for a hearing on the motion.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(B)** The Government may settle the action with the defendant notwithstanding the objections of the person initiating the action if the court determines, after a hearing, that the proposed settlement is fair, adequate, and reasonable under all the circumstances. Upon a showing of good cause, such hearing may be held in camera.

**(C)** Upon a showing by the Government that unrestricted participation during the course of the litigation by the person initiating the action would interfere with or unduly delay the Government's prosecution of the case, or would be repetitious, irrelevant, or for purposes of harassment, the court may, in its discretion, impose limitations on the person's participation, such as—

**(i)** limiting the number of witnesses the person may call;
**(ii)** limiting the length of the testimony of such witnesses;
**(iii)** limiting the person's cross-examination of witnesses; or
**(iv)** otherwise limiting the participation by the person in the litigation.

**(D)** Upon a showing by the defendant that unrestricted participation during the course of the litigation by the person initiating the action would be for purposes of harassment or would cause the defendant undue burden or unnecessary expense, the court may limit the participation by the person in the litigation.

**(3)** If the Government elects not to proceed with the action, the person who initiated the action shall have the right to conduct the action. If the Government so requests, it shall be served with copies of all pleadings filed in the action and shall be supplied with copies of all deposition transcripts (at the Government's expense). When a person proceeds with the action, the court, without limiting the status and rights of the person initiating the action, may nevertheless permit the Government to intervene at a later date upon a showing of good cause.

**(4)** Whether or not the Government proceeds with the action, upon a showing by the Government that certain actions of discovery by the person initiating the action would interfere with the Government's investigation or prosecution of a criminal or civil matter arising out of the same facts, the court may stay such discovery for a period of not more than 60 days. Such a showing shall be conducted in camera. The court may extend the 60-day period upon a further showing in camera that the Government has pursued the criminal or civil investigation or proceedings with reasonable diligence and any proposed discovery in the civil action will interfere with the ongoing criminal or civil investigation or proceedings.

**(5)** Notwithstanding subsection (b), the Government may elect to pursue its claim through any alternate remedy available to the Government, including any administrative proceeding to determine a civil money penalty. If any such alternate remedy is pursued in another proceeding, the person initiating the action shall have the same rights in such proceeding as such person would have had if the action had continued under this section. Any finding of fact or conclusion of law made in such other proceeding that has become final shall be conclusive on all parties to an action under this section. For purposes of the preceding sentence, a finding or conclusion is final if it has been finally determined on appeal to the appropriate court of the United States, if all time for filing such an appeal with respect to the finding or conclusion has expired, or if the finding or conclusion is not subject to judicial review.

**(d) Award to qui tam plaintiff.—(1)** If the Government proceeds with an action brought by a person under subsection (b), such person shall, subject to the second sentence of this paragraph, receive at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim, depending upon the extent to which the person substantially contributed to the prosecution of the action. Where the action is one which the court finds to be based primarily on disclosures of specific information (other than information provided by the person bringing the action) relating to allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government [FN2] Accounting Office report, hearing, audit, or investigation, or from the news media, the court may award such sums

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

as it considers appropriate, but in no case more than 10 percent of the proceeds, taking into account the significance of the information and the role of the person bringing the action in advancing the case to litigation. Any payment to a person under the first or second sentence of this paragraph shall be made from the proceeds. Any such person shall also receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs. All such expenses, fees, and costs shall be awarded against the defendant.

**(2)** If the Government does not proceed with an action under this section, the person bringing the action or settling the claim shall receive an amount which the court decides is reasonable for collecting the civil penalty and damages. The amount shall be not less than 25 percent and not more than 30 percent of the proceeds of the action or settlement and shall be paid out of such proceeds. Such person shall also receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs. All such expenses, fees, and costs shall be awarded against the defendant.

**(3)** Whether or not the Government proceeds with the action, if the court finds that the action was brought by a person who planned and initiated the violation of section 3729 upon which the action was brought, then the court may, to the extent the court considers appropriate, reduce the share of the proceeds of the action which the person would otherwise receive under paragraph (1) or (2) of this subsection, taking into account the role of that person in advancing the case to litigation and any relevant circumstances pertaining to the violation. If the person bringing the action is convicted of criminal conduct arising from his or her role in the violation of section 3729, that person shall be dismissed from the civil action and shall not receive any share of the proceeds of the action. Such dismissal shall not prejudice the right of the United States to continue the action, represented by the Department of Justice.

**(4)** If the Government does not proceed with the action and the person bringing the action conducts the action, the court may award to the defendant its reasonable attorneys' fees and expenses if the defendant prevails in the action and the court finds that the claim of the person bringing the action was clearly frivolous, clearly vexatious, or brought primarily for purposes of harassment.

**(e) Certain actions barred.—(1)** No court shall have jurisdiction over an action brought by a former or present member of the armed forces under subsection (b) of this section against a member of the armed forces arising out of such person's service in the armed forces.

**(2)(A)** No court shall have jurisdiction over an action brought under subsection (b) against a Member of Congress, a member of the judiciary, or a senior executive branch official if the action is based on evidence or information known to the Government when the action was brought.

**(B)** For purposes of this paragraph, "senior executive branch official" means any officer or employee listed in paragraphs (1) through (8) of section 101(f) of the Ethics in Government Act of 1978 (5 U.S.C. App.).

**(3)** In no event may a person bring an action under subsection (b) which is based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party.

**(4)(A)** No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government [FN3] Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(B)** For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

**(f) Government not liable for certain expenses.**—The Government is not liable for expenses which a person incurs in bringing an action under this section.

**(g) Fees and expenses to prevailing defendant.**—In civil actions brought under this section by the United States, the provisions of section 2412(d) of title 28 shall apply.

**(h)** Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole. Such relief shall include reinstatement with the same seniority status such employee would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. An employee may bring an action in the appropriate district court of the United States for the relief provided in this subsection.

CREDIT(S)

(Pub.L. 97-258, Sept. 13, 1982, 96 Stat. 978; Pub.L. 99-562, §§ 3, 4, Oct. 27, 1986, 100 Stat. 3154, 3157; Pub.L. 100-700, § 9, Nov. 19, 1988, 102 Stat. 4638; Pub.L. 101-280, § 10(a), May 4, 1990, 104 Stat. 162; Pub.L. 103-272, § 4(f)(1)(P), July 5, 1994, 108 Stat. 1362.)

[FN1] See, now, Rule 4(i) of the Federal Rules of Civil Procedure.

[FN2] So in original. Probably should be "General".

[FN3] So in original. Probably should be "General".

HISTORICAL AND STATUTORY NOTES

Revision Notes and Legislative Reports

1982 Acts

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
| --- | --- | --- |
| 3730(a) | 31:233 | R.S. § 3492. |
| 3730(b)(1) | 31:232(A), (B) (less words between 3d and 4th commas). | R.S. § 3491(A)-(E); restated Dec. 23, 1943, ch. 377, § 1, 57 Stat. 608; June 11, 1960, Pub.L. 86-507, § 1(28), (29), 74 Stat. 202. |
| 3730(b)(2) | 31:232(C) (1st-3d sentences, 5th sentence proviso). | |
| 3730(b)(3) | 31:232(C) (4th sentence, | |

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.