# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

UNITED STATES OF AMERICA,                )
Ex Rel. NYOKA LEE and                    )
TALALA MSHUJA,                           )
                                         )
                                         )
            Plaintiff,                   ) No. CV-07-01984
                                         )     PSG (MANx)
       vs.                               )
                                         )
CORINTHIAN COLLEGES, INC.; ERNST & )
YOUNG, LLP; DAVID MOORE; and             )
JACK D. MASSIMINO,                       )
                                         )
            Defendants.                  )
_____ )

VOLUME I

VIDEOTAPED DEPOSITION OF:  NYOKA J. LEE

MONDAY, DECEMBER 17, 2012, 9:07 A.M.

SANTA ANA, CALIFORNIA

REPORTED BY:

KIMBERLY REICHERT, CSR
CERTIFICATE NO. 10986

**0003**

1              IN THE UNITED STATES DISTRICT COURT

2             FOR THE CENTRAL DISTRICT OF CALIFORNIA

3                       WESTERN DIVISION

4

5

6    UNITED STATES OF AMERICA,          )
     Ex Rel. NYOKA LEE and              )
7    TALALA MSHUJA,                     )
                                        )
8                                       )
               Plaintiff,               ) No. CV-07-01984
9                                       )      PSG (MANx)
         vs.                            )
10                                      )
     CORINTHIAN COLLEGES, INC.; ERNST & )
11   YOUNG, LLP; DAVID MOORE; and       )
     JACK D. MASSIMINO,                 )
12                                      )
               Defendants.              )
13   _____)

14

15

16

17         Videotaped deposition of NYOKA J. LEE,

18   Volume I, taken on behalf of the Defendants, before

19   Kimberly Reichert, Certified Shorthand Reporter No.

20   10986 for the State of California, with principal

21   office in the County of Orange, commencing at 9:07

22   a.m. on Monday, December 17, 2012, located at

23   Corinthian Colleges, Inc., 6 Hutton Centre Drive,

24   Santa Ana, California.

25

**0004**

```
 1  schools and stuff like that, you know, like
 2  alternative schools.  So I guess that would be for
 3  profit.
 4       Q    What do you mean by "alternative schools"?
 5       A    Oh, they have schools that are like
 6  schools for students who don't do well in academic
 7  settings.  And they set up schools, alternative
 8  schools for their training, hands-on training in
 9  different areas.
10       Q    And were these high school students --
11       A    Yes.
12       Q    -- that attended the schools?
13       A    Uh-huh.
14       Q    Okay.  Other than --
15       A    Yes.
16       Q    Other than this consulting work that you
17  did with alternative schools from time to time prior
18  to 1999, did you have any other work that you did in
19  the education sector before 1999?
20       A    Let's see.  I can't remember anything.
21       Q    So let's talk about your employment at
22  Corinthian.  You started there in 1999?
23       A    Uh-huh.
24       Q    Do you recall what month you started?
25       A    Well, let's see.  I think it was at the
```

1    beginning of that year.

2         Q    Okay.  And in what capacity were you

3    employed in 1999 at Corinthian?

4         A    I was employed as an independent test

5    proctor.

6         Q    What were your responsibilities in that

7    position?

8         A    To test students who were coming into the

9    school to enroll and get an education.

10        Q    Did you have any other interaction with

11   the students other than proctoring the exams?

12        A    No.

13        Q    So you had no responsibility for

14   recruiting them to the school?

15        A    No.

16        Q    Is that right?

17        A    Not as a proctor, no.

18        Q    Okay.  And how were you paid as a test

19   proctor?

20        A    As an independent consultant.

21        Q    So did you have an independent contract

22   with the school?

23        A    Yes, I did.

24        Q    And what -- what was your pay based on?

25   Was it based on an hourly rate or how were you paid?

1        A     I was paid hourly.

2        Q     So the only thing your compensation

3    depended on as a test proctor was how many hours you

4    worked; is that right?

5        A     Yes.

6        Q     It didn't depend on how many students

7    passed the test; is that right?

8        A     That's correct.

9        Q     And it didn't depend on whether they

10    enrolled in the school; is that correct?

11        A     That's right.  Correct.

12        Q     Did you receive any bonuses during the

13    time that you worked as a test proctor?

14        A     No, I did not.

15        Q     How long did you work as a test proctor

16    for the school?

17        A     Approximately nine months.

18        MS. YOUNG:  I'm handing you what we'll mark as

19    Exhibit 1.

20                  (Defendants' Exhibit 1 was marked for

21    identification by the deposition officer and is

22    bound under separate cover.)

23    BY MS. YOUNG:

24        Q     Ms. Lee, what I just handed you is a

25    document titled "Independent Contractor Service

1    Agreement."

2          And if you turn to the third page, under

3    the signature line for "Contractor," is that your

4    signature there?

5          A    This page (indicating)?

6          Q    Correct.

7          A    Yes, it is.

8          Q    And did you sign this document on

9    November 19th, 1999?

10         A    Yes, I did.

11         Q    And is this --

12         A    I thought it was the beginning of that

13   year.  I see it's 11/99.

14         Q    Is this when you commenced your employment

15   with Corinthian, in November of 1999?

16         A    I believe so, yes.

17         MR. LEVY:  Can you give her a minute to look

18   through it?

19   BY MS. YOUNG:

20         Q    Take a minute to look through the

21   document, Ms. Lee.

22         A    Okay.  Yes.  Okay.

23         Q    Okay.  And this is the agreement that set

24   out the terms of your employment as an independent

25   test proctor with the school?

1      A    Yes.

2      Q    At what location did you work as a test

3  proctor for the school?

4      A    San Francisco.

5      Q    Did you work as a test proctor for the

6  school in any other location?

7      A    For this school or --

8      Q    For Corinthian.

9      A    No, I did not.

10      Q    Okay.  And then you think you were in this

11  position for about nine months?

12      A    Yes.

13      Q    What did you do next?

14      A    Well, I got recruited into the admissions

15  department.

16      Q    Okay.  Who recruited you?

17      A    Cary Kaplan, who was the director of

18  admissions at that time.

19      Q    And is this again at the San Francisco

20  campus?

21      A    Yes.

22      Q    Did you join the admissions department at

23  the San Francisco campus?

24      A    Yes.

25      Q    When did you do that?

```
 1        A    What month or --

 2        Q    If you can recall.

 3        A    I think it was August.

 4        Q    In August of what year?

 5        A    So this was '99.  So that would have been

 6   2000.  From 11 to -- to August.  I think that's nine

 7   months, isn't it?

 8        Q    Uh-huh.

 9        A    Yes.

10        MS. YOUNG:  Well, I tested your memory.  I have

11   a document here we can look at that nails it down,

12   but let's see.  We'll mark this as Exhibit 2.

13                (Defendants' Exhibit 2 was marked for

14   identification by the deposition officer and is

15   bound under separate cover.)

16        THE WITNESS:  Thank you.

17   BY MS. YOUNG:

18        Q    So take a moment to look at this document.

19   This is a letter dated August 8th of 2000 titled

20   "Confirmation of employment."  And at the bottom it

21   says "Accepted by" and there's a signature.

22                Is that your signature at the bottom?

23        A    Yes, it is.

24        Q    And it says here that -- in the first

25   paragraph you can see it congratulates you on your
```

1   new position at Bryman College.

2            And it says, "Your starting date" -- at

3   the end of that paragraph it says, "Your starting

4   date will be August 14th, 2000."

5            Does that sound about right?

6       A    Uh-huh, it does.  Thank you.

7       Q    Okay.

8       A    Or should I say "yes."

9       Q    I take it you read this letter before you

10  signed it?

11      A    Yes.

12      Q    Is that your practice, you read through

13  documents before you sign them?

14      A    Yes, it is.

15      Q    And you understood that signing the letter

16  would indicate your agreement with what was in the

17  letter; correct?

18      A    Yes.

19           Did I miss something?  Hopefully --

20      Q    No, I'm just --

21      A    Oh, okay.

22      Q    I'm asking for your thoughts in signing

23  the letter.

24      A    Yes, I signed it.  Mr. Plant gave it to

25  me.

1     Q    Okay.  And it says here in the last

2   paragraph, "Your signature below will acknowledge

3   that there have been no representations by this

4   company or its agents or any other agreements

5   regarding your employment that are not reflected in

6   this agreement."

7          Do you see that?

8     A    Yes, I do.

9     Q    You read that before you signed it; is

10  that right?

11    A    Yes.

12    Q    And that was an accurate statement as of

13  the date that you signed that letter --

14    A    Yes.

15    Q    -- correct?

16         Okay.  And what was your title when you

17  were hired into the admissions department?

18    A    Campus admissions rep.

19    Q    What were your responsibilities in that

20  position?

21    A    My responsibilities were to recruit

22  students, motivate them to come to school -- come to

23  the school, interview them and get them tested if

24  they wanted to go to school and to encourage them to

25  meet with financial aid, see if they qualified, and

1    also give them a tour of the school, and enroll

2    them.  Make sure they started on time, they stayed

3    in school until they graduated.

4         Q    So it wasn't just to recruit them and get

5    them into -- in the door; right, you had continuing

6    responsibilities to these students?

7         A    Yes, I did.

8         Q    Okay.  Was career guidance one of those

9    responsibilities?

10        A    Sorry?

11        Q    Was providing them with career guidance

12   one of those responsibilities?

13        A    Well, they didn't say I was supposed to do

14   that, but I did it.  You know, I provided them with

15   career guidance and encouraged them to continue

16   their education.

17        Q    Okay.  Did you have any responsibilities

18   as a campus admissions representative for

19   supervising other admissions representatives?

20        A    Well, that wasn't in my contract, but I

21   did it because I was good at my job and Cary Kaplan

22   trusted me and he wanted me to do it.

23        Q    As a campus admissions representative,

24   were you ever in a position to fill out a formal

25   performance evaluation of other admissions

 1   representatives?

 2        A    No, I was not.

 3        Q    So supervising other admissions

 4   representatives may have been something you did, but

 5   it wasn't officially part of your job description?

 6        A    No.  I wasn't really supervising them.  I

 7   was just being an example for them.

 8        Q    Okay.  And how long did you work as an

 9   admissions representative on the San Francisco

10   campus?

11        A    For about six years.

12        Q    Let's see if we can take a look at some

13   documents to maybe clear up the work history a

14   little bit.  I realize a lot of this is in the past.

15        A    Uh-huh.

16        Q    And I'm not trying to trick you.  I have

17   some documents that can maybe help us get a clear

18   chronology here.

19        A    Okay.  Great.

20        MS. YOUNG:  I'm sorry.  I keep bumping you.

21        THE VIDEOGRAPHER:  That's okay.

22        MS. YOUNG:  I'm handing you what we'll mark as

23   Exhibit 3.

24                  (Defendants' Exhibit 3 was marked for

25   identification by the deposition officer and is

```
1   bound under separate cover.)

2   BY MS. YOUNG:

3       Q    And I'd ask you to hold on to it.  We

4   might come back to it again a little later.  Oops.

5   Why don't you give that to the court reporter to

6   mark.

7       A    All right.

8       Q    And take a moment again to look at this

9   document.  This is a letter dated June 4th, 2004.

10  It states, "I am pleased to confirm Terry Harty's

11  offer of employment and your acceptance of a

12  position at Bryman College, Hayward campus."

13      A    Uh-huh.

14      Q    And then if you look on the second page,

15  there's a signature line for "Accepted by."  Is that

16  your signature in the line there?

17      A    It is.

18      Q    And the date on which this was signed was

19  June 10th, 2004?

20      A    That's what this says, yes.

21      Q    Okay.  And do you recognize this document?

22      A    Yes, I do.

23      Q    And what is it?

24      A    Well, it's giving me an outline of my

25  salary, of course, and the different dates that I
```

```
1    was supposed to be trained for specific job

2    descriptions that I was supposed to perform.

3         Q    Okay.  This document states -- where it

4    says "Start Date" in the margin on the first page,

5    you commenced employment in this position on

6    June 1st, 2004.  And the title in that same section

7    says "Director of Admissions."

8              Did you become a director of admissions at

9    Hayward -- at the Hayward campus on June 1st, 2004?

10        A    Yes, I did.  I think that was the date,

11   but there was some confusion with that specific

12   transfer.  It didn't take place properly.

13        Q    Okay.

14        A    So I'm not sure if that's the correct

15   date.

16        Q    Did you start sometime in the month of

17   June in 2004 as the director of admissions at

18   Hayward?

19        A    It couldn't have -- it could be that date

20   or it could have been -- I'm sure if it said June, I

21   started in June.

22        Q    Okay.  In June 2004?

23        A    Yes.

24        Q    And were you working as an admissions

25   representative in the San Francisco campus up until
```

1    that time, from 2000 up until that time?

2         A    Yes.  Yes, I was.  Or, yes, I did I should

3    say.

4         Q    So I don't think that's quite six years.

5    I think it's more like three years and -- and nine

6    months at San Francisco before you became a director

7    of admissions at Hayward.

8         A    Oh, it was more than that.

9         Q    Okay.  Well, I -- I thought we just talked

10   about you starting to work as an admissions

11   representative in San Francisco --

12        A    I was -- I thought you were speaking of

13   when I started employment because I did start in

14   1999.

15        Q    Okay.

16        A    And then I went into admissions.  So...

17        Q    All I'm trying to do is understand how

18   long you were an admissions representative in San

19   Francisco before you became the director of

20   admissions at Hayward.

21        A    Uh-huh.  Yeah.  Well, that's from 2000 --

22   let's see.  2000 to 2004, maybe.  Because I was a

23   student at University of Phoenix and I was an

24   admissions rep the whole time I was going to school

25   from when I started with my B.S. to when I finished

1    my courses, and my doctoral courses.

2        Q    Okay.

3        A    I was an admissions rep during that time.

4    I was going to school and working at Bryman at the

5    same time.

6        Q    Okay.

7        A    So that's how I was gauging how long I

8    worked there.  And then I went to Hayward.

9        Q    Okay.

10       A    Okay.  For a short period of time.

11       Q    Just focusing on your stint as an

12   admissions representative in San Francisco, that was

13   from August of 2000 until about the end of May 2004;

14   is that right?

15       A    Uh-huh.  Yes, something like that.

16   Uh-huh.

17       Q    All right.  And again, just focusing on

18   when you first started in San Francisco as a campus

19   admissions representative, how were you compensated?

20       A    Uh-huh.  As a campus rep?

21       Q    Uh-huh.

22       A    Well, I was salaried.  I was a salaried

23   employee.

24       Q    Okay.  And what was your starting salary?

25       A    I think it was on this page right here

1   (indicating).  It said 38-.

2        Q    Are you referring to what we've marked as

3   Exhibit 2?

4        A    This one, yeah, something like that.

5   Yeah, right here (indicating).

6        Q    Okay.  And the first paragraph says -- in

7   the last sentence of the first paragraph it says,

8   "As we discussed, your beginning salary is $38,400."

9        A    Uh-huh, yes.

10       Q    Is that consistent with what you recall?

11       A    Yes, it is.

12       Q    And was there a compensation plan that

13   governed your employment as a campus admissions

14   representative?

15       A    Compensation plan would be like how much I

16   was receiving or --

17       Q    Well, was there any plan that told you

18   what you would have to do to be eligible for a

19   promotion or for a raise?

20       A    In writing?  There might have -- not at

21   that time.  There might have been something that

22   came up later.

23       Q    Uh-huh.

24       A    Okay.

25       Q    Yeah, I'm focusing just on when you were

```
 1   hired.  Did you ever --

 2        A    Well, this is what I received when I went

 3   in there, was this letter here.

 4        Q    Okay.  And did you --

 5        A    There was no compensation plan that came

 6   with this.

 7        Q    Okay.

 8        A    That I recall.

 9        Q    If you look at the second-to-last

10   paragraph in Exhibit 2 that you were just looking

11   at, the second-to-last sentence of that -- of that

12   paragraph says, "You will not be eligible for merit

13   increase consideration until October 1st, 2001" --

14        A    Uh-huh.

15        Q    -- "at which time you will be reviewed

16   again.

17             "Admissions representatives will be

18   reviewed for Meritorious Performance in accordance

19   with the Meritorious Performance Compensation Plan,

20   which will be given to you on your first day of

21   employment."

22             Do you see that?

23        A    Yes, I do.

24        Q    And do you recall getting a meritorious

25   performance compensation plan on your first day of
```

1   employment?

2        A    No, I don't.  I don't recall receiving

3   that, but -- I recall receiving it later maybe, but

4   not on this.

5        Q    Okay.

6        A    Because I was given so many papers.  It

7   could have been there, but I don't remember it.

8        MS. YOUNG:  Okay.  Let me show you a document

9   that was produced to us by your attorney.  We'll

10  mark this as Exhibit 4.

11                 (Defendants' Exhibit 4 was marked for

12  identification by the deposition officer and is

13  bound under separate cover.)

14       THE WITNESS:  Thanks.

15  BY MS. YOUNG:

16       Q    If you'd take a moment to review this.

17       MS. YOUNG:  For the record, this document is

18  titled "Corinthian Schools, Inc. Campus Based

19  Admissions Representative Compensation Plan,

20  Effective October 1st, 1998."

21       Q    And on the second page of this document,

22  again, there are some signature lines.  Is that your

23  signature at the bottom of the document?

24       A    Yes, it is.

25       Q    And this document says, "Received,

1    acknowledged and agreed to this 10th day of August,

2    2000."

3            Do you see that?

4        A    Yes, I do.

5        Q    Did you receive this document on the 10th

6    day of August 2000?

7        A    As far as I know, it was -- I signed it

8    the 10th.

9        Q    And -- and this was produced to us by your

10   attorney.  So is this something that you maintained

11   in your own file?

12       A    Probably.  Sometimes things were moving so

13   fast, I might not have signed it on that date, but I

14   used that date.

15       Q    Okay.  Do you see on page 2 there's a

16   heading B, "Promotion Criteria"?

17       A    Yes, I do.

18       Q    And that makes reference to "the

19   achievement of the performance criteria outlined in

20   the enclosed promotional guidelines."

21           Do you see that at the end of that

22   paragraph?

23       A    I see that.

24       Q    Did you also receive the promotional

25   guidelines that this paragraph references?

1     A     Probably.  I'm sure I must have.

2     Q     Do you know what they were sitting here

3  today?

4     A     I'm not sure.  Not at this time.  I don't

5  remember what they were.

6     Q     When you were hired as an admissions

7  representative in 2000, were you given any other

8  documents that explained how you would be

9  compensated or when you would be eligible for a

10 promotion or a -- or a raise other than what we've

11 discussed?

12    A     Not at that time.  I have to say that.

13    Q     Okay.  And when you were hired as an

14 admissions representative in 2000, did you discuss

15 with anybody at the school how you would be

16 compensated?

17    A     Compensated for enrollments or --

18    Q     For your -- for your work there.

19    A     Well, I discussed that with the director

20 I'm sure.

21    Q     Okay.  Do you recall the substance of that

22 discussion?

23    A     Let's see.  Not at this time.  I don't

24 recall that.

25    Q     Did you discuss with anyone at the school

1    what you would have to do -- and again, this is

2    focusing on the time when you were hired in August

3    of 2000.

4             Did you discuss with anyone at the school

5    in August of 2000 what you would have to do to be

6    eligible for a promotion or a raise?

7         A    I'm sure I must have because I was told

8    that I needed to enroll students.

9         Q    Okay.

10        A    And I was hired to enroll students and

11   that's what I was supposed to do.

12        Q    Who told you you needed to enroll

13   students?

14        A    The director.  Everyone knew you get hired

15   to enroll students.  If you don't enroll students,

16   you get fired.  That was the general conversation in

17   the admissions department.

18        Q    Okay.  I want to understand exactly what

19   the conversation was about.  So is your

20   understanding that you needed to hire -- so -- so

21   you understood that you would be fired if you didn't

22   enroll students?

23        A    Yeah, if you didn't --

24   MR. LEVY:  Objection to form.

25   THE WITNESS:  In other words -- I'm sorry.

```
 1        MR. LEVY:  Objection to form.  It was just a

 2   little confusing.

 3        THE WITNESS:  Well, everybody knew if you

 4   didn't enroll students and meet your quotas, you

 5   were out of there.

 6   BY MS. YOUNG:

 7        Q    Okay.

 8        A    That was the general consensus in the

 9   admissions department.

10        Q    And what was --

11        A    So I got busy.

12        Q    What was the basis for that consensus?

13   Why did you believe that?

14        A    Because of what was happening around me

15   and what I was doing.

16        Q    Okay.  Tell me what that was.

17        A    I was recruiting students, getting them to

18   come to school and going by my leads that the

19   director gave me, leads -- he gave me specific

20   leads.  And I had to transform the leads into

21   interviews and interviews into enrollments,

22   conversion rates.  And I was responsible for doing

23   that.

24             That was my responsibility as an admission

25   rep -- admissions rep.  Leads to interviews,
```

1    interview -- interviews to enrollments, enrollments

2    to starts.

3        Q    Okay.  So we started off by talking about

4    whether you discussed with anyone what you were

5    required to do in order to get a promotion or a

6    raise.

7            Did you have a conversation with anyone

8    when you were hired at the school --

9        A    Uh-huh.

10        Q    -- in 2000 about what you had to do to get

11    a promotion or a raise?

12        A    I don't recall having specific

13    discussions.  I was given paperwork to read and told

14    by the director on many different occasions what I

15    had to do, but I don't remember the exact

16    conversations.  But I know that it was understood.

17    It was understood that you had to get enrollments

18    and -- and keep your numbers up.

19        Q    Okay.  You said you were told by the

20    director on many occasions about what you had to do.

21            Did you mean you were told by the director

22    on many occasions about what you had to do in order

23    to do your job or in order to get a promotion or a

24    raise?

25        A    Well, that's the same thing, isn't it?  Do

1   my job and get a promotion.

2        Q    Did the -- did your director specifically

3   tell you what you had to do in order to get a

4   promotion or a raise or is that something you were

5   just implying from what she said or he said?

6        A    No, I wasn't implying anything.  The

7   director was circling the admissions department all

8   the time to make sure that we converted our leads

9   into interviews.

10        Q    Yeah, I understand that your job was to

11   recruit students and that your director was trying

12   to make sure you did that.

13        A    Okay.

14        Q    What I'm trying to understand is what

15   specifically he -- it was a "he"; right?

16        A    Uh-huh.

17        Q    -- what specifically he said to you, to

18   the extent he said anything --

19        A    Uh-huh.

20        Q    -- about how recruiting students would

21   translate into getting a promotion or a raise.

22        MR. LEVY:  Objection; form.

23        THE WITNESS:  Okay.  Let me see how I can word

24   this.  I knew that I had to enroll students to get a

25   raise if I wanted one, but I don't know if he

1    specifically said that in our conversation, you

2    know.

3            That's what you're getting at; right?

4    BY MS. YOUNG:

5        Q    Yeah.  I'm trying to understand how you --

6    what made you know that you had to enroll students

7    in order to get a raise?

8        A    The admissions environment made me know

9    that and the director of education, everything that

10   was happening at school made me know that.

11       Q    Did anyone specifically tell you, "You

12   have to enroll a certain number of students to get a

13   raise"?

14       A    Yes, the director would tell me that and

15   also the president, Mr. Plant, would tell me that,

16   and other admissions reps would tell me that.

17       Q    So the director told you you had to enroll

18   students to get a raise?

19       A    Uh-huh.

20       Q    The director's name was?

21       A    Cary Kaplan.

22       Q    You say the president told you you would

23   have to enroll students to get a raise?

