ORIGINAL

1  BLANCA F. YOUNG (State Bar No. 217533)
2  Blanca.Young@mto.com
   ACHYUT J. PHADKE (State Bar No. 261567)
3  Achyut.Phadke@mto.com
   MUNGER, TOLLES & OLSON LLP
4  560 Mission Street
5  Twenty-Seventh Floor
   San Francisco, California 94105-2907
6  Telephone: (415) 512-4000
7  Facsimile: (415) 512-4077



FILED
CLERK, U.S. DISTRICT COURT
JAN 18 2013
CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

8  Attorneys for Defendants
9  Corinthian Colleges Inc., David Moore,
   and Jack D. Massimino
10

11          UNITED STATES DISTRICT COURT

12     CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

13

14  United States ex rel. Nyoka Lee, et     Case No. 07-cv-01984 PSG (MANx)
15  al.,
16          Plaintiff,                        **DECLARATION OF ACHYUT J.
                                              PHADKE IN SUPPORT OF
17                                            DEFENDANTS CORINTHIAN
    vs.                                       COLLEGES INC., DAVID MOORE,
18                                            AND JACK D. MASSIMINO'S
19  Corinthian Colleges Inc., et al.,         MOTION TO DISMISS**
20
            Defendants.                        [Notice of Motion and Motion to Dismiss
21                                             with attached Memorandum of Points and
22                                             Authorities; filed concurrently herewith]



LODGED
CLERK, U.S. DISTRICT COURT
JAN 17 2013
CENTRAL DISTRICT OF CALIFORNIA
DEPUTY

23                                             Judge: Honorable Philip S. Gutierrez
24                                             Courtroom: 880
                                               Date: March 11, 2013
25                                             Time: 1:30 p.m.
26

27          **EXHIBITS G-K FILED UNDER SEAL**
28

I, Achyut J. Phadke, hereby declare:

1.     I am an attorney in the law firm of Munger, Tolles & Olson, LLP, counsel of record for Defendants Corinthian Colleges Inc. (the "School") and David Moore and Jack D. Massimino (the "Individual Defendants"). I am an attorney duly admitted to practice in the State of California and before this Court in the above-captioned matter. I have personal knowledge of the matters set forth herein and if called upon to do so, I could and would testify competently thereto under oath.

2.     I make this declaration in support of the School and Individual Defendants' Rule 12(b)(1) Motion to Dismiss.

3.     Attached hereto as Exhibit A is a true and correct copy of excerpts of the transcript of the December 17, 2012 deposition of Relator Nyoka Lee ("Lee Deposition").

4.     Attached hereto as Exhibit B is a true and correct copy of excerpts of the transcript of the December 18, 2012 deposition of Relator Talala Mshuja ("Mshuja Deposition").

5.     Attached hereto as Exhibit C is a true and correct copy of a document entitled "Privilege Log," electronically mailed by Relators to the School and Individual Defendants on December 10, 2012.

6.     Attached hereto as Exhibit D is a true and correct copy of a document entitled "Plaintiff's Initial Disclosures," electronically mailed by Relators to the School and Individual Defendants on September 10, 2012.

7.     Attached hereto as Exhibit E is a true and correct copy of "Relator Nyoka Lee's Objections and Responses to Defendants Corinthian Colleges, Inc., David Moore, and Jack D. Massimino's Interrogatories to Relator Nyoka Lee – Set One, Dated November 9, 2012 (7 Items)," electronically mailed by Relators to the School and Individual Defendants on December 10, 2012.

8.     Attached hereto as Exhibit F is a true and correct copy of

1  "Relator Talala Mshuja's Objections and Responses to Defendants Corinthian

2  Colleges, Inc., David Moore and Jack D. Massimino's Interrogatories to Relator

3  Talala Mshuja – Set One, Dated November 9, 2012 (7 Items)," electronically mailed

4  by Relators to the School and Individual Defendants on December 10, 2012.

5           9.    Attached hereto as Exhibit G is a true and correct copy of

6  Exhibit 5 to the Lee Deposition.

7           10.   Attached hereto as Exhibit H is a true and correct copy of

8  Exhibit 6 to the Lee Deposition.

9           11.   Attached hereto as Exhibit I is a true and correct copy of

10  Exhibit 7 to the Lee Deposition.

11          12.   Attached hereto as Exhibit J is a true and correct copy of

12  Exhibit 8 to the Lee Deposition.

13          13.   Attached hereto as Exhibit K is a true and correct copy of

14  Exhibit 13 to the Lee Deposition.

15              I declare under penalty of perjury under the laws of the United States

16  and the State of California that the foregoing is true and correct.

17              Executed on January 14, 2013, at San Francisco, California.

18

19                                          /s/ Achyut J. Phadke
                                            Achyut J. Phadke
20

21

22

23

24

25

26

27

28

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

UNITED STATES OF AMERICA,      )
Ex Rel. NYOKA LEE and          )
TALALA MSHUJA,                 )
                               )
                               )
          Plaintiff,           )  No. CV-07-01984
                               )      PSG (MANx)
     vs.                       )
                               )
CORINTHIAN COLLEGES, INC.; ERNST & )
YOUNG, LLP; DAVID MOORE; and   )
JACK D. MASSIMINO,             )
                               )
          Defendants.          )
                               )
_____)

VOLUME I

VIDEOTAPED DEPOSITION OF:  NYOKA J. LEE

MONDAY, DECEMBER 17, 2012, 9:07 A.M.

