```
1        A    Yes.
2        Q    But that was not related to Corinthian?
3        A    No.
4        Q    So the only work you did on computers -- on
5   Corinthian computers was to notate your tests?
6        A    Yeah.  I managed my testing.
7        Q    Managed testing?
8        A    With the computer.
9        Q    And did you have a account that gave you access
10   to the Corinthian system -- the Corinthian data system?
11        A    No.
12        Q    So sort of Corinthian corporate documents, did
13   you have an access to that?
14        A    No.  No, I didn't.
15        Q    So the only -- so what did you have access to?
16   The Internet?
17        A    Yes, I did.
18        Q    And you had access to Word?
19        A    Yes, I -- in San Francisco, I didn't have access
20   to Internet.
21        Q    Okay.
22        A    I just had a desktop computer, and that was it.
23        Q    And --
24        A    In San Jose, I did have access to the Internet.
25        Q    And what did you have access to on your computer?
```

1      A    Just Microsoft Word.

2      Q    Just Microsoft Word?

3      A    Yeah.

4      Q    Anything else?

5      A    No.

6      Q    And so you -- and so you annotated your tests on

7   Microsoft Word?

8      A    Yes, I documented my activities.

9      Q    You documented your test-proctoring activities?

10     A    Yes.

11     Q    And you did nothing else on those computers?

12     A    No.

13     Q    And just to get the record clear, you didn't have

14   access to any sort of Corinthian database or set of

15   corporate documents?

16     A    No.

17     MR. LEVY:  Objection to form.

18     THE WITNESS:  No.

19   BY MR. PHADKE:

20     Q    You were never an admissions representative;

21   right?

22     A    No.

23     Q    And you were never director of admissions; right?

24     A    No.

25     Q    So you were never responsible for admitting or

```
 1    recruiting students; right?
 2        A    No.
 3        Q    And your pay was never based on any compensation
 4    policies that covered ad reps; right?
 5        A    No.
 6        Q    And it was never based on any compensation
 7    policies that covered directors of admission; right?
 8        A    No.
 9        Q    And you never gave any ad rep a performance
10    evaluation; right?
11        A    Could you state that question again?
12        Q    As a test proctor -- I mean, as a test proctor,
13    you never gave any ad rep a performance evaluation;
14    correct?
15        A    No.
16        Q    And you never gave a DOA a performance
17    evaluation?
18        A    No.
19        Q    Right?
20            As a test proctor, had you ever seen the forms
21    which DOAs used to give performance evaluations?
22        A    No.
23        Q    As a test proctor, had you ever seen the forms
24    which DOAs gave to -- DOAs looked at in considering
25    promotional criteria?
```

1    A    Yes.

2    Q    When did you see those?

3    A    When?  I don't remember exactly when.

4    Q    You don't remember when?

5    A    No.

6    Q    Do you know who showed them to you?

7    A    Who showed 'em to me?

8    Q    Do you know who showed 'em to you?

9    A    Yes.

10   Q    Who?

11   A    Nyoka.

12   Q    Nyoka showed them to you.  Aside from what Nyoka

13   showed you, had you ever seen the forms that were used to

14   determine whether ad reps got -- got compensation bonuses

15   or incentive pay?

16   A    I said Nyoka ... I think -- I'm not sure.

17   Q    So you have no recollection of seeing any -- any

18   documents that discuss ad rep compensation besides what

19   Nyoka showed you?

20   MR. LEVY:  Objection to form.

21   THE WITNESS:  I think I saw documents that John Chacon

22   and Susan Newman ....

23   BY MR. PHADKE:

24   Q    So in your work as a test proctor, you never saw

25   documents that -- that covered ad rep compensation?

1    MR. LEVY:  Objection to form.

2    THE WITNESS:  No.

3  BY MR. PHADKE:

4    Q    And you only ever saw those based on what Nyoka

5  Lee, Susan Newman or John Chacon showed you?

6    A    No.

7    Q    Let me clarify.  You only ever saw documents

8  covering ad rep compensation based on what Nyoka Lee,

9  Susan Newman or John Chacon showed you; right?

10   MR. LEVY:  Objection to form.

11  BY MR. PHADKE:

12   Q    I need an audible, verbal response.

13   A    That's the only way I saw it.

14   Q    That's the only way you saw it?

15   A    Yeah.

16   Q    And you never got -- reviewed yourself -- based

17  on any ad rep performance review; right?

18   A    No.

19   Q    And you were also never a financial aid officer;

20  right?

21   A    No.

22   Q    You were never involved in making decisions about

23  whether a student was eligible for financial aid?

24   A    No.  I was only the test proctor.

25   Q    And as part of your work as a test proctor, no

```
 1   DOA ever sent you any spreadsheets showing DOA or ad rep
 2   enrollment numbers; right?
 3       A    No.
 4       Q    Now, for your compensation, you submitted
 5   invoices to Corinthian for each pay period; right?
 6       A    That's correct.
 7       Q    Those invoices covered the money you were owed
 8   for a pay period based on your hourly rate?
 9       A    Yes.
10       MR. PHADKE:  Okay.  I'd like to introduce two
11   exhibits.
12            (Exhibit 38 was marked for identification and
13   is attached hereto.)
14            (Exhibit 39 was marked for identification and
15   is attached hereto.)
16       MR. PHADKE:  There -- there's a copy for you.  I
17   apologize.
18       MS. YOUNG:  Here you go.
19       MR. LEVY:  Okay.  Thank you.  So this is going to be
20   Exhibit 38.
21       MS. YOUNG:  Oh, are there two different documents?
22       MR. CALHOUN:  Yeah.
23       MS. YOUNG:  Scott, for you.
24       MR. LEVY:  No, I gave them the other --
25       MS. YOUNG:  Oh, you did?
```

1       Q    And after you stopped working for Corinthian, did

2   you get other employment?

3       A    Since 2009?

4       Q    Yeah, after January 2009.

5       A    No.

6       Q    So you left Corinthian because they weren't (sic)

7   paying you late and then you didn't seek other employment?

