1    SCOTT D. LEVY
2    Scott D. Levy & Associates PC
3    Tex. Bar No. 24000598
4    1844 Wheeler Street
5    Houston, Texas  77004
6    (713) 528-5409 Tel.
7    (713) 528-0117 Fax
8    levy.scott@mac.com
9
10    THOMAS D MAURIELLO
11    Mauriello Law Firm APC
12    1181 Puerta Del Sol Suite 120
13    San Clemente, CA 92673
14    949-542-3555
15    Fax: 949-606-9690
16    Email: tomm@maurlaw.com
17
18    Attorneys for Relators
19    NYOKA JUNE LEE AND TALALA MSHUJA
20
21                    U.S. DISTRICT COURT
22
23       CENTRAL DISTRICT OF CALIFORNIA — WESTERN DIVISION
24
25
26    UNITED STATES OF AMERICA,    CASE NO. CV 07-01984 PSG (MANx)
27    EX REL. NYOKA LEE and
28    TALALA MSHUJA,
29                           **RELATORS' OPPOSITION TO**
30            Plaintiff,          **DEFENDANTS' CORINTHIAN**
31                           **COLLEGES, INC.'S ET AL, AND**
32           v.                 **ERNST & YOUNG LLP'S MOTIONS**
33                           **TO DISMISS (DKT NOS. 150 and 154)**
34    CORINTHIAN COLLEGES INC.,
35    et al.,
36           Defendants.
37                           Place:  Courtroom 880
38                           Judge: Hon. Philip S. Gutierrez
39                           Date:  March 11, 2013
40                           Time:  1:30 p.m.

1

## **TABLE OF CONTENTS**

2                                                                                                 **Page**

3    Background .................................................................................4

4    Congresswoman Waters' Testimony ...............................................6

5    Public Knowledge That Fraud Was "Endemic" In For-Profit Education .......7

6    Generic Recruiter Compensation Allegations..................................12

7    Ad Rep Performance Flash Weekly Reports...................................13

8    Procedural Sequence For A "Public Disclosure" Analysis...........................14

9    Enrollment Quotas.......................................................................17

10       1.  *Termination based on recruitment numbers*. .....................................17

11   The Incentive Compensation Prohibition Is A "Legislative Fact"................19

12   Defendants' Judicial Admissions Contradict Any Public Disclosure...........22

13   EY's Obligation To Disclose Liability...........................................26

14   *Education Management* Ruling
15       On HEA Recruiter Compensation Violation............................................30

16

1
2

**TABLE OF CONTENTS**
**(Continued)**

3

**Page**

4   Securities Class Action Complaint Is Based On Enrollment Quotas............32

5   Other "Red Herring" And "Diversionary" Arguments ................................38

6   Affidavit Of Relator Nyoka June ....................................................39

7   Motion For Continuance Under Rule 56(D) .................................................40

1
2

# TABLE OF AUTHORITIES

**CASES**                                                                                           **PAGE**

*Cooper v. Blue Cross & Blue Shield of Florida, Inc.,*
    19 F.3d 562, 566 (11th Cir. 1994).....................................................   8

*Corinthian Colleges, Inc. v. Illinois Attorney General Lisa Madigan* ..................   21

*Devlin v. California,*
    84 F.3d 358 (9th Cir. 1996).............................................................   36

*Employers Teamsters Local Nos. 175 & 505 Pension Trust Fund v.* ...................   42

*Harrison v. Westinghouse Savannah River Co.,*
    176 F.3d 776, 784 (4th Cir. 1999) ...................................................   16, 18,19

*In re Corinthian Colls. Inc. Shareholder Litig.,*
    No. 04-cv-5025 (C.D. Cal.), *appealed sub nom. Metzler Inv.*
    *GMbh v. Corinthian Colls., Inc.*, No. 06-55826 (9th Cir)............................   30

*In re Natural Gas Royalties,*
    562 F.3d 1032 (10th Cir. 2009).......................................................   7,27

*Stinson, Lyons, Gerlin & Bustamente, P.A. v. Prudential Ins. Co.,*
    944 F.2d 1149, 1160 (3d Cir. 1991)                                                      10

*United States v. Corinthian Colleges,*
    655 F.3d 984, 992 (9th Cir. 2011)....................................................   *passim*

*United States v. Education Management Corporation,*
    2012 U.S. Dist. LEXIS 67103 *13-14
    (W.D. Penn. May 11, 2012) ...........................................................   *passim*

*United States ex rel. Main v. Oakland City Univ.,*
    426 F.3d 914 (7th Cir. 2005) ..........................................................   6,16,20

*United States ex rel. Wilkins v. United Health Group,*
    659 F.3d 295 (3d Cir. 2011)............................................................   20

*United States ex rel. Baltazar v. Advanced Healthcare,*
    635 F.3d 866 (7th Cir. 2011) ..........................................................   9

*U.S. ex rel. Springfield Terminal Railway v. Quinn,*
    14 F.3d 645 (D.C. Cir. 1994) ..........................................................   9

*U.S. ex rel. Bott v. Silicon Valley Colleges,*
    262 F. App'x 810, 812 (9th Cir. 2008) ..............................................   15

1
2
3
4

**TABLE OF AUTHORITIES**
(Continued)

**CASES**                                                                                                    **PAGE**

*U.S. ex rel. Hendow v. University of Phoenix,*
    461 F.3d 1166 (9th Cir. 2006), *cert. den.*, 127 S.Ct. 2099,
    167 L. Ed. 2d 813 (2007)...........................................................................11,20

*United States ex rel. Hagood v. Sonoma County Water Agency,*
    929 F.2d 1416, 1419-1420 (9th Cir. 1991) ....................................12

*United States ex rel. Williams v. NEC Corp.,*
931 F.2d 1493, 1500 (11th Cir. 1991)..............................................12

*United States ex rel. Biddle v. Board of Trustees of the Leland*
    *Stanford, Jr. University,*
    161 F.3d 533, 537 (9th Cir. 1998)..................................................13

*United States ex rel. Aflatooni v. Kitsap Physicians Services,*
163 F.3d 516, 524 (9th Cir. 1998)....................................................13,28

*United Steelworkers of America v. Retirement Income Plan for*
    *Hourly-Rated Employees of, ASARCO,*
    512 F.3d 555 (9th Cir. 2008) ........................................................24

*United States ex rel. Graves v. ITT Educational Services, Inc.,*
    284 F. Supp. 2d 487 (S.D. Tex. 2003), *aff'd*, 111 F. App'x 296
    (5th Cir. 2004).....................................................................................26

*University of Phoenix, Petitioner, v. United States ex rel. Mary*
    *Hendow and Julie Albertson, Respondents,*
    Pet. For Writ of Cert., 2006 U.S. Briefs 248760; 2007 U.S. S.
    Ct. Briefs LEXIS 972. .....................................................................27

*United States v. Science Applications Intl. Corp.,*
    626 F.3d 1257, 1275 (D.C. Cir. 2010)..........................................30

*U.S. ex rel. Leveski v. ITT Educ. Servs. Inc.,*
    No. 12-1369........................................................................................37

*United States ex rel. Smith v. Yale Univ.,*
415 F. Supp. 2d 58, 74 (D. Conn. 2006) ..........................................40

*Von Saher v. Norton Simon Museum of Art,*
592 F.3d 954, 960 (9th Cir. 2010)....................................................24

*Wang v. FMC Corp.,*
975 F.2d 1412, 1416 (9th Cir. 1992) .................................................*passim*

5

1
2
3

**TABLE OF AUTHORITIES**
**(Continued)**

**STATUTES AND RULES**                                                         **PAGE**

31 U.S.C. § 3730(e)(4) ....................................................................................... 4,15

20 U.S.C. 1094(a)(emphasis and brackets in original) ................................. 18

34 C.F.R. 668.14(a)(1) (emphasis and brackets in original) ......................... 18

31 U.S.C. 3729(a)(1) ......................................................................................... 19

31 U.S.C. 3729(a)(2) ......................................................................................... 19

Fed. R. Civ. P. 56(d) .................................................................................. 38,40,41

4

1   Pursuant to the Federal Rules of Civil Procedure, Relators Nyoka Lee

2   and Talala Mshuja submit this Relators' Opposition to Defendants'

3   Corinthian Colleges, Inc., David Moore and Jack Massimino's Motion to

4   Dismiss (together "COCO") (Doc. 150), and to Defendant Ernst & Young

5   LLP's Motion to Dismiss ("EY"), set forth below.

6   **BACKGROUND**

7   The issue before the Court is whether COCO's recruiter compensation

8   practices, *as implemented*, were publically disclosed.   The operation of

9   COCO's recruiter compensation program, *in practice*, is the critical issue.

10   In short, on three recent occasions the Courts of Appeals have
11   reversed the granting of motions to dismiss and have
12   recognized False Claims Act claims for very similar alleged
13   violations of the Incentive Compensation Ban 'as
14   implemented.'