24       A    The president told me that.

25       Q    And the president's name was?

```
 1        A    And Jim Martin told me that.

 2        Q    Back up.  The president's name was?

 3        A    Mr. Plant.  At that particular time when I

 4   was there it was Mr. Plant.

 5             And Jim Martin would come and we would

 6   have admissions meetings and -- and they would go

 7   over the script with us and tell us what we had to

 8   do to increase our numbers.

 9        Q    Who is Jim Martin?

10        A    Well, at that time he was vice president

11   of marketing and sales.

12        Q    You said other admissions representatives

13   would say you had to enroll students to get a raise?

14        A    Yeah, people that had been working there

15   for a long time before I started.

16        Q    Who were they?

17        A    Who were those people?

18        Q    Who told you -- who were the admissions

19   representatives who told you, "You have to enroll

20   students to get a raise"?

21        A    Well, the people were -- that were working

22   there at that time.  I'm sure they're not there now.

23        Q    Do you recall any of their names?

24        A    Yes, I recall their names.

25             Would you like for me to give them to you?
```

```
 1        Q    I would.

 2        A    Estella Aranas, Jan Dixon, Steve Aranas

 3   (sic).  Let's see.  I can remember some other people

 4   that were in that department at that time.  Katie

 5   Aspen, Daniel Vargas.

 6             You need more?

 7        Q    I want the names of everybody you can

 8   remember who told you --

 9        A    Okay.  Well, that's it.

10        Q    Just a minute.

11             -- who told you you have to enroll

12   students to get a raise.

13        A    Well, they didn't say, "You have to enroll

14   students to get a raise."  They said, "You have to

15   enroll students to keep your job."  Now, if you kept

16   your job, you could get a raise.

17        Q    So just so I'm clear --

18        A    Uh-huh.

19        Q    -- these admissions representatives you

20   just identified --

21        A    Uh-huh.

22        Q    -- none of them said to you, "You have to

23   enroll students to get a raise"; is that correct?

24        A    Well, they all said that.  People talked

25   in the admissions department.  Everybody talked
```

1    about what you had to do to keep your job.  And that

2    was part of the conversation that everybody knew and

3    everybody talked about and everybody was pressured

4    about.

5         Q    I just -- I just want to make sure that

6    we're clear on --

7         A    Uh-huh.

8         Q    -- the difference between getting a raise

9    and being fired; okay?

10        A    Okay.

11        Q    So was the communication to you, "You need

12   to enroll students to get your job"?

13        A    To keep your job.

14        Q    To keep your job?

15        A    Yeah.

16        Q    Okay.

17        A    Because if you didn't have your job, you

18   couldn't get a raise, of course.

19        Q    Okay.  But did anyone say to you, "You

20   need to enroll students in order to get a raise"

21   without talking about whether you needed to keep it

22   -- do it to keep your job?

23        A    Well, the bottom line was if you enrolled

24   X amount of students, you got a raise.  That was the

25   bottom line of that conversation.

1            Now, what don't you understand?  Maybe I

2    could make you -- clear it up.

3        Q    Well, I'm trying -- I'm trying to

4    understand where -- how you personally got to that

5    bottom line.

6            Is that something that you --

7        A    I got there from working in admissions and

8    being in the daily routine of the job.

9        Q    Okay.  So you arrived at the bottom line

10   based on what you personally had to do in the job;

11   correct?

12       A    That's right.

13       Q    Which was to enroll students?

14       A    Recruit them, enroll them, test them.

15       Q    And your job -- okay.

16       A    Let them get -- meet with financial aid

17   and start to school.  That was what I had to do.

18       Q    And you also arrived at the bottom line

19   because people talked about you would get fired if

20   you didn't enroll students?

21       A    Well, people were getting fired.  I was --

22   I saw what was happening.  I saw exactly what was

23   happening.  In other words, I was able to put it all

24   together in my head about what I needed to do for

25   myself to stay employed.  And I got that from other

```
 1   admissions reps, admissions reps from other schools,

 2   you know, talking on the phone, observing people and

 3   listening to conversations.

 4        Q    Okay.  But -- but the conversations you

 5   were listening to that caused you to conclude --

 6        A    Uh-huh.

 7        Q    -- that you needed to enroll students to

 8   get a raise were conversations about you could get

 9   fired if you don't enroll enough people?

10        A    Yeah, and I saw people getting fired who

11   weren't doing it.

12        Q    Were there any other types of

13   conversations that led you to believe that you had

14   to enroll students in order to get a raise?

15        MR. LEVY:  Objection; form.

16        THE WITNESS:  Well, I don't remember any.  That

17   was enough.  I didn't, you know -- I was in

18   admissions and I was doing what I had to do for my

19   spot in the cubby hole.  And that's how I performed

20   like that.  I didn't really talk to other people,

21   you know.

22             I heard conversations when I was working

23   there.  I just did my job and I enrolled students

24   and recruited them.  I mostly talked to my students

25   and I saw what was happening in the department.
```

```
 1   BY MS. YOUNG:
 2       Q    And again, what you saw was happening was
 3   people were getting fired if they didn't enroll
 4   enough students; right?
 5       A    Yes, ma'am.
 6       Q    Okay.  And again, this is --
 7       A    And I got fired for not meeting my numbers
 8   when I went to Hayward.  So -- and then I got hired
 9   again and then fired again for not meeting my
10   numbers.
11       Q    Okay.
12       A    So if you didn't meet your numbers,
13   basically, the bottom line is you get fired.
14   They're not going to pay you to not enroll students.
15       Q    Uh-huh.
16       A    That was the general consensus in that
17   department.
18       Q    Okay.
19       A    Okay.
20       Q    And we'll talk about all of that later.
21   I -- I just want to keep focusing on your -- your
22   first round of employment in San Francisco from 2000
23   to 2004; okay?
24       A    Okay.  Uh-huh.
25       Q    So other than the documents that we've
```

```
 1        Q    Okay.  And the 2000 date is the correct

 2   date; is that right?

 3        A    I think it is because that's this date

 4   here.  This says 10th and that says the 14th, but

 5   like I said, things were misconstrued sometimes

 6   there at that campus.  And sometimes I would get

 7   papers and I wouldn't even sign them until a month

 8   later maybe.  I don't know.  It wasn't necessarily

 9   always on the date I got it.

10        Q    Okay.  But to the best of your

11   recollection, you started working as an admissions

12   representative at the San Francisco campus in August

13   of 2000?

14        A    August -- because my hire date was 1999,

15   November.  So I was a proctor for nine months and I

16   went into admissions that August.

17        Q    Okay.

18        A    So that would make it 2000.

19        Q    Okay.  Now, I think we looked earlier at a

20   compensation plan --

21        A    I don't know why that was '01.  I'm not

22   sure.

23        Q    Okay.

24        A    Okay.

25        Q    I think we looked earlier at a
```

 1    compensation plan that you signed when you first

 2    started as a campus admissions representative in San

 3    Francisco.

 4          Do you recall that?

 5     A    Excuse me.  One of these documents

 6    (indicating)?

 7     Q    I think it was what we marked as

 8    Exhibit 4.

 9     A    Okay.  That's this -- that's this one.

10    2000.

11     Q    Okay.

12     A    Uh-huh.

13     Q    And we now have in front of us a

14    compensation plan that you've signed in November of

15    2001.

16          Do you --

17     A    Which exhibit is that?

18     Q    Exhibit 5.

19     A    Okay.  This one.  Okay.

20     Q    Why did you sign a new compensation plan?

21    MR. LEVY:  When?

22    BY MS. YOUNG:

23     Q    In 2001.

24     A    I don't recall.  I don't know why.  It's

25    signed right here.  I don't know why this happened.

1      Q    Okay.  Before you signed this document,

2  did you go over it with anyone else?

3      A    I don't recall.

4      Q    Did anyone tell you that the school

5  doesn't actually follow this plan?

6      A    Why would I be signing it and they give it

7  to me if they don't follow it?  I don't understand

8  the question.

9      Q    So no- -- nobody told you that "Here's the

10 plan, but we don't actually follow this plan," did

11 they?

12     A    I don't remember anybody telling me that,

13 but it probably happened because they were always

14 saying something that might not happen sometimes,

15 you know.

16     Q    It probably happened, but you don't know

17 if, in fact, it did happen, do you?

18     A    Are you speaking of this document here or

19 just things in general?

20     Q    No, I'm speaking about my question to you.

21     A    Okay.

22     Q    Which was did anyone tell you, "Here's the

23 plan, but we don't actually follow it"?

24     MR. LEVY:  Objection to form.

25     THE WITNESS:  Nobody told me that.  I don't

1  recall anyone telling me that.

2  BY MS. YOUNG:

3      Q    Let's look at the document within here

4  that starts -- it's actually page 4 of the exhibit.

5  The title of it is "Minimum Standards of

6  Performance."

7      A    The one you just gave me?

8      Q    Correct.  It's what we've marked as

9  Exhibit 5.

10     A    I don't see a page 4.

11     Q    It's not numbered as page 4, but it is the

12 fourth page in the document.

13     A    Okay.

14     Q    And the title on it is "Minimum Standards

15 of Performance."  That's it (indicating).

16     A    Okay.

17     Q    Okay.  Are you with me?

18     A    I'm with you.

19     Q    Okay.  What's your understanding of what

20 this document is?

21     A    Well, it looks like what I was supposed to

22 do as an admissions rep.

23     Q    Okay.

24     A    Take all inquiry calls, return inquiry

25 calls.  That's what I was supposed to do.  It takes

```
 1   -- it looks like that to me, what I -- what my

 2   duties were.

 3        Q    Okay.  And there's a list of 18 things

 4   here on this document.

 5        A    Uh-huh, yes, I see it.

 6        Q    Were you supposed to do all those 18

 7   things as an admissions representative?

 8        A    Probably, which was a lot.

 9        Q    Uh-huh.  So let's just talk about a couple

10   of them.  The first one is "Take all inquiry calls

11   from all potential students interested in knowing or

12   receiving information about the programs, including

13   entrance requirements, curricula and academic

14   standards."

15        A    Uh-huh.

16        Q    Was that one of the requirements of your

17   job?

18        A    Yes.

19        Q    Did you strive to do that?

20        A    I strived to do everything that's on this

21   list.

22        Q    Okay.  And were your calls monitored, your

23   phone calls with prospective students, were they

24   monitored by your director of admissions?

25        A    Sometimes and they would tell us that it
```

1  was monitored by corporate.

2      Q    Okay.  And what was your understanding of

3  the purpose of having those calls monitored?

4      A    I guess they wanted to make sure we were

5  doing our job.  I don't know.  I never discussed

6  that with anyone.

7      Q    Did you understand that your performance

8  was being evaluated based on how you were

9  communicating with the prospective students?

10     A    Yes.

11     Q    And that was one of the factors that your

12 director of admissions was looking at?

13     A    All the time.

14     Q    When you were doing your job; right?

15     A    Yes, uh-huh.

16     Q    No. 2 says, "Return inquiry calls promptly

17 to all potential students and give accurate

18 information about the programs, including entrance

19 requirements, curricula and academic standards."

20     A    Yes.

21     Q    And that was another responsibility in

22 your job?

23     A    Yes.

24     Q    And you tried to do that; right?

25     A    Yes.

1    Q    And this meant, among other things, noting

2  how -- giving accurate information to students?

3    A    Giving as accurate as it was given to me.

4    Q    Okay.  And was that important to you, to

5  make sure students got accurate information?

6    A    It was very important to me because I was

7  a student myself and I didn't want to misinform

8  anyone.

9    Q    Uh-huh, of course.  And -- and did you

10  understand that your director of admissions was

11  monitoring you to see that you were giving accurate

12  information to students?

13    A    Yes, I sat right across from his office.

14  He could hear me talking.

15    Q    And you understood that he would be

16  evaluating your performance in part based on whether

17  you were giving accurate information to people; is

18  that right?

19    A    That was probably his job, to monitor me

20  on that, yes.

21    Q    And you understood that that was his job;

22  right?

23    A    Uh-huh.  Yes, I did.

24    Q    No. 3 is "Accurately classify all

25  inquiries by the appropriate media source and

```
 1   account for all inquiries."
 2           Do you see that?
 3      A    Yes, I do.
 4      Q    And that -- that again was part of your
 5   responsibilities; correct?
 6      A    Yes.
 7      Q    Okay.  And you tried to do that in your
 8   job?
 9      A    Yes, I did.
10      Q    And was it your understanding that your
11   director was monitoring your performance to see if
12   you accurately classified all inquiries that came
13   in?
14      A    Yes, he would do that through the flash
15   sheets.
16      Q    Okay.  And "classify all inquiries by the
17   appropriate media source," what does that mean?
18   What do you understand that to mean?
19      A    Which one is that?  No. 4?
20      Q    It's No. 3.
21      A    No. 3.  That meant that -- the media
22   source would be the zip code from all the leads that
23   I received.
24      Q    Okay.
25      A    It would have a zip code on it.  So I
```

1    would organize those leads in zip codes when I would

2    call my students.

3        Q    Okay.

4        A    I believe that's what that means.

5        Q    Okay.  And I'm not going to go through all

6    of these, but just to touch on a couple of other

7    ones.

8             No. 5, "Comply with governmental

9    regulations and standards of accreditation as they

10   relate to enrolling students."

11            Do you see that?

12       A    Yes, I do.

13       Q    And that was part of your job

14   responsibilities as an admissions representative?

15       A    Yes, it was.

16       Q    And did you understand that your

17   performance was being evaluated in part by whether

18   you were complying with the governmental regulations

19   and standards of accreditation as they relate to

20   enrolling students?

21       A    Yes, because I explained all that to my

22   students.

23       Q    Okay.  Another thing on here was -- just

24   take a look at No. 14 and No. 15.  They're kind of

25   related.  "Ensure that all pre-start paperwork is

1    completed."

2           That was part of your responsibilities?

3      A    Yes.

4      Q    And you tried to do that?

5      A    Yes.

6      Q    And you understood that your performance

7    would be evaluated based in part on whether your

8    prestart paperwork was complete; correct?

9      A    Correct.

10     Q    And same thing with No. 15, "Keep all

11   required reports current and accurate"?

12     A    I did all those things, yes, I did.

13     Q    And you understood that your performance

14   was being evaluated in part on whether you kept

15   required reports current and accurate?

16     A    Yes, I suppose that's what Cary did

17   because I didn't -- you know, he had his own rules

18   for his evaluations on everybody in the department.

19     Q    Okay.  Say that one more time.

20     A    You know, he -- he evaluated all of his

21   admissions reps.  So I'm sure he had his own

22   evaluation criteria.

23     Q    Do you know what his evaluation criteria

24   were?

25     A    No, I never had a conversation with him

1    about it, but he expected high standards.  I know

2    that.

3           Q     Uh-huh.

4           A     That's what he was getting from me.

5           Q     Okay.

6           A     Maybe he went by this list.  I don't know

7    anything about that.

8           Q     Okay.

9                 Again, I'm so sorry.

10          THE VIDEOGRAPHER:  If this is a good time, I'll

11   switch the tapes over now.

12          MS. YOUNG:  Yes.  Off the record.

13          THE VIDEOGRAPHER:  The video deposition is now

14   going off record at 10:42 a.m.  This will also

15   conclude video No. 1 in today's deposition.

16                      (A recess was taken from 10:42 a.m.

17   to 10:51 a.m.)

18          THE VIDEOGRAPHER:  The video deposition of

19   Nyoka J. Lee, Volume No. 1, is returning to record

20   at 10:51 a.m.  This will also begin video No. 2 in

21   today's deposition.

22                 The location is still 6 Hutton Centre

23   Drive, Fourth Floor, in Santa Ana, California.  The

24   date is still Monday, December 17th, 2012.

25                 And my name is Ali Saheb with Dean Jones

```
 1   Attorney Video Services in Los Angeles and

 2   Santa Ana, California.

 3   BY MS. YOUNG:

 4       Q    Ms. Lee, I would remind you you're still

 5   under oath.  Do you understand that?

 6       A    Yes, I do.

 7       Q    And is there anything you would like to

 8   change about your testimony you've given today?

 9       MR. LEVY:  No, there's nothing she would like

10   to change.

11       MS. YOUNG:  I'm asking the witness.  I would

12   like an answer from the witness.

13       THE WITNESS:  No.

14   BY MS. YOUNG:

15       Q    Okay.  And just remember, our court

16   reporter is trying to take everything down.

17       A    Uh-huh.  Yes.

18       Q    And sometimes you've been jumping in

19   before I finish my question.  So please make an

20   effort to wait for me to finish completely before

21   you answer; okay?

22       A    Yes.

23       MS. YOUNG:  Okay.  I'm handing you what we're

24   going to mark as Exhibit 6.

25              (Defendants' Exhibit 6 was marked for
```

1    identification by the deposition officer and is

2    bound under separate cover.)

3    BY MS. YOUNG:

4         Q    Now, this is a document titled

5    "Confidential Employee Performance Review."  You see

6    on the last page where there's a line for a

7    signature, employ- -- for "Employee Acknowledgment."

8              Is that your signature?

9         A    Yes, it is.

10        Q    And it's dated November 19, 2001?

11        A    Yes, it is.

12        Q    And beneath that it says, "Review of

13   Performance Discussion Summary and Employee

14   Comments."

15             Do you see that?

16        A    Yes, I do.

17        Q    Do you recognize the signature beneath

18   that line?

19        A    Yes, it looks like Mr. Plant's signature.

20        Q    Okay.  And there are a couple of other

21   signatures on the same page in the box with section

22   Roman numeral VI.  One is over a line for

23   "Supervisor."

24             Do you see that?

25        A    Yes.

1      Q    Do you know whose signature that is?

2      A    Cary Kaplan.

3      Q    Okay.  And where it says "Approval," do

4   you know whose signature that is?

5      A    It looks like Mr. Plant's signature.

6      Q    Do you know whether Mr. Plant had to

7   approve this document?

8      A    Well, he obviously did.  It's his

9   signature on it.  He's the president of the school.

10     Q    Okay.  What is this document?

11     A    It says "Employee Performance Review."

12     Q    Is this a performance review that you

13  received while working on the San Francisco campus?

14     A    I was working there at that time, yes.

15     Q    And is this a performance review you

16  received?

17     A    Well, it's got my name on it and everybody

18  else's, so I received it.

19     Q    Okay.  Do you know -- and this form has

20  scores that are identified in various columns.

21     A    I see that.

22     Q    You'll see in section three there's a four

23  or a five in some of these columns, and then there

24  are other scores that are noted in the "Overall

25  Employee Rating" box there.

1          Do you see that?

2     A    Yes, I do.

3     Q    Do you know how the scores on this form

4  were awarded?

5     A    Well, the director put them in there, the

6  director of admissions.

7     Q    And that was Cary Kaplan?

8     A    Yes.

9     Q    Do you know how Cary Kaplan decided what

10  score --

11    A    No, I do not.  I don't know how he did it.

12  All I saw was the numbers.

13    Q    Okay.

14    A    I don't know how he came to the

15  conclusion.  He never told me how.

16    Q    Okay.  And just remember to wait for me to

17  finish my question first, please.

18    A    Okay.

19    Q    Okay.  Let's take a look at section three

20  of this form.  It says "Performance Categories," and

21  then there are several of them listed here.

22         Do you see that?

23    A    Which one?

24    Q    In section three of the form.

25    A    I see three, yes.

1      Q    In that section there are a number of
2  different categories listed beneath that.
3           Do you see that?
4      A    Uh-huh.  Yes, I do.
5      Q    There are about 15 different categories?
6      A    Uh-huh.
7      Q    Okay.  And they're scored either
8  "Improvement Critical," "Needs Improvement,"
9  "Satisfactory," "Good" or "Excellent."
10          Do you see that?
11     A    Yes, I do.
12     Q    Okay.  You don't know how Mr. Kaplan
13  decided where you fell in this grid, do you?
14     A    No, I don't know how he made his
15  decisions.
16     Q    Do you agree with the scores that you
17  received here?
18     A    I agree in terms of if they're accurate
19  or --
20     Q    Yeah, is that an accurate assessment of
21  your performance?
22          For example, the first criteria,
23  "demonstrates job knowledge and skill level required
24  for the position," and you got a five for excellent.
25          Did you agree with that assessment?

1      A      When I first looked at this, I probably

2  didn't agree.

3      Q      Why not?

4      A      Because I felt I was excellent in all

5  those areas, but I didn't get excellent.  But, you

6  know, like I said, I don't know how he evaluated me.

7      Q      Okay.  So you got "Good" in some and

8  "Excellent" in others.  You felt you should have

9  gotten "Excellent" in everything; is that right?

10     A      Yeah.

11     Q      And none of these categories here ask

12  whether you met an enrollment quota, do they?

13     A      I don't see that on there.  No, I don't.

14     Q      Take a look at section four, "Major

15  Accomplishments."

16     A      Okay.

17     Q      And right under that it says, "Zero to 25

18  Points of Evaluation," and then there's a little

19  narrative about your work.

20            Do you see that in that box?

21     A      Uh-huh.  Yes, I do.

22     Q      It says, "Nyoka has an outstanding work

23  ethic; arrives to work focused and prepared.  She is

24  highly organized and pays attention to detail.  She

25  relates exceptionally well with students and has

1    excellent customer service.  It is my recommendation

2    that Nyoka receive a promotion from Campus

3    Admissions Representative to Senior Admissions

4    Representative."

5          Do you see that?

6    A    Yes, I do.

7    Q    And did you agree with that assessment of

8    your performance?

9    A    Yes, of course, I did.

10   Q    And again, you don't know how Mr. Kaplan

11   arrived at this particular assessment; right?

12   A    Not from these numbers here, if that's

13   what you're asking me.

14         These numbers here (indicating), you're

15   asking me about them?

16   Q    No, I'm asking about what he wrote in --

17   in the box No. 4.

18   A    I have no idea other than the fact that he

19   observed me when I was working and he wrote

20   something he was feeling honest about.

21   Q    Okay.  So you have no knowledge of

22   Mr. Kaplan's basis for the ultimate score he awarded

23   you on this performance evaluation?

24   A    How could I know?  No.

25   Q    Were you offered a promotion at this time?

1    A    When I received this paper?

2    Q    Correct.  And remember --

3    A    According to this, I was offered one from

4    campus to senior.

5    Q    Okay.  It says, "It's my recommendation

6    that Nyoka receive a promotion from Campus

7    Admissions Representative to Senior Admissions

8    Representative."

9         Do you --

10   A    And I'm sure he based that on my numbers.

11   Q    Okay.  Why are you sure he based that on

12   your numbers?

13   A    Because he based everything on numbers,

14   you know, and then he had to fill this in because

15   this is the paper that they gave him to fill in.  So

16   he had to fill it in.

17   Q    Okay.  But he didn't tell you he was

18   making the recommendation for your promotion because

19   you met your numbers, did he?

20   A    He always told me that.

21   Q    He told you that you were being

22   recommended for a promotion because you met --

23   A    Well, he was always interested in my

24   numbers.