SANTA ANA, CALIFORNIA

REPORTED BY:

KIMBERLY REICHERT, CSR
CERTIFICATE NO. 10986

1              IN THE UNITED STATES DISTRICT COURT

2             FOR THE CENTRAL DISTRICT OF CALIFORNIA

3                       WESTERN DIVISION

4

5

6    UNITED STATES OF AMERICA,              )
     Ex Rel. NYOKA LEE and                  )
7    TALALA MSHUJA,                         )
                                            )
8                                           )
                    Plaintiff,              )  No. CV-07-01984
9                                           )      PSG (MANx)
          vs.                               )
10                                          )
     CORINTHIAN COLLEGES, INC.; ERNST &     )
11   YOUNG, LLP; DAVID MOORE; and           )
     JACK D. MASSIMINO,                     )
12                                          )
                    Defendants.             )
13   _____  )

14

15

16

17              Videotaped deposition of NYOKA J. LEE,

18   Volume I, taken on behalf of the Defendants, before

19   Kimberly Reichert, Certified Shorthand Reporter No.

20   10986 for the State of California, with principal

21   office in the County of Orange, commencing at 9:07

22   a.m. on Monday, December 17, 2012, located at

23   Corinthian Colleges, Inc., 6 Hutton Centre Drive,

24   Santa Ana, California.

25

1    schools and stuff like that, you know, like
2    alternative schools.  So I guess that would be for
3    profit.
4        Q    What do you mean by "alternative schools"?
5        A    Oh, they have schools that are like
6    schools for students who don't do well in academic
7    settings.  And they set up schools, alternative
8    schools for their training, hands-on training in
9    different areas.
10       Q    And were these high school students --
11       A    Yes.
12       Q    -- that attended the schools?
13       A    Uh-huh.
14       Q    Okay.  Other than --
15       A    Yes.
16       Q    Other than this consulting work that you
17   did with alternative schools from time to time prior
18   to 1999, did you have any other work that you did in
19   the education sector before 1999?
20       A    Let's see.  I can't remember anything.
21       Q    So let's talk about your employment at
22   Corinthian.  You started there in 1999?
23       A    Uh-huh.
24       Q    Do you recall what month you started?
25       A    Well, let's see.  I think it was at the

1    beginning of that year.

2        Q    Okay.  And in what capacity were you

3    employed in 1999 at Corinthian?

4        A    I was employed as an independent test

5    proctor.

6        Q    What were your responsibilities in that

7    position?

8        A    To test students who were coming into the

9    school to enroll and get an education.

10       Q    Did you have any other interaction with

11   the students other than proctoring the exams?

12       A    No.

13       Q    So you had no responsibility for

14   recruiting them to the school?

15       A    No.

16       Q    Is that right?

17       A    Not as a proctor, no.

18       Q    Okay.  And how were you paid as a test

19   proctor?

20       A    As an independent consultant.

21       Q    So did you have an independent contract

22   with the school?

23       A    Yes, I did.

24       Q    And what -- what was your pay based on?

25   Was it based on an hourly rate or how were you paid?

1    A    I was paid hourly.

2    Q    So the only thing your compensation

3  depended on as a test proctor was how many hours you

4  worked; is that right?

5    A    Yes.

6    Q    It didn't depend on how many students

7  passed the test; is that right?

8    A    That's correct.

9    Q    And it didn't depend on whether they

10  enrolled in the school; is that correct?

11    A    That's right.  Correct.

12    Q    Did you receive any bonuses during the

13  time that you worked as a test proctor?

14    A    No, I did not.

15    Q    How long did you work as a test proctor

16  for the school?

17    A    Approximately nine months.

18    MS. YOUNG:  I'm handing you what we'll mark as

19  Exhibit 1.

20              (Defendants' Exhibit 1 was marked for

21  identification by the deposition officer and is

22  bound under separate cover.)

23  BY MS. YOUNG:

24    Q    Ms. Lee, what I just handed you is a

25  document titled "Independent Contractor Service

```
1   Agreement."
2           And if you turn to the third page, under
3   the signature line for "Contractor," is that your
4   signature there?
5       A    This page (indicating)?
6       Q    Correct.
7       A    Yes, it is.
8       Q    And did you sign this document on
9   November 19th, 1999?
10      A    Yes, I did.
11      Q    And is this --
12      A    I thought it was the beginning of that
13  year.  I see it's 11/99.
14      Q    Is this when you commenced your employment
15  with Corinthian, in November of 1999?
16      A    I believe so, yes.
17      MR. LEVY:  Can you give her a minute to look
18  through it?
19  BY MS. YOUNG:
20      Q    Take a minute to look through the
21  document, Ms. Lee.
22      A    Okay.  Yes.  Okay.
23      Q    Okay.  And this is the agreement that set
24  out the terms of your employment as an independent
25  test proctor with the school?
```

```
 1      A    Yes.
 2      Q    At what location did you work as a test
 3   proctor for the school?
 4      A    San Francisco.
 5      Q    Did you work as a test proctor for the
 6   school in any other location?
 7      A    For this school or --
 8      Q    For Corinthian.
 9      A    No, I did not.
10      Q    Okay.  And then you think you were in this
11   position for about nine months?
12      A    Yes.
13      Q    What did you do next?
14      A    Well, I got recruited into the admissions
15   department.
16      Q    Okay.  Who recruited you?
17      A    Cary Kaplan, who was the director of
18   admissions at that time.
19      Q    And is this again at the San Francisco
20   campus?
21      A    Yes.
22      Q    Did you join the admissions department at
23   the San Francisco campus?
24      A    Yes.
25      Q    When did you do that?
```

1    A    What month or --

2    Q    If you can recall.

3    A    I think it was August.

4    Q    In August of what year?

5    A    So this was '99.  So that would have been

6  2000.  From 11 to -- to August.  I think that's nine

7  months, isn't it?

8    Q    Uh-huh.

9    A    Yes.

10    MS. YOUNG:  Well, I tested your memory.  I have

11  a document here we can look at that nails it down,

12  but let's see.  We'll mark this as Exhibit 2.

13              (Defendants' Exhibit 2 was marked for

14  identification by the deposition officer and is

15  bound under separate cover.)