8       A    No.  I did look for work, but I didn't find any.

9       Q    And there was -- there were no other reasons for

10  your leaving Corinthian?

11      A    No.

12      Q    So earlier today we talked about Susan Newman and

13  John Chacon; right?

14      A    Yes.

15      Q    And you said that you had two dinners with Susan

16  Newman and a meeting at her house at the -- when you first

17  started thinking about this case; right?

18      A    Yes.

19      Q    What was the first of those meetings?

20      A    The one in San Jose.

21      Q    That was the dinner in San Jose?

22      A    Yeah.

23      Q    Who was at that dinner?

24      A    Myself, Susan, John Chacon, Mr. Levy and Mr. Mark

25  Labaton.

1    Q    Do you remember when that dinner was?

2    A    What year?

3    Q    Was it in 2006?

4    A    I think so.  I'm not positive.

5    Q    So you think the dinner was in 2006.  And Ms. Lee

6  was not there?

7    A    No.

8    MR. LEVY:  Objection to form.

9    THE WITNESS:  No.

10  BY MR. PHADKE:

11    Q    And the list of people you recited was a complete

12  list of who was there?

13    A    Yes, correct.  Yeah.

14    Q    And what did you talk about at that dinner?

15    A    What did we talk about?  Problems with how

16  Corinthian Schools and -- no, IBT -- both of those schools

17  were operating.

18    MS. YOUNG:  Can I have that read back?  I didn't hear.

19  I'm sorry.

20    (Record read as follows:

21        "Q    What did we talk about?  Problems  with how

22     Corinthian Schools and -- no, IBT -- both of those

23     schools were operating.")

24  BY MR. PHADKE:

25    Q    Did Ms. Newman set up that dinner?

1    A    I'm not sure who set that up.

2    Q    Did you set up that dinner?

3    A    No, they called me in to the meeting.

4    Q    Who called you?

5    A    I think that was Susan that called me.

6    Q    And what did Susan say?

7    A    She would like for me to come to this meeting.

8    Q    Did she say why she wanted you to come to the

9  meeting?

10   A    Yes.

11   Q    What did she say?

12   A    She would like to -- for me to be involved and

13 take a look at what was going on.

14   Q    And what was going on?  Did she say what was

15 going on?

16   A    Yes.

17   Q    What did she say was going on?

18   A    The practices of both those schools.

19   Q    Before you discussed the practices of IBT and

20 Corinthian, had you ever thought about Corinthian

21 committing a fraud against the federal government?

22   A    I was aware of -- aware of how they treated their

23 students.

24   Q    But before you talked about IBT and Corinthian at

25 that dinner in 2006, had you ever thought about how

1    Corinthian was committing a fraud against the federal

2    government?

3         MR. LEVY:  Objection to form.

4         THE WITNESS:  I thought about how they were committing

5    a fraud against their students.

6    BY MR. PHADKE:

7         Q    And what was the fraud against their students

8    that you thought about?

9         A    Enrolling students and then not able to get them

10   jobs and charging 'em money.

11        Q    Okay.  So you thought that Corinthian was

12   committing a fraud by enrolling students who had no job

13   prospects after they completed their graduation?

14        A    That's correct, yeah.

15        Q    And you thought that was a fraud against the

16   Government?

17        A    If that's how they got their money, yes.

18        Q    And was that the -- was that the only fraud you

19   had thought about that Corinthian was committing against

20   the federal government?

21        A    As far as that they were committing against their

22   students?

23        Q    Yes.  The one you just described.

24        A    Yes.

25        Q    And you didn't think of any other sort of bad

1    actions being taken by Corinthian before that dinner?

2        A    Yeah, actions they took against me and other

3    people that worked there.

4        Q    What were those actions?

5        A    It's hard to describe how they -- in the normal

6    politics of a company, some people are favorites and

7    others aren't; and some people are treated differently

8    than others.  You know, that type of thing.

9        Q    So did you feel you were disfavored at

10   Corinthian?

11       A    If -- I had conflict with admissions rep because

12   of their practices.  I was in charge of what I was doing

13   and sometimes there was conflict with admission reps.

14       Q    But that didn't constitute a fraud against the

15   federal government; right?

16       MR. LEVY:  Objection.  Form.

17   BY MR. PHADKE:

18       Q    Did you think that constituted a fraud against

19   the federal government at the time?

20       MR. LEVY:  Objection.  Form.

21       THE WITNESS:  It was a fraud against the people

22   involved.

23   BY MR. PHADKE:

24       Q    So before that dinner, you thought that

25   Corinthian was committing a fraud against the federal

1    objection is appropriate for the communications you had

2    before --

3        MR. LEVY:  I absolutely -- I absolutely think it's

4    appropriate.  All communications with counsel,

5    anticipation of hiring counsel, are covered by the

6    privilege.

7            I instruct the witness not to answer.

8    BY MR. PHADKE:

9        Q    Were you looking for legal advice from Mr. Levy

10   when you came to that dinner?

11       A    Oh, I was just advised to come and see what was

12   going on.

13       Q    So you weren't looking for -- for legal advice

14   from Mr. Levy at the start of the dinner?

15       A    I didn't know what was going on at the start of

16   the dinner.

17       Q    Okay.  And were -- there were, at that dinner,

18   present, Mr. Chacon and Ms. Newman; correct?

19       A    Yes.

20       Q    And they were there for the whole dinner;

21   correct?

22       A    Yes.

23       Q    And they heard everything that was said at that

24   dinner; correct?

25       A    Yes, uh-huh.

1      Q     And are Mr. Chacon or Ms. Newman your co-relators

2    in this action?

3      A     Now?

4      Q     Yes.

5      A     No.

6      Q     Were they ever your co-relators in this action?

7      A     In the -- in the beginning.

8      Q     In the beginning?

9      A     Yes.

10     Q     Were they your co-relators -- how long were they

11   your co-relators in this action?

12     A     I don't remember the specific time.

13     Q     Were they your co-relators in this action when

14   you filed the Complaint in 2007?

15     A     I'm not sure.

16     Q     So you -- you just remember them being your

17   co- -- co-relators in this action at some point?