15   *United States ex rel. Washington v. Education Management*, 2012 U.S. Dist.

16   LEXIS 67103, *42 (W.D. Penn. 2012).   The Ninth Circuit clearly defined

17   the issue in the case to be "Corinthian's implementation of its policy, rather

18   than the written policy itself."   *United States v. Corinthian Colleges*, 655

19   F.3d 984, 996 (9th Cir. 2011).   Relators' testimony is that *in practice*, the

20   only factor considered in grading the recruiters' performance was their

21   recruitment numbers, as reflected in the detailed tracking of student

22   enrollment numbers.   This detailed tracking of recruiter "Lead-to-

1   Conversion Ratios" is reflected in the *Ad Rep Performance Flash* reports

2   distributed weekly by COCO's corporate office to the director of admissions

3   at each of the campuses.   Relators produced copies of these *Ad Rep*

4   *Performance Flash* reports, and documents identifying the directors of

5   admissions at other Corinthian campuses who simultaneously received *Ad*

6   *Rep Performance Flash* reports reflecting the performance of recruiters at

7   that campus.   In stark contrast to these *Ad Rep Performance Flash* reports,

8   COCO argues that the Relators were evaluated based on quality factors of

9   which they were completely unaware.  The School urges the Court to ignore

10  the Relators' testimony about how their performance was evaluated.   The

11  Ninth Circuit warned that attempts to quantify the basic job requirements.

12          If the performance rating of at least "Good" requires an
13          employee merely to fulfill basic performance requirements that
14          are expected of any employee (such as showing up on time),
15          then construing the Safe Harbor Provision so that these ratings
16          serve as an independent basis for compensation increases would
17          lead to an "absurd result."  Under such a system, educational
18          institutions could entirely circumvent the HEA incentive
19          compensation ban by simply formalizing through a
20          performance rating system, the basic requirements expected of
21          *any* employee, that is, the requirements of employment itself.
22          Allowing the Safe Harbor Provision to shield such a program
23          from HEA's recruiter compensation requirements would render
24          meaningless the "purpose or objective" of the statute.

25

26  (footnote and citations omitted).

27

28

**Congresswoman Waters' Testimony**

Defendants first asserted that there has been a "public disclosure" of the allegations in Relators' complaint in the Joint Rule 26 Report. COCO quoted testimony of Congresswoman Maxine Waters where she stated that the recruiter enrollment *quota system* used by Corinthian Colleges violated the Higher Education Act ("HEA") recruiter compensation ban.

> There is no question that the allegations and transactions on which Relators' claims are based were publicly disclosed. For example, before Relators filed their original complaint, the School was publicly accused in a Congressional hearing of allegedly violating the incentive compensation ban. [1] Representative Maxine Waters testified that for-profit colleges applied a "thinly disguised incentive compensation or quota system which violates the spirit and intent of the prohibition on incentive compensation under the Higher Education Act, and specifically identified the School as engaging in this alleged conduct. (Ex. A at 19.) She additionally claimed that alleged financial aid violations at the School's San Jose campus occurred because "admissions representatives were trying to meet their quotas." (*Id.* at 19, 20.)[2]

(Doc. 127, p. 3, Ex. A). COCO argued that Congresswoman Waters' testimony was a public disclosure that would divest the Court of jurisdiction pursuant to 31 U.S.C. § 3730(e)(4)(A) (2007), unless relators were shown to be an "original source" of the allegations in the lawsuit.

---

[1] *See* Transcript of March 1, 2005 Hearing on Enforcement of Federal Anti-Fraud Laws in For-Profit Education Before the Committee on Education and the Workforce, U.S. House of Representatives. (footnote in original, Doc. 127, Ex. A, Joint Rule 26 Report)

[2] Similarly, at the same Congressional hearing, a former director of admissions at the School's campus in Reseda, California, spoke of the School's alleged exclusive focus on "mere admission enrollment numbers and quotas." (Ex A at 39.) (footnote in original)

4

1    Congresswoman Waters' testimony about enrollment quotas has been

2    categorically foreclosed as a basis of liability in the case.  COCO completely

3    disregards the Ninth Circuit's explicit ruling that enrollment quotas do not

4    violate the Higher Education Act ("HEA") recruiter compensation ban as a

5    matter of law. *Corinthian Colleges, id.*, at 992.

6    **Public Knowledge that Fraud was "Endemic" in For-Profit Education**

7    COCO's motion dismiss now asserts that dozens of public disclosures

8    about widespread fraud in the for-profit education industry that predated this

9    action.  COCO asserts that there were broad industry-wide reports of

10   recruiter compensation violations in the for-profit education industry.

11   COCO is relying on this broad "endemic" fraud theory of public disclosure,

12   even where the specific culprits are unidentified and the fraudulent practices

13   are undefined.  In stark contract, the *Corinthian Colleges* decision explains

14   that the nature of the violation consist of concealing the actual illegal

15   recruiter compensation practices behind documentation that is ostensibly

16   shows practices that are permitted under the HEA.

17    "[D]espite the Compensation Program's purported or
18   documented reliance on something other than recruitment
19   numbers, these salary increases are *in practice* determined on
20   the sole basis of recruitment numbers.  It is Corinthian's
21   implementation of its policy, rather than the written policy
22   itself, that bears scrutiny under the HEA, and such allegations
23   would require additional discovery."

1    *Corinthian Colleges, id.,* at 996.  (emphasis in original).  This analysis was

2    elaborated in *United States ex rel. Washington v. Education Management*

3    *Corp.*, 2012 U.S. Dist. LEXIS 67103 (W.D. Penn. 2012) ("*Education*

4    *Management*"), which noted that three recent courts of appeals rulings

5    recognized violations of the incentive compensation ban "as implemented,"

6    versus according to the written recruiter compensation program.[3]  "This

7    argument fundamentally contradicts Plaintiffs' 'as implemented' theory of

8    the case, which is that even if the paperwork looked correct on its face, such

9    paperwork was only a pretext or cover-up and did not reflect EDMC's real

10   compensation practices."  *Education Management, id.*, at *40.  In short, the

11   defendant uses c*amouflage* to conceal its actual recruiter compensation

12   practices.  "Even though the Plan, on its face, appears to comply with the

13   Safe Harbor, at this stage of the case the Court cannot determine whether or

14   not, in actuality, the 'quality factors' were used merely as a proxy for

15   recruiting success." *Id.*, at *41.

16        The Notice of Proposed Rulemaking by the Department of Education

17   pointed out the same problem of detection discussed at length in the

18   *Corinthian Colleges* and *Education Management* decisions due to the fact

---

[3] The three decisions cited by *Education Management* for the proposition that are *United States ex rel. Main v. Oakland City Univ.*, 426 F.3d 914 (7th Cir. 2005), *United States ex rel. Hendow v. University of Phoenix*, 461 F.3d 1166 (9th Cir. 2006), and *United States v. Corinthian Colleges*, 655 F.3d 984 (9th Cir. 2011).

1    that the schools disguised their actual recruiter compensation practices

2    behind a facially valid compensation plan.  (*See* COCO's RJN Ex. 19, Doc.

3    152-19).

4          *Adjustments to employee compensation*.    The Department
5          explained that this safe harbor has led to allegations in which
6          the institutions concede that their compensation structures
7          include consideration of the number of enrolled students, but
8          aver that they are not *solely* based upon such numbers.  In some
9          of these instances, the substantial weight of the evidence has
10         suggested that the other factors purportedly analyzed are not
11         truly considered, and that, in reality, the institution bases
12         salaries exclusively upon the number of students enrolled.  For
13         this reason, the Department purposes to delete this safe harbor.

14   The authorities cited in Defendants' briefs as support for this industry-

15   wide public assertion reflect fraudulent practices that utilize a uniform

16   method and readily observable deception that "enabled the government to

17   readily identify wrongdoers…." *In re Natural Gas Royalties*, 562 F.3d 1032

18   (10th Cir. 2009) (the public information made it easy for the Government

19   because all it had to do was examine the royalty contracts to determine

20   which drillers were using the fraudulent measurement techniques.).  *Natural*

21   *Gas Royalties, id.,* at 1042.

22   In contrast, the courts have all concluded that the recruiter

23   compensation practices, *as implemented*, means that the Government would

24   "need to comb through myriad transactions performed by various types of

7

1   entities in search of potential fraud."  *Natural Gas Royalties, id.,* at 1042-

2   1043.  The recruiter compensation practices, *as implemented*, are not readily

3   observable, and did not employ uniform methods.