25   Q    Oh, I understood he was interested.

```
 1        A     Uh-huh.

 2        Q     I want to understand if he told you that

 3   the reason he was recommending you for promotion --

 4        A     Yes, he told me that.  Yes, he did.

 5        Q     Let me finish my question.

 6        A     Okay.  Sorry.

 7        Q     I want to understand if he told you that

 8   the reason that he was recommending you for

 9   promotion on this form in November of 2001 --

10        A     Yes.

11        Q     -- was because of the numbers that you met

12   as an admissions representative?

13        A     Yes.

14        Q     When did that conversation take place?

15        A     I have no idea.  I can't answer that

16   question.

17        Q     Did anyone else hear that conversation?

18        A     I don't know.

19        Q     What else did he say during that

20   conversation?

21        A     I don't know.

22        Q     Do you know where it happened?

23        A     Probably in the admissions department.

24        Q     Okay.  Was it in his office?  Was it in

25   the hallway?
```

```
 1        A     It could have been in his office.  It

 2   could have been in the hallway.  It could have been

 3   at lunch.  It could have been --

 4        Q     It could have been, but you don't remember

 5   where it was?

 6        A     No, I don't remember when I had that

 7   conversation with Cary, but he was always talking

 8   about it with me.

 9        Q     About what?

10        A     My numbers.

11        Q     Your numbers?

12        A     Yes.  Because my numbers meant his

13   numbers.

14        Q     Uh-huh.

15        A     So that's how that worked.

16        Q     Okay.  But you can't recall if you

17   actually got promoted at this time, can you?

18        A     Well, this is the paperwork for it.  This

19   was my promotion right here.  That's what this is.

20   It says it right there, campus rep to admissions rep

21   -- I mean, to senior rep.

22        Q     Where are you looking?

23        A     Right here (indicating).

24        Q     Where it says a "recommendation"?

25        A     Yes.
```

```
 1        Q    You don't -- you don't know if that
 2   recommendation was accepted, do you?
 3        A    I worked there.  Of course, it was
 4   accepted because I was still at that company.
 5        Q    Were you promoted to senior admissions
 6   representative in November of 2001?
 7        A    I was promoted, yes, and then I got
 8   promoted again.
 9        Q    My question was --
10        A    Yes, I was promoted.
11        Q    Please let me finish my question before
12   you answer.
13        A    Okay.
14        MR. LEVY:  Objection to form.
15        THE WITNESS:  Finish, finish.
16   BY MS. YOUNG:
17        Q    Were you promoted to a senior admissions
18   representative in November of 2001?
19        A    Yes, I was.
20        Q    And you're certain of that date?
21        A    Yes, I am.
22        MS. YOUNG:  Let's take a look at some other
23   documents.  I'm handing you what we're marking as
24   Exhibit 7.
25                   (Defendants' Exhibit 7 was marked for
```

```
 1    identification by the deposition officer and is

 2    bound under separate cover.)

 3    BY MS. YOUNG:

 4        Q    This is a document that was produced to us

 5    by your lawyer.  It's titled "Corinthian Colleges,

 6    Inc. Turnaround Document."

 7             Do you see that at the top?

 8        A    Yes, I do.

 9        Q    Okay.  And look in the box where it says

10    "Job Information."  Do you see that?

11        A    Which one?

12        Q    No. 4.  It's got the number 4 by it.

13        A    Yes, I see that.

14        Q    Okay.  And then it has one column that

15    says FDT (sic).  Do you have an understanding of

16    what that means?

17        A    Up here, FDT -- EFFDT?  Is that the one

18    you're looking at?

19        Q    Uh-huh.

20        A    No.  What is it?

21        Q    No.  I'm asking if you understand what

22    that means?

23        A    I said no.  What is it?  I'm asking you

24    what it is.

25        Q    I'm not here to answer the question,
```

```
 1   Ms. Lee.
 2        A    Okay.  Well, then, no, I don't.
 3        Q    So you don't know if that means "effective
 4   date" or something else?
 5        A    It probably means -- EFFDT probably means
 6   "effective date."
 7        Q    Okay.  And right underneath that is the
 8   date August 2nd, 2002.
 9        A    Uh-huh.  I see that.
10        Q    In that same row it says, "Job Title,
11   Senior Campus Admissions Representative."  Do you
12   see that?
13        A    Yes, I do.
14        Q    Did you -- were you promoted to senior
15   campus admissions representative on August 2nd of
16   2002?
17        A    Well, if this is saying -- I'm not sure if
18   these dates are correct, you know.  I'm not sure,
19   but I know I was promoted from campus to senior,
20   senior to master.
21        Q    Uh-huh.
22        A    I don't know if the dates are correct.  I
23   can't tell you at this moment.
24        Q    Okay.
25        A    Because that transpired already.  I can't
```

1    tell you that.

2        Q    Okay.  Is that your signature at the

3    bottom of this document?

4        A    It is.

5        Q    And this document was signed on

6    November 5th, 2003?

7        A    Yes, it is.  According to this paper, yes.

8        Q    Okay.  And where you see the numeral

9    ten -- do you see that?

10       A    Yes, I see No. 10.

11       Q    Where it says "Remarks," it says, "Changed

12   From Senior to Master Rep."  Do you see that?

13       A    Yes.

14       Q    Did you receive a promotion from senior to

15   master representative on or around November 5th,

16   2003?

17       A    According to this document, I was.

18       Q    Is that consistent with your recollection?

19       A    As far as I can tell, yes.

20       Q    Okay.  So is it fair to say you're not

21   sure exactly when or exactly what the date was when

22   you were promoted from a campus admissions

23   representative to a senior admissions

24   representative?

25       A    I don't recall that because it was a while

1   ago.  I don't know those dates.

2       Q    Okay.  That's completely understandable.

3       A    So no is the answer.

4       Q    Okay.  So you mean yes, it's fair to say

5   that you don't remember exactly when you received

6   that promotion?

7       A    Yes, it's fair to say that.

8       MS. YOUNG:  I'm handing you what we will mark

9   as Exhibit 8.

10                  (Defendants' Exhibit 8 was marked for

11   identification by the deposition officer and is

12   bound under separate cover.)

13       THE WITNESS:  Thank you.

14   BY MS. YOUNG:

15       Q    This is another turnaround document.  Is

16   that your signature at the bottom of the page?

17       A    That's my signature.

18       Q    Okay.  And it's dated in March of 2002.

19   Do you see that?

20       A    Yes, I do.  I can't see the two on my

21   signature, but I see it above that, yes.

22       Q    Did you receive a raise in or around March

23   of 2002?

24       A    This looks like I did.

25       Q    Okay.  Do you recall the reason for that

1   raise?

2        A    It looks like Mr. Plant was in a good mood

3   that day.  I don't know.  I don't recall the reason,

4   but I'm looking at this paper and it looks like I

5   received a raise.

6        Q    Okay.  And the other people who signed

7   these documents, do you recognize those other

8   signatures?

9        A    Yes, it's Cary and Mr. Plant.

10       Q    Okay.

11       A    Same signatures.

12       Q    Okay.  In the -- next to the numeral ten

13  there's a box called "Remarks."  Do you see that?

14       A    Yes, "Employee Hires."  That's where you

15  are?

16       Q    Uh-huh.  And it says, as best I can tell

17  from reading the handwriting, "Employee hired in at

18  very low wage and new employees with less experience

19  are hired in at projected wages of something like

20  $45,000 due to high cost of Bay Area."

21            Do you see that?

22       A    I see it.

23       Q    Do you recall being given that reason as

24  the reason why you were getting this raise?

25       A    No, I don't recall that.

1    Q    You don't recall any reason you were given

2  for getting this raise; is that correct?

3    A    No, I don't recall, but I see what

4  Mr. Plant wrote.

5    Q    Okay.  We looked in Exhibit -- what was

6  it -- Exhibit 7 a document showing that you received

7  a promotion from senior to master campus admissions

8  representative.

9        Do you see that?

10   A    Yes, I do.

11   Q    What's your understanding of why you

12 received that promotion?

13   A    Once again, Blanca, anytime you received a

14 raise, it was because you had outstanding numbers

15 for enrolling students.  And I'm -- I'm pretty sure

16 I enrolled some students.  And I got it because

17 that's how you got your raises.

18   Q    And again, did you have a conversation

19 with anyone in which they told you that the reason

20 you were being -- getting that promotion from

21 master -- senior to master campus admissions

22 representative in 2003 was because of the number of

23 people you enrolled?

24   A    No, I do not recall a conversation like

25 that, but I know that anytime anybody received a

```
 1    raise in admissions, it was because of how they

 2    enrolled their students -- excuse me, how many

 3    students they enrolled, their conversion rates and

 4    all of that.

 5         Q    And again, you know that because --

 6         A    That's how admissions is run or was run.

 7    I don't know how it's run now, you know.

 8         Q    Okay.  That's how it you was run at the

 9    time you were employed at the school?

10         A    When I was employed there, that's how

11    admissions was run.

12         Q    And the time you were employed there was

13    from 1999 until 2005; correct?

14         A    That's correct.

15         Q    May of 2005; correct?

16         A    To my knowledge.

17         Q    Okay.  And you don't know how admissions

18    was run after you left in May of 2005?

19         A    And I don't know how it was run before I

20    got there, but that's how it was run when I was

21    there.

22         Q    Okay.

23         A    Okay.

24         Q    And let me make sure I get a clear answer

25    to my question.  So please wait for me to finish.
```

```
 1              You don't know how admissions was run

 2     after May of 2005, do you?

 3        A    Well, I didn't work there anymore.

 4        Q    And you didn't know; correct?

 5        A    Well, no, I didn't know.  I didn't work

 6     there.  How could I know?  But I'm sure it was run

 7     the same way before I left, after I left.

 8        Q    But you don't know?

 9        A    No.  How could I know?

10        Q    Let's take another look at Exhibit 7.

11        A    Okay.

12        Q    Now, attached to this document is --

13        A    No. 7?

14        Q    Correct.  Please flip over the top page.

15              -- another employee performance review

16     form.  Do you see that?

17        A    I see it.

18        Q    Do you know why it was produced just next

19     to this turnaround document that we just looked at?

20        A    Why it was produced or stapled to?

21        Q    Well, this is something that we got from

22     your attorney and these documents were produced next

23     to each other.

24              Do you know why they came in that

25     sequence?
```

1        THE WITNESS:  Maybe you need to answer that.

2        MR. LEVY:  No.

3        THE WITNESS:  I don't know.  I don't know.

4    BY MS. YOUNG:

5        Q    Are these -- are these documents that you

6    had in your possession and then provided to your

7    attorney?

8        A    I had these documents in my possession

9    because when they were given to me and I signed

10   them, I filed them.

11       Q    Okay.

12       A    So I had them.

13       Q    I'm just trying to understand why these

14   two documents were next to each other in your files.

15       A    I can't tell you that.

16       Q    Okay.

17       A    This is the first time I'm seeing this.

18       Q    Okay.  So you don't know if this

19   confidential performance review form informed the

20   fact that you got a promotion, as noted in the

21   turnaround document that's on top?

22       A    You need to say that again.  Okay.

23       Q    Sorry.  There's this performance review

24   form.

25       A    Yes.

1      Q     It was produced to us just next to this

2    turnaround document, which indicates you got a

3    promotion in 2003.

4      A     Yes, that seems logical.

5      Q     Okay.  Do you have any knowledge as to

6    whether this employee performance review form

7    informed the decision to give you the promotion?

8      A     No, I don't.

9      Q     And that's because you weren't involved in

10   making that decision; right?

11     A     No, I wasn't involved.  It was Mr. Plant

12   and Cary Kaplan's decision.

13     Q     And, in fact, you don't know what reasons

14   they had for giving you the promotion?

15     A     No, I did not other than the fact that I

16   made my numbers.

17     Q     For the reasons that we've already talked

18   about?

19     A     Yes, for the reasons we've already talked

20   about.

21     MR. LEVY:  Objection to form.

22     THE WITNESS:  Because you got acknowledged for

23   that.  When you made numbers in admissions, you got

24   acknowledged for it in more than one way.

25   ///

```
 1   BY MS. YOUNG:
 2        Q    Okay.  Let's look at the performance
 3   review form.
 4        A    No. 7 again?
 5        Q    That is on No. 7.  Correct.
 6        A    Okay.
 7        Q    And again, there's a number of criteria
 8   listed in here that have points assigned to them.
 9   Do you see that?
10        A    Yes, I do.
11        Q    Do you know how those points were
12   assigned?
13        A    No, I do not.  I said that before.  No, I
14   do not.
15        Q    And in section four, again, which is that
16   box with the narrative description of your major
17   accomplishments and contributions --
18        A    Uh-huh, uh-huh.  I see that.
19        Q    -- do you know how the decision was made
20   about what to write into that box?
21        A    No, I do not.
22        Q    Okay.  So we talked about promotions that
23   you received from being a campus admissions
24   representative to being a senior admissions
25   representative to being a master admissions
```

```
 1   representative?

 2        A    Yeah, it was some sheet that was...

 3        Q    Did you receive any other promotions while

 4   you were working at the San Francisco campus from

 5   2000 until 2004?

 6        A    Other than what you see here, I didn't

 7   receive any promotions.

 8        Q    And did you receive any other salary

 9   increases other than what we discussed so far?

10        A    No.

11        Q    Did you receive any bonuses while you were

12   working at the San Francisco campus from August of

13   2000 until May 2005?

14        A    Bonuses like money bonuses?

15        Q    I'm sorry, May 2004.

16        A    Money bonuses?

17        Q    Yes, right.

18        A    Well, a bonus could be a new coat.  I

19   don't know.  That's why I asked you.

20        Q    Okay.

21        A    No.

22        Q    Did you get anything like a new coat as

23   well?

24        A    No, I did not, unfortunately.

25        Q    Okay.  So after you worked as an
```

1    admissions representative in San Francisco until May

2    of 2004, you then became the director of admissions

3    at Hayward; is that right?

4         A    That's true.

5         Q    And that was in June of 2004?

6         A    Well, it had to be after I left Bryman in

7    San Francisco.  And that was in 2005.

8         Q    Okay.  So I think we looked --

9         A    If I have the dates right.

10        Q    Yeah, I think we looked earlier at this

11   document, but let's take another look just to make

12   sure.  So this, I think, was Exhibit 3.  It's a

13   June 4, 2004 letter that we looked at earlier.

14        A    Yeah, I think this is from Terry Harty;

15   right?

16        Q    Right.  And this is about commencing

17   employment as director of admissions in June of

18   2004; right?

19        A    From my memory, I think I received this

20   like 30 days after I was in the position.  It was

21   late.  I know that.

22        Q    Okay.  But -- but you started --

23        A    So the dates are off is all I'm saying.

24        Q    Okay.  But is it accurate that you started

25   as the director of admissions at the Hayward campus

1   in June of 2004?

2        A    Well, it's accurate that I started there,

3   but I don't know if the date was exactly June.

4        Q    Okay.

5        A    I was over at the Hayward campus, yes, I

6   was.

7        Q    Okay.  And you started at the Hayward

8   campus as director of admissions sometime in June of

9   2004?

10        A    As director of admissions sometime in June

11   of 2004.

12        Q    Okay.  Now, how were you paid as a

13   director of admissions at the Hayward campus?

14        A    I was salaried.

15        Q    And were you eligible for a bonus?

16        A    Well, I was eligible if I could have

17   worked there long enough to get it, but I didn't

18   work there.

19        Q    How long did you work at the Hayward

20   campus?

21        A    Not very long because I was fired.

22        Q    When were you fired?

23        A    I'm not sure, but I worked there not even

24   long enough to produce any numbers.

25        Q    Okay.  Let's see if we can't pin that date

1    down.

2         A    There should be a termination somewhere,

3    I'm sure.

4         MS. YOUNG:  I'm handing you what we're going to

5    mark as Exhibit -- 8?

6         THE REPORTER:  9.

7         MS. YOUNG:  9.  Exhibit 9.

8              (Defendants' Exhibit 9 was marked for

9    identification by the deposition officer and is

10   bound under separate cover.)

11   BY MS. YOUNG:

12        Q    This document is titled "Separation

13   Report."  And it says the -- it says your name on it

14   as the employee's name, "Job Title, Director of

15   Admissions," "Last Day Worked, August 13th, 2004."

16             Does that sound right as the last day that

17   you worked as a director of admissions at the

18   Hayward campus?

19        A    I'm not sure, but my Social Security

20   number is incorrect.

21        Q    Okay.  So if you started as a director of

22   admissions in June of 2004, does it sound about

23   right that you worked in that position for about two

24   and a half months before you were terminated?

25        A    Yes, that sounds about right, maybe less

1    than that.

2         Q    Okay.  Two and a half months or less?

3         A    Uh-huh.  "Failure to meet admissions

4    goals." That's what it says on there.

5         Q    And what were your responsibilities as a

6    director of admissions?

7         A    Well, at that particular time my

8    responsibilities were to make sure that I met the

9    goals and the numbers for that particular -- for the

10   admissions department over there, but it wasn't

11   possible to do that.

12        Q    Okay.  You were not directly responsible

13   yourself for recruiting students?

14        A    I was responsible -- according to Terry

15   Harty, I was responsible.

16        Q    Did you interact with students in your

17   role as a director of admissions?

18        A    Yes, I did.

19        Q    You did.  Tell me what those interactions

20   were like.

21        A    It was like just doing second interviews

22   and sometimes interviewing because I had no

23   admissions department, everybody quit when I came

24   over there.

25        Q    How many people were in the department

```
 1    when you --
 2         A    I don't know.  Five or six, something like
 3    that.
 4         Q    Please let me finish my question,
 5    otherwise we're not going to have a clear record of
 6    what you're answering.
 7         A    Okay.
 8         Q    How many people were in the department
 9    when you started, in the admissions department when
10    you started?
11         A    Five or six.
12         Q    And you said that they all quit?
13         A    That's what I said.
14         Q    All -- all of them?
15         A    All of them quit.
16         Q    So not a single one was left?
17         A    Yeah, nobody was in admissions but me.
18    And I was the director.
19         Q    Okay.  So you never gave anyone a
20    promotion when you were the director?
21         A    No.  I had to hire a whole new team and I
22    couldn't do that in a month.  It was impossible.
23         Q    Uh-huh.  And you never filled out a
24    performance evaluation for any employee?
25         A    No, I did not.
```

1    Q    All right.  You never recommended anyone

2  for a raise when you were the director of

3  admissions?

4    A    No, I did not.

5    Q    Did you demote anybody when you were a

6  director of admissions at Hayward?

7    A    No, I did not.

8    Q    Was one of your responsibilities as a

9  director of admissions to evaluate employee

10  performance?

11    A    Yes, that's a responsibility of a

12  director.

13    Q    Okay.  And we saw earlier some performance

14  review forms that had been filled out for you by

15  your director of admissions when you were an

16  admissions representative.

17         Do you recall that?

18    A    Yes, I do.

19    Q    Were you supposed to fill out a similar

20  form for your employees when it became time for them

21  to be reviewed?

22    A    I'm not sure because I never collaborated

23  with Terry Harty on that and he never gave me one.

24  We didn't get that far.

25    Q    Okay.  So did you have any discussion with

```
 1    anyone at the Hayward campus about how you were
 2    supposed to go about doing those reviews?
 3         A    No.
 4         MS. YOUNG:  I'd like to show you a document.
 5    Okay.  Let's mark this as Exhibit 10.
 6              (Defendants' Exhibit 10 was marked
 7    for identification by the deposition officer and is
 8    bound under separate cover.)
 9         THE WITNESS:  Thank you.
10    BY MS. YOUNG:
11         Q    And this is a document that was produced
12    to us by your attorney.  Have you ever seen it
13    before?
14         A    It looks like the rest of the documents
15    that you showed me in terms of performance review.
16         Q    Uh-huh.  But this one is a blank one and
17    it also has some material attached to the end
18    starting at page R 00373 --
19         A    Uh-huh.
20         Q    -- which is titled "Performance
21    Evaluations For Employees," and then there's some
22    guidelines laid out here about how to fill out the
23    form.
24              Is that something you've seen before?
25         A    I don't recall this document.
```

1     Q    Do you know how that -- is this a document
2  that you provided to your counsel?
3     A    I'm not sure.
4     Q    So you don't recall if this document came
5  from your own files?
6     A    No, I don't recall, not at this moment.
7     Q    Okay.
8     A    But it's a typical CCI document.
9     Q    And I may have asked you this before, but
10 let me just ask in case I didn't.  I take it in the
11 two and a half months you worked as the director of
12 admissions for Hayward you never recommended anybody
13 for a salary increase; is that right?
14    A    No.
15    Q    Is that correct?
16    A    That's correct.
17    MS. YOUNG:  Okay.  I'm handing you what we're
18 going to mark as Exhibit 11.
19         (Defendants' Exhibit 11 was marked
20 for identification by the deposition officer and is
21 bound under separate cover.)
22 BY MS. YOUNG:
23    Q    And at the end of the document, is that
24 your signature?
25    A    Yes, it is.

```
 1        Q    Did you create this document?

 2        A    Yes, I did.

 3        Q    What is it?

 4        A    It was a goal plan for my admissions rep,

 5   the person that was hired over there.

 6        Q    So you created this in the first week you

 7   were hired as a director of admissions at Hayward?

 8        A    Yes, I did.

 9        Q    So sometime in June of 2004?

10        A    Something like that.

11        Q    Did you create this document on a

12   computer?

13        A    Yes, I did.

14        Q    Okay.  And what computer was it that you

15   created the document on?

16        A    Well, I don't know what computer it was.

17   It could have been one at the school or I don't

18   know.  I would have to say that or it could have

19   been one at my house.  I'm not sure.  It wasn't a

20   typewriter.  That's for sure.

21        Q    Okay.  And you said you created this in

22   the first week, but looking at the very top of the

23   document, it says "Week Four."

24             Do you see that?

25        A    Okay.  First week, second week, first
```

1        A     Yes, I wrote that.

2        Q     And then -- I wasn't asking if you wrote

3  it, I was asking if it's an accurate statement.

4        A     It is accurate.

5        Q     And then you continue, "The termination

6  will be based upon their attitude and current

7  marketing/sales plan that he/she is responsible to

8  develop."  Is that an accurate statement?

9        A     Yes, it is.

10       Q     So termination wasn't based on numbers, it

11  was based on their attitude and marketing plan;

12  right?

13       MR. LEVY:  Objection to form.

14       THE WITNESS:  Marketing, attitude, numbers,

15  enrollments.  It was based on all of that because

16  that's admissions.  That's what missions --

17  admissions is all about.

18  BY MS. YOUNG:

19       Q     When you wrote this sentence, you didn't

20  say "numbers," "admissions"?

21       A     No, I didn't because it's not in there,

22  but that's what it was.

23       Q     Okay.  But when you wrote this document,

24  you said, "The termination will be based upon their

25  attitude and current marketing/sales plan," and

1    that's all you said; right?

2        MR. LEVY:  Objection; the document speaks for

3    itself.

4        THE WITNESS:  That's what I wrote in this.

5    Right.

6    BY MS. YOUNG:

7        Q    Okay.  Take a look at paragraph seven.  In

8    paragraph seven of this document you write,

9    "Promotions occur when you meet or exceed the yearly

10   quota agreed upon at the time of hire.  The Director

11   of Admissions and members of the Corporate

12   Management Team determine promotions."

13            Do you see that?

14       A    Yes, I do.

15       Q    And that was your interpretation of how

16   things worked; is that right?

17       A    That was how it worked when I worked in

18   admissions.  And I feel, as a director, it was still

19   on board when I went to Hayward.  That was how it

20   worked when I was in admissions in San Francisco.

21       Q    Okay.

22       A    And that's how it worked at Hayward.

23       Q    But you never promoted anyone at Hayward,

24   so how do you know that?

25       A    No.  Excuse me?  Because -- because --

```
1        Q    How do you know --

2        A    -- I know polices -- policies.  I knew the

3   company policies because it was given to me when I

4   was hired.  And I worked there for several years, so

5   I know -- I knew the company policies.

6        Q    Okay.  So the written policy is what you

7   followed?

8        A    Yes.

9        Q    Okay.  And --

10       A    And what my director and my president told

11  me.

12       Q    Okay.  And --

13       A    So I followed the policies.

14       Q    And it's your understanding that other

15  directors of admissions followed the written policy;

16  is that right?

17       A    Yes.  You're an employee.  If you're an

18  employee and you're a director, you have to follow

19  the policies.

20       Q    Okay.  So if we want to figure out what

21  the practices were like, we should look at the

22  written policies?

23       A    Yeah, that or the brochures or whatever

24  corporate sends you or whatever.

25       Q    Okay.  But in your experience, the
```

1  directors of admissions, the other people that were

2  responsible for determining promotions and salary

3  raises, they just did what the written policy told

4  them to do; right?

5      MR. LEVY:  Objection; form, calls for

6  speculation.

7      THE WITNESS:  As far as I know.

8  BY MS. YOUNG:

9      Q    That's your understanding; right?

10     A    Yes, that's my understanding because I

11 wasn't trying to create any new rules.

12     Q    Okay.  When you say in paragraph seven,

13 "The Director of Admissions and members of the

14 Corporate Management Team determine promotions,"

15 what did you mean by the word "determine"?

16     A    Make the final decision.

17     Q    Okay.  So they have some discretion in

18 terms of who gets a promotion; is that right?

19     A    Yes.  Yes, they do.

20     Q    When they -- when they exercise that

21 discretion, they can consider factors other than

22 enrollments; isn't that right?