16    THE WITNESS:  Thank you.

17  BY MS. YOUNG:

18    Q    So take a moment to look at this document.

19  This is a letter dated August 8th of 2000 titled

20  "Confirmation of employment."  And at the bottom it

21  says "Accepted by" and there's a signature.

22              Is that your signature at the bottom?

23    A    Yes, it is.

24    Q    And it says here that -- in the first

25  paragraph you can see it congratulates you on your

1    new position at Bryman College.

2           And it says, "Your starting date" -- at

3    the end of that paragraph it says, "Your starting

4    date will be August 14th, 2000."

5           Does that sound about right?

6       A    Uh-huh, it does.  Thank you.

7       Q    Okay.

8       A    Or should I say "yes."

9       Q    I take it you read this letter before you

10   signed it?

11      A    Yes.

12      Q    Is that your practice, you read through

13   documents before you sign them?

14      A    Yes, it is.

15      Q    And you understood that signing the letter

16   would indicate your agreement with what was in the

17   letter; correct?

18      A    Yes.

19           Did I miss something?  Hopefully --

20      Q    No, I'm just --

21      A    Oh, okay.

22      Q    I'm asking for your thoughts in signing

23   the letter.

24      A    Yes, I signed it.  Mr. Plant gave it to

25   me.

1      Q    Okay.  And it says here in the last

2   paragraph, "Your signature below will acknowledge

3   that there have been no representations by this

4   company or its agents or any other agreements

5   regarding your employment that are not reflected in

6   this agreement."

7           Do you see that?

8      A    Yes, I do.

9      Q    You read that before you signed it; is

10  that right?

11     A    Yes.

12     Q    And that was an accurate statement as of

13  the date that you signed that letter --

14     A    Yes.

15     Q    -- correct?

16          Okay.  And what was your title when you

17  were hired into the admissions department?

18     A    Campus admissions rep.

19     Q    What were your responsibilities in that

20  position?

21     A    My responsibilities were to recruit

22  students, motivate them to come to school -- come to

23  the school, interview them and get them tested if

24  they wanted to go to school and to encourage them to

25  meet with financial aid, see if they qualified, and

1  also give them a tour of the school, and enroll

2  them.  Make sure they started on time, they stayed

3  in school until they graduated.

4      Q    So it wasn't just to recruit them and get

5  them into -- in the door; right, you had continuing

6  responsibilities to these students?

7      A    Yes, I did.

8      Q    Okay.  Was career guidance one of those

9  responsibilities?

10     A    Sorry?

11     Q    Was providing them with career guidance

12  one of those responsibilities?

13     A    Well, they didn't say I was supposed to do

14  that, but I did it.  You know, I provided them with

15  career guidance and encouraged them to continue

16  their education.

17     Q    Okay.  Did you have any responsibilities

18  as a campus admissions representative for

19  supervising other admissions representatives?

20     A    Well, that wasn't in my contract, but I

21  did it because I was good at my job and Cary Kaplan

22  trusted me and he wanted me to do it.

23     Q    As a campus admissions representative,

24  were you ever in a position to fill out a formal

25  performance evaluation of other admissions

```
 1    representatives?
 2         A    No, I was not.
 3         Q    So supervising other admissions
 4    representatives may have been something you did, but
 5    it wasn't officially part of your job description?
 6         A    No.  I wasn't really supervising them.  I
 7    was just being an example for them.
 8         Q    Okay.  And how long did you work as an
 9    admissions representative on the San Francisco
10    campus?
11         A    For about six years.
12         Q    Let's see if we can take a look at some
13    documents to maybe clear up the work history a
14    little bit.  I realize a lot of this is in the past.
15         A    Uh-huh.
16         Q    And I'm not trying to trick you.  I have
17    some documents that can maybe help us get a clear
18    chronology here.
19         A    Okay.  Great.
20         MS. YOUNG:  I'm sorry.  I keep bumping you.
21         THE VIDEOGRAPHER:  That's okay.
22         MS. YOUNG:  I'm handing you what we'll mark as
23    Exhibit 3.
24                    (Defendants' Exhibit 3 was marked for
25    identification by the deposition officer and is
```

1   bound under separate cover.)

2   BY MS. YOUNG:

3       Q    And I'd ask you to hold on to it.  We

4   might come back to it again a little later.  Oops.

5   Why don't you give that to the court reporter to

6   mark.

7       A    All right.

8       Q    And take a moment again to look at this

9   document.  This is a letter dated June 4th, 2004.

10  It states, "I am pleased to confirm Terry Harty's

11  offer of employment and your acceptance of a

12  position at Bryman College, Hayward campus."

13      A    Uh-huh.

14      Q    And then if you look on the second page,

15  there's a signature line for "Accepted by."  Is that

16  your signature in the line there?

17      A    It is.

18      Q    And the date on which this was signed was

19  June 10th, 2004?

20      A    That's what this says, yes.

21      Q    Okay.  And do you recognize this document?

22      A    Yes, I do.

23      Q    And what is it?

24      A    Well, it's giving me an outline of my

25  salary, of course, and the different dates that I

1   was supposed to be trained for specific job

2   descriptions that I was supposed to perform.

3       Q    Okay.  This document states -- where it

4   says "Start Date" in the margin on the first page,

5   you commenced employment in this position on

6   June 1st, 2004.  And the title in that same section

7   says "Director of Admissions."

8           Did you become a director of admissions at

9   Hayward -- at the Hayward campus on June 1st, 2004?

10      A    Yes, I did.  I think that was the date,

11  but there was some confusion with that specific

12  transfer.  It didn't take place properly.

13      Q    Okay.

14      A    So I'm not sure if that's the correct

15  date.

16      Q    Did you start sometime in the month of

17  June in 2004 as the director of admissions at

18  Hayward?

19      A    It couldn't have -- it could be that date

20  or it could have been -- I'm sure if it said June, I

21  started in June.