18     A     Yeah.

19     Q     And you don't know when that point was?

20     A     In the beginning.

21     Q     In the beginning of this case?

22     A     Yeah.

23     Q     But when you came to that dinner --

24     A     I think.

25     Q     -- you were not looking for legal advice?

1      A     No.

2      Q     What was said at the start of the dinner, if you

3   remember?

4      A     I don't remember.

5      Q     Do you remember who started talking?

6      A     No.

7      Q     Did you start talking?

8      A     I just welcome -- welcome -- we talked and, you

9   know, "How you doing," you know, general conversation, at

10   the start of the meeting, yeah.

11      Q     Did someone else bring up Corinthian?

12      A     Yes.

13      Q     Who brought up Corinthian?

14      A     I don't remember who exactly brought it up, what

15   individual brought it up.

16      Q     But it was --

17      A     It was Susan or --

18      Q     That's all right.

19      A     Yeah.

20      Q     You can finish.

21      A     It could have been Susan, more than -- more than

22   likely.

23      Q     It was more than likely Susan --

24      A     Yeah, uh-huh.

25      Q     -- who brought up Corinthian?

1         And what did Susan say about Corinthian, if you

2    remember?

3         A    It was about the practices and admissions.

4         Q    So did Susan bring up the practice of paying ad

5    reps incentive compensation?

6         A    Not that -- you know, I don't remember if there

7    was a -- one thing in particular that she said, you know.

8         Q    But she brought up the problems with -- with ad

9    reps?

10        A    Yeah.

11        Q    And do you remember the problems that she brought

12   up?

13        A    No.

14        Q    And did Mr. Levy or Labaton say anything about ad

15   reps?

16        A    I don't remember exactly what the conversation

17   was, but possibly.

18        Q    Okay.  Before you decided to retain counsel at

19   that dinner, did anybody bring up lawsuits that had been

20   brought against for-profit colleges about ad reps?

21        A    Not that I can remember.

22        Q    Was that discussed at that dinner?

23        A    Not that I can remember.

24        Q    Do you remember anything that was discussed at

25   that dinner?

1    A    No, it's been some time ago, I don't -- I can't

2  recall.

3    Q    So you can't remember anything then?

4    A    No.  Vaguely.

5    Q    What do you remember?

6  MR. LEVY:  Objection.  Asked and answered.

7  THE WITNESS:  I don't remember, you know -- you know,

8  my memory's vague on -- on all of that.

9  BY MR. PHADKE:

10    Q    Did Ms. Newman discuss lawsuits she was

11  bringing -- she was bringing as a relator against other

12  for-profit colleges?

13    A    No.

14    Q    But you said you learned about that later on?

15    A    Yes.

16    Q    And that -- and you learned about that before you

17  filed the Complaint in this case in March 2007?

18    A    Yes.

19    Q    And you don't remember anything about that dinner

20  besides what you've testified to at this point?

21    A    No.

22    Q    Did somebody suggest that you contact Ms. Lee?

23    A    No.

24    Q    Did you contact Ms. Lee after that dinner?

25    A    I suggested her.

1    Q    So you suggested --

2    A    Yes.

3    Q    -- that Ms. Lee --

4    A    Yes.

5    Q    -- be contacted in connection with this case?

6  Let me get the record clear.

7         You suggested at that dinner that Ms. Lee be

8  contacted?

9    A    Yes.

10   Q    Why did you suggest that?

11   A    Because she worked at the Corinthian Schools.

12   Q    And was it because she worked as an admissions

13  rep at Corinthian?

14   A    As well as admissions director.

15   Q    Was she working with Corinthian at the time?

16   A    I don't think she was.

17   Q    So this is after she had left Corinthian in --

18   A    I think so.

19   Q    -- May 2005?

20   A    Yes.

21   Q    And then did you then get in touch with Ms. Lee

22  after that dinner?

23   A    Yes.

24   Q    And what did you say to Ms. Lee?

25   A    I told her that she should come to the meeting.

1     Q   Had you and the other members of -- other people

2  who were at the dinner in San Jose discussed a follow-up

3  meeting?

4     A   I'm not sure.

5     Q   So when you called Ms. Lee and you said, "You

6  should come to the meeting," what meeting were you talking

7  about?

8     A   The one in San Mateo.

9     Q   So when --

10    A   The second meeting.

11    Q   How was the second meeting set up?

12    A   How?

13    Q   Who suggested the second meeting?

14    A   We all talked about it.

15    Q   Everybody at the dinner in San Jose --

16    A   Yes.

17    Q   -- talked about the second meeting?

18    A   Uh-huh.

19    Q   Let me just get the record clear.

20         Everybody at the dinner in San Jose talked about

21  a second meeting?

22    A   Yes.

23    Q   And you suggested bringing Ms. Lee to that second

24  meeting?

25    A   Yes.

1    Q    Because she was an ad rep at Corinthian?

2    A    Yes.

3    Q    And at that first meeting you had discussed the

4    possibility of suing Corinthian?

5    A    Yes.

6    Q    And that possibility was suggested by either

7    Ms. Newman or Mr. Levy or Mr. Labaton?

8    MR. LEVY:  Objection.  You're asking for

9    attorney-client communications.  You know that.

10          I instruct the witness not to answer.

11    THE WITNESS:  No, can't answer.

12    MR. LEVY:  Meaning you're not answering on the advice

13    of counsel; correct?

14    THE WITNESS:  In advice of counsel.

15    BY MR. PHADKE:

16    Q    So you said that during that first meeting in San

17    Jose, at some point during the meeting, you -- you made a

18    decision that you might retain counsel; correct?

19    A    I made a decision then?

20    Q    Did you?

21    A    I thought about it.  I mean I was thinking about

22    it.  I didn't make the decision.

23    Q    So you started thinking about whether you were

24    going to retain counsel at that first dinner in San -- in

25    San Jose?

1       A     Yes.

2       Q     And before you started thinking about that, if

3    you can remember, did somebody, either Ms. Newman or

4    Mr. Levy or Mr. Labaton, bring up the possibility of suing

5    Corinthian Colleges?

6       A     No.

7       Q     So you started thinking about retaining counsel

8    just -- just -- just because?