4        Courts have cautioned against using industry-wide allegations of fraud

5   to bar *qui tam* actions under the public disclosure bar.   The decision in

6   *Cooper v. Blue Cross & Blue Shield of Florida, Inc.*, 19 F.3d 562, 566 (11th

7   Cir. 1994) warned against applying the reasoning behind *Natural Gas*

8   *Royalties* too broadly.   The court noted that barring a relator's suit in that

9   circumstance

10       would preclude any *qui tam* suit once widespread – but not
11       universal – fraud in an industry was revealed.  The government
12       often knows on a general level that fraud is taking place and
13       that it, and the taxpayers, are losing money.   But it has
14       difficulty identifying all of the individual actors engaged in the
15       fraudulent activity.   This casting of the net to call all
16       wrongdoers is precisely where the government needs the help
17       of its "private attorneys general."

18   *Id.,* at 566.  Knowledge of industry-wide misconduct rises to the level

19   of a public disclosure only where the United States can file suit

20   against a particular entity based on the information.

21       Other   courts   of   appeals   have   concluded   that   reports
22       documenting a significant rate of false claims by an industry as
23       a whole  --  without attributing fraud to particular firm  --  do
24       not prevent a *qui tam* action against any particular member of
25       that industry.

1    *United States ex rel. Baltazar v. Advanced Healthcare*, 635 F.3d 866 (7th Cir.

2    2011).   *Baltazar*, explained for instance, that a statement that "half" of a

3    particular industry was engaged in a particular type of fraud would not

4    support a suit against a specific entity.

5         A statement such as "half of all chiropractors' claims are
6         bogus" does not reveal *which half* and therefore does not permit
7         suit against any particular medical provider.  It takes a provider-
8         by-provider investigation to locate the wrong-doers.

9         Chief Judge Easterbrook analyzed the FCA pubic disclosure doctrine

10   in terms of how a statute of limitations argument is addressed by a court.  If

11   there is insufficient information to trigger the statute of limitations, then the

12   public disclosure bar would not apply.

13        This would be clear if the dispute concerned the statute of
14        limitations.  No one would contend that the … [government]
15        Reports 'disclosed' any given provider's fraud and thus started
16        the statute of limitations for suit by the United States; only
17        information that a *particular* provider had committed a
18        *particular* fraud would do that.  Similarly a report by the SEC
19        revealing widespread securities fraud would not start the time to
20        sue *every* issuer for *every* fraud; again that requires a person-
21        specific disclosure that establishes not only falsity but also
22        intent to deceive, which is an element of fraud.

23   *Baltazar, id.*, at 867-868, *citing Merck & Co. v. Reynolds*, 130 S.Ct. 1784,

24   1796, 176 L. Ed. 2d 582 (2010).

25        The seminal case on the public disclosure bar is *U.S. ex rel.*

26   *Springfield Terminal Railway v. Quinn*, 14 F.3d 645 (D.C. Cir. 1994).  "The

9

1  language employed in § 3730(e)(40(A) suggests that Congress sought to

2  prohibit *qui tam* actions *only* when either the allegation of fraud or the

3  critical elements of the fraudulent transaction themselves were in the public

4  domain." *Id.*, at 654.

5      In terms of the mathematical illustration, when X by itself is in
6      the public domain, and its presence is essential but not
7      sufficient to suggest fraud, the public fisc only suffers when the
8      whistleblowers suit is banned.

9  *Id.* "The relator must possess substantive information about the particular

10  fraud, rather than merely background information…." *Stinson, Lyons,*

11  *Gerlin & Bustamente, P.A. v. Prudential Ins. Co.*, 944 F.2d 1149, 1160 (3d

12  Cir. 1991).

13  **Generic Recruiter Compensation Allegations**

14      Allegations of generic HEA recruiter compensation violations are

15  insufficient to trigger a public disclosure.  The general assertion that a school

16  pays incentive compensation to its recruiters does not necessarily state an

17  HEA violation.  *Education Management, id.*, at *15-16.  "A school may

18  consider a recruiter's success at recruiting student and adjust his/her salary

19  based in part on that success." *Id.*, at *16, *citing* 67 Fed. Reg. at 67,053.

20      "Even as broadly construed, the HEA does not prohibit any and
21      all employment-related decisions on the basis of recruitment
22      numbers; it prohibits only a particular type of incentive
23      compensation."

1    *Corinthian Colleges, id.*, at 992.

2    ***Ad Rep Performance Flash* weekly reports**

3         The Relators allege that COCO graded and compensation its recruiters

4 based on a calculation of the recruiter's Lead-to-Conversion Ratio.   The

5 Lead-to-Conversion Ratios were documented in an *Ad Rep Performance*

6 *Flash* report distributed weekly by COCO's corporate office to director of

7 admissions at each COCO campus.

8    <u>COCO's "serial FCA litigation" argument</u>

9         COCO asserts that at least five (5) other *qui tam* suits have been

10 brought by Relators' counsel that resemble the Complaint in this case.

11 Defendants also make the misleading assertion that the Fifth Circuit cases

12 filed by Relators' counsel were dismissed as being without merit.  The Fifth

13 Circuit held that HEA recruiter compensation violations are not actionable

14 under the FCA, a position directly at odds with the Ninth Circuit's decision

15 in *U.S. ex rel. Hendow v. University of Phoenix*, 461 F.3d 1166 (9th Cir.

16 2006), *cert. den.*, 127 S.Ct. 2099, 167 L. Ed. 2d 813 (2007).   First with

17 regard to previous cases filed by Relators' counsel, the United States

18 intervened in one case; the United States filed statements of interest in two

19 of the cases; and, the United States launched a massive criminal

20 investigation under 18 U.S.C. § 1962 *et seq.*, the Racketeer Influenced

1   Corrupt Organizations Act ("RICO") against a defendant sued by Relators'

2   counsel.  Moreover, the defendant in *University of Phoenix* filed a petition

3   for writ of certiorari to the U.S. Supreme Court failed in its attempt to

4   overturn the Ninth Circuit on the basis of the Fifth Circuit's decision.

5   **PROCEDURAL  SEQUENCE  FOR  A  "PUBLIC  DISCLOSURE"**
6   **ANALYSIS**
7
8         The procedural sequence for ruling on a public disclosure challenge to

9   jurisdiction in the Ninth Circuit is spelled out in *United States ex rel.*

10  *Hagood v. Sonoma County Water Agency*, 929 F.2d 1416, 1419-1420 (9th

11  Cir. 1991) and *Wang v. FMC Corp.*, 975 F.2d 1412, 1416 (9th Cir. 1992).  A

12  court may inquire into a relator's original source status *only if* the court first

13  finds that there has been a public disclosure of the allegations or transactions

14  set forth in the FCA lawsuit.

15        Wang alleges that FMC defrauded the government in four
16        separate ways.  A review of the record makes clear that neither
17        the allegations nor the evidence concerning three of those
18        projects has been publicly disclosed. … Neither the district
19        court nor the parties mentions this fact, and they seem not to
20        understand it implications.   Whether or not Wang was the
21        "original source" of the evidence concerning these three
22        projects, the jurisdictional bar of section 3730(e)(4) cannot
23        block Wang's prosecution of them.  Where there has been no
24        'public disclosure' within the meaning of section 3730(e)(4),
25        there is no need for a *qui tam* plaintiff to show that he is the
26        'original source' of the information.  *United States ex rel.*
27        *Hagood v. Sonoma County Water Agency*, 929 F.2d 1416,
28        1419-1420 (9th Cir. 1991); *see also United States ex rel.*
29        *Williams v. NEC Corp.*, 931 F.2d 1493, 1500 (11th Cir. 1991).

> A *qui tam* plaintiff need prove his status as an "original source"
> under section 3730(e)(4)(B) "**only if** an exception is sought to
> the bar of 4(A)." *Hagood*, 929 F.2d at 1420.

*Wang v. FMC Corp.*, 975 F.2d 1412, 1415-1416.   *Hagood* is equally

adamant that public disclosure is established beforehand; there shall be no

"original source" inquiry unless and until a public disclosure has been

established.

> There is, of course, no need for Hagood to show that he is "the
> original source" of the information. That statutory phrase in 31
> U.S.C. § 3730(e)(4)(B) comes into play only if an exception is
> sought to the bar of 4(A). As the bar of 4(A) does not apply,
> there is no need to invoke the exception.

*Hagood*, 929 F.2d at 1420.  W*ang* and *Hagood* control on the circumstances

that require a relator to establish that she is an "original source." The

procedural sequence the Defendants have urged in their motions is

completely backwards from Ninth Circuit law.  *See also, United States ex*

*rel. Biddle v. Board of Trustees of the Leland Stanford, Jr. University*, 161

F.3d 533, 537 (9th Cir. 1998); *United States ex rel. Aflatooni v. Kitsap*

*Physicians Services*, 163 F.3d 516, 524 (9th Cir. 1998).