23     A    Well, they never said that to me, but

24 that's how you got -- that's how you got to the top,

25 so to speak.  You enrolled your students and you got

1    your numbers.

2         Q    Now, a director of admissions couldn't

3    just promote somebody all by themself; right?

4         A    I never knew one director that did that.

5         Q    Okay.  Didn't they have to get approval

6    from someone else before somebody got promoted?

7         A    I'm not sure because I didn't ever promote

8    anybody.

9         Q    Okay.  So you don't know whether --

10        A    I only know from my experience of getting

11   promoted.  That's all I know.

12        Q    Okay.  Understood.

13        A    Okay.

14        Q    So you don't know to what extent there was

15   management oversight over the decision to promote

16   somebody or give them a raise?

17        A    No.  Because that was always done for me,

18   so I just know that part.

19        Q    You just know it was done for you?

20        A    Yes.

21        Q    Okay.  Now, I want to talk about your

22   compensation in the short time that you were the

23   director of admissions at Hayward for two and a half

24   months.

25        A    Yes.

```
 1        Q    Did you -- did you get any promotions

 2   while you were the director of admissions --

 3        A    No, I got demoted if you want to know the

 4   truth.

 5        Q    Okay.  Again, please let me finish.

 6             Did you get --

 7        MR. LEVY:  Objection to form.

 8             You keep interrupting her and you're

 9   saying she's cutting you off, but, you know, your

10   questions have been complete and she's answered

11   them.  So...

12        MS. YOUNG:  No, I've -- I've been unable to get

13   a complete question on the record and she's jumping

14   in and I want our transcript to be clear.  And for

15   the benefit of the court reporter, I would like to

16   finish my question before she answers.

17        MR. LEVY:  And it -- and it sounds like you are

18   finished and she's answering them timely.

19        MS. YOUNG:  No, that's not, in fact, true.  And

20   if you want to review the transcript during a break,

21   you should do that because I'm certain I have not

22   been able to get an answer to my question.  And

23   that's not the only time I've asked Ms. Lee to

24   please wait for me to finish.

25             Can I please have the last question read
```

```
 1   back into the record as well as the answer.

 2                    (Whereupon, the record was read as

 3   follows:

 4                    "Question:  Did you -- did you

 5             get any promotions while you were

 6             the director of admissions --

 7                    "Answer:  No, I got demoted if

 8             you want to know the truth.")

 9   BY MS. YOUNG:

10       Q    Okay.  And did you get any salary

11   increases while you were the director of admissions

12   at Hayward for that two-and-a-half month period?

13       A    No, I did not.

14       Q    And I take it you didn't receive any

15   bonuses either.  I think you testified to that.

16       A    No, I didn't.

17       Q    Okay.  After you were terminated from

18   Hayward, which was in or around -- when was it --

19   August of 2004, did you re-apply for employment with

20   Corinthian?

21       A    No, I did not.  I was asked to be

22   reinstated at San Jose by one of the district

23   managers because I was a heavy hitter.

24       Q    Who asked you to be reinstated?

25       A    I think it was Chris VanEs.  I'm not sure.
```

1    Q   So you did accept that offer and ended up

2  becoming employed again at Corinthian?

3    A   I got rehired.

4    Q   And when --

5    THE REPORTER:  I'm sorry.  I didn't hear you.

6    THE WITNESS:  Huh?

7    THE REPORTER:  I didn't hear your answer.

8    THE WITNESS:  She asked me a question.  I did

9  get rehired.

10 BY MS. YOUNG:

11   Q   And when did you get rehired?

12   A   I'm not sure of the date.  I think it was

13 one month after I left Hayward.

14   MS. YOUNG:  Okay.  Let's take a look at a

15 document that may help pin it down.  Okay.  Let's

16 mark this as Exhibit 12 -- I think we're on.

17          (Defendants' Exhibit 12 was marked

18 for identification by the deposition officer and is

19 bound under separate cover.)

20 BY MS. YOUNG:

21   Q   Okay.  And now, this document has your

22 signature on the second and third page; is that

23 correct?

24   A   The second page is correct.  The third

25 page is correct.

1      Q     The signature is dated November 19, 2004.

2  Do you see that?

3      A     Yes, I see it.

4      Q     And the title on the first page of the

5  document says, "Application for Employment,

6  Corinthian Colleges.  Position Desired:  Master

7  Rep."

8            Do you see that?

9      A     Yes, I see that.

10     Q     Was this the application that you filled

11 out to be rehired in San Jose?

12     A     Probably.  It looks like it could be.

13     Q     Okay.  Does November of 2004 sound like

14 the right time period when you were rehired in

15 San Jose?

16     A     Might be.  I'm not sure.  It was about a

17 month and a half after I left the Hayward campus or

18 around something like that.

19     Q     Okay.

20     A     Uh-huh.

21     Q     So sometime around maybe November 2004 or

22 thereabouts --

23     A     Yes.

24     Q     -- you were rehired as a master admissions

25 representative to San Jose?

```
 1        A    Yes.

 2        Q    And you were getting a salary-based

 3   compensation again?

 4        A    Yes.

 5        MS. YOUNG:  I'm handing you what we'll mark as

 6   Exhibit 13.

 7                  (Defendants' Exhibit 13 was marked

 8   for identification by the deposition officer and is

 9   bound under separate cover.)

10        MR. LEVY:  Can I have one?

11        MS. YOUNG:  I'm sorry.

12        MR. LEVY:  That's all right.  Thank you.

13   BY MS. YOUNG:

14        Q    And if you look at page 3, is that your

15   signature on the document?

16        A    That's it.

17        Q    And then again, there's some additional

18   three pages toward the back.  And on the very last

19   page, is that also your signature?

20        A    Yes, it is.

21        Q    Is this the compensation plan that

22   governed your employment as a master campus

23   admissions representative in San Jose?

24        A    I think this is the same one you showed me

25   before, yes.
```

1    Q    Is this what applied to you in the 2004

2   time period when you were rehired?

3    A    Yes, it applied to me.  Tim Lee was the

4   district manager.  Actually, he was the director of

5   admissions.  There's his signature right there

6   (indicating).

7    Q    Okay.  And who signed as college president

8   here, if you know?

9    A    Somebody.  I don't know who that was.

10    Q    Okay.

11    A    Lozer (phon.) or something.  I'm not sure.

12    Q    You read this document before you signed

13   it?

14    A    Yes.

15    Q    And you understood it before you signed

16   it; correct?

17    A    Yes.

18    Q    And on the first page of this document it

19   says, "Minimum Standards of Performance," and then

20   it lists 18 standards again.

21         Do you see that?

22    A    Yes, I do.

23    Q    And just like we talked about before,

24   these are -- were your job responsibilities when you

25   were rehired as an admissions representative in

1    2004?

2        A    Same, yes.  It didn't change.

3        Q    And -- and you tried to fulfill these

4    responsibilities?

5        A    Yes, I did.

6        Q    And you understood that you were being

7    evaluated based on whether you fulfilled all 18 of

8    these responsibilities?

9        A    That and my numbers.  It's always numbers.

10       Q    Okay.

11       A    Enrollments.

12       Q    When you received this document that we've

13   marked as Exhibit 13, did you go over it with

14   anybody?

15       A    I'm not sure, but I don't know why I

16   should have had to go over it with anyone because I

17   already had it before.

18       Q    Okay.  You don't recall whether or not you

19   reviewed this with someone, do you?

20       A    No, no.

21       Q    Okay.  And when you were hired as an

22   admissions representative in San Jose in 2004, did

23   you have any discussion with anybody about how you

24   would be compensated?

25       A    I'm sure I had a conversation with either

1    the director or the district manager.

2         Q    Do you recall the substance of that

3    conversation?

4         A    No, I don't recall.

5         Q    How long did you work as a master

6    admissions representative in San Jose?

7         A    Not long.

8         Q    Can you give me an estimate?  A couple of

9    months?

10        A    One month maybe.  And they sent me to San

11   Francisco.  So they juggled me around quite a bit.

12        Q    Okay.  So you never received a promotion

13   when you were a master admissions representative

14   working in San Jose?

15        A    No.

16        Q    No, you never -- it's correct that you

17   never received a promotion?

18        A    I never received a promotion in the one

19   month that I was working there.

20        Q    Okay.  And you never received a salary

21   increase in the one month you were working there?

22        A    No.

23        Q    Is that correct?

24        A    That's correct.

25        Q    And you never got a bonus during that time

1   period either?

2        A    Never got a bonus.

3        Q    Okay.  So you transferred to San Francisco

4   after that short period of time?

5        A    I didn't transfer, they sent me to San

6   Francisco.

7        Q    Okay.  You were transferred?

8        A    Without a transfer.  They didn't have a

9   transfer.

10       Q    Okay.

11       A    They just sent me to San Francisco.

12       Q    Do you know why they did that?

13       A    You'd have to ask them.

14       Q    Okay.

15       A    They said they needed a heavy hitter in

16  San Francisco.  That's what Tim Lee told me.  "Can

17  you go to San Francisco?"  So I went to San

18  Francisco.

19       Q    Okay.  Did you maintain your position as a

20  master admissions representative when you

21  transferred?

22       A    When I went to San Francisco, I did, yes.

23       Q    You did.  And did you maintain your same

24  salary level when you transferred from San Jose to

25  San Francisco?

1       A    As far as I know and can remember because

2   they never got it right.

3       Q    And when you made that transfer from

4   San Jose to San Francisco, at that time did you have

5   a discussion with anyone about how you would be

6   compensated?

7       A    Oh, man, I had conversations with a whole

8   bunch of people, with the corporate headquarters,

9   whoever was in H.R. at that time.  I can't remember

10  names.  And I had conversations with the school in

11  San Jose, the director of admissions, the president,

12  the president in San Francisco, and the director up

13  there.

14      Q    Describe the substance of those

15  communications with me.

16      A    Confused.  They didn't have their

17  paperwork in order.  So I was getting my paycheck

18  from San Jose and I'm working in San Francisco.

19  They didn't transfer me properly.

20      Q    Okay.  So your discussions relating to

21  your compensation during that time period had to do

22  with paperwork issues related to the transfer; is

23  that correct?

24      A    Yeah, related to the nontransfer.

25      Q    Or the nontransfer?

1    A    Okay.

2    Q    Okay.  In those discussions did the

3 subject of what you would have to do in order to get

4 a promotion or salary increase --

5    A    All the time.

6    Q    -- come up?

7    A    All the time.

8    Q    Okay.

9    A    Produce the numbers.  That was always the

10 production -- I mean, the conversation.

11    Q    And, again, in this time period --

12    A    I had -- hardly had any time to produce

13 any numbers before I was fired again because I

14 didn't produce.

15    Q    Okay.

16    A    Okay.

17    Q    Again, that's not what my question was.

18    A    Okay.  What was your question?

19    Q    Please let me ask my question.

20         In this time period when you were

21 transferring or being transferred from San Jose to

22 San Francisco --

23    A    Uh-huh.

24    Q    -- can you recall a specific conversation

25 with anybody where your compensation was discussed

```
 1    in connection with your numbers?
 2        A    Well, my conversations with the director
 3    in San Francisco was all about numbers.  Okay.
 4    "Produce the numbers" and that's all I got from
 5    them.
 6        Q    And were those conversations in
 7    connection --
 8        A    And convert the leads into interviews.
 9    That's all it was.  All the time.
10        Q    Okay.  And were those discussions in
11    connection with how you would be compensated or was
12    it just --
13        A    Well, I was salaried at that point.
14        Q    Okay.
15        A    So it was on this -- I didn't need to
16    discuss anything because when I hired in, I was
17    quoted a salary and that was it.
18        Q    Okay.  So when you had discussions the
19    second time around in the San Francisco campus about
20    the need to make numbers and all about enrollments,
21    that was not in connection with your compensation?
22    Am I understanding you correctly?
23        MR. LEVY:  Objection to form.  That completely
24    mischaracterizes what she's saying.
25    ///
```

1   BY MS. YOUNG:

2       Q    I just want to make sure --

3       A    Well, compensation is a salary.

4       Q    Right.

5       A    That's it.

6       Q    Okay.

7       A    Compensation is what salary they quoted me

8   they were going to pay me.  Okay.

9           Now, what are you getting at?

10      Q    I just want to know in what context the

11  discussion about meeting your numbers and enrolling

12  people took place.

13          Did that conversation when you were

14  working as an admissions representative in San

15  Francisco for the second time --

16      A    Yes.

17      Q    -- happen in the context of discussing

18  what your salary would be or what your compensation

19  would be?

20      A    No.  Once you signed the contract saying

21  you are getting a salary, you don't have to discuss

22  that no more.  All you have to do is get your

23  numbers.

24      Q    Okay.

25      A    You know, we never discussed changing my

1  salary at that time or anything.  Do you understand?

2       Q    I understand.

3       A    Okay.  That's what happened.

4       Q    Okay.  How long did you work in San

5  Francisco after you were transferred there?

6       A    Barely a month.

7       Q    So once again, you were not promoted

8  during that one-month time period?

9       A    No, I was not.  I was humiliated.

10      Q    Okay.

11      A    Okay.

12      Q    And you didn't get a salary increase?

13      A    No, I didn't.

14      Q    You didn't get a bonus?

15      A    I didn't get a bonus, I didn't get a

16 salary increase, I didn't get a compliment, I didn't

17 get anything.  But, you know, leads to conversions.

18 That's always what it is, your numbers.  "Produce."

19      Q    And then you were terminated?

20      A    Yes.

21      Q    Do you recall roughly what month?

22      A    I think it was May.  I'm not sure.

23      Q    May of 2005?

24      A    I'm pretty sure it was May.

25      Q    Do you know why you were terminated?

1        A     I just told you, Blanca.  I couldn't make

2    any numbers in 30 days because I was starting from

3    scratch in San Jose.

4        Q     Uh-huh.

5        A     As far as I can remember, I interviewed

6    about 100 people and I had my pipeline going, and

7    then something happened.  I was out of there.  They

8    didn't want me there anymore, so...

9        Q     I'm --

10       A     Because I wasn't producing.  There was no

11   way I could produce ten enrollments because the

12   economy was down, everything -- people weren't

13   enrolling at that particular time.  There was just

14   no way it was possible to do that.

15       Q     Okay.  So let me just see if I can

16   summarize your work history with Corinthian.

17       A     Okay.

18       Q     You were --

19       A     Good luck.

20       Q     Well, we'll see if we can do it.

21       A     Uh-huh.

22       Q     You were an independent contractor working

23   as a test proctor for the school --

24       A     Uh-huh.

25       Q     -- from approximately November 1999 until

1    August of 2000; is that correct?

2         A    Uh-huh.  I think that's what we said.

3         Q    Okay.  And then you worked as an

4    admissions representative at the San Francisco

5    campus at various levels --

6         A    Uh-huh.

7         Q    -- from approximately September or

8    thereabouts of 2000 until roughly May of 2004; is

9    that right?

10        A    Uh-huh.  Yes.

11        Q    Okay.  Then you were a director of

12   admissions at Hayward for a short period of time?

13        A    Uh-huh.

14        Q    Maybe from June of 2004 to about August of

15   2004; right?

16        A    Something like that.

17        Q    Okay.  And then you were rehired to work

18   as an admissions representative in San Jose around

19   November of 2004; is that right?

20        A    Whatever that paper says in there.  You're

21   getting me confused now.

22        Q    Okay.

23        A    But it was a short period.

24        Q    It was shortly after -- a few months after

25   you were terminated from Hayward, you were then

```
 1   asked to --

 2        A    To go to San Jose and shortly after that I

 3   was asked -- asked to go to San Francisco.

 4        Q    Okay.

 5        A    Because nobody was making any numbers up

 6   there.  And whenever they needed somebody to come

 7   and make enrollments, they called Nyoka.  And that's

 8   what they did.  And they asked me to go to San

 9   Francisco, Tim Lee did.  Didn't do a transfer or

10   nothing, just said, "Can you report to San

11   Francisco?"

12        Q    Okay.

13        A    It was very confusing to me, but I did

14   what my district manager asked me to do.  And that's

15   what I was supposed to do and he was supposed to

16   handle the rest, so...

17        Q    Okay.  So then you went to San Francisco

18   and worked there until about May of 2005?

19        A    Uh-huh.  Something like that, yes.  That

20   sounds about right.

21        Q    Okay.  And since May of 2005, you've never

22   done any work for Corinthian Colleges?

23        A    Huh-uh.  I don't think they would hire me

24   again after all of that, do you?  I've never worked

25   for Corinthian again.
```

```
 1          Q     Okay.
 2          A     It's the first time I showed up today at
 3   Corinthian Colleges.
 4          Q     And we've discussed all of the promotions
 5   that you ever received as a Corinthian employee; is
 6   that correct?
 7          A     Uh-huh.  Yes.
 8          Q     We've discussed all the salary increases
 9   you ever received as a Corinthian employee; is that
10   right?
11          A     Yeah, that's in these documents here.
12          Q     Okay.  And we've discussed all the
13   compensation that you received from Corinthian
14   Colleges; is that right?
15          A     As far as I know.
16          Q     Okay.  And you never at any time got a
17   bonus from the school; is that right?
18          A     No, I never went to Parthenon or any of
19   that stuff.
20          Q     You never got a bonus from the school?
21          A     No.
22          Q     And you've never at any time worked at a
23   school campus other than San Francisco, San Jose or
24   Hayward; is that correct?
25          A     Not for Corinthians (sic).
```

1      Q    Not for Corinthian?

2      A    No -- or actually, yes -- no, as you say.

3   Yes, I haven't worked for -- or no, I haven't.

4   You're getting me confused.  No, I haven't worked

5   for any other campuses at Corinthians.

6      Q    Other than San Francisco, San Jose or

7   Hayward?

8      A    Yes.

9      Q    Okay.  And you've never recruited students

10  to go to a campus other than San Francisco, San Jose

11  or Hayward?

12     A    I never worked in admissions after I left

13  Corinthian's admissions at any other campus.

14     Q    Okay.  And you don't have any firsthand

15  knowledge of how admissions representatives at other

16  campuses besides San Francisco, San Jose or Hayward

17  were compensated?

18     A    I have some idea.  They were operated on

19  the same principle because I went to three schools.

20  And we -- admissions reps talk, you know.  They do

21  the same thing that we were doing at other campuses.

22     Q    How do you know that?

23     A    Well, because admissions rep -- admissions

24  reps that I worked with while I was at Bryman or

25  Corinthians, they would quit when they couldn't make

```
 1   family.  They talk to each other, you know.

 2        Q    Okay.

 3        A    So I can't give you any specific dates or

 4   times or names at this moment, but it -- that was

 5   the general consensus.

 6        Q    Okay.  Can you name --

 7        A    And I thought it was shocking, but it --

 8   that's what happened.

 9        Q    Can you name a single admissions

10   representative --

11        A    No, I don't want to name any names.  I

12   don't have a name for you right now.  I don't have

13   any names.

14        Q    Okay.  Ms. Lee, if you know a name, I'm

15   entitled to it.

16        A    Well, I don't know any names.

17        Q    So you can't give me a name -- please let

18   me finish my question.  You can't give me a name of

19   an admissions representative at any campus other

20   than the ones you worked at for Corinthian who told

21   you anything about how they were compensated.  Am I

22   correct?

23        A    Compensated?  Oh, I thought we were

24   talking about -- can you state the question again

25   because you confused me on that one.
```

```
 1        Q    Sorry about that.

 2        MS. YOUNG:  Can I have my question read back,

 3   please.

 4                    (Whereupon, the record was read as

 5   follows:

 6                    "Question:  You can't give me a

 7             name of an admissions representative

 8             at any campus other than the ones

 9             you worked at for Corinthian who

10             told you anything about how they

11             were compensated.  Am I correct?")

12        THE WITNESS:  When you say "compensated," are

13   you talking about their salary or their numbers?

14   Because being compensated is one thing, your numbers

15   is another when you work in admissions.

16   BY MS. YOUNG:

17        Q    I'm talking about how people got paid, how

18   they got compensated.

19        A    Well, they got compensated on how many

20   enrollments they made, which are numbers, when they

21   got their promotion.  You got promoted because you

22   made 120 starts or however many they say it is now.

23   I'm not sure.  You got -- you got compensated on how

24   many starts you made, how many people stayed in

25   school.  If you had 120 starts, you could get
```

```
 1   promoted from one admissions rep to another or

 2   whatever the numbers are.  I just used that as an

 3   example.

 4        Q    I --

 5        A    That's how you got promoted in admissions.

 6        Q    I understand that's what you believe.

 7        A    No, that's what I know.

 8        Q    But I would like -- I would like an answer

 9   to my question.

10        MS. YOUNG:  If I can have it read back again,

11   please.

12        MR. LEVY:  Objection to form, argumentative.

13        THE REPORTER:  I'm sorry.  Objection to form

14   and?

15        MR. LEVY:  Argumentative.

16        THE WITNESS:  I'm just trying to understand

17   what you're -- where you're coming from.

18              (Whereupon, the record was read as

19   follows:

20              "Question:  You can't give me a

21         name of an admissions representative

22         at any campus other than the ones

23         you worked at for Corinthian who

24         told you anything about how they

25         were compensated.  Am I correct?")
```

```
 1          THE WITNESS:  That's correct.

 2   BY MS. YOUNG:

 3      Q     And did you have a discussion with any

 4   admissions representative who worked for Corinthian

 5   at a campus other than where you worked about

 6   whether they got promotions or raises?

 7          MR. LEVY:  Can I have that question again.

 8               (Whereupon, the record was read as

 9   follows:

10               "Question:  And did you have a

11          discussion with any admissions

12          representative who worked for

13          Corinthian at a campus other than

14          where you worked about whether they

15          got promotions or raises?")

16          THE WITNESS:  Basically, Blanca, the

17   conversations I had with other admissions reps were

18   always about numbers.  That's what it was always

19   about.  I never discussed their compensation or how

20   much they got for a raise or -- they didn't talk

21   about stuff like that.  They talked about how many

22   enrollments you had.

23   BY MS. YOUNG:

24      Q     And did they discuss anything about

25   getting promotions or whether they were --
```

1          A      No, I didn't discuss that kind of

2    information with other employees.  Nobody talked to

3    me about it, and I didn't talk to them about it

4    because it wasn't my business.  Because I could see

5    what enrollments were when I got the flashes.  And

6    everybody that worked at all the campuses could see

7    that.

8          Q      Uh-huh.

9          A      And that's what we got.

10         Q      Okay.

11         A      Weekly, monthly and daily.

12         Q      You didn't discuss --

13         A      No, I didn't discuss.

14         Q      Stop just a minute.

15                You didn't discuss salary raises or

16   whether someone was eligible for a raise with other

17   employees of Corinthian, did you?

18         A      Again, no, I didn't discuss that.

19         Q      Have you ever visited a campus of

20   Corinthian other than San Francisco, San Jose or

21   Hayward?

22         A      Let's see.  I don't think so.  I don't

23   recall.

24         Q      So just to summarize, since May of 2005

25   you've not been employed by the school in any

1   capacity?

2        A    No, I have not.

3        Q    You've not provided any services or any

4   independent contracting work to the school since

5   May of 2005; is that correct?

6        A    That's correct.

7        Q    You've received no compensation from the

8   school at all since you were terminated in May of

9   2005; is that correct?

10       A    No, I haven't.  That's correct.

11       Q    All the promotions you received at the

12  school happened before January 1st, 2005; is that

13  right?

14       A    That's correct.

15       Q    All the salary increases you received from

16  the school happened before January 1st, 2005; is

17  that correct?

18       A    I'm pretty sure those dates are correct,

19  but I would have to see it in writing on these

20  papers, but I'm going to say yes to that.

21       MS. YOUNG:  Okay.  And just make sure that your

22  mic is -- can you hear her on the mic?  I want to

23  make sure that --

24       THE WITNESS:  I need to leave to go to the

25  restroom.