22      Q    Okay.  In June 2004?

23      A    Yes.

24      Q    And were you working as an admissions

25  representative in the San Francisco campus up until

```
 1   that time, from 2000 up until that time?
 2        A    Yes.  Yes, I was.  Or, yes, I did I should
 3   say.
 4        Q    So I don't think that's quite six years.
 5   I think it's more like three years and -- and nine
 6   months at San Francisco before you became a director
 7   of admissions at Hayward.
 8        A    Oh, it was more than that.
 9        Q    Okay.  Well, I -- I thought we just talked
10   about you starting to work as an admissions
11   representative in San Francisco --
12        A    I was -- I thought you were speaking of
13   when I started employment because I did start in
14   1999.
15        Q    Okay.
16        A    And then I went into admissions.  So...
17        Q    All I'm trying to do is understand how
18   long you were an admissions representative in San
19   Francisco before you became the director of
20   admissions at Hayward.
21        A    Uh-huh.  Yeah.  Well, that's from 2000 --
22   let's see.  2000 to 2004, maybe.  Because I was a
23   student at University of Phoenix and I was an
24   admissions rep the whole time I was going to school
25   from when I started with my B.S. to when I finished
```

1    my courses, and my doctoral courses.

2        Q    Okay.

3        A    I was an admissions rep during that time.

4    I was going to school and working at Bryman at the

5    same time.

6        Q    Okay.

7        A    So that's how I was gauging how long I

8    worked there.  And then I went to Hayward.

9        Q    Okay.

10       A    Okay.  For a short period of time.

11       Q    Just focusing on your stint as an

12   admissions representative in San Francisco, that was

13   from August of 2000 until about the end of May 2004;

14   is that right?

15       A    Uh-huh.  Yes, something like that.

16   Uh-huh.

17       Q    All right.  And again, just focusing on

18   when you first started in San Francisco as a campus

19   admissions representative, how were you compensated?

20       A    Uh-huh.  As a campus rep?

21       Q    Uh-huh.

22       A    Well, I was salaried.  I was a salaried

23   employee.

24       Q    Okay.  And what was your starting salary?

25       A    I think it was on this page right here

1  (indicating).  It said 38-.

2      Q    Are you referring to what we've marked as

3  Exhibit 2?

4      A    This one, yeah, something like that.

5  Yeah, right here (indicating).

6      Q    Okay.  And the first paragraph says -- in

7  the last sentence of the first paragraph it says,

8  "As we discussed, your beginning salary is $38,400."

9      A    Uh-huh, yes.

10     Q    Is that consistent with what you recall?

11     A    Yes, it is.

12     Q    And was there a compensation plan that

13  governed your employment as a campus admissions

14  representative?

15     A    Compensation plan would be like how much I

16  was receiving or --

17     Q    Well, was there any plan that told you

18  what you would have to do to be eligible for a

19  promotion or for a raise?

20     A    In writing?  There might have -- not at

21  that time.  There might have been something that

22  came up later.

23     Q    Uh-huh.

24     A    Okay.

25     Q    Yeah, I'm focusing just on when you were

```
 1   hired.  Did you ever --
 2        A    Well, this is what I received when I went
 3   in there, was this letter here.
 4        Q    Okay.  And did you --
 5        A    There was no compensation plan that came
 6   with this.
 7        Q    Okay.
 8        A    That I recall.
 9        Q    If you look at the second-to-last
10   paragraph in Exhibit 2 that you were just looking
11   at, the second-to-last sentence of that -- of that
12   paragraph says, "You will not be eligible for merit
13   increase consideration until October 1st, 2001" --
14        A    Uh-huh.
15        Q    -- "at which time you will be reviewed
16   again.
17             "Admissions representatives will be
18   reviewed for Meritorious Performance in accordance
19   with the Meritorious Performance Compensation Plan,
20   which will be given to you on your first day of
21   employment."
22             Do you see that?
23        A    Yes, I do.
24        Q    And do you recall getting a meritorious
25   performance compensation plan on your first day of
```

1  employment?

2     A    No, I don't.  I don't recall receiving

3  that, but -- I recall receiving it later maybe, but

4  not on this.

5     Q    Okay.

6     A    Because I was given so many papers.  It

7  could have been there, but I don't remember it.

8     MS. YOUNG:  Okay.  Let me show you a document

9  that was produced to us by your attorney.  We'll

10  mark this as Exhibit 4.

11            (Defendants' Exhibit 4 was marked for

12  identification by the deposition officer and is

13  bound under separate cover.)

14     THE WITNESS:  Thanks.

15  BY MS. YOUNG:

16     Q    If you'd take a moment to review this.

17     MS. YOUNG:  For the record, this document is

18  titled "Corinthian Schools, Inc. Campus Based

19  Admissions Representative Compensation Plan,

20  Effective October 1st, 1998."

21     Q    And on the second page of this document,

22  again, there are some signature lines.  Is that your

23  signature at the bottom of the document?

24     A    Yes, it is.

25     Q    And this document says, "Received,

1  acknowledged and agreed to this 10th day of August,

2  2000."

3          Do you see that?

4      A    Yes, I do.

5      Q    Did you receive this document on the 10th

6  day of August 2000?

7      A    As far as I know, it was -- I signed it

8  the 10th.

9      Q    And -- and this was produced to us by your

10  attorney.  So is this something that you maintained

11  in your own file?

12     A    Probably.  Sometimes things were moving so

13  fast, I might not have signed it on that date, but I

14  used that date.

15     Q    Okay.  Do you see on page 2 there's a

16  heading B, "Promotion Criteria"?

17     A    Yes, I do.

18     Q    And that makes reference to "the

19  achievement of the performance criteria outlined in

20  the enclosed promotional guidelines."

21          Do you see that at the end of that

22  paragraph?