9       A     After that meeting.

10      Q     So you started thinking of retaining counsel

11   after the meeting?

12      A     If there was any way to do that, you know.  I --

13   I -- I wasn't sure if there was any way to do that or if

14   there was going to be a true follow-up, you know.  I was

15   just introduced to her.

16      Q     What -- what made you think about retaining

17   counsel?  What happened before you started thinking about

18   retaining counsel?

19      A     The meeting.

20      Q     So you didn't think about retaining counsel at

21   the meeting?

22      A     No.

23      Q     Did you say anything to Counsel about the

24   possibility of retaining counsel at that meeting?

25      A     No.

1    Q    So you didn't say anything to Mr. Levy

2  or Mister --

3    A    I was just as an observer.

4    Q    So you didn't say anything to Mr. Levy or

5  Mr. Labaton about the possibility of retaining counsel at

6  that first meeting --

7    A    No.

8    Q    -- in San Jose?

9         Let me just get the record clear.  You didn't say

10 anything to Mr. Levy or Mr. Labaton about the possibility

11 of retaining counsel at that first meeting?

12    A    No.

13    Q    And you started thinking about retaining counsel

14 after the -- after that first meeting?

15    A    Yeah, after listening to the input of everybody

16 involved.

17    Q    And when did you first discuss the possibility of

18 retaining counsel?

19    A    I think maybe after the second meeting.

20    Q    After the second meeting --

21    A    Yes.

22    Q    -- you first discussed the possibility of

23 retaining counsel with Mr. Levy and Mr. Labaton?

24    A    Yes.

25    MR. PHADKE:  Counsel, I don't see any basis for the

1    privilege.

2        MR. LEVY:  Yeah, I think all communications in

3    anticipation of litigation are clearly covered by the

4    privilege.  We've given you a lot of latitude on this.

5            It -- it's privileged and I'm instructing him not

6    to answer.

7        MR. PHADKE:  Counsel, there's case law that says the

8    initial attorney-initiated contact before there's a --

9    before there's an intent to --

10       MR. LEVY:  And --

11       MR. PHADKE:  -- initiate attorney-client relationship

12   is not privileged.

13       MR. LEVY:  And he didn't say this is

14   attorney-initiated contact.  You're saying that.

15       MR. PHADKE:  Well, it was initiated by a third party

16   named Susan Newman.

17       MR. LEVY:  Is she an attorney?

18       MR. PHADKE:  Well, she was a relator in two cases that

19   you brought against other for-profit colleges.

20       MR. LEVY:  And -- and she's not an attorney, and there

21   is no -- he's not testified about attorney-initiated

22   contact.

23       MR. PHADKE:  No, but he has testified that he didn't

24   think about retaining counsel until after the second --

25       MR. LEVY:  The objection stands.

1    MR. PHADKE:  And there were third parties present at

2  the meeting.

3    MR. LEVY:  And --

4    MR. PHADKE:  I don't see how that's a confidential

5  communication.

6    MR. LEVY:  -- and -- and -- and they were co-relators.

7  The objection stands.

8  BY MR. PHADKE:

9    Q   At that meeting, did you think that Ms. Newman or

10 Mr. Chacon were your -- were going to be in a lawsuit with

11 you?

12    A   Did I think at --

13    Q   At --

14    A   -- after the first meeting?

15    Q   -- at -- at that meeting -- at that first one.

16    A   Which one?

17    Q   At that first one.

18    A   No.

19    Q   You didn't?

20    A   Huh-uh.

21    Q   At that first -- at that -- at the second dinner,

22 did you think that Ms. Newman or Mr. Chacon were going to

23 be in a lawsuit with you?

24    A   No, I thought maybe there might be something, a

25 possibility or whatever, no, I don't ....

1      Q     Had you agreed to getting into a law -- to

2   bringing a lawsuit with Ms. Newman or Mr. Chacon at the

3   first dinner?

4      A     No.

5      Q     Did you agree at the second dinner?

6      A     No.

7      Q     Were there -- those discussions happened after

8   the second dinner; right?

9      A     Yes.

10   MR. CALHOUN:  I'll get copies for you.

11   MR. LEVY:  Thank you.

12   BY MR. PHADKE:

13     Q     Now, you said you contacted Ms. -- Ms. Lee after

14   the first dinner in San Jose?

15     A     Yes.

16     Q     What did you -- what did you tell Ms. Lee?

17     A     I thought that she should be involved in this

18   meeting.

19     Q     In the second meeting in --

20     A     Yes.

21     Q     -- San Mateo?

22     A     Uh-huh.

23     Q     Why did you think that?

24     A     Because she worked at Bry- -- or for Corinthian.

25     Q     And what was the amount of time that took place

1    between the first meeting in San Jose and the second

2    meeting in San Mateo?

3        A    I'm not sure.  I think it was a few days.

4        Q    And did you ask anyone else to come to the second

5    meeting besides Ms. Lee?

6        A    No.

7        Q    Did any --

8        A    Excuse me.  No.

9        Q    Did anyone else come?

10       A    No.

11       Q    So at that second meeting, who was present?

12       A    Mr. Levy, Mr. Labaton, John Chacon, Susan Newman

13   and Nyoka Lee and myself.

14       Q    And at that second meeting you still hadn't

15   made -- thought about a second -- strike that.

16            At that second meeting, you still thought -- you

17   still had not thought about obtaining counsel to bring a

18   suit against Corinthian; right?

19       A    I hadn't finalized any thoughts about that, no.

20       Q    Had you discussed it with anybody?

21       A    Yeah, we talked about it.

22       Q    At the second meeting, you talked about?

23       A    Yes.

24       Q    But you had not talked about it at the first

25   meeting; correct?

1     A    We talked about it at the first meeting too, but

2  we didn't finalize it.

3     Q    So you hadn't finalized anything at the second

4  meeting?