The Ninth Circuit' two-step procedure for analyzing public

disclosure has been adopted in other circuits.  The court are required to make

a finding on "public disclosure" as a prerequisite to any "original source"

inquiry under 31 U.S.C. 3730(e)(4)(A) (2007).

13

The 1986 *qui tam* amendments set up a two-part test for determining jurisdiction.   First, the reviewing court must ascertain whether the "allegations or transactions" upon which the suit is based were "publicly disclosed" in a "criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit or investigation, or from the news media."   31 U.S.C. 3730(e)(4)(A).   **If – and only if – the answer to the first question is affirmative**, *see Wang v. FMC Corp.*, 975 F.2d 1412, 1416 (9th Cir. 1992), will the court then proceed to the "original source" inquiry … .

*United States ex rel. Springfield Terminal Railway Co. v. Quinn*, 14 F.3d 645, 653 (D.C. Cir. 1993).

In response to direct questioning by the Court, counsel for COCO conceded that without a public disclosure, there is no challenge to the Court's jurisdiction.

THE COURT:      What happens if there's been no -- again, I have not focused on the merits, but what happens if there's no public transaction of the allegations or transaction.

MS. YOUNG:      It's true. If there's no public disclosure, then jurisdictional issue does not come into play.[4]

---

[4] *See*, p. 9:2-8, Reporter's Transcript of Proceedings dated October 29, 2012, attached hereto as Exhibit 1.

1

## ENROLLMENT QUOTAS

2       Defendants' public disclosure arguments depend entirely on

3   enrollment quotas, a category of allegations that has already been completely

4   eliminated by the Ninth Circuit as grounds for a jurisdictional challenge

5   under 31 U.S.C. § 3730(e)(4).  The FCA public disclosure bar is in no way

6   implicated by the fact that the school enforced mandatory enrollment quotas

7   as a condition of employment for its recruiters.

8       The Ninth Circuit has already eliminated enrollment quotas as a basis

9   for liability in this case.  *United States v. Corinthian Colleges*, 655 F.3d 984,

10  992 (9th Cir. 2011).  The Ninth Circuit ruled that enrollment quotas do not

11  violate the Higher Education Act ("HEA") recruiter compensation ban as a

12  matter of law.

13      1.   *Termination based on recruitment numbers*

14

15      [2]   Relators allege that employees were "disciplined,
16  demoted, or terminated" on the basis of their recruitment
17  numbers.  This does not state a violation of the incentive
18  compensation ban. …   Thus adverse employment actions,
19  including termination, on the basis of recruitment numbers
20  remain permissible under the statute's terms.  *See U.S. ex rel.*
21  *Bott v. Silicon Valley Colleges*, 262 F. App'x 810, 812 (9th Cir.
22  2008). …   The Complaint's allegation that Corinthian imposes
23  adverse employment consequences on the basis of recruitment
24  quotas does not, therefore, state a violation of the HEA
25  incentive compensation ban, and also does not state a claim that
26  a false statement was made.

27

15

1   *Id*. at 992.   Enrollment quotas are not fraudulent as a matter of law, and are

2   not a "false statement" within the definition of the False Claims Act

3   ("FCA").   Therefore, mandatory enrollment quotas, targets or goals for

4   recruiters may not be the basis of a "public disclosure" under the FCA.

5   <u>"Original Source" and the Program Participation Agreements ("PPA")</u>

6          COCO asserts that Relators do not qualify as original sources because

7   they lack knowledge about the Program Participation Agreements ("PPA")

8   COCO entered into with the Government.   The challenge based on the PPA

9   was thoroughly analyzed and refuted in the *University of Phoenix*, where the

10  Ninth Circuit held that statutory conditions for receiving funds from the

11  United States are in the nature of legislative facts.   The sequence of the

12  paperwork used to obtain federal funds by fraud is completely immaterial.

13  A "course of conduct" that results in payment by the Government is

14  sufficient to establish FCA liability, even in the absence of paperwork.

15          We agree with the Seventh Circuit that "it is irrelevant how the
16      federal bureaucracy has apportioned the statements among
17      layers of paperwork." *Main*, 426 F.3d at 916.[5]  All that matters
18      is whether the false statement or course of conduct causes the
19      government to "pay out money or to forfeit moneys due."
20      *Harrison*, 176 F.3d at 788.[6] Relators have properly alleged that
21      the University submitted a claim, for purposes of False Claims
22      Act liability.

23

---

[5] *United States ex rel. Main v. Oakland City Univ.*, 426 F.3d 914 (7th Cir. 2005)
[6]  *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999)

16

*United States ex rel. Hendow v. University of Phoenix*, 461 F.3d 1166, 1177-1178 (9th Cir. 2006).  Accordingly, "a false statement or fraudulent course of conduct" violates the FCA.  *Phoenix, id.*, at 1178.  As explained in *Phoenix*, the FCA "false certification" theory of liability does not actually require an assertion of compliance by the recipient of government funds.

> An explicit statement, however, is not necessary to make a statutory requirement a condition of payment, and we have never held as much.

*Phoenix*, *id.,* at 1177.   COCO's obligation to comply with government funding conditions arises from the statute itself.

> Therefore, because relators have alleged that the University fraudulently violated a regulation upon which payment is expressly conditioned in three different ways, we hold that they have properly alleged the University engaged in statements or courses of conduct that were material to the government's decision with regard to funding.

*Id.*

**The Incentive Compensation Prohibition Is A "Legislative Fact"**

*Phoenix* defines the HEA incentive compensation prohibition as a legislative fact, *i.e.*, an obligation that arises from law.

> … eligibility of the University under Title IV and the Higher Education Act of 1965 -- and thus, the funding that is associated with such eligibility -- is explicitly conditioned, in three different ways, on compliance with the incentive compensation ban.

> First, a federal statute states that in order to be eligible, an institution must enter into a program participation agreement with the Secretary [of Education].  The agreement shall condition the initial and continuing eligibility of an institution to participate in a

17

1   program upon compliance with the following requirements ...
2   [including the incentive compensation ban.]
3
4   20 U.S.C. 1094(a) (emphasis and brackets in original).  Second, a
5   federal regulation specifies:
6
7   An institution may participate in any Title IV, HEA program ...
8   only if the institution enters into a written program participation
9   agreement with the Secretary ....  A program participation
10   agreement conditions the initial and continued participation of an
11   eligible institution in any Title IV, HEA program upon compliance
12   with the provisions of this part [such as the incentive
13   compensation ban.]
14
15   34 C.F.R. 668.14(a)(1) (emphasis and brackets in original).  Third
16   and finally, the program participation agreement itself states:
17
18   The execution of this Agreement [which contains a reference to
19   the incentive compensation ban] by the Institution and the
20   Secretary is a prerequisite to the Institution's initial or continued
21   participation in any Title IV, HEA program. (emphasis and
22   brackets in original).
23
24   *Phoenix*, *id.* at 1176-1177.  The Incentive Compensation Ban is a statutory
25   condition for receiving payment from the Government.   The *Phoenix*
26   decision rejected the assertion made by COCO in its motion to dismiss that
27   FCA liability depends on a certain type of certification.
28
29   We note that the University and the district court below have taken
30   our holdings to mean that the word "certification" has some
31   paramount and talismanic significance, apparently believing that a
32   palpably false statement does not bring with it False Claims Act
33   liability, while a palpably false certification will.   This facile
34   distinction would make it all too easy for claimants to evade the
35   law.   The Fourth Circuit rightly noted that False Claims liability
36   attaches "because of the fraud surrounding the efforts to obtain the
37   contract or benefit status, or the payments thereunder." *Harrison*,
38   176 F.3d at 788 (emphasis by the Court).   That the theory of

18

liability is commonly called "false certification" in no indication
that "certification" is being used with technical precision, or as a
term of art: the theory could just as easily be called the "false
statement of compliance with a government regulation that is a
precursor to government funding" theory, but that is not as
succinct. Furthermore, because the word "certification" does not
appear in 31 U.S.C. 3729(a)(1) or (a)(2), there is no sense in
parsing it with the close attention typically attending an exercise in
statutory interpretation. So long as the statement in question is
knowingly false when made, it matters not whether it is a
certification, assertion, statement, or secret handshake; False
Claims Act liability can attach.

*Hendow*, *id.,* 461 F.3d at 1172 (quoting *Harrison v. Westinghouse Savannah*

*River Co.*, 176 F.3d 776 (4th Cir. 1999).)