1          MS. YOUNG:  Okay.

2          MR. LEVY:  Okay.  We'll take a break.

3          MS. YOUNG:  Let's take a quick break.

4          THE WITNESS:  Thank you.

5          THE VIDEOGRAPHER:  The video deposition is now

6     going off record at 12:08 p.m.  This will also

7     conclude video No. 2 in today's deposition.

8                    (A recess was taken from 12:08 p.m.

9     to 12:25 p.m.)

10          THE VIDEOGRAPHER:  The videotaped deposition of

11    Nyoka J. Lee, Volume No. 1, is returning to record

12    at 12:25 p.m.  This will also begin video No. 3 in

13    today's deposition.

14               The location is still 6 Hutton Centre

15    Drive, Second Floor, in Santa Ana, California.  The

16    date is Monday, December 17th, 2012.

17               My name is Ali Saheb with Dean Jones

18    Attorney Video Services in Los Angeles and Santa

19    Ana, California.

20    BY MS. YOUNG:

21          Q    Okay.  Ms. Lee, you understand you're

22    still under oath?

23          A    Yes, I do.

24          Q    Okay.  And we'll go for just a little bit

25    longer and then break for lunch.

1    BY MS. YOUNG:

2         Q    I'm sorry.  Go ahead, Ms. Lee.

3         A    Well, this is what the director would give

4    us every week, every Monday, as a matter of fact,

5    showing us how we stacked up against all the rest of

6    the admissions and all -- how all the directors

7    stacked up against all the rest of the directors.

8    They just would give us these reports and these

9    reports here.

10             I don't know.  Do you have them in there?

11        Q    And -- and --

12        A    That's the -- if you want the names of

13   some of the people in admissions, it's on there.

14        Q    Okay.  So you're --

15        A    But I can't --

16        Q    -- referring just now to the document with

17   the number 466 at the bottom?

18        A    This one, yes, that's what I was referring

19   to.

20        Q    Okay.

21        A    Any document in there that has the --

22   these are the activity reports that we would get.

23        Q    Okay.  I also see some documents titled

24   "Ad Rep Performance Flash."

25        A    Yeah, and that's for like the lead to

1    conversion rates on there.

2        Q    Okay.

3        MR. LEVY:  And we've provided those, the Bates

4    number is on -- these are all marked.

5    BY MS. YOUNG:

6        Q    Okay.  Am I correct though that none of

7    these documents say anything about compensation for

8    the admissions representatives?

9        A    I don't think it says.  The only

10   compensation is what you see on me.  Nobody else.

11       Q    Okay.  So --

12       A    And I don't have compensation documents on

13   anybody else but myself.

14       Q    Okay.  And you've not provided us with any

15   documents today that describe or explain how

16   admissions representatives were compensated; is that

17   right?

18       A    Other than what we have in here that we've

19   gone over.

20       Q    I'm talking about the documents you

21   brought with you to the deposition today.

22       A    No, this is -- the same stuff you have, I

23   have.

24       Q    Okay.  So other than the documents that

25   describe how you, Nyoka Lee, were compensated,

```
 1    you're not aware of any documents describing how
 2    other admissions representatives were compensated?
 3         A    No, I'm not aware of that.
 4         Q    And are you aware of any documents
 5    explaining how directors of admissions would be
 6    compensated by Corinthian?
 7         A    No.
 8         Q    We've discussed various communications
 9    you've had with other individuals at this school.
10    Other than what we've already discussed up until
11    now, are you aware of any discussions among anyone
12    at Corinthian about how admissions representatives
13    were compensated?
14         A    No, I'm not.  All I'm aware of is that if
15    you wanted a raise, like I say, you have to have
16    your numbers.  And they give you -- I don't think
17    that document is in here, but they give you a line
18    of how many starts you have to have per year,
19    annually, if you want -- if you're getting a raise.
20              It lists how many starts you need and how
21    many enrollments and all that.  There's a form.  I
22    don't know if it's in here or not, but I'm sure you
23    must have it.
24         Q    You're referring to a document?
25         A    Well, it's in writing, yes.  It's a
```

1    document.

2         Q    Okay.

3         A    It lists all the starts that you need to

4    make from campus to -- to senior to master.

5         Q    Okay.  And it lists other things that you

6    need to do to get a promotion as well; right?

7         A    Yes, which are some of the documents you

8    gave me.

9         Q    Like meeting minimum standards of

10   performance?

11        A    Yeah, that's all I know.  I don't know

12   about any other documents.

13        Q    Okay.  And getting a certain score on your

14   performance evaluation; right?

15        A    No, I don't know about any other documents

16   other than what we have here.

17        Q    Okay.  Are you aware, other than what

18   we've already talked about, of discussions among

19   anyone at Corinthian about how to evaluate the

20   performance of admissions representatives?

21        A    No.

22        Q    Okay.  And again, other than what we've

23   already talked about, are you aware of discussions

24   among anyone at Corinthian about how directors of

25   admissions would be compensated?

1      A    No, other than conversations I would have

2   with Cary Kaplan.

3      Q    Okay.

4      A    He is a -- he was a director.  He would

5   say, "Well, if you have X amount of numbers, I'll

6   get so much," you know.  He got paid on his -- his

7   numbers.

8      Q    Okay.

9      A    He would get paid, you know, and get

10  compensated if the admissions department made a

11  certain amount of enrollments and starts and

12  numbers.  It's all about numbers.

13     Q    Okay.

14     A    Then he would get -- if he was at a

15  certain bracket, he would get a raise.

16     Q    And Mr. Kaplan was your director of

17  admissions up until 2004; correct?

18     A    Yeah, when I was working at Bryman.

19     Q    Okay.  You didn't work with him after

20  2004; is that right?

21     A    No, I did not.  No, I did not.

22     Q    And your only knowledge of how directors

23  of admissions were compensated other than your own

24  experience as a director of admissions was what you

25  heard secondhand from Mr. Kaplan; is that right?

```
 1        A    Yes.

 2        MR. LEVY:  Objection; form.  She heard it

 3   firsthand from Mr. Kaplan.

 4        THE WITNESS:  That's what you said; right?

 5   BY MS. YOUNG:

 6        Q    Well, you heard it secondhand from

 7   Mr. Kaplan?

 8        A    Yeah, well, firsthand, just like I'm

 9   talking to you.  I would have -- he would have a

10   conversation with me, that's firsthand; right?

11        Q    Okay.  But you had a conversation with

12   Mr. Kaplan and your only knowledge about how

13   directors of admissions were compensated other than

14   when you were a director of admissions is based on

15   what Mr. Kaplan told you; right?

16        A    That's true.

17        Q    Okay.  Can you identify by name any

18   admissions representative for Corinthian who got a

19   salary increase or a promotion after January 1st,

20   2005?

21        A    No.

22        Q    Can you identify by name any director of

23   admissions for the school who got a salary increase

24   or a bonus after January 1st, 2005?

25        A    I never saw any of those people when I
```

1   left, or talked to them.  So I couldn't -- I can't

2   identify anybody like that.

3       Q    Okay.  So you -- you can't identify any

4   admissions representative who worked for Corinthian

5   after you were terminated in May of 2005?

6       A    No.

7       Q    You can't identify any director of

8   admissions who worked for the school after you were

9   terminated in May of 2005; is that right?

10      A    Well, I think Cary is working somewhere.

11  I don't know.  I haven't talked to him.  I heard

12  through the grapevine he was working at Heald.

13      Q    But you don't have direct knowledge of --

14      A    No, I don't.  I haven't been to Heald and

15  I haven't gone into his office and sat down and

16  said, "How are you doing, Cary?"  I haven't done

17  that, no.  I haven't seen him.

18      Q    You don't have direct knowledge of the

19  name of any director of admissions who was working

20  at Corinthian after you were terminated in May of

21  2005?

22      A    No.

23      Q    And can you name a school president who

24  held that position after May of 2005?

25      A    I don't know the name of the lady that

1    took over for Mr. Plant.  I don't know her name.

2         Q    Okay.  Can you name --

3         A    I don't need to know that.

4         Q    Can you name any regional director who

5    held that position after May of 2005?

6         A    I don't know any of those people and I

7    don't know their names, no.

8         Q    Okay.  And have we discussed all the job

9    responsibilities that you had at Corinthian during

10   the time periods you worked for Corinthian?

11        A    All the ones that were listed on here.  I

12   didn't have any other job responsibilities for

13   Corinthian other than what was listed in here.

14        Q    And -- and you've described for me all the

15   responsibilities that you had in the various

16   positions you held during your tenure at Corinthian;

17   is that right?

18        A    Yes, I -- yes, I did.

19        Q    Okay.  So you had no involvement in

20   designing compensation programs for admissions

21   representatives; is that correct?

22        A    Designing?  What are you saying?

23        Q    Did you help put together the compensation

24   program that governed how admissions representatives

25   would be paid?

1        A    No, I wasn't hired to do that.

2        Q    Okay.  So you didn't participate --

3    participate in any discussions about how to design

4    the written program for admissions representatives?

5        A    No, I didn't do any curriculum design or

6    any of that.

7        Q    Okay.

8        A    I was an admissions rep and that's what I

9    did when I worked for Bryman.  I didn't do any

10   designing for them.

11       Q    Okay.  And that includes --

12       A    I did that for myself.

13       Q    Uh-huh.  And so you didn't play any role

14   in developing the written materials that were part

15   of the --

16       A    No.

17       Q    -- compensation programs for admissions

18   representatives?

19       A    No, I did not.  Corporate did all that.

20       Q    And you have no knowledge, I take it,

21   about how that compensation program was designed; is

22   that right?

23       A    No.  No, I do not.  All I did was read it

24   when they gave it to me.

25       Q    Okay.  Do you know who designed the

1    compensation program for admissions representatives?

2         A    I should ask you that or somebody working

3    here.  I don't know.

4         Q    You don't know?

5         A    Huh-uh.

6         Q    And you don't know what factors they took

7    into account --

8         A    No.

9         Q    -- to design the compensation program?

10        A    No, I could find something that they might

11   want to take part in, though, but I didn't know

12   anything like that.

13        Q    Okay.  And you don't know what their

14   intent was in designing the written compensation

15   program?

16        A    No, I didn't work with that team.  That

17   was all done through corporate.

18        Q    And we looked earlier at some performance

19   evaluation forms.  Did you have any involvement in

20   designing what the performance evaluation forms

21   would look like?

22        A    No.

23        Q    Okay.  Do you know how they were

24   developed?

25        A    Corporate.  It's like I say, I've got that

1    stuff from corporate and that's it.  I don't know

2    anything about it.

3         Q    You don't know what factors --

4         A    No.

5         Q    -- were taken into account in figuring out

6    how to design that form, do you?

7         A    No.

8         Q    You don't know what the intent was --

9         A    No, I don't.

10        Q    -- in designing the performance evaluation

11   form, do you?

12        A    No.

13        Q    And did you participate in any discussions

14   about how the performance of admissions

15   representatives should be evaluated?

16        A    No, I did not.

17        Q    I take it you also had no involvement in

18   designing the compensation or bonus programs for

19   directors of admission?

20        A    No, I did not.

21        Q    Okay.  And you didn't participate in any

22   discussion about how to design those programs?

23        A    No, I did not.

24        Q    You didn't develop any of the written

25   materials for those programs?

1      A     No, I did not.

2      Q     You don't know what factors were

3  considered in designing those programs?

4      A     No, I did not.  The only thing I did was

5  this sheet when I was a director, design a plan for

6  the -- for the admissions team to get their numbers.

7      Q     Okay.  And by that --

8      A     That was my job.

9      Q     By that you were referring to that "Week

10  Four" agenda we looked at earlier?

11      A     Yeah.  Yes, that's the only thing.

12      Q     Okay.  And that's not --

13      A     I wouldn't say that I designed it.  I just

14  wrote it up how it was given to me when I was in

15  admissions for them.

16      Q     Okay.  So you don't know what the intent

17  was in designing the overall bonus program that

18  applied to directors of admissions; is that right?

19      A     No.  I didn't delve off into that area.

20      Q     Okay.

21      A     That wasn't my job.

22      Q     Am I correct that the only

23  management-level position you held was for that

24  roughly two-month time period --

25      A     That's it.

 1      Q    -- where you were a director of admissions

 2  at Hayward?

 3      A    Yes, that's the only one.

 4      Q    Okay.  Did you ever personally participate

 5  in meetings involving school executives?

 6      A    Yes, I did.

 7      Q    Okay.  How often did you participate in

 8  meetings like that?

 9      A    I'm not sure how many times corporate came

10  down to the school, but they would always have

11  admissions meetings and bring all the admissions

12  teams in.  And the corporate people would help them

13  write the scripts, change the scripts.  I guess they

14  designed them, too.  I don't know.

15           But they would tell us -- give us

16  information on how to change the scripts.  If the

17  enrollments weren't up or if the enrollments were

18  down, they would tell us how to change the scripts.

19      Q    And by "scripts," you mean what you use to

20  communicate with potential students?

21      A    That's what I mean.

22      Q    Okay.  And was anything else discussed

23  during those meetings?

24      A    No, that was basically it.  They would

25  come up and have those meetings and fire us up.

1    Q    So it was to get you sort of --

2    A    That's what they used, the words "fire us

3    up."

4    Q    -- get you excited about your job?

5    A    Uh-huh, uh-huh.

6    Q    And to work on the script that you would

7    use when communicating with students?

8    A    Yeah, and how to change it and stuff like

9    that.

10    Q    Okay.  And that was the extent of

11    discussions that you had with corporate executives

12    about admissions?

13    A    Yeah, I would be in a meeting with a bunch

14    of people.  I wouldn't have a direct conversation

15    with them.

16    Q    Okay.  Were you ever personally in a

17    position to observe a meeting between school

18    executives other than the ones that you participated

19    in yourself?

20    A    Like what?  You mean like -- give me an

21    example of what you're talking about.

22    Q    Well, if you attended a meeting where

23    other executives were talking to each other --

24    A    No.

25    Q    -- other than the meetings you just

1  described?

2       A    Huh-uh, no.

3       Q    David Moore is one of the defendants in

4  this case.  Do you know who he is?

5       A    He was at the University of Phoenix,

6  wasn't he?

7       Q    I'm just asking if you know who he is.

8       A    Oh, I'm trying to figure out if I do.  I

9  think he was at the University of Phoenix.  I'm not

10 sure.

11      Q    He's not somebody you know personally?

12      A    No.

13      Q    You don't even know if he worked for

14 Corinthian?

15      A    Well, I saw -- I don't know where he's

16 working now, but I saw the corporate page.  And I

17 think he got transferred over here from the

18 University of Phoenix.  I don't know.  That's a

19 question you have to ask David Moore because I don't

20 know the answer to that.

21      Q    Okay.  You've never met him in person?

22      A    I might have seen him on the Web page, but

23 I have never met him in person.

24      Q    And you never communicated with

25 David Moore; is that right?

```
 1        A    Not like I'm communicating with you.

 2        Q    I'm asking if you've ever communicated --

 3        A    No, I haven't.

 4        Q    -- with David Moore?

 5        A    No.

 6        Q    And have you ever been in a meeting in

 7   which he was present?

 8        A    Oh, I think he might have spoken at some

 9   of those University of Phoenix meetings.  I'm not

10   sure.

11        Q    Okay.  You don't recall a meeting --

12        A    No.

13        Q    -- at -- at Corinthian --

14        A    I had no meetings with David Moore.

15        Q    Okay.  And you don't recall him speaking

16   at any meeting at Corinthian; is that correct?

17        A    No.

18        Q    Is that correct?

19        A    That's correct.

20        Q    Another one of the defendants is someone

21   named Jack Massimino.  Do you know who that is?

22        A    I think he was with the University of

23   Phoenix.  I can't remember the names.

24        Q    Okay.

25        A    But he might have been with the University
```

1    of Phoenix.

2        Q    Okay.  You've never --

3        A    I think he was the president over there or

4    something.  I'm not sure.

5        Q    And you never met him in person?

6        A    I can't remember meeting him in person.

7        Q    Okay.  And I take it you don't recall

8    communicating with him?

9        A    No.

10       Q    Do you know what a "program participation

11   agreement" is?

12       A    No.  What is that?

13       Q    I'm just asking whether you know what it

14   is.

15       A    No, I don't.

16       Q    Never heard of it before?

17       A    Program participation?

18       Q    A program participation agreement.

19       A    Okay.  No.

20       Q    Is today the first day you've heard that

21   word?

22       A    As far as I know in relationship to

23   Corinthian.

24       Q    Have you ever heard of a program

25   participation agreement in relation to anything

```
 1    else?
 2         A    No.
 3         Q    Okay.  Have you ever seen any agreements
 4    that Corinthian has with the government, the U.S.
 5    government?
 6         A    Like what?
 7         Q    Any agreements of any kind.  Have you ever
 8    seen any agreements that Corinthian has with the
 9    government?
10         A    Not that I know of, no.  I would have to
11    say no to that.
12         Q    Uh-huh.  Are you aware that -- whether or
13    not Corinthian --
14         A    It says right here on this one, "comply
15    with government regulations."  Are you talking about
16    that kind of --
17         Q    No, I'm just -- I'm not asking you
18    questions about anything that's in a document.  I
19    just want to know what you know sitting here today.
20         A    I don't know anything about that, what
21    you're asking me.
22         Q    Okay.  So -- so you don't know whether or
23    not Corinthian has any agreements with the
24    government; is that right?
25         A    No, I don't know for sure.  They probably
```

1    do, though.

2         Q    Okay.  But you don't know one way or

3    another?

4         A    No, I wouldn't even need to know that.

5         Q    Okay.  I want to ask you about financial

6    aid.  And by that I mean any federal government or

7    state government assistance that's given to a

8    student to help finance their education.  So that

9    could be a grant, it could be a loan.

10             As an employee of Corinthian, did you have

11   any responsibility for helping students submit

12   financial aid applications?

13        A    I didn't work in financial aid, I worked

14   in admissions.

15        Q    Okay.

16        A    That's what I did.  I didn't mess around

17   with financial aid.

18        Q    Okay.  Have you ever prepared a financial

19   aid application for a Corinthian student?

20        A    No, I have not.

21        Q    Have you ever submitted a financial aid

22   application for a Corinthian student?

23        A    No.

24        Q    Have you ever communicated with the

25   federal government on behalf of Corinthian?

```
 1        A    No.

 2        Q    Did you ever see or hear any

 3   communications between a representative of

 4   Corinthian and the government?

 5        A    No.

 6        Q    Did you ever submit any claim for payment

 7   to the federal government on behalf of Corinthian?

 8        A    No.

 9        Q    Did you ever see any claim for payment to

10   the federal government that was made by Corinthian?

11        A    No.

12        Q    Is the same true for state governments as

13   well?

14        A    I didn't delve off into that area.  That's

15   true.

16        Q    You never communicated with state

17   governments?

18        A    No, except for myself and as a student I

19   did that for myself.

20        Q    But on behalf of --

21        A    It wasn't with Corinthian.  So...

22        Q    On behalf of Corinthian --

23        A    No, I didn't.

24        Q    -- you never communicated with a state

25   government?
```

```
 1              And you never submitted a claim for

 2    payment to any state government on behalf of

 3    Corinthian?

 4         A    No, I did not.

 5         Q    You never saw a claim for payment --

 6         A    No, I haven't.

 7         Q    -- to a state government on behalf of

 8    Corinthian?

 9              And you never saw or heard any

10    communications between any representative of the

11    school and any state government; is that right?

12         A    No.

13         Q    I'm correct?

14         A    That's correct.

15         Q    Okay.  Just a few more questions here.

16         A    Uh-huh.

17         Q    When you were recruiting students as an

18    admissions representative for the school, did you

19    ever lie to them?

20         A    No.

21         Q    Did you ever mislead them?

22         A    No.

23         Q    You were honest with them; right?

24         A    Yes.

25         Q    And you did your best to provide
```

```
1    prospective students with accurate information?

2         A    Yes, I did.

3         Q    What was the pitch that you would give

4    prospective students who you were trying to recruit

5    to Corinthian?

6         A    The pitch?

7         Q    Well, what would you -- well, what would

8    you tell them when you were trying to recruit them

9    to the school?

10        A    I told them all kinds of things, you know.

11   I can't remember what I told them.  I followed the

12   script that Corinthians gave me.

13        Q    Okay.

14        A    That's what I did.

15        Q    And you believed that what you were

16   telling those students or prospective students was

17   true; is that right?

18        A    That's right because I wouldn't be telling

19   them a lie.

20        Q    When you were a director of admissions,

21   did you ever tell the admissions representatives

22   that you supervised to mislead students in any way

23   that they were trying to recruit?

24        A    That I what?

25        Q    When you were a director of admissions,
```

```
1    did you ever tell the admissions representatives
2    that you were responsible for supervising to mislead
3    prospective students that they were trying to
4    recruit to the school?
5         A    No.
6         Q    Okay.  And did you personally comply with
7    the school's policies and procedures at the time
8    that you were employed at the school?
9         A    Yes, I did.
10        Q    You never purposely violated any of those
11   procedures?
12        A    No.
13        Q    And you did your best to follow the
14   policies and the procedures of the school?
15        A    Yes, I did.
16        Q    Did you ever tell any other employees of
17   the school that they should violate the school's
18   written policies and procedures?
19        A    No, I did not.
20        Q    Were you ever told that you should violate
21   the school's written policies and procedures?
22        A    Regarding enrollments, no, I -- no one
23   told me to do that.
24        Q    Okay.  And are you aware of any legal or
25   regulatory requirements that relate to recruiting or
```

1    the compensation of recruiters?

2         A    Repeat that, please.

3         Q    Are you aware of any legal or regulatory

4    requirements that relate to recruiting or

5    compensating recruiters?

6         A    No.

7         Q    Have you ever heard of the Higher

8    Education Act?

9         A    Yes, I have.

10        Q    Okay.  When -- what is your understanding

11   of the Higher Education Act?

12        A    I don't know.  I can't tell you right now.

13        Q    When was the first time you heard of the

14   Higher --

15        A    I don't want to make an error in telling

16   you that.  So I don't want to tell you that.

17        Q    Okay.

18        A    It's not in my brain right now.

19        Q    Okay.  When was the first time you heard

20   of the Higher Education Act?

21        A    Well, I heard about it when I was at

22   Bryman.  I think it has something to do with

23   financial aid.

24        Q    Okay.  Have you ever heard of a provision

25   in the Higher Education Act that prohibits schools

1  from paying incentive compensation to people who are

2  involved in recruiting activities?

3       A    I read something about that.

4       Q    Okay.  Where did you read something about

5  that?

6       A    I probably read it online.

7       Q    Okay.  When was the first time you heard

8  about that?

9       A    Since I've been away from Corinthians,

10  since I got fired.

11       Q    Okay.  So the first you heard of the

12  provision I just described was after you were

13  terminated from Corinthian?

14       A    I probably heard about it when I was

15  working there, but I was focused on something else.

16       Q    Okay.

17       A    I couldn't like outline everything that's

18  in there for you right now if you asked me to.  I

19  couldn't do that, so I'm not going to tell you that

20  I can.

21       Q    Okay.  And you became aware of this

22  prohibition against paying incentive compensation to

23  people involved in recruiting by doing Internet

24  research?