23     A    I see that.

24     Q    Did you also receive the promotional

25  guidelines that this paragraph references?

1    A    Probably.  I'm sure I must have.

2    Q    Do you know what they were sitting here

3  today?

4    A    I'm not sure.  Not at this time.  I don't

5  remember what they were.

6    Q    When you were hired as an admissions

7  representative in 2000, were you given any other

8  documents that explained how you would be

9  compensated or when you would be eligible for a

10  promotion or a -- or a raise other than what we've

11  discussed?

12    A    Not at that time.  I have to say that.

13    Q    Okay.  And when you were hired as an

14  admissions representative in 2000, did you discuss

15  with anybody at the school how you would be

16  compensated?

17    A    Compensated for enrollments or --

18    Q    For your -- for your work there.

19    A    Well, I discussed that with the director

20  I'm sure.

21    Q    Okay.  Do you recall the substance of that

22  discussion?

23    A    Let's see.  Not at this time.  I don't

24  recall that.

25    Q    Did you discuss with anyone at the school

1  what you would have to do -- and again, this is

2  focusing on the time when you were hired in August

3  of 2000.

4          Did you discuss with anyone at the school

5  in August of 2000 what you would have to do to be

6  eligible for a promotion or a raise?

7      A    I'm sure I must have because I was told

8  that I needed to enroll students.

9      Q    Okay.

10     A    And I was hired to enroll students and

11 that's what I was supposed to do.

12     Q    Who told you you needed to enroll

13 students?

14     A    The director.  Everyone knew you get hired

15 to enroll students.  If you don't enroll students,

16 you get fired.  That was the general conversation in

17 the admissions department.

18     Q    Okay.  I want to understand exactly what

19 the conversation was about.  So is your

20 understanding that you needed to hire -- so -- so

21 you understood that you would be fired if you didn't

22 enroll students?

23     A    Yeah, if you didn't --

24     MR. LEVY:  Objection to form.

25     THE WITNESS:  In other words -- I'm sorry.

1    MR. LEVY: Objection to form. It was just a
2  little confusing.
3    THE WITNESS: Well, everybody knew if you
4  didn't enroll students and meet your quotas, you
5  were out of there.
6  BY MS. YOUNG:
7    Q    Okay.
8    A    That was the general consensus in the
9  admissions department.
10   Q    And what was --
11   A    So I got busy.
12   Q    What was the basis for that consensus?
13  Why did you believe that?
14   A    Because of what was happening around me
15  and what I was doing.
16   Q    Okay. Tell me what that was.
17   A    I was recruiting students, getting them to
18  come to school and going by my leads that the
19  director gave me, leads -- he gave me specific
20  leads. And I had to transform the leads into
21  interviews and interviews into enrollments,
22  conversion rates. And I was responsible for doing
23  that.
24       That was my responsibility as an admission
25  rep -- admissions rep. Leads to interviews,

1    interview -- interviews to enrollments, enrollments

2    to starts.

3         Q    Okay.  So we started off by talking about

4    whether you discussed with anyone what you were

5    required to do in order to get a promotion or a

6    raise.

7              Did you have a conversation with anyone

8    when you were hired at the school --

9         A    Uh-huh.

10        Q    -- in 2000 about what you had to do to get

11   a promotion or a raise?

12        A    I don't recall having specific

13   discussions.  I was given paperwork to read and told

14   by the director on many different occasions what I

15   had to do, but I don't remember the exact

16   conversations.  But I know that it was understood.

17   It was understood that you had to get enrollments

18   and -- and keep your numbers up.

19        Q    Okay.  You said you were told by the

20   director on many occasions about what you had to do.

21             Did you mean you were told by the director

22   on many occasions about what you had to do in order

23   to do your job or in order to get a promotion or a

24   raise?

25        A    Well, that's the same thing, isn't it?  Do

1    my job and get a promotion.

2        Q    Did the -- did your director specifically

3    tell you what you had to do in order to get a

4    promotion or a raise or is that something you were

5    just implying from what she said or he said?

6        A    No, I wasn't implying anything. The

7    director was circling the admissions department all

8    the time to make sure that we converted our leads

9    into interviews.

10       Q    Yeah, I understand that your job was to

11   recruit students and that your director was trying

12   to make sure you did that.

13       A    Okay.

14       Q    What I'm trying to understand is what

15   specifically he -- it was a "he"; right?

16       A    Uh-huh.

17       Q    -- what specifically he said to you, to

18   the extent he said anything --

19       A    Uh-huh.

20       Q    -- about how recruiting students would

21   translate into getting a promotion or a raise.

22       MR. LEVY:  Objection; form.

23       THE WITNESS:  Okay.  Let me see how I can word

24   this.  I knew that I had to enroll students to get a

25   raise if I wanted one, but I don't know if he

1    specifically said that in our conversation, you

2    know.

3            That's what you're getting at; right?

4    BY MS. YOUNG:

5        Q    Yeah.  I'm trying to understand how you --

6    what made you know that you had to enroll students

7    in order to get a raise?

8        A    The admissions environment made me know

9    that and the director of education, everything that

10   was happening at school made me know that.

11       Q    Did anyone specifically tell you, "You

12   have to enroll a certain number of students to get a

13   raise"?

14       A    Yes, the director would tell me that and

15   also the president, Mr. Plant, would tell me that,

16   and other admissions reps would tell me that.

17       Q    So the director told you you had to enroll

18   students to get a raise?

19       A    Uh-huh.

20       Q    The director's name was?

21       A    Cary Kaplan.

22       Q    You say the president told you you would

23   have to enroll students to get a raise?

24       A    The president told me that.

25       Q    And the president's name was?

1        A     And Jim Martin told me that.

2        Q     Back up.  The president's name was?

3        A     Mr. Plant.  At that particular time when I

4   was there it was Mr. Plant.