5     A    No, it was in formulation.

6     Q    Okay.  And you formu- -- you formulated the

7  retainer agreement after the second meeting; correct?

8     A    Yes.  I didn't formulate it, no.

9     Q    Who formulated it?

10    A    The attorneys did.

11    Q    So Mr. Levy and Mr. Labaton formulated the

12 retainer agreement?

13    A    Yes.

14    Q    And before that first dinner, you hadn't -- you

15 hadn't thought about the possibility of suing Corinthian;

16 correct?

17    A    No.

18    Q    And you only made your decision about suing -- to

19 sue Corinthian after the second dinner; correct?

20    A    Yeah.

21    Q    And did you have any other communications besides

22 these two dinners with Mr. Levy, Mr. Labaton, Susan Newman

23 and John Chacon, where you talked about suing Corinthian?

24    A    After that?

25    Q    No --

1  whatever.

2      Q   In the second meeting, did you eat dinner there?

3      A   Yes.

4      Q   And was that a nice place?

5      A   Yes, a very nice place.

6      Q   The place in San Mateo?

7      A   Yeah.

8      Q   Do you remember what place it was?

9      A   I think in hearing discussion about that -- I

10  think it was called "Van."

11      Q   Could you spell that?

12      A   V-A-N.  I'm not even sure --

13      Q   Okay.

14      A   -- if that's correct, so ....

15      Q   So you remember it being called "Van," in San

16  Mateo?

17      A   After hearing it discussed yesterday.  I don't

18  remember the name of the restaurant.

19      Q   And --

20      A   It was the first time I'd ever been to it.

21      Q   And did you pay -- pay for that dinner?

22      A   Did I pay for it?

23      Q   Yes.

24      A   No.

25      Q   Did one of the attorneys pay for it?

1    A    I think we pitched in.  I'm not sure.  I don't

2  know exactly -- know what went down.

3    Q    But you didn't pay for it?

4    A    No.

5    Q    Did people drink wine at that dinner?  If you

6  remember.

7    A    I don't remember.

8    Q    Just asking.

9         Do you eat dinners with lawyers a lot?

10   A    No.

11   Q    So that was a pretty unique experience, that

12  dinner?

13   A    I mean, I've dealt with attorneys before, but I

14  haven't been out to dinner with them.

15   Q    And you haven't been out to dinner where you

16  talked about a potential lawsuit?

17   A    No.

18   Q    Was that first dinner in the -- the one in San

19  Jose -- was that the first time you've ever met or

20  communicated with Mr. Levy or Mr. Labaton?

21   A    Yes.

22   Q    And at that dinner, Ms. Newman didn't tell you

23  that she had been a client of Mr. Levy in

24  another for-profit -- in another suit against a for-profit

25  college?

1    A    No.

2    Q    And you were still working at Corinthian at the

3  time; correct?

4    A    I think I was working at IBT.

5    Q    Okay.  You were working at IBT?

6    A    Yeah.

7    MR. LEVY:  We'd like to take a break.

8    MR. PHADKE:  Okay.  Let me just finish up a couple

9  questions and then we can.

10    Q    And before that dinner with Mr. Levy and

11  Mr. Labaton, did you have any idea that Corinthian was

12  violating the ban on incentive compensation?

13    A    I'm not sure if I was aware or not.  I'm not

14  sure.

15    Q    You're not sure?

16    A    No.

17    Q    You have no recollection?

18    A    No.

19    Q    And how long after the second dinner did you

20  retain Mr. Levy and Mr. Labaton as counsel?

21    A    I don't know.  I have -- I have to check the

22  documents and the dates to give you that answer.

23    Q    Do you have an estimate?

24    A    No.

25    Q    But it was after the second dinner?

1    Mr. Chicone's potential involvement in this case?

2        A    Yes, at that dinner.

3        Q    The first dinner in San Jose?

4        A    Yes.

5        Q    Do you know what a Program Participation

6    Agreement is?

7        A    No.  Could you explain that to me?

8        Q    Do you know what a PPA is?

9        A    No.

10       Q    So sitting here right now, without explanation

11   from somebody else, you don't have any understanding of

12   what a PPA is?

13       A    I'm not familiar with that type of document,

14   haven't had any need -- need to.

15       Q    So you've never had to prepare a PPA for anybody

16   before?

17       A    As far as I know, no.

18       Q    You've never reviewed a Program Participation

19   Agreement, or PPA, at any point?

20       A    Program Participation Agreement?  No.

21       Q    And you've never submitted a Program

22   Participation Agreement to anybody?

23       A    No.

24       Q    Because you have no idea what it is?

25       A    Until you mentioned it.

1     Q    So you've heard me mention Program Participation

2     Agreement?

3     A    Just now.

4     Q    And that's the first time you've --

5     A    Yes.

6     Q    -- ever heard of it?

7     A    Uh-huh.

8     Q    So the first time you -- just to get the record

9     clear, the first time you've ever heard of a Program

10    Participation Agreement was today when I asked you about

11    it?

12    A    That's correct.

13    Q    Are you aware of any legal or regulatory

14    requirements relating to recruiting or compensating

15    recruiters?

16    A    Aware of what?

17    Q    Are you aware of any legal or regulatory

18    requirements relating to the compensation of recruiters?

19    A    No.

20    Q    So you're not aware of any legal or regulatory

21    requirements relating to the compensation of recruiters

22    for for-profit schools?

23    A    Legal or regulatory compensation, is that what --

24    Q    No.

25    A    -- you said?

1   Q    No.

2   MR. LEVY:  Objection to form.

3   BY MR. PHADKE:

4   Q    Are you aware of any legal requirements that

5   govern the compensation of recruiters at for-profit

6   schools?

7   A    I'm not sure.  You know, I may be aware of it,

8   but not the way you're presenting it.

9   Q    Okay.  Are you aware of any restrictions that

10  limit how a for-profit school can pay its ad reps or

11  recruiters?

12  A    Vaguely.

13  Q    You're vaguely familiar?

14  A    Yeah.

15  Q    But you have -- you don't have any clear

16  understanding of legal restrictions that govern how a

17  for-profit school can pay its ad reps or recruiters?