The court in *United States v. Education Management Corporation*,
2012 U.S. Dist. LEXIS 67103 *13-14 (W.D. Penn. May 11, 2012)
(*Education Management*) issued a highly relevant decision addressing the
distinction between a "factually false" and a "legally false" FCA cause of
action in the context of the incentive compensation ban. The *Education
Management* decision adopted the Ninth Circuit's reasoning in *Phoenix* and
explained the "implied false certification," explaining in relevant part that
the obligations imposed by law establish FCA liability:

A claim is "legally false" when the claimant knowingly falsely
certifies that it has complied with a statute or regulation, the
compliance with which is a condition of Government payment.
There are two types of "legally false" claims. Under the
"express false certification" theory, an entity is liable under the
FCA for falsely certifying that it is in compliance with
regulations that are prerequisites to Government payment in
connection with claim for payment of federal funds. Under the
broader "implied false certification" theory adopted in *Wilkins*,
liability attaches when a claimant seeks and makes a claim for

19

1  payment from the Government without disclosing that it has
2  violated regulations that affect its eligibility for payment.  As
3  the *Wilkins* court explained:   "Thus, an implied false
4  certification theory of liability is premised on the notion that the
5  act of submitting a claim for reimbursement itself implies
6  compliance with governing federal rules that are a precondition
7  of payment."
8
9  *Id.*, at *14 (citing *United States ex rel. Wilkins v. United Health Group*, 659

10  F.3d 295 (3d Cir. 2011)).   Furthermore, it is simply beyond dispute that

11  Corinthian signed and submitted the PPA to the government as the statute

12  and regulation required in order to obtain the Title IV funding, a fact that the

13  Relators are not required to prove under the FCA.

14       *Education Management* noted that it was following the ruling of the

15  Seventh Circuit in *United States ex rel. Main v. Oakland City Univ.*, 426

16  F.3d 914 (7th Cir. 2005) ("*Main*") and the rulings of the Ninth Circuit in

17  *U.S. ex rel. Hendow v. University of Phoenix*, 461 F.3d 1166, 1168 (9th Cir.

18  2006) and *United States v. Corinthian Colleges*, 655 F.3d 984 (9th Cir.

19  2011).

20  **Defendants' Judicial Admissions Contradict Any Public Disclosure**

21       COCO has made judicial admissions that its recruiter compensation

22  practices have never been publicly disclosed.  First, COCO filed suit against

23  the Illinois Attorney General in response to a subpoena requesting

24  documents showing COCO's practices for evaluation compensation for

1  company recruiters.  COCO filed suit against the Illinois Attorney General

2  saying that its recruiter compensation documents were "trade secrets" under

3  Illinois law.[7]  Second, in support of its Application for Protective Order

4  (Doc. 177), COCO asserts that the documents produced by Relators were

5  confidential business records that were not previously disclosed.   The

6  Application is supported by the Declaration of Roger Van Duinen (No. 177-

7  1), vice-president of marketing, responsible for all Corinthian Colleges, Inc.

8  marketing activities, which says that the *Ad Rep Flash Reports* were part of

9  the "School's confidential business practices ….   The School treats these

10  reports as confidential because they include sensitive business information."

11          2.    Corinthian Colleges (the "School") has used various
12          reports, some of which I understand have been referred to in
13          this litigation as "Ad Rep Flash Reports," to track admissions
14          activity at the School and monitor employee performance.
15          These reports are generated from proprietary School databases
16          and reflect the School's confidential business processes for
17          encouraging attendance and admitting students, and for tracking
18          and reporting employee performance.

19          3.    The School treats these reports as confidential because
20          they include sensitive business information about the School's
21          encouraging attendance and enrollment activities that could he
22          harmful in the hands of competitors. These types of documents
23          also reflect business processes the School uses to ensure that its
24          operations    are    running    efficiently,    effectively,    and    in

---

[7] *See*, *Corinthian Colleges, Inc. v. Illinois Attorney General Lisa Madigan in her official
capacity*, No. 12 CH 23872, Circuit Court of Cook County, Illinois, County Department,
Chancery Division, attached as Exhibit 2.

21

1    compliance with applicable rules and regulations, all of which
2    give the School a competitive advantage.

3    The *Ad Rep Flash Reports* show the Lead-to-Conversion Ratios for

4    recruiters employed at Corinthian Colleges.   COCO affirmatively asserts

5    that these *Ad Rep Flash Reports* have never before been publicly disclosed.

6    The *Ad Rep Flash Reports* demonstrate that the Defendant compensates its

7    recruiters based solely on their success in securing enrollments in violation

8    of the HEA.   Relators filed an ex parte application "[t]o protect the

9    confidentiality of those documents, the School moved for  --  and was

10   granted  --  an order sealing certain exhibits to its motion."[8]  Defendants also

11   represented to the Court that the *Ad Rep Flash Reports* among "the School's

12   confidential and competitively sensitive information," along with other

13   recruiter compensation records produced by Relators have not been publicly

14   disclosed in Defendants Corinthian Colleges, Inc., David Moore, and Jack

15   D. Massimino's Ex Parte Motion For Entry of Protective Order (Doc. 177).

16   Defendants' counsel Blanca F. Young provided her personal Declaration

17   attesting to the non-public nature of the *Ad Rep Flash Reports* and other

18   recruiter compensation documents (Doc. 177-2, Decl. of Blanca F. Young).

---

[8]  *See* The School Defendants' Opposition to Relators' *Ex Parte* Application filed Jan. 29, 2013.

1   The reasons for requesting a protective order are to keep concealed from the

2   public COCO's recruiter compensation practices.

3       The School Defendants requested the Proposed General
4       Protective Order because this lawsuit concerns the School's
5       compensation practices for employees involved in admissions
6       activities at the School, and the School Defendants were
7       concerned about protecting the confidentiality of documents
8       that may be relevant to the case including employee
9       compensation records and personnel files, and the School's
10      proprietary and competitively sensitive documents reflecting
11      how it compensates and tracks performance of its employees.
12      (Id."
13

14  Doc. 177, Page 5 of 12, *citing* Young Decl. (Doc. 177-2).  These judicial

15  admissions made by Blanca F. Young contradict the entire premise of

16  Defendants' public disclosure argument!  There in fact has been no public

17  disclosure the *Ad Rep Performance Flash* reports, which defense counsel has

18  personally admitted to the Court.  Defendant Ernst & Young LLP adopted

19  the position taken in the Motion and in Ms. Young's Declaration that the *Ad*

20  *Rep Performance Flash* reports have not been publicly disclosed and so

21  indicated by filing a Statement of Support of Defendants Corinthian

22  Colleges, Inc., David Moore, And Jack Massimino's Ex Parte Motion For A

23  Protective Order. (Doc. 180).  Defendants have made affirmative assertions

24  to the Court that the *Ad Rep Performance Flash* reports have not been placed

25  in the public realm.   Defendants are judicially estopped from now

1  contradicting their assertions regarding the non-disclosure of the *Ad Rep*

2  *Performance Flash* reports produced by Relators, which have have not been

3  disclosed in the public realm. *United Steelworkers of America v. Retirement*

4  *Income Plan for Hourly-Rated Employees of, ASARCO*, 512 F.3d 555 (9th

5  Cir. 2008). Moreover, the Court should take judicial notice that of this fact:

6  there has been no public disclosure of *Ad Rep Performance Flash* reports,

7  and these records are not been placed in the public realm. Fed. R. Evid. 201.

8  "Courts may take judicial notice of publications introduced to 'indicate what

9  was in the public realm at the time, not whether the contents of those articles

10  were in fact true.'" *Von Saher v. Norton Simon Museum of Art*, 592 F.3d

11  954, 960 (9th Cir. 2010).

12  **EY'S OBLIGATION TO DISCLOSE LIABILITY**

13      The Ninth Circuit explicitly held that whether EY had the obligation

14  to report Corinthian's liabilities resulting from potential violations of the

15  Higher Education Act ("HEA") recruiter compensation prohibition was a

16  question of fact, "certainly subject to 'reasonable dispute.'" *United States v.*

17  *Corinthian Colleges*, 655 F.3d 984 (9th Cir. 2011). The financial statements

18  for Corinthian Colleges, Inc. submitted to the U.S. Department of Education

19  ("DoE") made no mention of Corinthian's HEA-related liability to the

24

1   Government.  These financial statements were audited and certified by EY, a

2   requirement under the HEA.

3       Here, we can consider the *existence of* the reports identified by
4       EY, since the Complaint expressly refers to and 'necessarily
5       relies on' them.  Nonetheless, we may not, on the basis of these
6       reports, draw inferences or take notice of facts that might
7       reasonably be disputed.  Whether EY is ultimately responsible
8       for certifying Corinthian's compliance with HEA, and whether
9       the Financial Reports they submitted failed accurately to reflect
10      Corinthian's   HEA-related   liabilities,   are   open   questions
11      requiring further factual development.  At the very least, they
12      are certainly subject to 'reasonable dispute.'"
13
14  *Id.*   The crux of Relators' FCA claim against EY is that Corinthian had

15  liability to the United States as the result of its violations the HEA recruiter

16  compensation prohibition, and EY failed to report the "HEA-related

17  liabilities" in its audit opinions for these financial statements.