25       A    Can you repeat that, please.

```
1        Q    I'm just trying to understand how you
2   became aware of the provision in the Higher
3   Education Act I described.
4        A    Well, I became aware of it since I've been
5   working on this case with you.
6        Q    Okay.  Before working on putting together
7   this case, were you aware that there was a
8   prohibition in the Higher Education Act against
9   paying incentive compensation to employees involved
10  in recruiting?
11       A    No, no.  Well, they didn't tell me that
12  when I got hired at Corinthians, no.
13       Q    Okay.  So the first time you became aware
14  of the provision in the Higher Education Act that
15  prohibits the payment of incentive compensation to
16  people involved in recruiting was when you started
17  to put together this lawsuit; is that right?
18       A    I didn't put this lawsuit together.  I'm
19  just involved in it.  But I heard of it then, yes.
20       Q    When you became involved in the lawsuit?
21       A    Yes.
22       Q    Okay.  Who put this lawsuit together?
23       A    This is my lawyer, Scott Levy.
24       Q    Okay.  Just a few more questions here and
25  then we can break for lunch.
```

```
 1              How did Mr. Levy become your lawyer?

 2      A     How did he become my lawyer?

 3      Q     Right.

 4      MR. LEVY:  Are you asking for attorney-client

 5  communications?

 6      MS. YOUNG:  No.

 7      MR. LEVY:  Because it sounds like you're --

 8  you're getting close to asking that.

 9      MS. YOUNG:  I am not asking for that.

10      Q     I want to know how it came to be that

11  Mr. Levy is your lawyer, given that he's in Houston

12  and you're in the Bay Area.

13      A     He was recommended to me and I was -- and

14  I met him.

15      Q     Okay.  Who recommended Mr. Levy to you?

16      THE WITNESS:  What's that person's name, Scott?

17  I don't really need to answer that, do I?

18  BY MS. YOUNG:

19      Q     You do.  It's not privileged.

20      A     I do.  Well, I don't know the person's

21  name because I'm not -- I met that person one time

22  and I haven't seen that person in several years, so

23  I can't even remember the name.

24      Q     How did you meet this person?

25      A     I met that person having dinner one time.
```

1        Q     Male or female person?

2        A     She was a female.

3        Q     What was the subject of your dinner

4   conversation?

5        A     I can't remember that.  How good the

6   potatoes were.  I don't know.

7        Q     Why did you have dinner with her?

8        A     Well, she invited me.

9        Q     So this is a person you've never met

10  before in your life and she invites you to dinner.

11  Did she say why?

12       A     She wanted to get to know me.

13       Q     Did she -- I mean, if I got a call like

14  that, I would want to know why.  Did you ask her why

15  she wanted to get to know you?

16       A     No, I didn't.  I just went to dinner.  I

17  had dinner with her.

18       Q     What did you discuss during that dinner?

19       A     Well, I can't remember.  It's been a

20  while.  I can't remember everything I discussed with

21  her.

22       Q     Can you remember in general what you

23  talked about?

24       A     Yes, I do.  Admissions.

25       Q     Can you be more specific?

1      A     Just stuff about admissions, her job or

2  whatever.

3      Q     Was this person an admissions

4  representative at Corinthian?

5      A     Maybe.  I'm not sure.  I didn't ask her

6  whether she was in admissions.  I didn't ask.

7      Q     How did it come to be that she gave you a

8  reference to Mr. Levy?

9      A     I think she might have worked with him

10  before.  I'm not sure.

11      Q     Was that what she told you?

12      A     She didn't tell me that because I didn't

13  ask her that because I don't get in people's

14  business.  I didn't ask her.

15      Q     So you said she contacted you.  Do you

16  know how she got your information?

17      A     No, I don't.

18      Q     When did she contact you?

19      A     I'm not sure of the date.

20      Q     So this lawsuit was filed in 2007 -- I'm

21  sorry.  We have a -- we have a communication that we

22  know happened between you and Mr. Levy on

23  October 7th, 2006.

24      A     Uh-huh.

25      Q     Did this woman contact you around that

```
 1        Q    Was the purpose of the meeting to talk
 2   about anything?
 3        A    Not necessarily.
 4        Q    So who contacted you to set up the
 5   meeting?
 6        A    Who contacted me to set it up?
 7        Q    Correct.
 8        A    The meeting was already set up when I got
 9   there.
10        Q    How did the meeting get set up?
11        A    I'm not sure because I didn't set it up.
12        Q    Who set up the meeting?
13        A    I'm not sure.  I didn't set it up.
14        Q    How did you know to go to the
15   restaurant -- you were at a restaurant for this
16   dinner meeting?
17        A    I was at a restaurant, yes.
18        Q    How did you know to go to the restaurant
19   for the meeting?  Did somebody call you and say that
20   a meeting was going to happen?
21        A    Someone called me.
22        Q    Who told you?
23        A    Talala called me.
24        Q    And what did he say to you?
25        A    And I didn't know what was happening until
```

1    I got there.  I didn't know what the meeting was all

2    about and I just had dinner and left.

3        Q    What did Talala say to you when he called

4    you about this meeting?

5        A    What did he say to me?

6        Q    Uh-huh.

7        A    This has been a while.  I can't tell you

8    exactly what he said to me.  He asked -- told me he

9    was having dinner and to come over.  So I went over

10   there to the restaurant.

11       Q    Okay.  Who paid for dinner?

12       A    Who paid?

13       Q    Uh-huh.

14       A    I don't know.  Probably one of those

15   people that was with me.  I didn't pay.  I'm not

16   sure who paid because I didn't -- I wasn't paying

17   that close of attention who paid, but I didn't pay.

18       Q    So was there any discussion at this dinner

19   meeting about bringing a lawsuit against Corinthian?

20       A    Repeat that.

21       Q    Was there any discussion at this dinner

22   meeting about bringing a lawsuit against Corinthian?

23       A    It could have been.  I'm not sure.

24       Q    Had you thought about bringing a lawsuit

25   against Corinthian before that dinner meeting?

```
 1        A    No, I hadn't.  I didn't know anything

 2   about a lawsuit with Corinthians.

 3        Q    Had you ever thought that Corinthian might

 4   have been defrauding the government before that

 5   dinner meeting?

 6        A    In terms of defrauding them?

 7        Q    You're bringing a claim for fraud in this

 8   lawsuit.  Do you understand that?

 9        A    Yes, I do.

10        Q    Okay.

11        A    But you have to be specific when you ask

12   me a question.

13        Q    Did you --

14        A    Defrauding them in terms of?

15        Q    It's a broad question.  Did you believe

16   that --

17        MR. LEVY:  It's 1:00 o'clock, too, so make this

18   your last one.

19        MS. YOUNG:  Well, I'm going to wrap up this

20   line of questioning.

21        Q    Before you had this dinner meeting --

22        A    Uh-huh.

23        Q    -- did you believe that Corinthian had

24   engaged in any fraud against the government?

25        A    No.  I would have to say no to that.
```

1    Q    And before attending this meeting, did you

2    believe that Corinthian had done anything improper

3    in the way it compensated admissions

4    representatives?

5    A    No.

6    MS. YOUNG:  Okay.  That's all I have.  Let's

7    break for lunch.

8    THE VIDEOGRAPHER:  The video deposition is now

9    going off record at 1:02 p.m.

10                    (A recess was taken from 1:02 p.m. to

11    2:32 p.m.)

12    THE VIDEOGRAPHER:  The video deposition is now

13    returning to record at 2:32 p.m.

14    BY MS. YOUNG:

15    Q    Okay.  Ms. Lee, we're returning after a

16    lunch break and you understand that you are still

17    under oath?

18    A    Yes, I do.

19    Q    Okay.  And is there anything that you

20    would like to amend in terms of your testimony

21    earlier today?

22    A    Not that I know of at this moment.

23    Q    Okay.  Before the break we were talking

24    about a dinner that you attended with Mr. Levy and

25    Mr. and Mrs. Mshuja.

1           Am I saying that correctly, by the way,

2    Talala --

3        A    Ask him.  It's his name.

4        Q    Unfortunately, the only person that I'm

5    supposed to be asking questions of is you.  And

6    so --

7        A    Okay.

8        Q    How do you pronounce his name?

9        A    Mshuja.

10       Q    Mshuja?

11       A    Mshuja.

12       Q    Mshuja.  Okay.

13           So we were talking about this dinner that

14   you attended with Mr. Mshuja -- Mshuja and Mr. Levy

15   and Mr. Labaton and another woman.

16       A    Uh-huh.  Yes.

17       Q    Do you have that in mind?

18       A    Uh-huh.

19       Q    And you say that Mr. Mshuja called you

20   about the dinner to tell you to come to it?

21       A    Yes, he did.

22       Q    Okay.  What is your relationship with

23   Mr. Mshuja?

24       A    What's my relationship?  I worked with him

25   at Corinthians.

1       Q    Okay.  Do you have any familial

2   relationship with him?

3       A    Do I have what?

4       Q    Any familial relationship with him?  Is he

5   part of your family?

6       A    He's my brother.

7       Q    Okay.  And you also worked with him at

8   Corinthian?

9       A    Yes, I did.

10      Q    In what way did you work with him at

11  Corinthian?

12      A    Well, he worked there the same time I did.

13  I didn't work in the same -- you know, I didn't work

14  with him, but he worked there when I was working

15  there.

16      Q    Okay.  Okay.  And what did Mr. Mshuja do

17  at Corinthian?

18      A    He was at one time the test proctor.

19      Q    You said "at one time."  During what time

20  period was he a test proctor for Corinthian?

21      A    I'm not sure because I took care of my

22  business and that's it.  I'm not sure of the dates

23  on that.  So you can't ask me that.  I'm sorry.

24      Q    Okay.  He overlapped with you a little bit

25  at Corinthian?

1      A    Well, he was the proctor when I was in

2   admissions.

3      Q    So at the same time that you were in

4   admissions, he was employed as a test proctor; is

5   that correct?

6      A    Yes.

7      Q    Do you know if he worked for Corinthian

8   after you stopped your employment there?

9      A    I wish you could ask him those questions

10  because I don't get in people's business, but I was

11  there and I left and I was gone.  So I don't know

12  what he did.  You'd have to ask him these questions.

13     Q    Okay.

14     A    Okay.  If you don't mind.

15     Q    We will have an opportunity to do that

16  tomorrow.

17     A    Okay.  Okay.

18     Q    But we are entitled to what you know

19  today.  So if you --

20     A    About him?

21     Q    Correct.

22          Are you aware of him continuing to work

23  for Corinthian after you left your employment there

24  in 2005?

25     A    Okay.  I think he left before I did.  I'm

1   not sure.

2        Q    Okay.  And are you aware of him having any

3   position at Corinthian other than as a test proctor?

4        A    No, I'm not.

5        Q    How frequently would you communicate with

6   him about or -- strike that.

7             Did you communicate with Mr. Mshuja about

8   your work for Corinthian?

9        A    No.

10        Q    Are you aware of anybody else who

11   communicated with Mr. Mshuja about their work at

12   Corinthian?

13        A    No.

14        Q    Did you ever see him visit anyone in

15   admissions -- the admissions department at

16   Corinthian?

17        A    Visit?

18        Q    Correct.

19        A    Well, I mean, he had to walk around the

20   admissions department and give everybody their test

21   scores.  And he gave me mine when I had schooling

22   and got tested, but I wasn't like trying to figure

23   out where he was.  I wasn't doing that.

24        Q    Okay.

25        A    Uh-huh.

```
 1        A    Not that I know of.
 2        Q    Okay.  So when Mr. Mshuja called you about
 3   this dinner, did you ask him who would be at this
 4   dinner?
 5        A    No, I did not.
 6        Q    Did he tell you who would be at this
 7   dinner?
 8        A    No.
 9        Q    Did you ask him why --
10        A    I didn't ask any questions.  I'm not a
11   question asker.
12        Q    Okay.  What did he tell you about the
13   dinner when he called you?
14        A    He said, "I want you to come over and meet
15   me for dinner" and I did.
16        Q    That was all he told you about it?
17        A    That's what he told me and that's what I
18   did.
19        Q    Okay.  And then you went to the dinner.
20   We talked about who was there.
21             And at that point were you introduced to
22   Mr. Levy?
23        A    Yes, I was.
24        Q    And what -- how were you introduced to
25   him?
```

1      A     Like you introduce somebody.  "This is

2  Scott Levy" and "I'm Nyoka."  I introduced myself to

3  him.

4      Q     Did he tell you at that time that he was a

5  lawyer?

6      A     Probably.  I'm sure he did.  I can't

7  remember.

8      Q     Did you understand that you were meeting

9  with a lawyer at that dinner?

10     A     Well, after I got there I did, but I

11 didn't know that before I got there.

12     Q     Okay.  And what about Mr. Labaton, was he

13 introduced to you as a lawyer?

14     A     Yes, he was.

15     Q     Were you told anything about why lawyers

16 were at this dinner?

17     A     I didn't ask, I just had dinner.

18     Q     Okay.  That wasn't my question.

19           I was asking were you told anything about

20 why lawyers were at this dinner?

21     A     Told like -- I was told who they were,

22 introduced to them, and then there was a

23 conversation going on that I was involved in because

24 I was there, you know, and I was listening.

25     Q     And the conversation, did it discuss

1    bringing a legal action or a lawsuit against

2    Corinthian?

3        A    I can't remember now at that time.

4        Q    Did it discuss any potential wrongdoing

5    that might have been going on at Corinthian?  Was

6    that a subject of discussion at this dinner?

7        A    No.  Because I didn't see this person for

8    a few years until yesterday.

9        Q    So after the dinner that took place that

10   we've just been discussing, you haven't seen

11   Mr. Levy until yesterday?

12       A    Yeah, I didn't see him for years.

13       Q    Okay.  At the dinner, was there any

14   discussion about how you might benefit from bringing

15   a lawsuit against Corinthian?

16       A    No.

17       Q    Do you have an understanding of whether --

18   what you might stand to gain by bringing a lawsuit

19   against Corinthian?

20       A    Do I have an understanding of what

21   might -- what I might be able to gain?  Not at this

22   moment.

23       Q    Okay.  Did you have an understanding after

24   you went to that dinner about what you might have to

25   -- might stand to gain from bringing a lawsuit

```
 1   against Corinthian?

 2       A    Gain in terms of?  You have to be specific

 3   when you talk to me.

 4       Q    An award of money as a result of a

 5   lawsuit?

 6       A    No, I didn't have an understanding of any

 7   kind of money at that point.

 8       Q    That wasn't a subject that you discussed

 9   at the dinner?

10       A    No.

11       Q    Did you bring any documents with you to

12   the dinner?

13       A    No, I did not.  I brought my bag and my

14   body.  That's it.

15       Q    And did you get any documents at the

16   dinner?

17       A    No, I did not.

18       Q    Were you shown any documents at the

19   dinner?

20       A    No.

21       Q    At some point did you sign an agreement to

22   retain Mr. Levy as your lawyer?

23       A    Yes, I did.

24       Q    Do you recall when you did that?

25       A    No, I don't.
```

```
 1       Q    Let me show you a document that may help
 2  refresh your memory on that.
 3       A    I don't know dates like that on that.
 4       MS. YOUNG:  We're going to mark this as
 5  Exhibit 13.
 6       MR. LEVY:  15.
 7       MS. YOUNG:  Exhibit 15.  That's right.  I'm
 8  sorry.
 9            (Defendants' Exhibit 15 was marked
10  for identification by the deposition officer and is
11  bound under separate cover.)
12  BY MS. YOUNG:
13       Q    So this is a privilege log that was
14  provided to us by your attorney recently.
15       A    Uh-huh.
16       Q    And if you could turn to the second page
17  of this document.
18       A    Okay.
19       Q    There are various entries in this log that
20  are listed by date.  The first column is labeled
21  "Date."  And I'm looking at an entry which is the
22  second-to-last one from the bottom of page 2 --
23       A    I see that.
24       Q    -- dated October 10th, 2006.  And it's
25  described as a "Retainer Agree" letter, authored by
```

1    Mark Labaton and received by Nyoka Lee, Talala

2    Mshuja, Susan Newman and John Chacon.

3            Do you see that?

4        A    I see this right where it is.

5        Q    Is that the retainer agreement that you

6    signed?

7        A    Well, it could have been.  I'm not sure

8    because that's the first time I've seen this

9    document.

10       Q    Okay.

11       A    It says it right here, but I haven't seen

12   this document.

13       Q    Okay.  And I think you said earlier that

14   you don't know who Susan Newman and John Chacon are?

15       A    I don't know those people and I didn't

16   know them when I showed up.  I don't know those

17   people now.  I see their names on this piece of

18   paper, but I don't know them.

19       Q    Okay.  And you personally have never

20   communicated with Susan Newman or John Chacon to

21   your knowledge?

22       A    I don't know those people.

23       MR. LEVY:  Other than at the dinner; correct?

24       MS. YOUNG:  Well, I believe the testimony is

25   she doesn't recall the names of the people who were

```
 1   at the dinner.
 2        Q    Do you want to change that?
 3        MR. LEVY:  I -- I don't recall that being the
 4   testimony, but --
 5        MS. YOUNG:  Well, let me ask the question so
 6   the record is clear.
 7        THE WITNESS:  Yes.  Like I said, when I showed
 8   up, I didn't know either of those individuals.
 9   BY MS. YOUNG:
10        Q    Okay.  Did --
11        A    And I don't know them now.  I don't know
12   where they are.  I don't talk to them.  I mean, what
13   do you consider "know them"?  I don't talk to them.
14        Q    Have you ever met any of these people,
15   Susan Newman or John Chacon, ever?
16        A    They were at the dinner.
17        Q    They were both at the dinner?
18        A    Yeah.
19        Q    Okay.
20        A    But I didn't really engage in a
21   conversation with them even at the dinner.
22        Q    Okay.
23        A    I wasn't like, "Hey, how are you doing?"
24   I didn't do that.
25        Q    Okay.  How --
```

1          A     They were just there and I was there.

2          Q     You said that a woman who attended the

3    dinner recommended that you hire Mr. Levy as your

4    lawyer?

5          A     I didn't say that.  No, I didn't say that.

6          Q     You didn't say that?

7          A     No, nobody recommended me to do that.

8          Q     Why did you hire Mr. Levy as your counsel?

9          A     Because he was interested in working with

10   me.  Okay.

11         Q     Did --

12         A     So I was interested in what he had to say

13   and that's how he -- that's how we came together.

14         Q     Did he tell you why he was interested in

15   working with you?

16         A     Yes, of course.

17         Q     Why was that?

18         A     Because he felt at that particular time

19   that Corinthian Colleges was involved in some

20   default or whatever, and that he wanted to defend

21   this case right now while we're sitting here.

22         Q     Okay.  Prior to that time, the idea that

23   Corinthian was in default of something was not an

24   idea that had occurred to you; is that right?

25         A     Well, I saw some malpractices when I was

```
 1   else about what happens if --

 2        A    Not at this time.  I don't.

 3        Q    Please let me finish my question.

 4             Do you have an agreement with anybody else

 5   about what happens if you win an award in this case?

 6        A    I don't have an agreement.

 7        Q    Do you have an understanding with

 8   Mr. Mshuja about what happens if you win an award in

 9   this case?

10        A    I wouldn't have an understanding with him

11   about that, no, I don't.

12        Q    Okay.  Do you have an agreement with

13   Mr. Levy or Mr. Labaton about what happens if you

14   win an award in this case?

15        A    I don't have an agreement with them.

16        Q    Looking back at this document that we've

17   marked as Exhibit 15, this privilege log.

18        A    Uh-huh.

19        Q    I understand that you didn't prepare it.

20   Did you look at this document before it was --

21        A    No.

22        Q    -- finalized?

23        A    I have never seen this document before.

24        Q    Please look at an entry -- it's the third

25   one from the top on the first page.
```

1      A    On the right-hand side?

2      Q    Well, they go from left -- the description

3  goes from left to right.  So what I'm looking at is

4  a document dated 10/20/2006.  The author is noted as

5  Mark Labaton.

6      A    Uh-huh.

7      Q    The recipient is Gary Plessman, Assistant

8  U.S. Attorney.  And it's described as a letter,

9  "Regarding:  Draft complaint Re IBT."

10         Do you see that?

11     A    No, I don't.

12     Q    Okay.  It's -- it's this one right here

13  (indicating).  I'm looking at the third entry down.

14     A    I see that, "Re:  Draft complaint."

15     Q    Are you with me?

16     A    Yeah.

17     Q    Regarding the draft complaint re IBT.  Do

18  you see that?

19     A    I see that, uh-huh.

20     Q    Do you know what that refers to, "Draft

21  complaint Re IBT?

22     A    No, I don't know anything about IBT.

23     Q    Okay.  You don't know what IBT is?

24     A    Well, I know what it is, but I don't know

25  anything about IBT.  I never worked there, so...

1      Q    What is IBT?

2      A    International business something, I guess.

3   International Business Technology, maybe.  I don't

4   know.

5      Q    Okay.

6      A    I don't work -- I didn't work for IBT, so

7   I can't answer any questions about them.

8      Q    Okay.  Okay.  Do you know if they're a

9   for-profit school or --

10     A    I don't know about them.

11     Q    Okay.

12     A    I didn't work for them.

13     Q    Okay.

14     A    So I can't discuss it.

15     Q    Okay.  Let's put this aside for now.

16     A    Okay.  Look how many papers I had.

17     Q    You mentioned before that you felt like it

18  was all about the numbers.  I think I heard you say

19  that many times.

20     A    Yes, it was.

21     Q    And I just want to try to understand what

22  numbers you're talking about.  So if you can look at

23  Exhibit 13, what we marked as Exhibit 13.

24          In this document, if you -- this is the

25  campus-based admissions representative minimum

1    standards of performance.  If you look on page 2,

2    under No. 18, do you see where it says, "Start the

3    established annual minimum performance targets

4    required of each admissive" -- "admissions

5    representative classification as described below"?

6          A    Yes, I see that.

7          Q    Okay.  And then it has descriptions of

8    different titles of admissions representative.  And

9    the first one is associate campus admissions

10   representative.

11              Do you see that?

12         A    Yes, I do.

13         Q    And then it says that the requirement is

14   to "Achieve a minimum of 100 starts (net of

15   reversals) in the four most recent company defined

16   fiscal" -- "fiscal quarters."

17              Do you see that?

18         A    Yes.

19         Q    And then it goes on for campus admissions

20   representative to say "Achieve a minimum of 120

21   starts"?

22         A    I see that.

23         Q    Okay.  And it goes on and it's got

24   different numerical requirements, increasing as you

25   go from one level to the next?

1        A    Yes, I see that.

2        Q    When you said it was all about the

3    numbers, are these the numbers that you were

4    referring to?

5        A    Yes.

6        Q    And these are the numbers you understood

7    admissions representatives would have to hit or they

8    would be terminated?

9        A    Yes.  And they would have to accomplish

10    that in order to get a raise.

11        Q    Okay.  They would also have to hit those

12    numbers in order to get a raise?

13        A    Yeah, you got to hit them numbers.

14        Q    Did you ever express a concern to anybody

15    at Corinthian about how admissions representatives

16    were being compensated?

17        A    In terms of hitting these numbers or just

18    in general?

19        Q    In general, did you express a concern to

20    the school about anything related to how admissions

21    representatives were being compensated?

22        A    Well, I don't -- I remember having had --

23    having a conversation with Mr. Plant about my

24    numbers when he was supposedly giving me my annual

25    raise.  He didn't give me my raise and he said I

1   didn't hit my numbers, and I told him that I did.

2   So we had a discussion about that.

3          And he checked with corporate because I

4   told him he needed to check with corporate because

5   he would discover that I had hit those numbers and

6   he needed to give me my raise.  I had a conversation

7   with Plant about that.

8       Q    And that was in what time period?

9       A    I'm not sure what time period it was, but

10   it was one time when I was getting my raise.  I

11   don't know the exact year or whatever, but one time

12   that did happen.  And I had my files on the numbers

13   that I had hit and I presented it to him.  And he

14   had to give me my raise.

15       Q    Okay.  And that was before January 1st of

16   2005; correct?

17       A    Yes.  Excuse me.

18       Q    And you don't know what other factors

19   Mr. Plant or anyone else might have considered in

20   deciding whether you should get a raise?

21       A    Other than those numbers, you got to hit

22   those numbers.  If you hit them, they have to give

23   you a raise because that's what they said.

24       Q    But -- but you don't know what Mr. Plant

25   was thinking about, whether you should get a raise

1    or whether there were any other factors that should

2    determine whether you should get a raise?

3         A    I never discussed that with Plant.  I

4    didn't discuss that with him ever.  The only time

5    Mr. Plant spoke to you is when you made your

6    numbers.

7         Q    Okay.  So other than this one conversation

8    with Mr. Plant that happened sometime prior to

9    January 1st, 2005 --

10        A    Uh-huh.

11        Q    -- did you ever express a concern to

12   anybody at the school about how admissions

13   representatives were being compensated?