5              And Jim Martin would come and we would

6   have admissions meetings and -- and they would go

7   over the script with us and tell us what we had to

8   do to increase our numbers.

9        Q     Who is Jim Martin?

10       A     Well, at that time he was vice president

11  of marketing and sales.

12       Q     You said other admissions representatives

13  would say you had to enroll students to get a raise?

14       A     Yeah, people that had been working there

15  for a long time before I started.

16       Q     Who were they?

17       A     Who were those people?

18       Q     Who told you -- who were the admissions

19  representatives who told you, "You have to enroll

20  students to get a raise"?

21       A     Well, the people were -- that were working

22  there at that time.  I'm sure they're not there now.

23       Q     Do you recall any of their names?

24       A     Yes, I recall their names.

25              Would you like for me to give them to you?

1    Q    I would.

2    A    Estella Aranas, Jan Dixon, Steve Aranas

3  (sic).  Let's see.  I can remember some other people

4  that were in that department at that time.  Katie

5  Aspen, Daniel Vargas.

6         You need more?

7    Q    I want the names of everybody you can

8  remember who told you --

9    A    Okay.  Well, that's it.

10   Q    Just a minute.

11        -- who told you you have to enroll

12  students to get a raise.

13   A    Well, they didn't say, "You have to enroll

14  students to get a raise."  They said, "You have to

15  enroll students to keep your job."  Now, if you kept

16  your job, you could get a raise.

17   Q    So just so I'm clear --

18   A    Uh-huh.

19   Q    -- these admissions representatives you

20  just identified --

21   A    Uh-huh.

22   Q    -- none of them said to you, "You have to

23  enroll students to get a raise"; is that correct?

24   A    Well, they all said that.  People talked

25  in the admissions department.  Everybody talked

1    about what you had to do to keep your job.  And that

2    was part of the conversation that everybody knew and

3    everybody talked about and everybody was pressured

4    about.

5        Q    I just -- I just want to make sure that

6    we're clear on --

7        A    Uh-huh.

8        Q    -- the difference between getting a raise

9    and being fired; okay?

10       A    Okay.

11       Q    So was the communication to you, "You need

12   to enroll students to get your job"?

13       A    To keep your job.

14       Q    To keep your job?

15       A    Yeah.

16       Q    Okay.

17       A    Because if you didn't have your job, you

18   couldn't get a raise, of course.

19       Q    Okay.  But did anyone say to you, "You

20   need to enroll students in order to get a raise"

21   without talking about whether you needed to keep it

22   -- do it to keep your job?

23       A    Well, the bottom line was if you enrolled

24   X amount of students, you got a raise.  That was the

25   bottom line of that conversation.

1           Now, what don't you understand?  Maybe I
2    could make you -- clear it up.
3        Q    Well, I'm trying -- I'm trying to
4    understand where -- how you personally got to that
5    bottom line.
6           Is that something that you --
7        A    I got there from working in admissions and
8    being in the daily routine of the job.
9        Q    Okay.  So you arrived at the bottom line
10   based on what you personally had to do in the job;
11   correct?
12       A    That's right.
13       Q    Which was to enroll students?
14       A    Recruit them, enroll them, test them.
15       Q    And your job -- okay.
16       A    Let them get -- meet with financial aid
17   and start to school.  That was what I had to do.
18       Q    And you also arrived at the bottom line
19   because people talked about you would get fired if
20   you didn't enroll students?
21       A    Well, people were getting fired.  I was --
22   I saw what was happening.  I saw exactly what was
23   happening.  In other words, I was able to put it all
24   together in my head about what I needed to do for
25   myself to stay employed.  And I got that from other

1   admissions reps, admissions reps from other schools,

2   you know, talking on the phone, observing people and

3   listening to conversations.

4       Q    Okay.  But -- but the conversations you

5   were listening to that caused you to conclude --

6       A    Uh-huh.

7       Q    -- that you needed to enroll students to

8   get a raise were conversations about you could get

9   fired if you don't enroll enough people?

10      A    Yeah, and I saw people getting fired who

11  weren't doing it.

12      Q    Were there any other types of

13  conversations that led you to believe that you had

14  to enroll students in order to get a raise?

15      MR. LEVY:  Objection; form.

16      THE WITNESS:  Well, I don't remember any.  That

17  was enough.  I didn't, you know -- I was in

18  admissions and I was doing what I had to do for my

19  spot in the cubby hole.  And that's how I performed

20  like that.  I didn't really talk to other people,

21  you know.

22          I heard conversations when I was working

23  there.  I just did my job and I enrolled students

24  and recruited them.  I mostly talked to my students

25  and I saw what was happening in the department.

1    BY MS. YOUNG:

2       Q    And again, what you saw was happening was

3    people were getting fired if they didn't enroll

4    enough students; right?

5       A    Yes, ma'am.

6       Q    Okay.  And again, this is --

7       A    And I got fired for not meeting my numbers

8    when I went to Hayward.  So -- and then I got hired

9    again and then fired again for not meeting my

10   numbers.

11      Q    Okay.

12      A    So if you didn't meet your numbers,

13   basically, the bottom line is you get fired.

14   They're not going to pay you to not enroll students.

15      Q    Uh-huh.

16      A    That was the general consensus in that

17   department.

18      Q    Okay.

19      A    Okay.

20      Q    And we'll talk about all of that later.

21   I -- I just want to keep focusing on your -- your

22   first round of employment in San Francisco from 2000

23   to 2004; okay?

24      A    Okay.  Uh-huh.

25      Q    So other than the documents that we've

1    Q    Okay.  And the 2000 date is the correct

2    date; is that right?

3    A    I think it is because that's this date

4    here.  This says 10th and that says the 14th, but

5    like I said, things were misconstrued sometimes

6    there at that campus.  And sometimes I would get

7    papers and I wouldn't even sign them until a month

8    later maybe.  I don't know.  It wasn't necessarily

9    always on the date I got it.