18  MR. LEVY:  Objection to form.

19  MR. PHADKE:  Can you repeat the question?

20  (Record read as follows:

21        "Q   But you don't have any clear

22  understanding of any legal restrictions that govern of how

23  a for-profit school can pay its ad reps or

24  recruiters?")

25  THE WITNESS:  Vaguely.

1  BY MR. PHADKE:

2      Q    What are those restrictions?

3      A    I don't know.  I can't name 'em off to you.

4      Q    Can you generally describe what they do?

5      A    Who?

6      Q    What the restrictions restrict?  Can you

7  generally describe what those restrictions do?

8      A    No.

9      Q    So do you have any specific understanding of any

10  legal requirements or restrictions on how for-profit

11  schools can pay their ad reps or recruiting staff?

12      A    Legal restrictions on how they pay 'em?

13      Q    Yeah.

14      A    Not to my knowledge.

15      Q    Do you know what Title IV of the Higher Education

16  Act is?

17      A    Vaguely.

18      Q    What is it?

19      A    Title IV of the education program, I guess it has

20  something legally to do with how they operate.

21      Q    Do you have anything more specific to say about

22  Title IV besides that?

23      A    No.  I would have to look at it again.  I've

24  looked at it before, but I don't remember what exactly it

25  said.

1    Q    When did you look at it?

2    A    I don't remember.

3    Q    Did you look at it after filing this lawsuit?

4    A    I may have saw a copy of it before, because I've

5    been involved in education for a number of years, so I --

6    I can't exactly say when or -- it does kind of ring a

7    bell.

8    Q    Are you aware of any requirements under Title IV

9    that pertain to this case?

10   A    Yes, somewhat.

11   Q    Which requirements are those?

12   A    I can't name 'em.

13   Q    So you're aware of requirements under Title IV

14   that pertain to this case --

15   A    Yes.

16   Q    -- but you can't name any of them?

17   A    No.

18   Q    And when did you become aware of requirements

19   under Title IV that pertain to this case?

20   A    I don't know exactly when.

21   Q    Did you -- were you aware of the requirements

22   that pertain to Title IV that pertain to this case, before

23   that dinner in San Jose in 2006?

24   A    No.

25   Q    So it's only after the dinner in San Jose in 2006

1    that you became aware of any requirements under Title IV

2    that pertain to this case?

3        A    Like I mentioned before, I -- I was maybe aware

4    of Title IV, but not in any real essence of all the parts

5    about it.

6        Q    So none of this was provisions that could apply

7    to this case -- you became -- you weren't aware of any of

8    those before that dinner?

9        A    I was aware of Title IV, but not in any real

10   detail.

11       Q    Okay.  And not -- and you weren't aware of any of

12   the specific provisions that apply to this case prior to

13   that dinner?

14       A    Could have, yeah.

15       Q    But you don't know?

16       A    I don't know.

17       MR. LEVY:  Objection.  Argument.

18   BY MR. PHADKE:

19       Q    And you don't recall any requirements that apply

20   to this case?

21       MR. LEVY:  Objection.  Argument.

22   BY MR. PHADKE:

23       Q    You can answer.

24       A    I'm aware of any -- can you --

25       Q    And you're not aware of any legal requirements

1  Title IV that govern this case?

2      MR. LEVY:  Objection to form.

3      THE WITNESS:  Am I -- no.  Not -- you know, not that I

4  can ....

5  BY MR. PHADKE:

6      Q    And you've never communicated with the federal

7  government on behalf of Corinthian; correct?

8      A    Yes.

9      Q    When did you communicate with the federal

10  government on behalf of Corinthian?

11      A    Oh, on behalf of Corinthian?

12      Q    Yes.

13      A    No.

14      Q    So you've never communicated on behalf of

15  Corinthian with the federal government?

16      A    No.

17      Q    And have you ever seen or heard any

18  communications between somebody who represents Corinthian

19  and the federal government?

20      A    Say that again.

21      Q    Have you ever seen anybody who's representing

22  Corinthian communicate with the federal government or have

23  you ever observed such communications?

24      A    In what -- in what capacity would they

25  communicate with the federal government?

```
 1      Q    You have to answer the question.
 2      MR. LEVY:  Can you repeat the question, please?
 3      (Record read as follows:
 4           "Q    Have you ever seen anybody who's
 5       representing Corinthian communicate with the federal
 6       government or have you ever observed such
 7       communications?")
 8      MR. LEVY:  I mean, that's confusing.  Object.
 9      MR. PHADKE:  All right.  I'll -- I'll restate.
10      Q    Did you ever see or hear any communications
11   between anyone representing Corinthian and someone at the
12   federal government?
13      A    At what capacity at the federal government?  I --
14   you know, it's not very clear, the question you're asking
15   me.  At the federal government?  What do you mean?
16      Q    It could be anybody at the federal government.
17   So let me rephrase, get the full question out.
18           Did you ever see or hear any communications
19   between anyone representing Corinthian and anybody at the
20   federal government?
21      A    Federal government is a -- one big entity, you
22   know.
23      Q    Do you need the question repeated?
24      A    Yeah.
25      MR. LEVY:  I thought he gave an answer.  Go ahead.
```

```
 1      (Record read as follows:

 2           "Q   It could be anybody at the federal

 3      government.  So let me rephrase, get the full

 4      question out.

 5           "Did you ever see or hear any communications

 6      between anyone representing Corinthian and anybody at

 7      the federal government?")

 8      MR. LEVY:  And his response.

 9      (Record read as follows:

10           "A   Federal government is one big

11      entity, you know.")

12      MR. PHADKE:  Strike his response as nonresponsive.

13      MR. LEVY:  I mean, I object to the argument with him.

14 I think he's telling you the question is overbroad.  Ask

15 him another way.

16      MR. PHADKE:  The question is perfectly clear.

17      THE WITNESS:  At the federal government, that's too

18 vague of a question for me to answer.  Pinpoint it.  What

19 department in the federal government?

20 BY MR. PHADKE:

21      Q   Have you ever seen any communications at all

22 between anybody at Corinthian and anybody in any

23 department of the federal government?

24      A   Have I seen them do it, talk to somebody?

25      Q   In any department of the federal government.
```

1      A     Possibly.  I'm not sure.

2      Q     So you have no recollection of any

3   communications --

4      MR. LEVY:  Objection.  He just said he's not sure; he

5   didn't say he had no recollection.