18      The information provided by Relators to the Government is whether

19  the HEA recruiter compensation violations occurred.   There is no

20  requirement that a relator must qualify as an expert witness in auditing as a

21  prerequisite to bringing an FCA claim against an auditor.

22      Ernst & Young LLP urges this Court to rely on the Fifth Circuit

23  authority in deciding their motions to dismiss.  EY makes the following

24  argument in its motion to dismiss (Doc. 154):

25      The substantial similarity between the allegations pled against
26      EY in this case and the allegations pled against PwC in the *ITT*

25

1    *Case* is sufficient to trigger the FCA's jurisdictional bar. … But
2    there is more.

4           Second, the *qui tam* complaint filed against EY in the
5    *Whitman Case*[9] made the following allegations:
6    .   .   .
7    "E&Y made false statements and records, falsely certified, and
8    fraudulently induced the [DoE] by representing that E&Y had
9    audited Whitman's and Ultrasound's financial statements in
10   accordance with GAAS, and that the financial statements were
11   fairly presented in accordance with GAAP." (*Id*. ¶ 63.)

13   (Doc. 154, at 16-17).   The Fifth Circuit forecloses FCA suits for

14   violations the HEA recruiter compensation prohibition.  In the Fifth Circuit,

15   an FCA suit cannot be brought for violations of the HEA recruiter

16   compensation ban.  *See United States ex rel. Graves v. ITT Educational*

17   *Services, Inc.,* 284 F. Supp. 2d 487 (S.D. Tex. 2003), *aff'd*, 111 F. App'x 296

18   (5th Cir. 2004).  The Ninth Circuit, in contrast, held in the *University of*

19   *Phoenix* case that HEA recruiter compensation violations can be asserted

20   under the FCA.  Therefore, Fifth Circuit law does not allow an FCA for

21   violations of the HEA recruiter compensation prohibition, while the Ninth

22   Circuit allows FCA suits based on violations of the recruiter compensation

23   prohibition. This split between the Fifth and Ninth Circuit is clearly defined

24   in the petition for writ of certiorari filed in the *University of Phoenix* case.

---

[9] The *Whitman* case was voluntarily stayed in the district court without a ruling on
any issue.

1    *Graves* therefore bars a litigant in the Fifth Circuit from
2    bringing an FCA claim that, under the decision below, would
3    be viable in the Ninth Circuit.
4
5    *University of Phoenix, Petitioner, v. United States ex rel. Mary Hendow and*

6    *Julie Albertson, Respondents,* Pet. For Writ of Cert., 2006 U.S. Briefs

7    248760; 2007 U.S. S. Ct. Briefs LEXIS 972.

8        EY argues that the Relators cannot be an original source since they

9    have no knowledge of the professional standards for conducting audits.  This

10   issue is whether EY had an obligation to disclose HEA-related liabilities

11   based on the recruiter compensation violations reported by the Relators.  It

12   cites no authority in support of this position.  Moreover, EY's relies mainly

13   on *In re Natural Gas Royalties*, 562 F.3d 1032 (10th Cir. 2009) to support its

14   public disclosure argument.  No industry-wide disclosure is shown.

15       EY attempts to ride on the back of the public disclosure arguments

16   asserted by COCO.  EY's audit and reporting obligations are not implicated

17   under any of the public disclosure theories advanced by Defendants.  EY's

18   gatekeeper role as auditor is a separate and independent issue.  EY argues

19   public disclosure based on cases filed more than ten (10) years ago that

20   never ruled on the auditor's liability under the FCA.  A public disclosure

21   about one defendant affords no protection to another defendant.  *Wang v.*

22   *FMC Corp.*, 975 F.2d 1412 (9th Cir. 1992).  EY's violations have never been

27

1    publicly disclosed. *See United States ex rel. Aflatooni v. Kitsap Physician*

2    *Services,* 163 F.3d 516, 523 (9th Cir. 1998) (fraud was alleged "against two

3    distinct groups of defendants." Following *Wang, id.* at 1415-1416, the Ninth

4    Circuit reversed the public disclosure finding as to the second group of

5    defendants: "[W]e find that the district court erred in concluding that the

6    public disclosure bar applied to all Defendants…."

7    ***Education Management* ruling on HEA recruiter compensation violation**

8        *Education Management* rejected the same attempt to minimize the

9    Relators in a case against a for-profit education company that the Defendants

10    have done in their briefs in this case. *Education Management* involved

11    parallel attacks on the Relators. The Defendants in *Education Management*

12    challenged the Relators knowledge on the following grounds:[10]

13      1.     Relators have limited knowledge, *i.e.,* Relators have no knowledge
14             before June 2004 or after June 2007;
15

---

[10]      "EDMC further notes that the Relators have limited knowledge. For example, there are no allegations regarding conduct prior to June 2004 or after June 2007. In addition, Neither Washington nor Mahoney had responsibility for evaluating ADAs or making compensation decisions or had access to the factors actually used to pay ADAs. EDMC points out that the Relators did not work at each individual school named as a Defendant nor did they participate in the certifications made to the governments. EDMC also contends that Plaintiffs have failed to identify the conduct of each separately named Defendant. Moreover, EDMC argues that the Complaints fail to adequately plead the scienter element in that the Complaint fails to allege facts regarding EDMC's knowledge at the time the Plan was drafted and implemented and does not link the persons who signed the PPA's and/or certifications to the alleged compensation violations."
*Education Management, id.*, at *43-44.

2.      Relators had no responsibility for evaluating recruiters or making
        compensation decisions, or had access to the factors actually used
        to pay recruiters;

3.      Relators did not work at each individual school named in the
        complaint;

4.      Relators did not participate in the certifications, *i.e.*, the Program
        Participation Agreements;

5.      Relators failed to identify the conduct of each Defendant named
        separately;

6.      Relators fail to allege the state of mind of the Company at the time
        the recruiter compensation program was drafted; and,

7.      Relators do not link the persons who executed the Program
        Participation Agreement to the compensation violations.

*Education Management* rejected the identical argument COCO makes

that the relator can only allege violations for the campus where he was

employed.  There is no need to detail the conduct of each school because the

schools are related corporate entities.

> "Because Plaintiffs' theory is that there was one, EDMC-wide
> scheme controlled by top-level executives, it is not necessary to
> allege separate conduct by each of the affiliated schools named
> as Defendants."

*Education Management, id.*, at *54.   Similarly, *Education Management*

broadly rejected the challenge that relators were required to know about the

Program Participation Agreement ("PPA") with the Government, or the

identify of the persons who executed the PPA, *i.e.*, Relators did "not link the

1  persons who signed the PPA's and/or certifications to the alleged

2  compensation violations." *Education Management, id*., at *43-44.   The

3  implementation of the fraudulent recruiter compensation plan was done

4  "top-down, company-wide." *Id.*, at *50.

> "Moreover, the *Science Applications* Court recognized that the
> definition of 'knowingly' in the False Claims Act was intended
> 'to capture the ostrich-like conduct which can occur in large
> corporations where corporate officers insulate themselves from
> knowledge of false claims submitted by lower-level
> subordinates.'" *Education Management, id.,* at p. *52, *citing
> United States v. Science Applications Intl. Corp.*, 626 F.3d
> 1257, 1275 (D.C. Cir. 2010).

**Securities Class Action Complaint is based on Enrollment Quotas**

15  There is no merit to COCO's assertion that a public disclosure

16  resulted from the allegations of recruiter compensation violations made in *In*

17  *re Corinthian Colls. Inc. Shareholder Litig*., No. 04-cv-5025 (C.D. Cal.),

18  *appealed sub nom. Metzler  Inv. GMbh v. Corinthian Colls., Inc.*, No. 06-

19  55826 (9th Cir).   The factual assertions beneath the allegations of recruiter

20  compensation violations were that recruiters were forced to meet enrollment

21  *quotas, targets* and *goals*.   As discussed above, recruiter enrollment quotas

22  do not violate the HEA incentive compensation ban as a matter of law under

23  the Ninth Circuit decision in this case.   Set forth are multiple allegations of

24  recruiter compensation violations from the Corinthian shareholder litigation.

¶180. Another former employee, CW5, a Senior Admissions Representative at GMI in Atlanta, Georgia, who was there through the first part of the Class Period, described the admissions process as "entirely sales." It was about the "bottom line," not what was best for the student. According to the witness, the **quota** for each admission representative at GMI was 20 students per month, which the witness stated was a difficult number to meet. As with other campuses, pressure was intense on the representatives, who were "always on 30 days notice," which meant, if you missed your **quota** and failed to bring it up in 30 days, you would be terminated.