14        A    No, I did not.

15        Q    Okay.  Did you ever express concern to

16   anybody at the school about how directors of

17   admissions were being compensated?

18        A    No, I did not.

19        Q    Now, you filed a complaint in this case on

20   March 26th, 2007; is that right?

21        A    You have it.

22        Q    I do.  I'm just asking do you remember

23   when the complaint was filed?

24        A    Well, it depends on which one it was.  I

25   filed several complaints.

1        Q    Okay.

2        A    You have to tell me which one you're

3   talking about.

4        Q    I'm talking about the very first one.

5        A    Oh, which one is that?  What does it say?

6        Q    It's the first complaint that was filed in

7   this case.  Do you recall when it was filed?

8        A    No, I do not.  That's why I'm asking you

9   to refresh my memory.

10       Q    Okay.  Let's -- well, we can take a look

11  at it to see if it will refresh your memory.

12       A    Okay.

13       MS. YOUNG:  We'll mark this as Exhibit 17.

14       THE WITNESS:  Oh, you're talking about the

15  court.  I thought you were talking against the

16  school.

17       THE REPORTER:  We're on 16.

18       MS. YOUNG:  Oh, are we on Exhibit 16?  I'm

19  sorry.  This is Exhibit 16.

20       MR. PHADKE:  Well, we numbered the last one 15.

21       MS. YOUNG:  Okay.

22              (Defendants' Exhibit 16 was marked

23  for identification by the deposition officer and is

24  bound under separate cover.)

25  ///

```
 1    BY MS. YOUNG:

 2         Q    So this is Exhibit 16.

 3              Before we look at this document, have you

 4    made any informal complaints against the school?

 5         A    I thought you meant when I was working at

 6    the school.

 7         Q    Okay.

 8         A    You know, if something went down or

 9    somebody had a disagreement or whatever, I would

10    document it and I thought you were talking about

11    that.

12         Q    Okay.  Well, let me ask you some questions

13    about that since you brought it up.

14              Did you make it a practice to document all

15    the complaints that you had against the school at

16    the time you were working there?

17         A    Uh-huh.  That's what you're supposed to

18    do.  Yeah, I did.

19         Q    Okay.  And you provided those complaints

20    to people at the school?

21         A    Yeah, to Mr. Plant or Cary or corporate or

22    whoever.

23         Q    Okay.  And did any of the complaints that

24    you documented have anything to do with how

25    compensation was being paid to admissions
```

1   representatives?

2        A    I don't remember that.

3        Q    Okay.

4        A    Nothing like that.

5        Q    Have you provided us with all of the

6   complaints that you made to the school while you

7   were employed there?

8        A    I'm not sure.

9        Q    Do you still have all of the complaints?

10       A    I might have.  I would have to look --

11       Q    Okay.  Have you --

12       A    -- in my records.

13       Q    Have you provided all of those complaints

14   to your lawyer?

15       A    I don't know.  I had some papers I gave

16   him.  I don't know if they were in there or not.  As

17   far as I can see, I provided them.

18       Q    Okay.  Well, we'll get back to that later.

19            Okay.  So let's take a look at Exhibit 16.

20   This is the first complaint that was filed in this

21   lawsuit.  And if you look at the top, the date is

22   March 26, 2007.

23            Do you see that?

24       A    Yes, I see that.

25       Q    Okay.  Have you seen this document before?

```
 1       A    I probably have.  I saw a lot of

 2  documents.  I can't remember every single document

 3  that I've seen.

 4       Q    This is the complaint in which you're

 5  bringing this lawsuit and you don't recall if you've

 6  seen it?

 7       MR. LEVY:  Objection; form.  That's not what

 8  she said.

 9       THE WITNESS:  I saw a lot of documents.  I've

10  seen a lot of documents, a lot.

11  BY MS. YOUNG:

12       Q    But sitting here right now, you don't

13  recall if you've seen this or not?

14       A    Like I said, one document gives you

15  cross-eye if you're reading everything.  This is --

16  I'm sure I've seen this before.  I've seen a lot of

17  documents relating to this case.

18       Q    Okay.

19       A    Does that make you clear?

20       Q    No, because I want to know if you've seen

21  this document before.

22       A    I'm looking at it now.

23       Q    And if you -- if you can't answer the

24  question, that's fine.  If you don't know, that's

25  okay.  Just say so.
```

```
 1        MR. LEVY:  Objection to form.

 2        THE WITNESS:  Okay.  Okay.

 3   BY MS. YOUNG:

 4        Q    So this document was filed on March 26,

 5   2007.

 6        A    Okay.

 7        Q    Before that date, did you receive any

 8   information about Corinthian's compensation policies

 9   or practices from any source other than what we've

10   already talked about?

11        A    No.

12        Q    And before filing this complaint in

13   March 20 -- on March 26th of 2007, did you receive

14   any information about any complaints or lawsuits

15   against Corinthian?

16        A    I can't remember that.  There could have

17   been something online about Corinthians.  I don't

18   remember.

19        Q    Are you aware of any other complaints or

20   lawsuits against Corinthian?

21        A    I think I saw one online.  Somebody was

22   complaining of -- having a lawsuit against

23   Corinthians, but I didn't read all of it.  I wasn't

24   trying to dig up anything like that.

25        Q    Uh-huh.
```

1      A    But I saw something regarding complaints.

2      Q    Do you recall what the nature of the

3  complaint was against the school that you found on

4  the Internet?

5      A    I'm not sure.  Because every once in a

6  while I'll log on and see what's happening in

7  corporate or whatever, but I'm not -- after I left

8  Corinthians, I wasn't interested in doing any of

9  that stuff again.

10     Q    Okay.  Before you filed your complaint on

11 March 26, 2007, did you receive any information

12 about any complaints or lawsuits against other

13 for-profit schools?

14     A    I saw some stuff, some information

15 regarding University of Phoenix and some admissions

16 reps that filed against them.

17     Q    Where did you get that information from?

18     A    It was on- -- online.

19     Q    When did you get that information?

20     A    I'm not sure.  I'm not sure to be honest

21 with you.

22     Q    It was -- it was before you filed your

23 complaint?

24     A    I'm not sure.

25     Q    Okay.

1       A     I'm not sure of that date.  Okay.

2       Q     Do you recall anything about the nature of

3  the allegations that admissions representatives were

4  making against these other for-profit schools?

5       A     They were making the same allegations I'm

6  making right now in terms of meeting the numbers and

7  that sort of thing that we've been talking about

8  here.  The same type of...

9       Q     And did you base your complaint in part on

10 what you read about these other lawsuits?

11      A     No, I did not.

12      Q     Before you filed your complaint on

13 March 26, 2007, other than this dinner meeting we've

14 discussed, did you talk with any nonlawyers about

15 your work as an admissions representative against

16 Corinthian or about bringing a lawsuit against

17 Corinthian?

18      A     No, I did not.

19      Q     Okay.  Have you ever communicated with the

20 United States government about your lawsuit?

21      A     No, I have not.

22      Q     Are you aware of something called a

23 "confidential disclosure statement"?

24      A     Yes.

25      Q     What do you understand that to be?

1      A    I understand that I was not supposed to

2   discuss this case with anybody, period, dot, except

3   for my lawyer, Scott Levy.

4      Q    Okay.  Are you aware of a document called

5   a "confidential disclosure statement" that was

6   provided to the United States government about your

7   case?

8      A    No, I'm not aware of that document.

9      Q    Are you aware of any documents that were

10  provided to the United States government about your

11  case?

12     A    Well, I probably have this one in my

13  files.  I have lots of documents, like I said,

14  regarding this case.

15     Q    I understand you have lots of documents.

16  I just want to know if you know about any documents

17  that were provided to the United States government

18  either by you or your attorney.

19     A    Well, I know that I don't know about that.

20     Q    Okay.

21     A    Okay.  So I don't know how else I would

22  know about anything like that.

23     Q    So you don't know if your attorney

24  provided any documents to the government before this

25  complaint was filed?

1        A    No, I don't.

2        THE VIDEOGRAPHER:  Counsel, can I ask you not

3   to twist the wire of the mic.  Thank you.

4   BY MS. YOUNG:

5        Q    And did your counsel collect documents

6   from you at some point before the lawsuit was filed?

7        A    I know that they collected documents from

8   me.  I don't know if it was before this date or not.

9   I'm not sure what date it was.  I did send some

10  documents.

11       Q    Okay.  Was that recently or was it some

12  years ago?  Because this document is dated March of

13  2007.

14       A    It was a few years ago.

15       Q    Okay.  But you can't tell me sitting here

16  today if it was before or after March 26th, 2007?

17       A    No, I can't tell you that.

18       Q    And did you provide those documents along

19  with a cover letter or did you just send them to

20  your attorney?  How did you provide them to your

21  attorney?

22       A    I sent them in the mail.

23       Q    What documents did you provide to your

24  attorney?

25       A    Everything that I had that might be

```
 1   pertinent.  All kinds of stuff that I had --

 2        Q    Okay.

 3        A    -- you know, when I was working at

 4   Corinthians that was in my briefcase when I left.

 5        Q    Is that -- is the universe of those

 6   documents what you brought with you to your

 7   deposition today?

 8        A    I do believe so.  I think so.

 9        Q    Okay.

10        MR. LEVY:  Do you mean Exhibit 14 or do you

11   mean the document production we gave you last week?

12        MS. YOUNG:  I mean Exhibit 14.

13        Q    So Exhibit 14 -- you can take a look at

14   it.

15        A    She has my documents over there.  Can I

16   have it?

17        Q    Oh, I have it.  I'm sorry.  Here's

18   Exhibit 14.

19        A    Oh, okay.

20        Q    Is Exhibit 14 the universe of documents

21   that you --

22        A    This whole packet.

23        Q    This whole packet that we marked as

24   Exhibit 14, which you brought with you to the

25   deposition today, is that the universe of documents
```

```
 1    that you provided to your attorney some years ago?

 2         A    Uh-huh.  When you say "universe," are you

 3    saying all of them?

 4         MR. LEVY:  Is that everything?

 5    BY MS. YOUNG:

 6         Q    Is that everything?

 7         MR. LEVY:  She's asking if that's everything.

 8         THE WITNESS:  Okay.  Well, she has to say what

 9    she's asking and then I'll understand her.

10              "Universe" means everything?

11    BY MS. YOUNG:

12         Q    That means everything.

13         A    There were some more documents other than

14    this as far as I can tell.

15         Q    That you brought --

16         A    But I don't know where they are.

17         Q    Okay.  And you provided those documents to

18    your attorney?

19         A    Yes.

20         Q    Can you describe what the documents

21    consisted of?

22         A    No, because I don't have -- my memory is

23    not set up like that.

24         Q    Okay.

25         A    There are a lot of documents and I don't
```

```
 1   know each one.

 2        MR. LEVY:  And we provided all those documents

 3   to you.

 4   BY MS. YOUNG:

 5        Q    Do you know if the government received a

 6   copy of this complaint, Exhibit 16, before it was

 7   filed on March 26, 2007?

 8        A    How would I know that?  I don't know that.

 9        Q    Okay.  Did you help draft the document

10   that we marked as Exhibit 16?

11        A    No, I did not.

12        Q    And you've seen it before, I think you

13   said -- well, I'm not sure that you -- strike that.

14             Did you review the document before it was

15   filed on March 26, 2007?

16        A    I can't remember.

17        Q    Okay.  Exhibit 16 has an Exhibit A

18   attached to it.  It's toward the back of the

19   document.

20        A    Okay.

21        Q    You see this page marked as "Exhibit A"

22   toward the back?

23        A    Okay.  Hold on.

24             Yes, I see that.

25        Q    Okay.  For the record, Exhibit A, page 1,
```

1    the heading says, "Corinthian Schools and Rhodes

2    Colleges Adult Admissions Representative

3    Compensation Program.  Updated:  July 6th, 2005."

4            And by July 6, 2005, you were no longer

5    employed at Corinthian; is that right?

6        A    If I have this, I must have been employed

7    there.  How else would I get this document?

8        Q    Well, I'm not sure that -- did you -- did

9    you get this document?  Is this a document that came

10   from you?

11       A    Somebody got it.

12       Q    But you don't know if it's a document that

13   came from you or somebody else?

14       A    Well, it had to come from me because I was

15   the one that worked at Corinthians.

16       Q    Well, Mr. Mshuja also worked at

17   Corinthian; right?

18       A    But he didn't work in admissions.

19       Q    Okay.  Well, how did you get a copy of

20   this document?

21       A    Like I said, someone at Corinthians gave

22   it to me, obviously.  How else would I get it?

23       Q    Do you know who gave it to you?

24       A    Somebody.  I don't know, whoever gives

25   these out.  It's a promotion probably from Cary

1    Kaplan.

2        Q    Okay.  So this says the document was

3    created on July 5th, 2005.

4            Do you see that at the bottom?

5        A    I see that up here, right here

6    (indicating).

7        Q    And then at the very bottom of the first

8    page --

9        A    Uh-huh.

10        Q    If you'd look with me at the first page of

11    this Exhibit A, please.

12        A    Okay.  I got it.

13        Q    In -- in the margin at the bottom it says,

14    "Document Created:  July 5th, 2005."

15            Do you see that?

16        A    Okay.  Uh-huh.  Yes, I do.

17        Q    You were terminated as of May 2005;

18    correct?

19        A    You have that termination paper?  Whatever

20    date is on there, that's when I was terminated.

21        Q    I think we did look at it.  I think you

22    said a couple of --

23        A    Did it say 2004?

24        Q    No, I think it's May 2005.

25        A    Okay.  Then if it said May 2005, that's

```
 1   when it was because I signed it.  I'm sure I
 2   didn't...
 3        Q    Okay.  So how did you get a document that
 4   was created after you were terminated?
 5        A    Like I said, I must have got it before I
 6   was terminated because I couldn't get a document
 7   like this if I was terminated before this.
 8        Q    You were never compensated under the plan
 9   that's attached as Exhibit A to the complaint; is
10   that right?
11        A    This is Exhibit A (indicating); right?
12        Q    Correct.
13        A    I was never compensated?
14        Q    Correct.
15        A    What does that mean?  You mean in terms of
16   my raises or --
17        Q    Yeah, at that point you had been
18   terminated from the school, so you were never
19   compensated under this plan; correct?
20        A    Well, if I was terminated, there is no way
21   I could be.
22        Q    Right.  And there's no way you could be
23   promoted or receive a salary increase under this
24   plan that's attached as Exhibit A; right?
25        A    That's right.  Uh-huh.  I'm not sure where
```

1   this came from.  I didn't -- I don't remember having

2   it.

3        Q    Okay.  Do you recall seeing this document

4   at all?

5        A    Well, I've seen documents like this.

6        Q    Okay.

7        A    I don't know if it was this particular one

8   with this particular date on it.

9        Q    I'm actually asking about this particular

10  document because it is attached as an exhibit to the

11  complaint you filed.  And you don't recall --

12       A    If it was attached to that, then I

13  probably saw it because -- you know, I didn't read

14  every word from the pages of this document when I

15  received it, but I -- I skimmed it.  I was aware of

16  what was going on.

17       Q    Okay.  And am I correct that the --

18       A    I didn't -- I didn't notice those dates.

19       Q    Okay.  And am I correct that the

20  allegations in your complaint are based on the

21  experiences you had when you were employed as an

22  admissions representative at Corinthian?

23       A    Yes, that's correct.

24       MS. YOUNG:  I'm handing you what we'll mark as

25  Exhibit 17.

```
 1                  (Defendants' Exhibit 17 was marked

 2    for identification by the deposition officer and is

 3    bound under separate cover.)

 4    BY MS. YOUNG:

 5         Q    This is a copy of the first amended

 6    complaint that was filed in this action.

 7                  Have you seen this document before?

 8         A    I'm sure I have.

 9         Q    Did you help to draft it?

10         A    No, I did not.

11         Q    Did you review it before it was filed?

12    And this document was filed on December 15, 2011.

13         A    It's a possibility I could have reviewed

14    it.  I'm not sure.

15         Q    And are the allegations in your first

16    amended complaint also based on your experiences --

17         A    Are you talking about this one

18    (indicating)?

19         Q    No, I'm talking about the new one that

20    we've marked as Exhibit 17.

21         A    Are they based on what?

22         Q    Are the allegations in the first amended

23    complaint --

24         A    Which is this one (indicating)?

25         Q    -- which is what we've marked as
```

```
 1   Exhibit 17 --
 2        A    Uh-huh.
 3        Q    -- based on your experiences that you had
 4   when you were employed as an admissions
 5   representative for Corinthian?
 6        A    Yes, I'm sure it is because I was employed
 7   at Corinthian's admissions.
 8        Q    Are the allegations in the first amended
 9   complaint based on any information different from
10   the information that formed the basis for your first
11   complaint?
12        A    That's a hard question because I don't
13   remember everything in each one of these documents.
14        Q    What I'm just trying to understand is are
15   they based on the same factual information?
16        A    Well, if it's the same case, I'm sure it
17   is.  It's the same case.
18        Q    It's the same case?
19        A    Right.
20        Q    Did you learn anything in between the
21   original complaint you filed and the filing of the
22   first amended complaint that changed any of the
23   allegations you're making in the lawsuit?
24        A    I'm not -- I don't think so.  I think it
25   was one thing, but I can't remember what it was.
```

1       Q    You think you learned something new in

2   between?

3       A    No, I didn't learn anything new.

4       MS. YOUNG:  I'm handing you what we'll mark as

5   Exhibit 18.

6               (Defendants' Exhibit 18 was marked

7   for identification by the deposition officer and is

8   bound under separate cover.)

9   BY MS. YOUNG:

10      Q    These are the plaintiff's initial

11  disclosures that were filed in this lawsuit on

12  September 17th, 2012.

13              Have you seen this document before?

14      A    I'm sure I must have if you have it.

15      Q    So why do you say you must have seen this?

16      A    Because I have a lot of documents on my

17  computer.  I read some of them that my lawyer sent

18  me.  If this was one of them, I saw it because I

19  looked at everything, pretty much.

20      Q    Okay.

21      A    That's what I mean by that.

22      Q    Okay.  So if you turn to the second page

23  of this document, there's a list of 19 people here.

24  And these people were identified as people who are

25  likely to have information "that the disclosing

```
 1    party," which is you, "may use to support its claims

 2    and defenses."

 3            Do you see that?

 4    A    This is on the second page; right?

 5    Q    Yeah.

 6    A    Yes, I see it.

 7    Q    Okay.  Do you know how this list of names

 8    was created?

 9    A    No, I don't because I didn't create it.

10    Q    Does this list of names identify every

11    individual you are aware of who might have

12    information to support the claims you're asserting

13    in this lawsuit?

14    A    This list contains the names of people

15    that I worked with when I was at Corinthian

16    Colleges.  I worked with these people.

17    Q    Is there anybody else who has information

18    relevant to this lawsuit who is not listed among

19    these 19 names?

20    A    How could I know that?  I'm sorry.  I

21    can't answer that question.

22    Q    Well, you're bringing this lawsuit and

23    we're entitled to know who you think the relevant

24    witnesses are.

25    A    Well, I just said I don't know.
```

1      A    I'm not sure.

2      Q    Just -- just let me finish my question,

3  please.

4           Was Mr. Martin still working at the school

5  at the time that you were rehired in San Jose?

6      A    Like I said, I'm not sure.  I couldn't

7  keep up with all them people because they was moving

8  around pretty frequently.

9      Q    Okay.

10     A    I couldn't keep up with everybody.  I

11 barely could keep up with myself.

12     Q    And were any of the 19 people listed here

13 at the dinner that you told us about earlier?

14     A    No.

15     Q    Okay.  And you've not had any

16 communications with any of these folks since 2005?

17     A    No.

18     THE VIDEOGRAPHER:  Counsel, is this a good time

19 for me to switch the tape?

20     MS. YOUNG:  Yes, let's switch the tape.  Thank

21 you.  Sorry.

22     THE VIDEOGRAPHER:  It will take five minutes.

23     MS. YOUNG:  Sure.  Five minutes for a

24 five-minute break.

25     THE VIDEOGRAPHER:  The video deposition is now

```
 1        MS. YOUNG:  Has the disclosure statement been

 2   provided to us?

 3        MR. LEVY:  It has not.  It's 788 -- 789.

 4   That's 789 pages Bates stamped.

 5        MS. YOUNG:  Okay.  Let's look at some of the

 6   documents that we received.  We'll mark this as

 7   Exhibit 19.

 8                  (Defendants' Exhibit 19 was marked

 9   for identification by the deposition officer and is

10   bound under separate cover.)

11   BY MS. YOUNG:

12        Q    Okay.  Exhibit 19 are documents from

13   November 5th, 2003 and from April and May 2005.

14             Do you see that?

15        A    Did you say 2003?

16        Q    Yes.  If you look at the top right-hand

17   corner of the document.

18        A    Oh, the top right.  Okay.  It's 2005,

19   November 3rd (sic) to -- what did you say the other

20   date was?

21        Q    Well, I'm looking at the top of these

22   documents and they're dated in 2003, April 2005 and

23   May of 2005.

24             Do you see that?

25        A    I see December -- I see November 2003 and
```

```
 1   November -- is this the same document you have?
 2   This one doesn't even have a date.
 3        Q    If you look at the very top line.
 4        A    April 2005 on that one, April 2005 on this
 5   one.
 6        Q    And I grouped these together because they
 7   look like the same type of document.
 8             Have you seen these documents before,
 9   Ms. Lee?
10        A    Yes, I've seen them.
11        Q    What are they?
12        A    These are conversion rates that Earon
13   Mackey gave me when I was in San Francisco.  Some
14   kind of rates.  Seventy-three leads -- leads and
15   interviews.
16        Q    Where are you looking?
17        A    Right here, leads, interviews
18   (indicating).  Leads, interviews, leads.
19        Q    Okay.  And you're looking at the page with
20   the number R 00023?
21        A    Well, this is on four, 24.
22        Q    Okay.  Whose handwriting is on these
23   documents?
24        A    That's Earon Mackey.  That's his
25   handwriting.
```

1    Q    What was this report used for when you

2    were an employee at Corinthian?

3    A    To put pressure on you.  Okay.  To perform

4    when they think you're not performing.  They want

5    you to perform better or whatever.  They give you

6    these documents so that they can compare you to

7    everybody else who is enrolling students so you can

8    look at them and bring your numbers up if they're

9    down.

10    Q    Okay.

11    A    Okay.  Is that good?

12    Q    And you're not aware of these reports

13    being used for any other purpose?

14    A    I don't know what else they would be used

15    for.

16    Q    And you don't know how these reports were

17    used after you left your employment at Corinthian;

18    is that correct?

19    A    No.  Probably the same thing, but I don't

20    know.  I can't speculate on that because they were

21    always changing things up.

22    MS. YOUNG:  I'm handing you what we'll mark as

23    Exhibit 20.

24             (Defendants' Exhibit 20 was marked

25    for identification by the deposition officer and is

```
 1   new.

 2        Q    But you don't know one way or another?

 3        A    No, I do not.

 4        MS. YOUNG:  I just handed you Exhibit 22.

 5               (Defendants' Exhibit 22 was marked

 6   for identification by the deposition officer and is

 7   bound under separate cover.)

 8   BY MS. YOUNG:

 9        Q    And your name is not anywhere on this

10   document.  Do you see that?

11        A    Oh, I'm looking right now.

12        Q    Yeah, take a look and...

13        A    This has somebody else's name up there.

14   Okay.

15        Q    Uh-huh.  And am I right that your name

16   doesn't appear anywhere on this document?

17        A    I don't see my name on there.

18        Q    Have you ever seen this document before

19   today?

20        A    No, I have not.

21        Q    Do you have any idea how it came to be in

22   the possession of your lawyer?

23        A    No.

24        MS. YOUNG:  Okay.  I'm handing you what we'll

25   mark as Exhibit 23.
```

1           (Defendants' Exhibit 23 was marked

2   for identification by the deposition officer and is

3   bound under separate cover.)