10    Q    Okay.  But to the best of your

11    recollection, you started working as an admissions

12    representative at the San Francisco campus in August

13    of 2000?

14    A    August -- because my hire date was 1999,

15    November.  So I was a proctor for nine months and I

16    went into admissions that August.

17    Q    Okay.

18    A    So that would make it 2000.

19    Q    Okay.  Now, I think we looked earlier at a

20    compensation plan --

21    A    I don't know why that was '01.  I'm not

22    sure.

23    Q    Okay.

24    A    Okay.

25    Q    I think we looked earlier at a

1    compensation plan that you signed when you first
2    started as a campus admissions representative in San
3    Francisco.
4             Do you recall that?
5        A    Excuse me.  One of these documents
6    (indicating)?
7        Q    I think it was what we marked as
8    Exhibit 4.
9        A    Okay.  That's this -- that's this one.
10   2000.
11       Q    Okay.
12       A    Uh-huh.
13       Q    And we now have in front of us a
14   compensation plan that you've signed in November of
15   2001.
16            Do you --
17       A    Which exhibit is that?
18       Q    Exhibit 5.
19       A    Okay.  This one.  Okay.
20       Q    Why did you sign a new compensation plan?
21       MR. LEVY:  When?
22   BY MS. YOUNG:
23       Q    In 2001.
24       A    I don't recall.  I don't know why.  It's
25   signed right here.  I don't know why this happened.

1    Q    Okay.  Before you signed this document,
2    did you go over it with anyone else?
3    A    I don't recall.
4    Q    Did anyone tell you that the school
5    doesn't actually follow this plan?
6    A    Why would I be signing it and they give it
7    to me if they don't follow it?  I don't understand
8    the question.
9    Q    So no- -- nobody told you that "Here's the
10   plan, but we don't actually follow this plan," did
11   they?
12   A    I don't remember anybody telling me that,
13   but it probably happened because they were always
14   saying something that might not happen sometimes,
15   you know.
16   Q    It probably happened, but you don't know
17   if, in fact, it did happen, do you?
18   A    Are you speaking of this document here or
19   just things in general?
20   Q    No, I'm speaking about my question to you.
21   A    Okay.
22   Q    Which was did anyone tell you, "Here's the
23   plan, but we don't actually follow it"?
24   MR. LEVY:  Objection to form.
25   THE WITNESS:  Nobody told me that.  I don't

1    recall anyone telling me that.

2    BY MS. YOUNG:

3        Q    Let's look at the document within here

4    that starts -- it's actually page 4 of the exhibit.

5    The title of it is "Minimum Standards of

6    Performance."

7        A    The one you just gave me?

8        Q    Correct.  It's what we've marked as

9    Exhibit 5.

10       A    I don't see a page 4.

11       Q    It's not numbered as page 4, but it is the

12   fourth page in the document.

13       A    Okay.

14       Q    And the title on it is "Minimum Standards

15   of Performance."  That's it (indicating).

16       A    Okay.

17       Q    Okay.  Are you with me?

18       A    I'm with you.

19       Q    Okay.  What's your understanding of what

20   this document is?

21       A    Well, it looks like what I was supposed to

22   do as an admissions rep.

23       Q    Okay.

24       A    Take all inquiry calls, return inquiry

25   calls.  That's what I was supposed to do.  It takes

```
1    -- it looks like that to me, what I -- what my

2    duties were.

3         Q    Okay.  And there's a list of 18 things

4    here on this document.

5         A    Uh-huh, yes, I see it.

6         Q    Were you supposed to do all those 18

7    things as an admissions representative?

8         A    Probably, which was a lot.

9         Q    Uh-huh.  So let's just talk about a couple

10   of them.  The first one is "Take all inquiry calls

11   from all potential students interested in knowing or

12   receiving information about the programs, including

13   entrance requirements, curricula and academic

14   standards."

15        A    Uh-huh.

16        Q    Was that one of the requirements of your

17   job?

18        A    Yes.

19        Q    Did you strive to do that?

20        A    I strived to do everything that's on this

21   list.

22        Q    Okay.  And were your calls monitored, your

23   phone calls with prospective students, were they

24   monitored by your director of admissions?

25        A    Sometimes and they would tell us that it
```

1    was monitored by corporate.

2         Q    Okay.  And what was your understanding of

3    the purpose of having those calls monitored?

4         A    I guess they wanted to make sure we were

5    doing our job.  I don't know.  I never discussed

6    that with anyone.

7         Q    Did you understand that your performance

8    was being evaluated based on how you were

9    communicating with the prospective students?

10        A    Yes.

11        Q    And that was one of the factors that your

12   director of admissions was looking at?

13        A    All the time.

14        Q    When you were doing your job; right?

15        A    Yes, uh-huh.

16        Q    No. 2 says, "Return inquiry calls promptly

17   to all potential students and give accurate

18   information about the programs, including entrance

19   requirements, curricula and academic standards."

20        A    Yes.

21        Q    And that was another responsibility in

22   your job?

23        A    Yes.

24        Q    And you tried to do that; right?

25        A    Yes.

1    Q    And this meant, among other things, noting

2   how -- giving accurate information to students?

3    A    Giving as accurate as it was given to me.

4    Q    Okay.  And was that important to you, to

5   make sure students got accurate information?

6    A    It was very important to me because I was

7   a student myself and I didn't want to misinform

8   anyone.

9    Q    Uh-huh, of course.  And -- and did you

10  understand that your director of admissions was

11  monitoring you to see that you were giving accurate

12  information to students?

13   A    Yes, I sat right across from his office.

14  He could hear me talking.

15   Q    And you understood that he would be

16  evaluating your performance in part based on whether

17  you were giving accurate information to people; is

18  that right?

19   A    That was probably his job, to monitor me

20  on that, yes.