6      THE WITNESS:  I'm not sure.

7   BY MR. PHADKE:

8      Q     And have you ever submitted any claim for payment

9   to the federal government on behalf of Corinthian?

10     A     Have I submitted any payment of -- or claim?

11  What -- what was that?

12     MR. PHADKE:  Could you repeat the question?

13          (Record read as follows:

14          "Q    And have you ever submitted any claim for

15           payment to the federal government on behalf of

16           Corinthian?")

17     THE WITNESS:  Your questions are, you know, kind of

18  far-reached.  I don't -- you know, I can't answer that.

19  BY MR. PHADKE:

20     Q     Do you know that Corinthian makes claims for

21  payment to the federal government?

22     A     In their daily operations?  I'm quite sure they

23  must.

24     Q     Have you ever submitted any claims --

25     A     No, I haven't.

1    Q    -- to Corinthian on behalf --

2    A    I haven't.

3    Q    -- to the federal government on behalf of

4  Corinthian?

5    A    No.

6    Q    And you've never seen any claims to the federal

7  government that were made on behalf of Corinthian; right?

8  Have you ever seen any of those claims --

9    A    No.

10   Q    -- at Corinthian, made to the federal government

11  for payment?

12   A    No.

13   THE VIDEOGRAPHER:  Two minutes left.

14  BY MR. PHADKE:

15   Q    And you've never communicated to any state

16  governments on behalf of Corinthian either; correct?

17   A    No.

18   Q    And have you ever seen any communications between

19  anyone at Corinthian and anybody working for a state

20  government?

21   A    Have I seen them talk to someone?  No, not as far

22  as I can recall.

23   Q    And you've never submitted any claims on behalf

24  of Corinthian for payment by a state government?

25   A    Me?  No.

1    Q    And you've never seen any claims for payment made

2    by Corinthian to a state government?

3    A    No.

4    Q    And in your time working for Corinthian as an

5    independent contractor, did you ever participate in any

6    meetings involving school executives?

7    A    Yes.

8    Q    What meetings were those?

9    A    With the president -- presidents of each one of

10   those colleges I worked for.

11   Q    Did you participate in any meetings with anybody,

12   any executives from corporate?

13   A    No.

14   Q    So no Corinthian management, then?

15   A    Some people from corporate may have spoke to me

16   or said, "Hi, you're doing a good job" or that kind of

17   thing.

18   Q    But other than those kinds of incidental

19   communications --

20   A    No.

21   Q    -- you never communicated with anybody from

22   corporate?

23   A    No.

24   Q    And did you ever personally observe any

25   communications or meetings with anybody from corporate?

1      A    With anybody meeting with someone from corporate?

2  Did I observe that?  Yes, in passing.

3      Q    What did you observe?

4      A    That -- that they were meeting.

5      Q    Did you actually sit in on the conversation?

6      A    No.

7      Q    Did you -- did you -- do you know what happened

8  at those meetings?

9      A    No.

10     THE VIDEOGRAPHER:  Is this a good time for me to

11  switch tapes over?

12     MR. PHADKE:  Yes.

13     THE VIDEOGRAPHER:  The video deposition is now going

14  off record at 12:34 p.m.  This will also conclude Video

15  No. 2 in today's deposition.

16          (Interruption in proceedings.)

17     THE VIDEOGRAPHER:  The videotape deposition of Talala

18  Mshuja, Volume No. 1, is returning to record at 12:36 p.m.

19  This will also begin Video No. 3 in today's deposition.

20  Location is still 6 Hutton Centre Drive, 2nd Floor, in

21  Santa Ana, California.  The date is Tuesday,

22  December 18th, 2012.  And my name is Ali Saheb with Dean

23  Jones Attorney Video Services of Los Angeles and Santa

24  Ana, California.

25  ///

```
 1   BY MR. PHADKE:
 2       Q    Do you know who David Moore is?
 3       A    No.
 4       Q    David Moore is one of the defendants in this
 5   action.  Have you ever met him in person?
 6       A    No.
 7       Q    So you've never talked to him?
 8       A    No.
 9       Q    Have you ever received any communications from
10   him?
11       A    I'm not sure.
12       Q    Have you ever heard of David Moore?
13       A    Kind of vaguely remember, I've heard of him.
14       Q    What do you remember about him?
15       A    I don't know.
16       Q    So the name's not --
17       A    I mean, I've heard it mentioned in these
18   depositions.
19       Q    So other -- other than the -- what you've heard
20   in yesterday's deposition of Ms. Lee and today's
21   deposition, you haven't heard of David Moore?
22       A    No.
23       Q    And the name does not sound familiar?
24       A    No.
25       Q    So that would mean you never participated in any
```

1   communications or meetings with Mr. Moore?

2       A    No.

3       Q    And you've never observed any communications or

4   meetings with Mr. Moore?

5       A    No.

6       Q    And you've never seen any documents that

7   Mr. Moore authored or signed?

8       A    Not that I can remember.

9       Q    Do you know Jack Massimino?

10      A    Do I know him personally?  No.

11      Q    So you've never met him in person or talked to

12  him?

13      A    No.

14      Q    Have you ever received any communications from

15  Mr. Massimino?

16      A    I don't think so.

17      Q    And you've never participated in any meetings

18  with Mr. Massimino?