¶186. CW25, a former Senior Financial Aid Representative at Everest College in Dallas, Texas until early 2004 further stated that, in order to meet **quotas** imposed by management, financial aid representatives improperly processed prospective students who were already in default on loans.

¶198. In June 2004, Corinthian finally disclosed to the public that the DOE's review of its school in San Jose found violations of federal funding rules, but despite firing two people, the Company asserted that the agency review did not uncover fraud. A former financial aid officer who worked at the school at the time, however, said that several employees were engaging in fraud in order to meet their enrollment **quotas** and maximize the amount of Title IV funding the school received. Specifically, a former financial aid officer, CW35 who worked at the San Jose campus of Bryman College for several years until near the end of the Class Period, said an admissions officer, who was attempting to meet his enrollment **quotas**, told students that he could get them "free money" through the federal loan program if they signed up for classes at the school. …

¶228. CW25, a Senior Financial Aid Representative at Everest College in Dallas, Texas during most of the Class Period, said bonuses were given to schools, individual department heads and individual representatives in both the admissions and financial aid departments who met their **quotas**, in violation of the HEA's prohibition against incentive compensation.

31

¶231. A former Financial Aid Officer at the San Francisco campus of Bryman College until mid-2004, CW32, admitted that Directors of Admissions, Directors of Financial Aid and School Presidents received quarterly bonuses contingent upon meeting **target** numbers set by corporate and, therefore, had incentive to cheat.

¶232. C13, a Senior Admissions Representative at the Port Orchard, Washington campus of Bryman College for a year and a half until April 2004, stated that, although admissions representatives in CW13's department did not get commissions for meeting **quotas**, hitting **target** numbers was a condition of employment and determined whether a representative would receive the annual raise of 20% or not.

¶235. Former Corinthian employees throughout the United States confirmed that defendants set unrealistic goals for enrollment, retention and placement and exerted enormous pressure on employees at each Corinthian school to meet these **targets**.

¶237. CW25 further confirmed that admission representatives were regularly threatened with termination and some were terminated for failing to meet recruiting **quotas**.  However, numerous former employees at various schools stated that the **quotas** were unreasonably high and unreachable without using questionable or fraudulent practices. For example, supervisors directed them to do whatever was necessary to get students enrolled and packaged in order to meet **quotas.** As a result, CW25 and other financial aid representatives improperly processed prospective students who were already in default on loans.

¶238. Other former employees related similar pressure to sign up students to boost enrollment for Corinthian. A former Financial Aid Director at Everest College in California through early 2004, CW7, described it as an "admissions driven" school that was under constant pressure from headquarters to start as many students as possible each enrollment period in order to impress the corporation's shareholders. "It was all about the

numbers and the bottom line; how many starts we could report to shareholders and how much money we were making." In fact, the witness admitted the school was under so much pressure to meet its admission **quotas** that admission officers often talked students into enrolling in school before they wanted to do so.   They needed to get every person they could to agree to start the program. "If a student sat in a classroom for fifteen minutes, it was counted as a 'start.'" *CW7 estimated that 10% of the students who started each quarter should not have been counted as "starts." By January 2004, according to CW7, the campus had 600 files for students whose financial aid packages had not been properly processed.* CW7 was knowledgeable about such facts because, as Financial Aid Director, CW7 was responsible for processing student aid applications, Title IV funding administration and ensuring that federal and state guidelines for both enrollment and financial aid eligibility are met.

¶239. A former Director of Admissions at the El Monte, California campus of the Bryman College, CWI4, stated that during his/her tenure from 1999-2002, the corporate officers set admissions **goals** as part of the budgeting process and expected them to start 100 new students every month. They had "very, very lofty **goals**," CWl4 said. "It was all about putting the numbers up on the board ... we had to make our numbers. [The Regional Manager] said to do whatever it takes to get the job done." One means used to "get the job done" was to have students sit in class for a day or two so they could be counted as starts, even though they were not legitimate students and would drop out shortly after starting. CW14 estimated at least 12 students each quarter were improperly counted as starts. Another 6-12 students each quarter were admitted although they didn't pass their admissions tests. The examinations would be conveniently "lost" by admission representatives so the students could still be admitted. From all accounts, this is typical of the culture that continued throughout the Class Period.

¶241. Likewise, a former Senior Admissions Representative at Corinthian's Kee Business College in Virginia, CW37, portrayed the immense pressure to meet monthly **quotas**, or

face termination, that existed during CW37's three-year tenure at the Company. CW37 stated that, in order to meet the department's monthly quotas, each of the five admissions representatives had to enroll at least five students every week. "We had to make those numbers no matter what," CW37 said. If a representative failed to meet the monthly enrollment **quota**, then he or she was put on a performance improvement plan or "PIP." If the employee failed to meet their **quota** the following month, he or she would be terminated. The pressure was so great to meet the Company-mandated **quota** that the college even admitted students who had severe disabilities *(i.e.* students who were legally blind, schizophrenic, or suffering from severe scoliosis) which prevented them from performing in the fields for which they were studying. CW37 was intimately knowledgeable of such facts since CW37 was directly involved in student recruitment and enrollment and was, thus, subject to the **quotas**.   In fact, CW37's yearly raises were based on whether CW37 met his/her enrollment **goals**. CW37 was also responsible for sending weekly flash reports to corporate managers summarizing whether CW37 and the four other members of the admission office at the Kee Business College in Newport News, Virginia had met their enrollment **quota**. During CW37's tenure, he/she saw colleagues lose their jobs for failing to make their enrollment **quotas** and witnessed at least one suffer illness from the pressure to meet the **quotas**. Although CW37 left the school in June 2003, CW37's experience was shared by employees at other schools during the Class Period.

¶245. At another Bryman campus located in another state, CW13, who was a Senior Admissions Representative during most of the Class Period, was required to enroll three students per week or be terminated. "Enrollments" were measured by the number of "sits" or the student's presence in a classroom, regardless of whether they were fully admitted or would subsequently be reversed. Hitting **target** numbers was a condition of employment. Although CW13 left employment with Corinthian before the end of the Class Period, CW13 remains in contact with friends who still work there who tell CW13 the enrollment **quotas** are now seven per week for each

representative, which they say is unrealistic for the school and region and unachievable by legitimate means.

¶247. The threat of termination for failing to meet enrollment **quotas** was described by nearly every former employee encountered in plaintiffs' investigation who had responsibility for admissions. In another example, the former Director of Admissions at Bryman College, CW29, was responsible for admissions representatives who each had to enroll a minimum number of students each month or lose their job. Between August and November 2004, during CW29's first months with the Company, the School President fired six admissions representatives for not meeting their **quota**. CW29 was given a budget requiring a certain number of admissions per month and told to enroll "anyone" who came in the door including prospective students with criminal records - even though they would never be able to get a job in their selected field, such as for medical assistants, because of their criminal record.

¶250. The undue pressure to meet admissions **quotas** was not limited to the Bryman schools.  An Admissions Representative who was responsible for recruiting and enrolling prospective students at Las Vegas College for part of the Class Period, CW4, describes a tyrannical approach to requiring employees to meet unrealistic **quotas**. The Director of Admissions "wouldn't let us leave until we had met our **quota.**" CW4 and fellow representatives were forced to work on Saturdays to meet their **quotas**. "We had to enroll anyone" in order to meet the **targets**. *According to CW 4, "false starts" (students not fully processed),"were continuous," and accounted for about 50% of "enrollments.* "By way of illustration, CW4 explained that in a typical class of 20 enrolled students, maybe 15 would go to at least a couple of classes while five would never show up at all. Within the first week, five of the 15 who showed up originally would stop attending.  So, of the original 20, maybe 10 (or 50%) would actually be legitimate enrollments. The others would be reversed or dropped.

¶353. According to former Corinthian employees, defendants actively monitored and tracked the progress of each Corinthian

35

1         school in reaching "sales **quotas**" (emollment), and retention

2         figures (among other benchmarks)

3         Enrollment quotas do not violate the HEA recruiter compensation ban

4 as a matter of law. *Corinthian Colleges, id.*, at 992. This is a rehash of the

5 public disclosure argument COCO makes Congresswoman Maxine Waters,

6 which is directly at odds with the Ninth Circuit's decision.  The securities

7 class action complaint statements are the same: that "hitting target numbers

8 was a condition of employment …," and that "quarterly bonuses [were]

9 contingent upon meeting target numbers set by corporate …." COCO motion

10 at 9-10 (Doc. 150).  Enrollment quotas, goals and targets are perfectly legal.