4   BY MS. YOUNG:

5       Q    This is a series of documents with the

6   header "Ad Rep Performance Flash."

7       A    Uh-huh.

8       Q    And they're from various dates in 2005.

9   The first date being November 4th, 2005.  I'm

10  looking at the first page relating to San Jose.

11          Now, am I correct that you were not

12  employed at the San Jose campus of Corinthian in

13  2005, in November of 2005?

14      A    I don't think so.

15      Q    Okay.  Is there a way to tell from looking

16  at this document when this report was printed?

17      A    You're asking me that?

18      Q    I'm asking you that.

19      A    I'm not -- I have no idea.

20      Q    Okay.  Did you print these reports that

21  I've marked as Exhibit 23?

22      A    No.

23      Q    Have you seen them before?

24      A    I don't recall them.

25      Q    Okay.  And --

1      A     We used to get this kind of report in San

2   Francisco, but I don't remember seeing this

3   particular one.

4      Q     You've never seen this particular group of

5   reports before; is that right?

6      MR. LEVY:  Objection to form.

7      THE WITNESS:  No, my name isn't on here.

8   BY MS. YOUNG:

9      Q     The reports I've placed in front of you,

10  you haven't seen before; is that correct?

11     A     I haven't seen this.  I don't know.

12     Q     Do you see the --

13     A     I'm not on here as an admissions rep.

14     Q     Okay.  And -- and do you see in the

15  right -- lower right-hand corner where it says

16  "mgreen"?

17     A     "mgreen"?

18     Q     Uh-huh.  Do you see that in the lower

19  right-hand corner?

20     A     Yes, I do.

21     Q     Do you know what that means?

22     A     No, I don't.

23     Q     Do you have an understanding of how this

24  group of documents came to be in the possession of

25  your lawyer?

1        A     No, I do not.

2        Q     You didn't provide these documents to your

3   lawyer, did you?

4        A     No.

5        Q     If you look on every other page here,

6   there's some handwritten notations.

7              Do you see that?

8        A     Over on the side?

9        Q     There may be some notations in the margin,

10  but then on every even-numbered page there are also

11  pages with handwriting on them.

12             Do you see that?

13       A     Yes, I do.

14       Q     Do you recognize that handwriting?

15       A     No, I don't.  It's not mine.

16       Q     Okay.

17       A     And this isn't mine either (indicating).

18       MS. YOUNG:  I'm handing you what we'll mark as

19  Exhibit 24.

20              (Defendants' Exhibit 24 was marked

21  for identification by the deposition officer and is

22  bound under separate cover.)

23  BY MS. YOUNG:

24       Q     And in the upper left-hand corner of this

25  group of documents they say "CP Mar Flash Summary"

```
 1   and the date is April 7th, 2006 on the first page

 2   and the dates go back to July 30th, 2005 in the set

 3   of documents if you look toward the end.

 4              So you had already stopped working at the

 5   school by July of 2005; correct?

 6        A    I haven't seen these documents.

 7        Q    My -- my question was you had stopped

 8   working for the school by July of 2005; right?

 9        A    Yes.

10        Q    And you've never seen these documents

11   before?

12        A    No.

13        Q    Do you know how they were generated?

14        A    No, I do not.

15        Q    And do you know how they came to be in

16   your attorney's possession?

17        A    No, I don't.

18        Q    And you don't know what this -- these

19   documents were used for; is that correct?

20        A    I have never seen these documents.

21        Q    So you don't know what they were used for?

22        A    My name is not on there as an admissions

23   rep.

24        Q    You don't know what they were used for;

25   correct?
```

1        A    No, I don't.  Actually, these aren't reps.

2    This is something (inaudible).

3        THE REPORTER:  I'm sorry.  I can't hear you.

4    BY MS. YOUNG:

5        Q    You have to speak loudly so that the court

6    reporter can hear what you're saying.

7        A    Oh, I was just saying this -- these aren't

8    reps' names, they're cities.  I thought they were

9    reps' names, but they're cities.

10       Q    Okay.  That still doesn't help you figure

11   out how these reports were used?

12       A    No, I'm not -- I don't know anything about

13   these documents.

14       Q    Okay.

15       A    It looks like budgets and something and

16   starts.

17       MS. YOUNG:  I'm handing you what we'll mark as

18   Exhibit 25.

19            (Defendants' Exhibit 25 was marked

20   for identification by the deposition officer and is

21   bound under separate cover.)

22   BY MS. YOUNG:

23       Q    At the top of this group of documents they

24   say "Quarterly Ad Rep Activity Report" and others

25   say "Daily Flash" at the top of them.  The dates on

```
1    these documents are from 2006 and after September of

2    2005.

3             Have you seen any of these documents

4    before?

5        A    Have I seen -- these aren't my documents,

6    no.

7        Q    Okay.  Do you know whose handwriting is on

8    these documents?

9        A    No, I do not.  Not mine.

10       Q    And do you know how these documents came

11   to be in the possession of your attorney?

12       A    No, I do not.

13       Q    Do you know how these documents that we've

14   marked as Exhibit 25 were used by the school or by

15   anyone at the school?

16       A    Well, it's a daily flash and it's got all

17   the names of the schools that are under the umbrella

18   of Corinthians.

19       Q    But -- but you weren't at the school at

20   the time, so you don't know how this -- these

21   particular documents were used by the school?

22       MR. LEVY:  Objection --

23       THE WITNESS:  Well, that's the same document

24   that they gave me when I was there.

25       MR. LEVY:  Objection to form.
```

```
 1        THE WITNESS:  So I'm just telling you on that

 2    aspect.

 3    BY MS. YOUNG:

 4        Q    Okay.  But you would have to speculate as

 5    to --

 6        MR. LEVY:  Objection to form.

 7    BY MS. YOUNG:

 8        Q    -- how this group of documents was used by

 9    the school?

10        A    What I'm saying to you, Angie -- no.

11        Q    Blanca.

12        A    -- Blanca, is that this same form was used

13    when I was working there.  So I recognize the form,

14    but I don't recognize this document here.

15        Q    Okay.  You don't know if the form

16    continued to be used the way it was at the time --

17        A    No, I don't know all of that.

18        Q    Please, please let me finish my question.

19             You don't know how the form continued to

20    be used after you left your employment at the

21    school; is that correct?

22        MR. LEVY:  Objection to form.

23        THE WITNESS:  That's correct.  I don't know how

24    it was used.  This is -- this particular document is

25    an activity report that was used when I was there.
```

1   So maybe it was used after I left.  I'm sure it was,

2   but I don't recognize any of those people on there

3   as -- as admissions reps.

4   BY MS. YOUNG:

5       Q    Okay.  And you don't know how the activity

6   report was used after you left your employment at

7   the school; is that correct?

8       A    Well, it was probably used the same way

9   because it's the same form.  So...

10      Q    But you don't know that for a fact, do

11  you?

12      A    No, I don't know that because I'm not

13  employed there.  So I'm just giving you the ups on

14  it's probably still being used.  I don't know.

15      MS. YOUNG:  Okay.  I'm handing you what we'll

16  mark as Exhibit 26.

17              (Defendants' Exhibit 26 was marked

18  for identification by the deposition officer and is

19  bound under separate cover.)

20      THE WITNESS:  Thanks.

21  BY MS. YOUNG:

22      Q    Have you seen these documents before?

23      A    No.  No, I haven't.

24      Q    Okay.  And do you know how they came to be

25  in the possession of your attorney?

1       A      No, I don't.

2       Q      And you don't know how they were used by

3  anyone at the school; is that correct?

4       A      No.  That's correct.

5       MS. YOUNG:  I apologize for the thickness of

6  this document.  We'll mark this as Exhibit --

7       THE REPORTER:  27.

8       MS. YOUNG:  -- 27.

9              (Defendants' Exhibit 27 was marked

10  for identification by the deposition officer and is

11  bound under separate cover.)

12  BY MS. YOUNG:

13      Q      And this is a very lengthy document, but

14  at the top of the document it says the run date is

15  September 8th, 2006.

16             Do you see that?

17      A      Yes.

18      Q      And this is a stat- -- it looks like a

19  status report for San Jose north.

20             Do you see that?

21      A      Uh-huh.

22      Q      Have you seen this document before?

23      A      I've seen documents like this, yes.

24      Q      Have you seen this particular document

25  before?

1        A    I don't think so.  If my name is on it, I
2    probably have, but I don't see my name.
3        Q    There are some handwritten notations
4    toward the back of the document on a number of the
5    pages.
6             Do you see those?
7        A    Yeah, some Xs.
8        Q    Do you know whose handwriting that is?
9        A    No, I don't.
10       Q    That's not your handwriting?
11       A    No.
12       Q    Okay.  And do you know how this document
13   came to be in the possession of your attorney?
14       A    No, I don't.
15       Q    And this particular report, you don't know
16   how it was used by people at the school; is that
17   correct?
18       A    Well, it looks like an end-of-year report
19   to me maybe on how many leads you got and -- you
20   know, these are lead reports, looks like to me.
21       Q    Okay.  But you don't know how this report
22   was used by the school after you left your
23   employment there; is that right?
24       A    No, I don't.  How could I know that?  No,
25   I do not.

```
 1        MS. YOUNG:  I'm handing you what we'll mark as
 2   Exhibit 28.
 3             (Defendants' Exhibit 28 was marked
 4   for identification by the deposition officer and is
 5   bound under separate cover.)
 6   BY MS. YOUNG:
 7        Q    These are a series of documents that
 8   relate to an employee named Melissa Wong.
 9             Do you know who that person is?
10        A    No.
11        Q    The date on the first document is
12   October 17th, 2005.  That was after you left your
13   employment at Corinthian; correct?
14        A    Yes.
15        Q    Okay.  On the cover page of this document
16   it mentions Gina Zappariello.  Do you know who that
17   is?
18        A    No, I do not.
19        Q    Have you ever seen these documents before?
20        A    No.
21        Q    Do you know how they came to be in the
22   possession of your lawyer?
23        A    No, I do not.
24        Q    All right.  Have you ever communicated
25   with anyone associated with or employed by the law
```

```
 1   firm of Milberg Weiss Bershad & Schulman?

 2       A    No.

 3       Q    Have you ever heard of that law firm?

 4       A    No, I haven't.

 5       Q    Have you ever heard of an attorney named

 6   Jeff Westerman?

 7       A    No, I haven't.

 8       Q    Have you ever heard of an attorney named

 9   Karen Rogers?

10       A    No.

11       Q    Have you ever heard of an attorney named

12   Sabrina Kim?

13       A    No, I haven't.

14       Q    Have you ever communicated with a

15   representative of Congress named Maxine Waters?

16       A    No.

17       Q    Have you ever communicated with anyone on

18   her staff?

19       A    No.

20       Q    Do you know a former employee of

21   Corinthian named Paula Dorsey?

22       A    No, I don't.

23       Q    Have you ever communicated with a

24   government accounting office or the Government

25   Accountability Office about anything relating to
```

1    Corinthian?

2         A    Accountability?

3         Q    The Government Accountability Office, have

4    you ever communicated with that federal office about

5    your employment at Corinthian?

6         A    No.  No, I haven't.

7         Q    Did you ever communicate with the

8    Department of Education about anything?

9         A    Oh, about Corinthians?

10        Q    Correct.

11        A    Well, I was a proctor, so I had to

12   communicate with the Department of Education.

13        Q    By "Department of Education," I mean the

14   federal agency of the Department of Education.

15        A    Well, that's the one I'm talking about

16   because they're over the proctoring.

17        Q    Okay.  So in what way did you communicate

18   with the Department of Education when you were a

19   test proctor in 1999?

20        A    Well, just gave them various forms that

21   they needed to certify me.  That's it.  I didn't

22   really communicate with them.  I had to go through

23   them to get certain forms to become certified.

24        Q    Okay.

25        A    So then -- then I communicated with them.

1      Q    And the extent of that communication was

2   in connection with your responsibilities as a test

3   proctor for Corinthian; is that correct?

4      A    Not responsibilities, just the forms that

5   you need to fill out to become certified.

6      Q    Okay.  And that was in the 1999 through

7   2000 time period?

8      A    Yes.

9      Q    And other than that, you've had no

10  communications with anyone at the Department of

11  Education?

12     A    No.

13     Q    Have you ever provided testimony at a

14  congressional hearing?

15     A    No, I haven't.

16     Q    Have you ever spoken to anybody who

17  provided testimony at a congressional hearing?

18     A    No.

19     Q    Have you filed any other lawsuits or

20  complaints alleging a violation of the ban on

21  incentive compensation?

22     A    No, I haven't.

23     Q    Have you ever filed a complaint against

24  any other educational institution other than

25  Corinthian?

1       A     No, I have not.

2       Q     Have you communicated with anyone from the

3  attorneys general -- Attorney General's office in

4  any state?

5       A     Not that I know of.

6       Q     Okay.  Have you had any meetings with

7  anyone out of an Attorney General's office in any

8  state?

9       A     I had -- had a meeting.  I'm not sure.

10      THE WITNESS:  Was that the Attorney General?

11          I'm not sure if that was him or not, but I

12  did have a meeting with -- in Los Angeles several

13  years ago with someone from -- maybe it was the

14  Attorney General's office.  I'm not sure.  I can't

15  remember.

16  BY MS. YOUNG:

17      Q     Do you recall, was it a meeting with

18  someone in the United States Attorney's Office?

19      A     Yes, I think it was.  I'm not sure.

20      Q     Do you recall the name of the person with

21  whom you met?

22      A     No, I do not.

23      Q     Was it Abraham Meltzer by any chance?

24      A     I don't recall the name.

25      Q     Okay.  I'm just trying to see if I can

```
 1   help you remember by providing some names about who

 2   it may have been.

 3           Do you remember meeting with anybody named

 4   Jay Majors?

 5       A    Huh-uh, no, ma'am.

 6       Q    And you said the meeting took place in Los

 7   Angeles?

 8       A    Yes.

 9       Q    And you said it was some time ago.  Can

10   you give me a time frame?  Like five years ago, ten

11   years ago?

12       A    Maybe four or five years ago.

13       Q    Do you know if that meeting took place

14   before or after you filed your original complaint in

15   this case?

16       A    After.

17       Q    Who else was at that meeting?

18       A    Mr. Mshuja was there.  I can't remember if

19   Scott was there.  I can't remember.

20       Q    You don't remember if Mr. Levy was there?

21       A    No, I can't remember.

22       Q    Was Mr. Labaton there?

23       A    I don't think so.

24       Q    Do you recall anyone else being present at

25   that meeting?
```

```
 1        A     No.

 2        Q     What was discussed at that meeting?

 3        A     Different -- Jesus.  We were talking

 4   about -- see, you're making me really reach back.  I

 5   can't even remember.  It's -- you know, it's been a

 6   while.

 7        Q     Uh-huh.

 8        A     I don't recall the conversation, but it

 9   was about this case right here.

10        Q     Okay.

11        A     So I don't remember all the different --

12        Q     Do you remember the general subjects you

13   discussed?

14        A     No, I don't.

15        Q     Aside from that one meeting in Los Angeles

16   after your complaint was filed, did you have any

17   other meetings --

18        A     No, I didn't.

19        Q     -- with anyone who you understood to be

20   working for the United States Attorney's Office?

21        A     No.

22        Q     And was that an in-person meeting you had?

23        A     In person?

24        Q     Was it in person in Los Angeles?

25        A     Oh, it was in person, yes.
```

```
 1   numbers was high -- were high.  So he would get paid
 2   more money.
 3        Q    And if I'm correct, Mr. Kaplan was your
 4   director of admissions the first time you were
 5   employed at the San Francisco campus; correct?
 6        A    Yes, for several years, yes.
 7        Q    Okay.  And he was not your director of
 8   admissions the second time that you were employed in
 9   San Francisco; correct?
10        A    No.  No, he was not.
11        Q    So he never acted as your director of
12   admissions at any time after January 1st, 2005; is
13   that correct?
14        A    No, only in San Francisco the first time.
15        Q    Okay.  So am I correct that after
16   January 1st, 2005 Mr. Kaplan never acted as your
17   director of admissions?
18        A    That's -- that's correct.
19        Q    Okay.  So you said your understanding was
20   that you would get some sort of an increase or a
21   raise to your salary if you met certain numbers;
22   right?
23        A    Well --
24        MR. LEVY:  Objection to form.
25        THE WITNESS:  It was written if you wanted to
```

1    get a raise from campus to senior to master, how

2    many starts you had to get.

3    BY MS. YOUNG:

4        Q    Okay.  So again, you're just basing this

5    off of what was in the written compensation plans

6    that governed your compensation; is that right?

7        A    Everybody's compensation.  If you get

8    20 -- 120 starts or exceed that, you go from one

9    level to the next.  It stated that in one of these

10   documents that we read.  I don't know which one.

11       Q    All right.  So you're -- when you say you

12   had to meet numbers, you're referring to the written

13   programs that the school had in place that described

14   how people were going to be compensated; is that

15   right?

16       MR. LEVY:  Objection to form.

17       THE WITNESS:  No, not necessarily.  I'm

18   referring to how many students we enrolled per year.

19   BY MS. YOUNG:

20       Q    Right.  Okay.

21       A    Okay.

22       Q    And what's your understanding of how often

23   you could get a raise?

24       A    It's once a year, uh-huh.

25       Q    And the same thing with promotions?

1      A    Yeah, and they would add up all your

2    numbers and if you met your numbers, you could go

3    from one level to the next.

4      Q    And to figure out if you had met those

5    numbers, you would refer to the written program that

6    the school had put in place; is that right?

7      A    Yeah, yeah.  That's all we had to refer

8    to.

9      Q    Okay.  And that same document would govern

10   other factors that went into whether or not you

11   would get a raise; is that right?

12     A    Yes.

13     MR. LEVY:  Objection to form.

14   BY MS. YOUNG:

15     Q    Did you ever act (sic) with Jim Martin

16   after you left the San Francisco campus the first

17   time around?

18     A    Did I ever act with him?

19     Q    Interact with Jim Martin after you left

20   San Francisco?

21     A    No, I haven't seen Jim Martin in almost,

22   say, 20 years, but a long time since I left Bryman.

23   I don't see Jim Martin.

24     Q    Okay.  And so the second time you came

25   back to the Bryman campus in San Francisco, you

```
 1        A     Yes.

 2        Q     Did it surprise you that you were

 3  receiving reports that talked about how you were

 4  doing in terms of recruiting people to come to

 5  Corinthian?

 6        A     Did it surprise me?

 7        Q     Uh-huh.

 8        A     In terms of what?

 9        Q     Well, did it come as a surprise --

10        A     It was -- it was a weekly thing that

11  happened.

12        Q     Uh-huh.  Were you surprised to see that

13  your performance in terms of recruiting people to

14  the school was being tracked?

15        A     No, I wasn't surprised.

16        MR. LEVY:  Objection to form.

17  BY MS. YOUNG:

18        Q     That's what you were hired to do; right?

19        A     Yeah, I wasn't surprised.  I was surprised

20  when I was on top.

21        Q     Mr. Levy asked you earlier what did you

22  have to do to get a raise and your response was you

23  had to make your numbers.  Do you recall that?

24        A     Yes, that's true.

25        Q     And in responding to that question, you
```

1   referred to the paper that identified what those

2   numbers were.  Do you recall that?

3        A    No, I didn't have that paper, not then,

4   but I discussed it with you when you were talking to

5   me.

6        Q    Right.  So I just wanted to clarify.  The

7   numbers that you believed you had to meet in order

8   to get a raise, those were numbers that were laid

9   out in the written compensation programs that you

10  received from the school; is that right?

11       A    Uh-huh.

12       Q    Is that a "yes"?

13       A    Yes.  Excuse me.

14       Q    Okay.  Thank you.

15            And Mr. Levy asked you whether you were

16  evaluated on anything other than the numbers of

17  students you recruited to the school.  Do you recall

18  that question?

19       A    Well, I recall that question earlier, yes.

20  Uh-huh.

21       Q    Okay.  And I asked you earlier -- we went

22  through those minimum standards.  Do you remember

23  that?

24       A    Yes.

25       Q    And there were something like 18 of them

```
 1   in the document; right?

 2        A    Uh-huh.

 3        Q    Do you recall that?

 4        A    Yes, I recall that.

 5        Q    And we went through a number of them and I

 6   asked you whether you understood that your

 7   performance was being evaluated on whether you

 8   complied with each of those 18 standards.

 9             Do you recall that?

10        A    Part of my performance.

11        MR. LEVY:  Objection to form.

12        THE WITNESS:  Part of my raise was considered

13   in that, but it was -- the bottom line was numbers.

14   BY MS. YOUNG:

15        Q    Okay.  But part of your raise --

16        MR. LEVY:  Objection to form.

17   BY MS. YOUNG:

18        Q    Part of your raise depended on some of the

19   other things, including what we looked at --

20        A    Getting to work on time and all that

21   stuff, naturally.

22        Q    Okay.  Including what we --

23        A    And how I interacted with other people and

24   stuff like that.

25        Q    Okay.  So -- so part of your raise
```

1    depended on how you interacted with other people?

2        A    According to that paper that they gave me

3    those fours and fives on, it did, but, you know --

4        Q    Okay.  And was that --

5        MR. LEVY:  Let her finish her answer.

6    BY MS. YOUNG:

7        Q    Go ahead.

8        A    And, you know, I never understood how I

9    got fours and fives.  Nobody said, "Well, you did

10   this and that's why I gave you a five" or "You did

11   this and this and this and that's why you got a

12   four."  I didn't get that information.

13       Q    Right.  So you had no personal insight

14   into how --

15       A    I was evaluated.

16       Q    -- that performance evaluation form was

17   filled out; correct?

18       A    No.  No, I did not.

19       MR. LEVY:  Objection to form.

20       THE WITNESS:  And I didn't go up and say,

21   "Well, why did you give me a four or five?"  I

22   didn't do that.

23       MS. YOUNG:  Okay.  I have nothing further.

24   Thank you so much for your time.

25       THE WITNESS:  Okay.  You're welcome.  Thank

```
 1              CHANGES AND SIGNATURE (Continued)

 2    PAGE   LINE   CHANGES                    REASON

 3    _____

 4    _____

 5    _____

 6    _____

 7    _____

 8    _____

 9    _____

10    _____

11    _____

12    _____

13    _____

14

15

16                        -oOo-

17         I certify, under penalty of perjury under

18    the laws of the United States of America, that the

19    foregoing is true and correct, with the exceptions,

20    if any, noted above.

21

22    Executed at _____ on _____, 2013.
                      (Place)              (Date)
23

24                     _____
                         (Signature of Deponent)
25
```

```
 1   STATE OF CALIFORNIA )

 2                       ) SS.

 3   COUNTY OF ORANGE    )

 4

 5            I, KIMBERLY C. REICHERT, Certified Shorthand

 6   Reporter, Certificate No. 10986, for the State of

 7   California, hereby certify that:

 8            I am the deposition officer that

 9   stenographically recorded the testimony in the foregoing

10   deposition;

11            Prior to being examined, the deponent was by

12   me first duly sworn;

13            The foregoing transcript is a true record of

14   the testimony given.

15            I further certify that I am neither counsel

16   for, related to, nor employed by any of the parties or

17   attorneys in the action in which this proceeding was

18   taken, and further certify that I am not financially or

19   otherwise interested in the outcome of the action;

20            Pursuant to information given to me at the

21   time said testimony was taken, the appearance page

22   includes counsel for all parties of record;

23            Before completion of the deposition, review of

24   the transcript {  X  } was  {     } was not requested.

25            If review and signature was requested, the
```

1    noticing letter was send to the witness or to the

2    attorney for the witness for examination, for review,

3    corrections and signature;

4            That any changes made by the deponent,

5    according to the FRCP, and provided to the reporter

6    during the period allowed, are appended hereto.

7

8    Dated:  January 4, 2013.

9

10

11                        _____
                          KIMBERLY C. REICHERT
12                        CSR NO. 10986

13

14

15

16

17

18

19

20

21

22

23

24

25