21   Q    And you understood that that was his job;

22  right?

23   A    Uh-huh.  Yes, I did.

24   Q    No. 3 is "Accurately classify all

25  inquiries by the appropriate media source and

1    account for all inquiries."

2            Do you see that?

3        A    Yes, I do.

4        Q    And that -- that again was part of your

5    responsibilities; correct?

6        A    Yes.

7        Q    Okay.  And you tried to do that in your

8    job?

9        A    Yes, I did.

10        Q    And was it your understanding that your

11   director was monitoring your performance to see if

12   you accurately classified all inquiries that came

13   in?

14       A    Yes, he would do that through the flash

15   sheets.

16       Q    Okay.  And "classify all inquiries by the

17   appropriate media source," what does that mean?

18   What do you understand that to mean?

19       A    Which one is that?  No. 4?

20       Q    It's No. 3.

21       A    No. 3.  That meant that -- the media

22   source would be the zip code from all the leads that

23   I received.

24       Q    Okay.

25       A    It would have a zip code on it.  So I

1    would organize those leads in zip codes when I would

2    call my students.

3         Q    Okay.

4         A    I believe that's what that means.

5         Q    Okay.  And I'm not going to go through all

6    of these, but just to touch on a couple of other

7    ones.

8              No. 5, "Comply with governmental

9    regulations and standards of accreditation as they

10   relate to enrolling students."

11             Do you see that?

12        A    Yes, I do.

13        Q    And that was part of your job

14   responsibilities as an admissions representative?

15        A    Yes, it was.

16        Q    And did you understand that your

17   performance was being evaluated in part by whether

18   you were complying with the governmental regulations

19   and standards of accreditation as they relate to

20   enrolling students?

21        A    Yes, because I explained all that to my

22   students.

23        Q    Okay.  Another thing on here was -- just

24   take a look at No. 14 and No. 15.  They're kind of

25   related.  "Ensure that all pre-start paperwork is

1  completed."

2        That was part of your responsibilities?

3     A   Yes.

4     Q   And you tried to do that?

5     A   Yes.

6     Q   And you understood that your performance

7  would be evaluated based in part on whether your

8  prestart paperwork was complete; correct?

9     A   Correct.

10     Q   And same thing with No. 15, "Keep all

11  required reports current and accurate"?

12     A   I did all those things, yes, I did.

13     Q   And you understood that your performance

14  was being evaluated in part on whether you kept

15  required reports current and accurate?

16     A   Yes, I suppose that's what Cary did

17  because I didn't -- you know, he had his own rules

18  for his evaluations on everybody in the department.

19     Q   Okay.  Say that one more time.

20     A   You know, he -- he evaluated all of his

21  admissions reps.  So I'm sure he had his own

22  evaluation criteria.

23     Q   Do you know what his evaluation criteria

24  were?

25     A   No, I never had a conversation with him

1    about it, but he expected high standards.  I know

2    that.

3         Q    Uh-huh.

4         A    That's what he was getting from me.

5         Q    Okay.

6         A    Maybe he went by this list.  I don't know

7    anything about that.

8         Q    Okay.

9              Again, I'm so sorry.

10        THE VIDEOGRAPHER:  If this is a good time, I'll

11   switch the tapes over now.

12        MS. YOUNG:  Yes.  Off the record.

13        THE VIDEOGRAPHER:  The video deposition is now

14   going off record at 10:42 a.m.  This will also

15.  conclude video No. 1 in today's deposition.

16              (A recess was taken from 10:42 a.m.

17   to 10:51 a.m.)

18        THE VIDEOGRAPHER:  The video deposition of

19   Nyoka J. Lee, Volume No. 1, is returning to record

20   at 10:51 a.m.  This will also begin video No. 2 in

21   today's deposition.

22              The location is still 6 Hutton Centre

23   Drive, Fourth Floor, in Santa Ana, California.  The

24   date is still Monday, December 17th, 2012.

25              And my name is Ali Saheb with Dean Jones

1   Attorney Video Services in Los Angeles and

2   Santa Ana, California.

3   BY MS. YOUNG:

4       Q   Ms. Lee, I would remind you you're still

5   under oath.  Do you understand that?

6       A   Yes, I do.

7       Q   And is there anything you would like to

8   change about your testimony you've given today?

9       MR. LEVY:  No, there's nothing she would like

10  to change.

11      MS. YOUNG:  I'm asking the witness.  I would

12  like an answer from the witness.

13      THE WITNESS:  No.

14  BY MS. YOUNG:

15      Q   Okay.  And just remember, our court

16  reporter is trying to take everything down.

17      A   Uh-huh.  Yes.

18      Q   And sometimes you've been jumping in

19  before I finish my question.  So please make an

20  effort to wait for me to finish completely before

21  you answer; okay?

22      A   Yes.

23      MS. YOUNG:  Okay.  I'm handing you what we're

24  going to mark as Exhibit 6.

25              (Defendants' Exhibit 6 was marked for

1   identification by the deposition officer and is

2   bound under separate cover.)

3   BY MS. YOUNG:

4       Q    Now, this is a document titled

5   "Confidential Employee Performance Review."  You see

6   on the last page where there's a line for a

7   signature, employ- -- for "Employee Acknowledgment."

8           Is that your signature?

9       A    Yes, it is.

10      Q    And it's dated November 19, 2001?

11      A    Yes, it is.

12      Q    And beneath that it says, "Review of

13  Performance Discussion Summary and Employee

14  Comments."

15          Do you see that?

16      A    Yes, I do.

17      Q    Do you recognize the signature beneath

18  that line?

19      A    Yes, it looks like Mr. Plant's signature.

20      Q    Okay.  And there are a couple of other

21  signatures on the same page in the box with section

22  Roman numeral VI.  One is over a line for

23  "Supervisor."

24          Do you see that?

25      A    Yes.