19      A    No.

20      Q    Have you ever seen any documents that

21  Mr. Massimino signed?

22      A    I don't remember.

23      Q    Any -- any documents that Mr. Massimino authored?

24      A    I don't remember.

25      Q    But the name doesn't sound familiar in the least?

1    MR. LEVY:  Objection.  Form.

2    THE WITNESS:  Vaguely.  I just heard it --

3  BY MR. PHADKE:

4    Q    How does it sound familiar?

5    A    I just heard it mentioned.

6    Q    So the only time you've heard of Jack Massimino

7  is at today's deposition and at yesterday's deposition --

8    A    Yeah.

9    Q    -- of Ms. Lee?

10    A    That's true.

11    Q    Now, before filing the first Complaint in this

12  action in March of 2007, did you ever express to anyone at

13  Corinthian, who was still working at Corinthian, a concern

14  about how ad reps were compensated?

15    A    Did I ever talk to anyone about it?

16    Q    Did you ever complain about it, to anyone?

17    A    Did I complain about it to anyone?  No.

18    Q    So you never raised any sort of issue or

19  complaint about the way ad reps were compensated at

20  Corinthian?

21    A    No.

22    MR. LEVY:  Other than the lawsuit?

23  BY MR. PHADKE:

24    Q    Prior to this lawsuit, you never raised any

25  complaint about how ad reps were compensated at

1   question.

2       MR. PHADKE:  It's fine.  I'll -- I'll rephrase.

3       Q    When did it first cross your mind that Corinthian

4   was committing a -- committing the fraud described in this

5   Complaint?

6       A    When I started working at the school and got

7   immersed in through the operations of the school.

8       Q    But previously you said that you hadn't -- you --

9   you hadn't thought of Corinthian -- you hadn't thought of

10  Corinthian defrauding the Government except for its -- the

11  way it treated its students, prior to meeting Mr. Levy.

12      MR. LEVY:  Objection to form.

13      THE WITNESS:  I hadn't thought of it?  Yes, I did

14  think of it.

15  BY MR. PHADKE:

16      Q    Has it ever crossed your mind that Corinthian

17  wasn't following its own compensation policies?

18      A    Compensation to?

19      MR. PHADKE:  You can repeat the question.

20      (Record read as follows:

21           "Q    Has it ever crossed your mind that

22       Corinthian wasn't following its own compensation

23       policies?")

24      THE WITNESS:  It's too vague for me to answer.

25      MR. LEVY:  I want a two-minute break, that's it.  Two

1  minutes off the record.

2     MR. PHADKE:  Counsel, I just want to get an answer to

3  this question.

4     Q    Has it ever crossed your mind that Corinthian

5  wasn't following its compensation policies for ad reps or

6  DOAs?

7     A    No.

8     Q    Thank you.

9     THE VIDEOGRAPHER:  The video deposition is now going

10  off record at 12:47 p.m.

11         (Recess taken.)

12     THE VIDEOGRAPHER:  The video deposition is now

13  returning to record at 2:21 p.m.

14  BY MR. PHADKE:

15     Q    Mr. Mshuja?

16     A    Yes.

17     Q    Do you recall that you're under oath?

18     A    Yes.

19     Q    And that everything you testify will be truthful?

20     A    Uh-huh.

21     Q    Okay.  Just one question about what we talked

22  about earlier today.  Is IBT a Corinthian College school?

23     A    No.

24     Q    So IBT is not part of Corinthian?

25     A    No.

1    Q    And the printed research that you said you had

2    looked at in preparation for this deposition, do you still

3    have -- have copies of that printed research?

4        MR. LEVY:  Objection.  Form.

5        THE WITNESS:  No.

6    BY MR. PHADKE:

7        Q    You -- you threw away the printed copies?

8        A    Yeah, probably threw it in the fireplace, get my

9    fire going.

10       Q    Is that what you do with -- is that what -- what

11   you did with all the documents that you reviewed --

12       A    No.

13       Q    -- before you prepared for this deposition?

14       A    No.

15       Q    What did you do with the remainder of the

16   documents?

17       A    They're at home.

18       Q    Why did you throw those documents away into the

19   fireplace?

20       A    Because I feel that I didn't need 'em.

21       Q    Had you been told by your attorney to preserve

22   any documents that you use to refresh your recollection

23   for this deposition?

24       A    No.  Normally I do keep the documents.

25       Q    But in this case you did not?

1       A       The ones that I mentioned that I threw away, no.

2       Q       Also, earlier today we discussed two meetings

3   that you had, one at the house of Susan Newman and the

4   other at the house of John Chacon.

5               Do you recall that?

6       A       I never met at John's place.

7       Q       So you only met at Susan's house?

8       A       Yes.

9       Q       So was there only one meeting then at Susan's

10  house?

11      A       I just happened to stop by there.

12      MS. YOUNG:  I'm sorry, I didn't hear that answer.

13      (Record read as follows:

14              "Q    I just happened to stop by there.")

15      MS. YOUNG:  Okay.  Thank you.

16  BY MR. PHADKE:

17      Q       When did you stop by Ms. Newman's house?

18      A       A few years ago.

19      Q       Do you recall if it was before or after the

20  dinner that we've discussed in --

21      A       It was after the dinner.

22      Q       -- San Jose?  It was after the dinner in San

23  Jose?

24      A       Yes.

25      Q       Was it after the dinner we've discussed in San

1    discovery requests that defendants provided the relators

2    in this case, seeking all documents that are relevant to

3    your claims or defenses?

4         A    Could you repeat that?

5         MR. PHADKE:  Strike that.

6              I'd like to introduce an exhibit.  I'd like to

7    mark this as Exhibit 40.

8              (Exhibit 40 was marked for identification and

9    is attached hereto.)

10   BY MR. PHADKE:

11        Q    These are documents Bates-stamped R-1 to

12   R-4- -- these are documents Bates-stamped R-0001 to

13   R-00402; and R-00408 to R-00789, that were produced by

14   your counsel to us in this action.

15             Have -- have you ever seen these documents

16   before?

17        A    All of them?

18        Q    Yes.  Answer if you can.

19        A    I don't recall if I've seen 'em all.  I've seen

20   some of 'em.  I guess I've seen some of 'em.  I don't know

21   what I've got here.

22        Q    Yesterday you attended the deposition of your

23   co-relator, Ms. Lee; correct?

24        A    Yes.

25        Q    And do you recall during that deposition your