11 **OTHER "RED HERRING" AND "DIVERSIONARY" ARGUMENTS**

12   **1**      COCO's motion relies extensively on *Devlin v. California*, 84 F.3d

13          358 (9th Cir. 1996) in support of its original source argument.

14          *Devlin* was not brought by the employee who observed the fraud

15          take place while working for the company, but by a third-party

16          with no connection to the company who learned of the fraud from

17          the employee actually observed it.  Nyoka Lee and Talala Mshuja

18          both worked in the admissions department of COCO, and they

19          have direct fist-hand knowledge of the violations.

20   **2**      COCO asserts that Relators did not provide information to the

21          Government before suit was filed.  Relators provided a draft

36

1    complaint together with attachments to the U.S. Attorney on

2    October 11, 2006, five months before suit was filed.  In the event

3    the Court reaches the original source question, the draft complaint

4    will be provided for *in camera* review by the Court.

5    **3**    Oral argument was held in the U.S. Court of Appeals for the

6    Seventh Circuit in *U.S. ex rel. Leveski v. ITT Educ. Servs. Inc.,*,

7    No. 12-1369, on January 17, 2013.  The decision in *Education*

8    *Management* involved circumstances similar to the case at hand,

9    and relies on Ninth Circuit law.  *Leveski* wrongly decided under

10   Ninth Circuit law.

11   **AFFIDAVIT OF RELATOR NYOKA JUNE**

12   The Affidavit of Nyoka June Lee is attached and incorporated hereto

13   for all purposes.   Nyoka Lee and Talala Mshuja are model relators.

14   Together they were worked at Corinthian Colleges, Inc. for over a dozen

15   years.   Nyoka Lee provided extensive business records of the recruiter

16   compensation practices of the Defendant.  Ms. Lee worked as a recruiter in

17   the admissions department.  Ms. Lee has firsthand, direct, and independent

18   knowledge of the recruiter compensation practices engaged in by her

19   employer.  Mr. Mshuja was a test proctor whose job function placed in a

20   direct working relationship with the recruiters in the admissions department.

1   He made direct and independent observation of the recruiters throughout the

2   years of his employment.  He has direct and independent knowledge of the

3   job requirements of the recruiters he worked with every day.

4         Ms. Lee testified repeatedly in deposition that she was evaluated

5   based entirely on her "numbers."  54:3 – 54:23; 81:10 – 83:15; 90:13; 94:13;

6   127:2 – 130:18; 140:12 – 142:22.  *See* Deposition excerpts of Nyoka Lee,

7   attached as Exhibit 3.  Ms. Lee also testified that the admissions directors

8   were also paid based entirely on the number of enrollments. 150:14.

9

10  **MOTION FOR CONTINUANCE UNDER RULE 56(D)**

11        Relators in the instant lawsuit are entitled to obtain the discovery

12  necessary to fully respond the motions to dismiss filed by Corinthian

13  Colleges, Inc. and by Ernst & Young LLP under Fed. R. Civ. P. 56(d).

14  During the October 29, 2012 hearing, the Court instructed Relators to file a

15  Rule 56(d) request for continuance to obtain discovery after the Defendants

16  filed their motions to dismiss.[11]  In accordance with the Court's directions,

17  Relators make this application for a continuance to obtain the discovery

18  needed to respond to the respective motions to dismiss filed by Defendants

19  (Doc. 150 and 154).  Pursuant to the Federal Rules of Civil Procedure 56(d),

---

[11] *See*, Reporter's Transcript of Proceedings dated October 29, 2012, attached
hereto as Exhibit 1.

1    Relators seek a continuance to obtain the *Ad Rep Performance Flash* for

2    each campus of Corinthian Colleges, Inc. for the time periods relevant to this

3    lawsuit, until 2010, for all 100 campuses of defendant Corinthian Colleges,

4    Inc.  This evidence will help corroborate Ms. Lee's assertions that all 100

5    campuses received a weekly *Ad Rep Performance Flash* that graded

6    recruiters according to their Lead-to-Conversion Ratios.  Moreover, these *Ad*

7    *Rep Performance Flash* reports continue to be routinely distributed through

8    the present.

9        Relators request one-hundred twenty (120) days to obtain the Ad Rep

10   Performance Flash Reports for all 100 Corinthian campuses from 2000

11   through 2010.  This evidence is necessary for Relators to respond to the

12   motions to dismiss for lack of jurisdiction filed respectively by Corinthian

13   Colleges, Inc. *et al*. (Doc. 150) and by Ernst & Young, LLP (Doc. 154).

14       The Motion to Dismiss filed by Corinthian Colleges, Inc. (Doc. 150)

15   was adopted and incorporated into the Motion To Dismiss filed by

16   Defendant Ernst & Young (Doc. 154), and therefore a complete response to

17   EY's motion necessarily includes the response to the motion of Defendant

18   Corinthian Colleges, Inc.

19       Relators should be allowed to discover the *Ad Rep Performance Flash*

20   reports of all 100 Corinthian Colleges' campuses.  Defendants assert that the

39

1   Relators cannot be the "original source" of the practices that occurred (a)

2   after Relator Nyoka Lee's employment terminated in 2005, and (b) at

3   campuses other than the campus where Relators were employed.   The

4   weekly *Ad Rep Performance Flash* reports for the period 2000-2012 will

5   corroborate Ms. Lee's testimony that all of the campuses of Corinthian

6   Colleges, Inc. graded their recruiters based on the L-C Ratios, and that this

7   practice continued after Ms. Lee's employment was concluded in 2005.  Mr.

8   Mshuja's employment ended in 2009.   Where the fraudulent practices

9   commence during Relators' employment, they can still establish "direct and

10  independent" knowledge of the fraud.

11          All of these instances of alleged conduct occurring after the
12          Relator's departure involve conduct that began during his
13          employment and continued after his departure.  Therefore, as
14          the "information underlying the claim" commenced during
15          Relator's employment, he is not prevented from establishing
16          "direct and independent knowledge" solely because the conduct
17          continued after his departure.
18
19  *United States ex rel. Smith v. Yale Univ.*, 415 F. Supp. 2d 58, 74 (D. Conn.

20  2006).

21          Relators herein are entitled to discovery of this evidence under Rule

22  56(d).   Fed. R. Civ. P. 56(d) provides:

23                  (d) WHEN   FACTS   ARE   UNAVAILABLE   TO
24                  NONMOVANT.  If a non-movant shows by affidavit or
25                  declaration that, for specified reasons, it cannot present
26                  facts essential to justify its opposition, the court may:

40

1                        (1)  defer considering the motion or deny it;

2

3                        (2)  allow time to obtain affidavits or declarations or to

4                              take discovery; or

5

6                        (3)  issue an other appropriate order.

7

8        Relators are entitled to a continuance under Rule 56(d) to obtain the

9  *Ad Rep Performance Flash* for each campus of Corinthian Colleges, Inc. for

10  the time periods relevant to this lawsuit, and ediscovery relating to these

11  reports.  This evidence exists and was disclosed by Relator Nyoka Lee in her

12  deposition given on December 17, 2012.

13        Since the Court's order for Phase I Discovery (Doc. 131) allowed only

14  the Defendants to obtain written and deposition discovery from Relators to

15  determine of the Relators had direct and independent knowledge of the

16  events and transactions alleged in the suit, discovery by Relators has been

17  completely stayed by operation of Rule 16.  The Defendants have now filed

18  their motions to dismiss challenging the Court's jurisdiction over the

19  lawsuit.  Motions for summary judgment should not be considered until the

20  non-movant has an opportunity to obtain relevant discovery.[12]  *Employers*

21  *Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.*, 353

22  F.3d 1125, 1129-30 (9th Cir. 2004).  The additional time will enable Relators

---

[12]  In the Joint Rule 26 Report, Defendants point out that their jurisdictional motions
are for summary judgment, made under Fed. R. Civ. P. 56. (Doc. 127, at pp. 9-10).

1   to rebut movants' allegations challenging Relators' direct and independent

2   knowledge that every campus of Corinthian Colleges, Inc. received a weekly

3   *Ad Rep Performance Flash* report showing the Lead-to-Conversion Ratio

4   ("L-C Ratio") for every recruiter employed at the campus.  Relator Nyoka

5   Lee produced several *Ad Rep Performance Flash* reports for the period she

6   was employed through 2005, for the campuses where she worked.

7          This Rule 56(d) motion is supported by the Declaration of Scott D.

8   Levy, which is incorporated by reference.

9
10  Dated:  February 8, 2013              Respectfully submitted:
11
12                                        LEVY & ASSOCIATES PC


13                                        By:  _____// SDL //_____


14                                              SCOTT D. LEVY
15                                        Attorney for Relators Nyoka June Lee
16                                        and Talala Mshuja

42